# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARC BAIN RASELLA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ELON R. MUSK and ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003,<br><br>Defendants. | No. 1:22-cv-03026-ALC-GWG<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>DEMAND FOR JURY TRIAL |

### TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION AND VENUE ....................................................................... 6

III.  PARTIES ............................................................................................................ 7

    A.    Lead Plaintiff .......................................................................................... 7

    B.    Defendant Musk ...................................................................................... 7

    C.    Relevant Nonparty Twitter ..................................................................... 8

IV.   RELEVANT BACKGROUND ........................................................................ 8

    A.    Musk's Contempt For The SEC And The United States Securities Laws.............. 8

    B.    SEC Rule 13 Disclosures Are Critically Important To Investors ......................... 13

        1.    Rule 13 Was Enacted To Ensure Full Disclosure Of Substantial Ownership Interests And Flag Potential Takeovers For Investors .......... 14

        2.    Investors Pay Close Attention To Schedule 13 Filings As They Typically Result In Stock Price Increases For Target Companies .......... 15

        3.    Relevant Distinctions Between Schedule 13D And 13G Forms ............. 17

    C.    Musk's Specific Knowledge Of Rule 13 And History Of Filing Schedule 13 Forms ........................................................................................... 18

V.    DEFENDANT MUSK'S SCHEME TO DECEIVE INVESTORS WHO SOLD TWITTER SECURITIES DURING THE CLASS PERIOD ......................................... 20

    A.    Musk Starts Acquiring Twitter Stock .................................................. 20

    B.    March 14, 2022: Musk Crosses The 5% Threshold, Which Triggered His Obligation To Disclose His Twitter Stake Within 10 Days................................. 22

    C.    March 25, 2022: At The Start Of The Class Period, Musk Continued To Conceal His Twitter Interest And Secretly Continued To Acquire Twitter Shares At Artificially Low Prices ........................................................................ 22

    D.    During The Class Period: Instead Of Disclosing His Twitter Stake, Musk Teases The Public With Obfuscating Messages About Twitter .......................... 24

E.      During The Class Period: Musk Covertly Discusses His Plans With Senior Twitter Executives And Others While Hiding His Growing Ownership Stake From Investors ................................................................. 26

F.      During The Class Period: Musk Silently Purchases Nearly 15 Million Shares of Twitter Stock at Artificially Depressed Prices ...................................... 28

VI.    THE TRUTH EMERGES ................................................................. 30

A.      On April 4, 2022, Musk Attempts To Hide His Activist Intentions And Files A Misleading Schedule 13G, Eleven Days Late ........................................... 30

B.      Musk Is Finally Revealed As An Activist Investor As Twitter Announces His Appointment To Its Board ................................................................. 33

VII.   POST-CLASS PERIOD EVENTS ................................................................. 35

A.      Regulatory Investigations Surrounding Musk's 13G And 13D Filings ............. 35

B.      Musk Agrees To Acquire Twitter, Appears To Have Second Thoughts, And Then Again Proceeds With The Takeover On Its Original Terms ............... 37

VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER ........................................... 39

IX.    DEFENDANT MUSK'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................. 43

X.     LOSS CAUSATION ................................................................. 44

XI.    PRESUMPTION OF RELIANCE ................................................................. 45

XII.   CLASS ACTION ALLEGATIONS ................................................................. 46

XIII.  COUNTS ................................................................. 48

XIV.  PRAYER FOR RELIEF ................................................................. 51

XV.   JURY DEMAND ................................................................. 52

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff"), by and through its undersigned counsel, brings this federal securities class action (the "Action") on behalf of investors who sold the securities of Twitter, Inc. ("Twitter" or the "Company") between March 25, 2022 and April 4, 2022, inclusive (the "Class Period"), and who were damaged as a result of Defendants' omissions and misrepresentations as alleged in this Complaint (the "Class"). The securities claims asserted in this Complaint are alleged against Defendants Elon R. Musk and the Elon Musk Revocable Trust dated July 22, 2003 (together, "Musk").

I.   **INTRODUCTION**

1.   This securities class action is about a billionaire tech mogul, Elon Musk, who cheated investors out of the true value of their Twitter securities by violating his disclosure obligations under the law. During the Class Period, Musk knowingly or recklessly concealed his significant ownership stake in Twitter, which he was legally required to report, so he could buy Twitter stock at artificially discounted prices and continue to pursue his takeover of Twitter without public scrutiny for as long as possible.

2.   When Musk belatedly complied with his disclosure obligations, the price of Twitter's stock predictably skyrocketed. But everyone who sold Twitter securities before then— while Musk illegally omitted disclosure of his interest—was deprived of critical information affecting the value of their securities, including that Musk owned over 5% of Twitter and the Company was the target of a potential takeover by Musk. These investors suffered enormous damages.

3.   Musk now owns Twitter—following his takeover of the Company that unfolded over the last several months—and has dubbed himself its "Chief Twit." He is famous for owning and controlling several high value tech companies responsible for his vast wealth, including Tesla, where he is the self-titled "Technoking." Musk also is a repeat violator of SEC rules and

regulations and has faced multiple penalties and investigations by the SEC.  Musk makes no secret of his contempt for the SEC and its rules: he has publicly referred to the SEC as the "Shortseller Enrichment Commission," openly proclaimed "I do not respect the SEC," and called the SEC office that prosecuted him "bastards" and "shameless puppets of Wall St shortseller sharks."

4.      During the Class Period (March 25, 2022 to April 4, 2022), Musk violated Section 13 of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 13(d) promulgated thereunder ("Rule 13") because he failed to timely or properly report his ownership interest in Twitter.  Rule 13 requires that investors who obtain 5% or more beneficial ownership of a company's stock publicly disclose that interest, as well as their intentions for the company.  In particular, within 10 days after passing the 5% threshold, an investor must file one of two forms disclosing their holdings in a target company and stating whether they intend to "chang[e] or influenc[e] the control of the issuer"—in which case they must file a Schedule 13D—or whether they intend to be a passive investor, in which case they can file a Schedule 13G.  The default is to file a Schedule 13D.

5.      The timely filing of a Schedule 13D is important to investors as it reports critical information regarding significant ownership interests in, and potential takeovers of, a company.  As noted when Congress enacted Rule 13, "[T]he disclosure provisions of 13(d) are 'the only way that corporations, their shareholders and others can adequately evaluate ... the possible effect of a change in substantial shareholdings.'"

6.      Musk is well aware of Rule 13 and its requirements.  As he testified under oath at an August 29, 2018 deposition taken by the SEC: "***U.S. reporting requirements start at 5 percent***."[1]  He further testified that acquiring anything higher than 4.99% ownership "***would create***

---

[1] Unless otherwise noted, all internal citations and punctuation are omitted, and all emphasis is added.

*a splash because of the reporting requirement*." Musk himself has a long history of filing both Schedules 13D and 13G, including by having personally filed and signed no less than *twenty* Schedule 13 forms (eight Schedule 13Ds and twelve Schedule 13Gs) since 2011.

7.       Musk's Twitter stock buying spree and eventual takeover of the Company started in early 2022. On January 31, 2022, unknown to investors, Musk purchased over 600,000 shares of Twitter stock for $22.8 million. He continued to purchase massive quantities of Twitter shares nearly every day leading up to March 14, 2022. That day, Musk crossed the 5% threshold in his Twitter holdings, which triggered his obligation to file a Schedule 13D form within 10 days. On March 24, 2022, the last day of the 10-day deadline to disclose, Musk kept silent, violating his legal obligation to make the required disclosures under Rule 13.

8.       The Class Period starts on March 25, 2022—the first day after Musk omitted his required disclosure. By that time, Musk had secretly purchased nearly 60 million shares of Twitter stock at a cost of over $2 billion. For the next eleven days, while Musk concealed his stake in Twitter by not making disclosures required by law, investors sold tens of millions of Twitter shares and traded other Company securities without knowing about Musk's ownership interest or that the Company was "in play" in a potential takeover by Musk. All the while, Musk continued to quietly purchase tens of millions of dollars of Twitter shares each trading day—increasing his Twitter stake by $1.2 billion at a significant discount during the Class Period.

9.       Although Musk hid his purchases of Twitter stock during the Class Period, he did not remain silent. Instead, he repeatedly teased the public with messages on Twitter, including by posting polls about whether Twitter "rigorously adhered" to free speech. Musk even sought to further distract from his increasing stake in Twitter by claiming that he was "giving serious

thought" to creating a competitor to Twitter.  Musk's social media posts received hundreds of thousands of views but disclosed nothing about his ownership of Twitter.

10.     Musk's "smoke and mirrors" campaign was deliberate.  While he was teasing the public with social media messages and concealing his share ownership and intentions regarding Twitter, behind the scenes Musk was meeting with Twitter's senior-most executives regarding his plans for Twitter.  For example, as Twitter revealed *after* the Class Period in a filing with the SEC, Musk held a series of private meetings during the Class Period with Parag Agrawal (Twitter's then-CEO) and other Company insiders like Jack Dorsey (Twitter's founder and then-director) and Bret Taylor (then-Chair of Twitter's Board).  At these meetings, Musk discussed "joining the Twitter Board," Musk's "significant stake of more than five percent" in the Company, and that Musk was also "considering the possibility of taking Twitter private"—***the very information about Musk's Twitter ownership and activist intentions that he was obligated to disclose under Rule 13 (but did not)***.

11.     By concealing his interests in Twitter, Musk reaped the benefit of substantial savings when purchasing Twitter stock, because his omissions kept the prices of Twitter's securities artificially low.  Indeed, he ultimately turned out to save over an estimated $200 million.  But Twitter investors who sold their Company shares (or traded options) during the Class Period were cheated out of the true value of their securities, because they sold at prices that were kept artificially low by Musk's violation of his disclosure obligations.

12.     On April 3, 2022, Twitter formally offered Musk a position on its Board.  On April 4, 2022, Musk and Twitter entered into a letter agreement stating that Musk would be appointed to Twitter's Board.

13.     Also on April 4, 2022, recognizing that his undisclosed buying spree would likely soon come to light as he was joining the Board, Musk personally signed and filed a Schedule 13G that disclosed his 9.2% ownership of Twitter.  Although Musk's Schedule 13G did disclose his ownership interest in Twitter, this filing only partially fulfilled Musk's reporting obligations—and was itself materially misleading.  Musk's filing of a "short-form" Schedule 13G—as opposed to a Schedule 13D—falsely signaled to investors that Musk was a "passive" investor.  And it said nothing about Musk joining Twitter's Board.

14.     Further, Musk intentionally manipulated the Schedule 13G form.  Instead of certifying that he "[h]as *not* acquired the securities with any purpose, or with the effect, of changing or influencing the control," as required for a proper Schedule 13G, Musk deliberately deleted the certification language and replaced it with the words "Not Applicable."  As was later revealed, the improprieties in Musk's Schedule 13G form prompted the SEC to write to Musk the same day to ask "why … you determined that the [requisite certification] was not applicable."  The SEC also asked why Musk's disclosure was not "made within the required 10 days."

15.     In the morning on April 5, 2022, before the markets opened, Twitter filed a Form 8-K with the SEC announcing that Musk had agreed to join its Board.  Later that same day, counsel for Musk amended his misleading Schedule 13G by filing the requisite Schedule 13D form, through which Musk (finally) disclosed both his ownership stake and his activist intentions.

16.     In response to these disclosures, Twitter's stock price skyrocketed.  Twitter's stock price ballooned by more than $10 per share, or 27%, to close at $49.97 per share on April 4, 2022 (up from $39.31).  Then, Twitter's stock price responded with another increase on April 5, 2022—spiking to $54.57 per share before closing at $50.98 per share—and continued to react positively on April 6, 2022 (after accounting for market-wide movements).  Thus, everyone who sold Twitter

stock or traded its other securities while Musk illegally withheld his interest in and intentions for Twitter were fraudulently deprived of enormous value for their securities.

17.     This action seeks to recover the damages suffered by investors due to Musk's refusal to timely and properly meet his disclosure obligations under the law.

## II.    JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rules 10b-5 and 10b-5(1) promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     This Court has personal jurisdiction over Musk because he has sufficient contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  During the Class Period, Musk purchased shares of Twitter on the New York Stock Exchange, which is in this District, while making materially misleading omissions and misrepresentations.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Twitter's securities were listed and traded on the New York Stock Exchange during the Class Period, and many of the acts and transactions alleged in this Complaint, including the dissemination of materially false and misleading statements and omissions, occurred in substantial part in this District.  Musk also transacts business in this District.

21.     In connection with the acts, omissions, conduct, and other wrongs alleged in this Complaint, Musk, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

### III.   PARTIES

#### A.   Lead Plaintiff

22.     Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma. Currently, Lead Plaintiff manages over $3.8 billion in assets on behalf of nearly 26,000 participants.  As set forth in its previously filed Certification, Lead Plaintiff sold more than 14,000 shares of Twitter stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

#### B.   Defendant Musk

23.     Defendant Musk is now the owner of Twitter following a $44 billion takeover transaction that closed on October 27, 2022.  After acquiring Twitter, Musk dubbed himself the Company's "Chief Twit," ousted Twitter's top executives, and terminated approximately half of Twitter's workforce.  Musk is also the billionaire CEO and self-anointed "Technoking" of Tesla, Inc. ("Tesla"), a public automotive and clean energy company that had a market capitalization of over $685 billion as of October 2022.  Beyond Twitter and Tesla, Musk is also the CEO and founder of several other technology companies, including Space-X and The Boring Company.

24.     Musk has an estimated net worth of approximately $194 billion as of the date of the filing of this Complaint.  Musk's biggest asset is his 155 million shares of Tesla stock, which accounts for a significant majority of his wealth.  Indeed, "[a]s much as 99% of Musk's wealth is held in shares of [Tesla and Space-X]," leading *The Wall Street Journal* in a May 8, 2020 to dub Musk "Tech's Cash-Poor Billionaire."

25.     As noted above, Musk's trust, the "Elon Musk Revocable Trust dated July 22, 2003" (the "Musk Trust") is also a named defendant in this Action.  According to Musk's Schedule

13D filed on April 5, 2022, the Twitter common stock beneficially owned by Musk is "held by the [Musk Trust]." Further, Musk is the "sole Trustee" of, and controls, the Musk Trust.

### C.   Relevant Nonparty Twitter

26.     Twitter is a global social media company whose stock traded on the New York Stock Exchange during the Class Period. Twitter users interact with each other by publishing "tweets," of up to 280 characters, which can be liked, commented on, or reposted by other users. Twitter users also can "follow" each other to view and interact with each other's tweets more readily. Since its origin in 2006, Twitter has become one of the biggest and most influential names in social media.

## IV.   RELEVANT BACKGROUND

### A.   Musk's Contempt For The SEC And The United States Securities Laws

27.     The present Action is the latest episode in Musk's history of disregard for the federal securities laws and contempt for the SEC and its rules and regulations. Indeed, Musk has long used his bully pulpit on Twitter to flout SEC regulations at will. Musk himself admitted in an October 7, 2022 interview with the *Financial Times* that, while using Twitter, he "often shoot[s] [him]self in the foot and cause[s] [him]self all sorts of trouble."

28.     A prime example of Musk's use of Twitter to violate the securities laws occurred on August 7, 2018, when Musk tweeted that he was "considering taking Tesla private at $420" with "[f]unding secured."



29.     The market reacted swiftly, with Tesla's shares soaring seven percent within 90 minutes of Musk's post, as reported by the *New York Times* in an August 16, 2018 article titled "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil."  Shortly after Musk's tweet, the Nasdaq stock exchange had to halt trading in Tesla stock.  In an interview from the same *New York Times* article, Musk was asked how he chose the price, to which he replied "It seemed like better karma at $420 than at $419."  In reality, "420" is a slang reference to marijuana.  There also was no clear basis for Musk's proclamation of "funding secured" to take Tesla private at $420 per share, which represented an approximately 20 percent premium over where the stock recently traded.

30.     The SEC immediately commenced an investigation into Musk's tweet.  As reported by the *New York Times* in the above-cited article: "[o]rdinarily, such material information about a public company's plans is laid out in detail after extensive internal preparation and issued through official channels"—not the shotgun-blast of a tweet.  This led to an SEC enforcement action against Musk, charging him with falsely indicating that "it was virtually certain that he could take

9

Tesla private at a purchase price that reflected a substantial premium over Tesla stock's then-current share price" when, "[i]n truth[,] Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential funding source."

31.     Musk agreed to settle the SEC enforcement action on September 29, 2018.  Among other corporate governance and oversight overhauls, the SEC settlement required that Musk and Tesla each pay a separate $20 million penalty, Musk step down as Tesla's Chairman, and he was "required to have Tesla-related tweets that contain material company information approved by an attorney before posting them"—a so-called "Twitter Sitter."

32.     During a later *Ted Talk* interview published on YouTube.com dated April 14, 2022, Musk called the SEC "***bastards***" who "***unlawfully***" forced him to settle.  He also refused to accept responsibility for the misconduct with which the SEC charged him, and even claimed he was forced to lie to save Tesla.  Specifically, Musk stated that he was "forced to concede[] to the SEC, unlawfully, those bastards" and asserted that "I was forced to admit that I lied … to save Tesla's life."  By making these statements, Musk violated the terms of his settlement with the SEC, which provides:

> "Defendant: (i) will not take any action to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis …."

33.     Since then, Musk has repeatedly attempted to wriggle out of his SEC settlement. For example, on March 8, 2022, Musk filed a motion seeking to terminate the SEC settlement in *United States Securities and Exchange Commission v. Musk*, Case No. 1:18-cv-08865-LJL (S.D.N.Y.).  There, Musk argued, *inter alia*, that the SEC had misused the settlement to "harass him and to launch investigations of his speech."  In an order issued April 27, 2022, the Honorable Lewis J. Liman of this Court rejected Musk's argument as "meritless," explaining (ECF No. 81 at 21-22):

"Musk cannot now seek to retract the agreement he knowingly and willingly entered by simply bemoaning that he felt like he had to agree to it at the time but now—once the specter of the litigation is a distant memory and his company has become, in his estimation, all but invincible—wishes that he had not."

34.     In multiple public statements, Musk has openly mocked and derided the SEC.  For example, days after settling the SEC charges, Musk sarcastically called the SEC "the Shortseller Enrichment Commission."



Two months later, in a *60 Minutes* interview on December 9, 2018, Musk stated "***I want to be clear.  I do not respect the SEC.  I do not respect them***."

35.     Undeterred by the SEC sanctions, Musk has continued to tweet with abandon and has even flouted the requirements of the SEC settlement that he obtain preapproval of his tweets.  For example, Musk recently testified at the trial in *Tornetta v. Musk*, C.A. No. 2022-0408-JRS (Del. Ch.) (the "*Tornetta* Action") that the Twitter Sitter "does not routinely review [his] tweets before" Musk publishes them.  Instead, Musk "self-regulates"—*i.e.,* he selects and submits his own tweets for Twitter Sitter approval, "wait[s] for some period of time and see[s] if there's any response," and "if not, I post the tweet."

36.     Musk's disregard for the SEC settlement terms has had disastrous consequences for investors, including in the following instances:

11

- On February 19, 2019, without getting pre-approval, Musk tweeted that "Tesla made 0 cars in 2011, but will make around 500k in 2019" without getting pre-approval. Hours later, Musk tweeted a pre-approved, corrected message: "Meant to say annualized production rate at end of 2019 probably around 500k, [*i.e.*,] 10k cars/week. Deliveries for year estimated to be about 400k." This tweet caused Tesla's stock to fall 3% in premarket trading. The SEC initiated an investigation and brought contempt charges, which Musk resolved by agreeing to more restrictive review of his tweets.

- On May 1, 2020, Musk tweeted that "Tesla stock price is too high imo [*i.e., in my opinion*]." That day, as reported in a May 1, 2020 *Wall Street Journal* article, Musk was "asked…if he'd had his tweet vetted before posting it," and he replied: "No." Musk's tweet caused Tesla's stock to fall 10%, erasing $14 billion of shareholder value.

- On November 6, 2021, Musk tweeted a poll asking whether he should sell 10% of his Tesla stock. In response, 58% of the 3.5 million responses voted yes. This caused Tesla's stock to fall 4.9% the next trading day, erasing over $59 billion in shareholder value. Conspicuously, Musk's brother sold $108 million in Tesla shares the day ***before*** Musk's tweet. This led to another SEC investigation.

37. Musk has continued to make his disdain for the SEC clear. For instance, on April 25, 2022, Musk lashed out at the San Francisco office of the SEC (which opened the investigation into Musk's "$420" tweet) by calling it a "shameless puppet[] of Wall St shortseller sharks" that does "nothing to protect actual shareholders." Musk further proclaimed that he had "lost all respect for them."



38.     Musk has even published tweets with more overtly offensive and explicit sentiments regarding the SEC, including a July 2, 2020 tweet yet again ridiculing the SEC's acronym.  When Ross Gerber, a leading investment advisor and one of Musk's followers, labelled this tweet "Dangerous," Musk responded "But sooo satisfying."

39.     Musk has become so well-known for his disregard for shareholder interests and SEC regulation that UCLA Law now has a course entitled "Law of Elon Musk."  This course examines how "Musk constantly faces the temptation to pursue his own interests and goals rather than focusing on the welfare of those who have entrusted him with their savings" and "some of the ways in which law constrains (or fails to) Musk's divergences from shareholder interests."

**B.      SEC Rule 13 Disclosures Are Critically Important To Investors**

40.     Rule 13 requires that investors who obtain 5% beneficial ownership or more of a company's stock file a Schedule 13 with the SEC within 10 calendar days of passing the 5% threshold.  As summarized below, Rule 13 and the Schedule 13 disclosure forms play a critical role in disseminating to investors material information about substantial share acquisitions and potential company acquisitions.

> 1.   **Rule 13 Was Enacted To Ensure Full Disclosure Of Substantial Ownership Interests And Flag Potential Takeovers For Investors**

41.     Rule 13 was enacted as part of an amendment to the Securities and Exchange Act of 1934, known as the Williams Act (the "Act").  The Act was passed in 1968, in response to concerns that cash-tender offer corporate takeovers were depriving shareholders of necessary information regarding corporate control and valuation.

42.     When Congress enacted the Act, its purpose and importance were clear.  For example, a 1968 House of Representatives Report noted, "The [Act] would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with … techniques for accumulating large blocks of equity securities of publicly held companies."  Senator Harrison Williams, sponsor of the Act, stated the disclosure provisions of 13(d) are "the only way that corporations, their shareholders and others can adequately evaluate ... the possible effect of a change in substantial shareholdings."

43.     The SEC has likewise explained that significant stock ownership, such as holdings reported in adherence to Rule 13, "contains market-moving information related to potential changes of corporate control which could influence investors' decision making," and that "Section 13(d) was enacted with the intention to 'alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.'"

44.     Subsequent case law has confirmed this purpose.  As the Second Circuit explained in *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971), "[S]ection 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing.  ***Disclosure which is false or misleading subverts this purpose***."  Relatedly, the Court in *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566

14

(S.D.N.Y. Mar. 30, 2021), succinctly highlighted how misleading it is to disregard Rule 13 disclosure obligations, stating, "[A]n intentional failure to disclose beneficial ownership information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose."

45.    The SEC has continued to recognize the critical materiality of Schedule 13 filings. Most recently, the agency has proposed a rule change that, among other things, would shorten the reporting period from 10 days to 5 days, explaining that:

> During *any delay* between a market-moving event and the Schedule 13D filing, *securities are likely to be mispriced* relative to a full-information benchmark, and information asymmetry between Schedule 13D filers and those with whom they share the information, and the rest of the market, is greater than otherwise.  The prolonged delay could, therefore, *harm the investors who happen to sell their shares during the 10-day window* . . . .  If an initial Schedule 13D were required to be filed more promptly, those investors might be able to sell their shares at a higher price, or they may re-evaluate their investment decisions.  Timelier reporting would also allow other market participants, such as analysts and investment advisers, to better value the securities and make better recommendations."

46.    In a press release regarding the SEC's proposed rule shortening Rule 13's 10-day window, SEC Chair Gary Gensler re-affirmed the importance of Rule 13, stating "The filing of [a] Schedule 13D can have a material impact on a company's share price, so it is important that shareholders get that information sooner."  Dozens of institutions submitted comment letters in support of the proposed rule, including the Nasdaq stock exchange, which submitted an April 12, 2022 letter stating: "Information contained in unnecessarily delayed 13D or 13G filings is clearly important for informing investors and the market regarding the value and potential control of the affected company."

### 2.    Investors Pay Close Attention To Schedule 13 Filings As They Typically Result In Stock Price Increases For Target Companies

47.    Schedule 13 filings are carefully tracked by investors, including because they signal that a company is "in play" for a potential takeover, which in turn will likely result in a stock price

increase for the target company.  As explained in the *Columbia Law Review*, there are a "large number of 13D tracking websites, which provide readers with information about recent 13D filings by prominent investors" and which "supports the notion that these [Schedule 13D] filings can prompt copy-cat investor behavior" that drives up stock prices.  Experienced market participants have stated that the filing of a Schedule 13 is "like blood in the water" that "***driv[es] up the price***" of a target company's securities.

48.     Indeed, Schedule 13D filings have a predictable and positive impact on target company stock prices.  As the SEC recently noted, "It is well documented in the academic literature that economically significant price changes occur in response to news about changes in corporate control, such as the initial filing of a Schedule 13D.  For example … the filing of a Schedule 13D is associated with large positive average abnormal returns, in the range of 7% to 8%, during the [–20,+20] announcement window, and about 2% during the filing day and the following day."

49.     As such, for any investor, the filing of a Schedule 13D would represent a red flag that the Company is the target of a potential takeover and that the stock price will likely go up.  As such, the investor would invariably halt any plans for continued selling once a Schedule 13D was filed.  And for quantitative trading strategies that use systematic trading algorithms, a Schedule 13D filing would likely trigger an automatic stop to any campaign of selling a company's securities.

50.     Given the importance of Schedule 13 filings to investors, broker-dealers will customarily inform their clients as their purchases approach the 5% threshold necessary for disclosure under Rule 13.  These notifications are provided as a matter of course and are particularly common amongst large-scale broker-dealers with shareholder reporting programs.

### 3. Relevant Distinctions Between Schedule 13D And 13G Forms

51.     Schedule 13 forms reveal the name, ownership stake, and the stated intentions of the filer.  As noted above, the specific type of Schedule 13 that must be filed—Schedule 13D or Schedule 13G—largely depends on the investor's intentions for the target company.

52.     The default presumption for investors that hit the 5% beneficial ownership threshold is that they are active investors and must file a Schedule 13D that discloses the purpose of their acquisition.  *See* Rule 13d-1(a).

53.     However, if certain exceptions apply, an investor may disclose an over-5% interest in a company via a Schedule 13G, which is a "short-form" filing with fewer requirements.  As relevant here, an investor may file a Schedule 13G if they acquired the securities ***without*** a purpose or effect "of changing or influencing the control of the issuer."  As such, a Schedule 13G filing signals to the market that the investor is taking a passive interest in the target company.  Indeed, when filing a Schedule 13G form pursuant to this exception, an investor must expressly certify that they have "not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect."  *See* 17 C.F.R. § 240.13d-1(c).

54.     In Question and Answer 103.04 of the SEC's *Questions and Answers of General Applicability* for Section 13(d), the SEC explained that reaching the 5% threshold while becoming a member of a target company's board presumptively qualifies as acquiring securities "with the effect of, changing or influencing the control of the issuer," and thus "eliminate[s] … eligibility to file on Schedule 13G pursuant to Rule 13d-1(c)."

C.    **Musk's Specific Knowledge Of Rule 13**
      **And History Of Filing Schedule 13 Forms**

55.    Musk is well aware of Rule 13 and its requirements.  Indeed, Musk has testified under oath about his knowledge of this reporting requirement and, further, has a long history of filing Schedule 13 forms.

56.    For example, as discussed above, in 2018 the SEC brought an enforcement action against Musk relating to his tweet about taking Tesla private.  The SEC deposed Musk in connection with the enforcement proceeding on August 29, 2018.  Excerpts of Musk's deposition testimony given to the SEC were subsequently made public in connection with *In re Tesla, Inc. Securities Litigation*, Case No. 18-cv-04865-EMC (N.D. Cal. 2020) (the "*Tesla Securities Litigation*"), a related suit brought by Tesla investors in the Northern District of California.

57.    As relevant here, during this SEC deposition, Musk revealed that he had engaged with the Public Investment Fund (PIF), Saudi Arabia's sovereign wealth fund, to invest in Tesla. Musk explained that he advised the PIF to buy a significant stake in Tesla, but under 5%, to show that it was serious.  According to the district court's summary judgment opinion, Musk testified that the reason he suggested 5% as a ceiling was because "***U.S. reporting requirements start at 5 percent***."[2]

58.    Similarly, an excerpt from the transcript published on the docket of the *Tesla Securities Litigation* shows that Musk specifically discussed the 5% reporting requirement with a representative of the PIF.  For example, Musk testified:

> "[The representative of the PIF] mentioned that he had invested 5 percent--he purchased 5 percent of the company already, just on the open market, and that the only thing that was inhibiting a higher ownership ***was the reporting requirements***, 4.99 percent*.*  And he wanted to go considerably higher but did not want to do that

---

[2] *See In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *4, n.4 (N.D. Cal. Apr. 1, 2022).

without checking with me.  And obviously, ***this would create a splash because of the reporting requirement***."[3]

59.    In addition, Musk has a long history of filing Schedule 13s with the SEC.  In fact, as detailed in the below chart, Musk has personally filed and signed ***twenty*** Schedule 13 — including twelve Schedule 13Gs and eight Schedule 13Ds—since 2011.

| Form | Date | Filer/Preparer | Issuer |
|------|------|----------------|--------|
| Schedule 13D | Dec. 20, 2012 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Feb. 7, 2014 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Feb. 13, 2015 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Jan. 29, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Feb. 16, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | June 21, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | July 31, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Nov. 21, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13G | Feb. 3, 2011 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2012 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2013 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2014 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 13, 2015 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 12, 2016 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 9, 2017 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2018 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2019 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2020 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 12, 2021 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2022 | Elon Musk c/o Tesla Motors | Tesla |

60.    As such, Musk has personal knowledge of the purpose, timing, and requirements for both Schedule 13D and Schedule 13G.

61.    Moreover, even if Musk did not already have detailed knowledge of Rule 13 and its reporting requirements—which he did as explained above—he likely received a specific notification from the broker-dealer executing his Twitter stock purchases that he had crossed the 5% threshold and had to make the required disclosures under Rule 13.

---

[3] *See, e.g.*, ECF No. 438-13 at 11, *Tesla Securities Litigation*, No. 18-cv-04865-EMC (N.D. Cal. June 15, 2022).

V.   **DEFENDANT MUSK'S SCHEME TO DECEIVE INVESTORS WHO SOLD TWITTER SECURITIES DURING THE CLASS PERIOD**

   A.   **Musk Starts Acquiring Twitter Stock**

   62.   At the end of January 2022, unknown to investors, Musk began to quietly amass shares of Twitter stock.  On January 31, 2022, Musk purchased over 600,000 shares of Twitter stock for $22.8 million.  Afterwards, Musk continued to silently purchase hundreds of thousands of shares of Twitter stock—and, in many instances, millions of shares—on a near daily basis in the weeks before the Class Period.  Indeed, Musk would go from owning zero shares of Twitter stock as of January 28, 2022 to spending over $2 billion of his personal capital to acquire nearly 60 million shares of the Company by March 24, 2022.  And it did not stop there.  Musk would ultimately purchase over $2.6 billion of Twitter shares from January 2022 through the end of the Class Period on April 4, 2022.  Of course, Musk eventually took over Twitter, acquiring the whole Company and taking it private.

   63.   Musk's pre-Class Period acquisitions of Twitter stock are set forth in Table 1.

**TABLE 1: Musk's Pre-Class Period Purchases of Twitter Stock**
January 31, 2022—March 24, 2022

| Date | Shares Bought | Price | Cost to Defendant Musk |
|------|---------------|-------|------------------------|
| 1/31/2022 | 620,083 | $36.828 | $22,836,416.72 |
| 2/1/2022 | 542,496 | $37.549 | $20,370,182.30 |
| 2/2/2022 | 850,373 | $36.748 | $31,249,507.00 |
| 2/3/2022 | 3,649,957 | $34.391 | $125,525,671.19 |
| 2/4/2022 | 1,070,429 | $36.184 | $38,732,402.94 |
| 2/7/2022 | 4,839,507 | $36.515 | $176,714,598.11 |
| 2/8/2022 | 730,000 | $35.733 | $26,085,090.00 |
| 2/9/2022 | 638,283 | $36.886 | $23,543,706.74 |
| 2/10/2022 | 2,604,907 | $36.642 | $95,449,002.29 |
| 2/11/2022 | 1,291,432 | $36.523 | $47,166,970.94 |
| 2/14/2022 | 958,849 | $35.920 | $34,441,856.08 |
| 2/15/2022 | 371,075 | $36.511 | $13,548,319.33 |
| 2/16/2022 | 655,000 | $35.814 | $23,458,170.00 |
| 2/17/2022 | 731,581 | $35.891 | $26,257,173.67 |
| 2/18/2022 | 1,331,040 | $34.506 | $45,928,866.24 |
| 2/22/2022 | 1,256,751 | $33.231 | $41,763,092.48 |
| 2/23/2022 | 1,063,170 | $32.806 | $34,878,355.02 |
| 2/24/2022 | 838,793 | $33.765 | $28,321,845.65 |
| 2/25/2022 | 695,849 | $34.784 | $24,204,411.62 |
| 2/28/2022 | 1,025,518 | $35.320 | $36,221,295.76 |
| 3/1/2022 | 897,656 | $35.326 | $31,710,595.86 |
| 3/2/2022 | 992,785 | $34.575 | $34,325,541.38 |
| 3/3/2022 | 1,211,426 | $33.971 | $41,153,352.65 |
| 3/4/2022 | 1,016,259 | $33.376 | $33,918,660.38 |
| 3/7/2022 | 1,779,530 | $33.067 | $58,843,718.51 |
| 3/8/2022 | 2,228,858 | $33.769 | $75,266,305.80 |
| 3/9/2022 | 1,005,125 | $34.154 | $34,329,039.25 |
| 3/10/2022 | 1,228,833 | $33.932 | $41,696,761.36 |
| 3/11/2022 | 2,927,000 | $33.238 | $97,287,626.00 |
| 3/14/2022 | 2,770,284 | $33.082 | $91,646,535.29 |
| **Musk Reaches 5% Ownership:** | | | |
| 41,822,849 shares at a cost of $1,365,228,535.27 | | | |
| 3/15/2022 | 1,966,000 | $33.791 | $66,433,106.00 |
| 3/16/2022 | 2,978,376 | $34.992 | $104,219,332.99 |
| 3/17/2022 | 1,500,000 | $37.089 | $55,633,500.00 |
| 3/18/2022 | 2,858,340 | $38.252 | $109,337,221.68 |
| 3/21/2022 | 1,942,482 | $37.280 | $72,415,728.96 |
| 3/22/2022 | 2,476,000 | $38.542 | $95,429,992.00 |
| 3/23/2022 | 2,502,140 | $38.149 | $95,454,138.86 |
| 3/24/2022 | 1,926,764 | $38.675 | $74,517,597.70 |

| | |
|---|---|
| **Total Shares Purchased:** | **59,972,951** |
| **Total Cost:** | **$2,130,315,688.73** |

**B.** **March 14, 2022**: Musk Crosses The 5% Threshold, Which Triggered His Obligation To Disclose His Twitter Stake Within 10 Days

64.     On March 14, 2022, Musk's acquisitions of Twitter stock crossed the 5% ownership threshold.  By this day, Musk had purchased 41,822,849 shares of Twitter stock.  This represented over 5.2% of Twitter's 800,641,166 shares of common stock outstanding as of February 10, 2022 as reported in Twitter's Annual Report on Form 10-K for the year ended December 31, 2022.

65.     By crossing the 5% threshold, Musk triggered the start of the 10-day window to satisfy his Rule 13 disclosure obligations.  Indeed, Musk later admitted in an SEC filing that March 14, 2022 was the "Date of the Event" that required submission of a Schedule 13.

66.     On March 24, 2022, the last day of the 10-day window, Musk did not file the requisite Schedule 13D.  Instead, Musk violated Rule 13, omitted his reporting obligations and continued to secretly amass an ever-increasing ownership stake in Twitter.

67.     That same day, according to texts subsequently made public through *Twitter, Inc. v. Musk*, C.A. No. 2022-0613-KSJM (Del. Ch.) (the "*Twitter* Action"), Musk texted with "TJ" (which news reports subsequently revealed to be Musk's ex-wife) that Musk would "Maybe buy [Twitter] and change it to properly support free speech."

**C.** **March 25, 2022**: At The Start Of The Class Period, Musk Continued To Conceal His Twitter Interest And Secretly Continued To Acquire Twitter Shares At Artificially Low Prices

68.     The Class Period starts on March 25, 2022—the first day after Musk violated his statutory obligation to file a Schedule 13D.  That day alone, over 20.7 million Twitter shares changed hands on the New York Stock Exchange, as Twitter investors sold or traded their Company securities without knowing about Musk's significant ownership interest or that Twitter was in play for a potential takeover by Musk.

69.     Musk's refusal to comply with his legal disclosure obligations allowed him to continue to acquire Twitter shares at artificially low prices and to continue his takeover campaign free of public scrutiny for the time being.  Because the public was unaware that Musk was buying up Twitter stock, Twitter's stock price was artificially depressed by Musk's deception.

70.     Musk knew he was saving a considerable amount of money by omitting disclosure of his Twitter interest, but at the time he did not know exactly how much he was saving.  Musk also knew that these savings would end as soon as he disclosed his growing stake in Twitter to the public—as investors would know that the Company was in play for a takeover, would stop selling their shares at artificially low prices, and many investors would start buying—thereby driving up Twitter's stock price.  In the end, Musk's failure to comply with his disclosure obligations *saved him over $200 million* on his acquisitions of Twitter shares from March 25, 2022 to April 4, 2022.

71.     In contrast to Musk, who benefitted from substantial savings due to his omissions and misstatements, investors who sold Twitter securities during the Class Period were cheated out of the true value of the securities that they traded.  As discussed above, the filing of a Schedule 13D predictably drives up the price of a company's stock.  During the Class Period, Twitter's daily trading volume averaged approximately 48 million shares a day and peaked as high as 269 million shares on April 4, 2022.  Every single one of these trades occurred at artificially depressed prices due to Musk's willful nondisclosure of his Twitter interests and failure to comply with Rule 13. For example, on March 28, 2022, Lead Plaintiff sold 14,367 shares of Twitter stock at $39.09 per share.  If Musk had timely adhered to his statutory reporting obligations under Rule 13, that sale would have generated significantly more money for the benefit of firefighters in Oklahoma.

**D.    <u>During The Class Period</u>: Instead Of Disclosing His Twitter Stake, Musk Teases The Public With Obfuscating Messages About Twitter**

72.    Instead of disclosing his growing stake in Twitter, Musk decided during the Class Period to issue messages about Twitter and even sought to distract attention away from his interest in the Company.  All the while, Musk privately continued to amass more Twitter stock.

73.    For example, on March 25, 2022, the first day of the Class Period, Musk posted a poll to Twitter, stating "Free Speech is essential to a functioning democracy.  Do you believe that Twitter rigorously adheres to this principle?"  He later tweeted: "The consequences of this poll will be important.  Please vote carefully."  After more than 2,035,000 votes, over 70% of the participants said "No."



74.    Likewise, on March 26, 2022, Musk followed up on his poll by stating "Given that Twitter serves as the de facto public town square, failing to adhere to free speech principles fundamentally undermines democracy," and then asking "Is a new platform needed?"

24



75.     Later the same day, Musk tweeted that he is "giving serious thought" to building a new social media platform.



E.   **During The Class Period: Musk Covertly Discusses His Plans With Senior Twitter Executives And Others While Hiding His Growing Ownership Stake From Investors**

76.   While Musk engaged in public misdirection on Twitter, he privately met with senior Twitter executives regarding his plans for the Company, including his growing ownership stake and potential takeover of Twitter.

77.   For example, as Twitter later revealed in a Form PREM14A filed with the SEC on May 17, 2022 (the "Proxy"), Musk contacted Jack Dorsey (Twitter's founder, former CEO, and then-current director) on March 26, 2022—the second day of the Class Period and the same day Musk tweeted that he was "giving serious thought" to creating a rival social media platform to Twitter.  *See* Proxy at 42.  Musk and Dorsey privately "discuss[ed] the future direction of social media, including the benefits of open social protocols."  *Id.*  In one specific exchange unknown to investors, and only partially unsealed in the *Twitter* Action, Dorsey privately texted Musk that

"Twitter started as a protocol.  It should have never been a company.  That was the original sin."
Musk responded, "***I'd like to help if I am able to*** … I think it's worth both trying to move Twitter
in a better direction and doing something new that's decentralized."  Musk's response confirmed
that his intention was to change or influence the control of the Company.

78.     On both March 26 and 27, 2022, as only revealed after the Class Period in the
Proxy, Musk spoke with Egon Durban (Twitter director) about "the potential of Mr. Musk joining
the Twitter Board, ***as well as the fact that Mr. Musk had purchased a significant stake of more
than five percent of [Twitter's] common stock***."  Proxy at 42.

79.     Also on March 27, 2022, Musk spoke with Bret Taylor (then-Chair of Twitter's
Board) and Parag Agrawal (Twitter's then-CEO) about "Mr. Musk's interest in Twitter and
potentially joining the Twitter Board."  *Id.*  During this discussion, "Mr. Musk stated that he was
considering various options with respect to his ownership, including potentially joining the Twitter
Board" or "seeking to take Twitter private."  *Id.*  That same day, in an exchange only partially
unsealed in the *Twitter* Action, Egon Durban texted Musk as well as Agrawal, Taylor, and Martha
Lane-Fox, former Head of Twitter's Nominating and Governance Committee, and stated: "Hi
everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon.
He is briefed on my conversations w you.  Elon – everyone excited about prospect of you being
involved and on [the] board."

80.     On March 31, 2022, Musk again privately spoke with Agrawal and Taylor,
"reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter's
business as a director of Twitter."  Proxy at 42.

81.     Also on March 31, 2022, according to a nonpublic document cited in the Complaint
filed by Twitter in the *Twitter* Action, Musk internally determined that he wanted to ***buy*** Twitter

to rid it of "crypto spam," which he viewed as a "major blight on the user experience." Still, Musk disclosed nothing about his interest in or plans for Twitter to the investing public.

**F.     During The Class Period: Musk Silently Purchases Nearly 15 Million Shares of Twitter Stock at Artificially Depressed Prices**

82.     During the Class Period, Musk purchased 2,000,000 to nearly 3,500,000 shares of Twitter stock on a near-daily basis, marking the highest overall volume of Twitter shares Musk purchased since his buying spree started on January 31, 2022. All told, Musk purchased nearly approximately 13,000,000 shares of Twitter stock during the Class Period, representing almost 20% of his total holdings. By disregarding his statutory disclosure obligations under Rule 13, Musk secured artificially depressed pricing for his purchases of Twitter stock during the Class Period, ***ultimately saving over $200,000,000*** by intentionally concealing his interests in the Company.

83.     Musk's acquisitions of Twitter stock and other key events during the Class Period are set forth below in Table 2.

## TABLE 2: Key Events During The Class Period

| Date(s) | Key Events |
|---|---|
| Thursday, March 24, 2022 | <ul><li>Ten-day deadline for compliance with Rule 13 expires.</li><li>Musk files nothing and fails to satisfy his reporting requirements under Rule 13.</li></ul> |
| Friday, March 25, 2022 | <ul><li>**Beginning of Class Period.**</li><li>Musk purchased 3,491,274 shares of Twitter stock for $133,373,649.35.</li></ul> |
| Saturday, March 26, 2022 | <ul><li>Musk and Jack Dorsey (founder and then-director of Twitter) privately "discuss[ed] the future direction of social media, including the benefits of open social protocols."</li><li>Dorsey privately texted Musk that "Twitter started as a protocol. It should have never been a company. That was the original sin." Musk responded, "*I'd like to help if I am able to* … I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized."</li></ul> |
| Saturday, March 26, 2022 Sunday, March 27, 2022 | <ul><li>Musk spoke with Egon Durban (Twitter director) about "the potential of Mr. Musk joining the Twitter Board, *as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock*."</li></ul> |
| Sunday, March 27, 2022 | <ul><li>Musk spoke with Bret Taylor (then-Chair of Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about "Mr. Musk['s] interest in Twitter and potentially joining the Twitter Board." During this discussion, "Mr. Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private."</li><li>Egon Durban texted Musk as well as Agrawal, Taylor, and Martha Lane-Fox, Head of Nominating and Governance Committee, and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board."</li></ul> |
| Monday, March 28, 2022 | <ul><li>Musk purchased 2,603,779 shares of Twitter stock for $100,953,719.39.</li></ul> |
| Tuesday, March 29, 2022 | <ul><li>Musk purchased 2,875,934 shares of Twitter stock for $115,903,016.13.</li></ul> |

| Date(s) | Key Events |
|---|---|
| Thursday, March 31, 2022 | • Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter['s] business as a director of Twitter."<br>• According to a nonpublic document cited in the Complaint in the *Twitter* Action, Musk internally determined that he wanted to ***buy*** Twitter to rid it of "crypto spam," which he viewed as a "major blight on the user experience."<br>• Musk purchased 2,000,000 shares of Twitter stock for $77,636,000.00. |
| Friday, April 1, 2022 | • Musk purchased 2,171,100 shares of Twitter stock for $85,413,245.10. |
| Sunday, April 3, 2022. | • Twitter formally invited Musk to join its Board of Directors.<br>• Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "Jared, there is important paperwork to be done to ***allow for me to hopefully join the Twitter Board***." |
| Monday, April 4, 2022 (see details below) | • Before the market opened, Musk partially disclosed his interest in Twitter and falsely filed a Schedule 13G with the SEC. The Schedule 13G revealed Musk's 9.2% ownership in Twitter.<br>• The SEC privately probes Musk about inconsistences in his Schedule 13G.<br>• **End of Class Period.** |
| Tuesday, April 5, 2022 (see details below) | • Before market open, Twitter filed a Form 8-K that announced the Company would appoint Musk to its Board of Directors<br>• Before market open, Musk and Agrawal announced Musk's appointment to Twitter's Board on Twitter.<br>• After market close, Musk belatedly filed a Schedule 13D disclosing his 9.1% ownership of Twitter and activist intentions. |

*Sources: Partially unsealed text messages in the Twitter* Action*; Proxy at 42; Musk's April 5, 2022 Schedule 13D.*

## VI.   THE TRUTH EMERGES

### A.   On April 4, 2022, Musk Attempts To Hide His Activist Intentions And Files A Misleading Schedule 13G, Eleven Days Late

84.   On Sunday, April 3, 2022, unknown to investors, Twitter formally invited Musk to join its Board of Directors. That same day, as revealed in a text message partially unsealed in the *Twitter* Action, Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "there is important paperwork to be done to ***allow for me to hopefully join the Twitter Board***." On April

4, 2022, Musk and Twitter entered into a letter agreement providing, *inter alia,* that Musk would be appointed to Twitter's Board.

85.     Knowing that Twitter would disclose that Musk was joining its Board, which would likely lead to the disclosure of his ownership in the Company, Musk understood that his secret buying scheme had to come to an end.  On April 4, 2022, Musk belatedly provided investors with a partial disclosure of his interest in Twitter when he filed a Schedule 13G with the SEC.  *See* Exhibit 1.  This Schedule 13G reported that Musk owned 9.2% of Twitter's common stock, although it was filed 11 days after the disclosure window mandated by Rule 13, which ended March 24, 2022.  In this filing, Musk admitted that the "Date of Event" that required the submission of the filing was March 14, 2022, confirming beyond question that it was 11 days late, and 21 days after his Twitter interest had crossed the 5% threshold.

86.     With his ownership stake now revealed, the public learned for the first time that Musk was Twitter's largest shareholder.  As *The Wall Street Journal* reported on May 11, 2022, the "lag" allowed Musk "to buy more stock without alerting other shareholders to his ownership."

87.     However, Musk's Schedule 13G filing only partially revealed the truth.  In order to delay the full disclosure of his activist intentions, Musk affirmatively deceived investors through his filing of the Schedule 13G.  As a threshold matter, Musk chose the Schedule 13G form, which is reserved for passive investors (which he was not).  Also, Musk's Schedule 13G omitted any mention of Musk joining Twitter's Board.

88.     Further, Musk deliberately manipulated the Schedule 13G form to omit a required certification.  This deliberate act underscores that Musk knew, or at minimum was reckless as to, the misleading nature of his Schedule 13G filing.

89. If Musk were truly a passive investor—which he was not—he would have had to provide the below sworn certification as part of his Schedule 13G. Indeed, Musk claimed he was filing a Schedule 13G pursuant to the exemption in 17 C.F.R. § 240.13d-1(c), which requires the filer to swear to the below certification as a condition of filing:

Item 10. Certifications

By signing below I certify that, to the best of my knowledge and belief, the securities referred to above ***were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities*** and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect, other than activities solely in connection with a nomination under § 240.14a-11.

To be sure, the SEC publishes a standard form that has this certification language included by default (available here: https://www.ecfr.gov/current/title-17/chapter-II/part-240/section-240.13d-102). However, Musk intentionally removed this language in the Schedule 13G that he personally signed and filed on April 4, 2022. Musk replaced the certification language with the words "Not Applicable."

90. Later that same day, unknown to investors at the time, the SEC's Office of Mergers and Acquisitions sent Musk a letter inquiring about improprieties in his Schedule 13G. *See* Exhibit 3. Specifically, the SEC's questions included the following:

(a) "Please advise us why the Schedule 13G does not appear to have been made within the required 10 days from the date of acquisition as required by Rule 13d-1(c), the rule upon which you represented that you relied to make the submission."

(b) "Given that a beneficial owner relying upon Rule 13d-1(c) to make a filing on Schedule 13G in lieu of Schedule 13D must provide a response to Item 10(c) of the form, please advise us why the response provided in Item 10 of this Schedule 13G, titled 'Certifications,' indicates that you determined the line item was '[n]ot [a]pplicable.'"

(c) "Please provide us with a brief analysis of the bases upon which you determined that you were eligible to rely upon Rule 13d-1(c) to make the filing on Schedule 13G. Your response should address, among other things,

32

your recent public statements on the Twitter platform regarding Twitter (the issuer), including statements questioning whether Twitter (the issuer) 'rigorously adheres to' 'free speech principles.'"

The SEC's letter was not publicly filed until April 6, 2022, after the full truth about Musk's activist ownership of Twitter stock had already been disclosed.

91.     Although they still did not know the full truth regarding Musk's plans for Twitter, investors reacted strongly to the revelation of Musk's 9.2% interest in Twitter on April 4, 2022. In response, Twitter's stock price increased precipitously, soaring approximately 27% on unusually high trading volume—an increase of $10.66 per share—to close at $49.97 on April 4, 2022 (from the prior close of $39.31 on Friday, April 1, 2022).

92.     Analysts noted Musk's substantial stake in Twitter but believed that it was passive given the Schedule 13G filing.  For instance, Bank of America analysts stated that they "expect[ed] the news to drive significant retail investor interest in, and activity for, the stock" and "highlight platform value to potential acquirers"—but explained that "[t]he type of form used (13G) often indicates the investor isn't seeking to acquire control, or to influence who controls it."

**B.     Musk Is Finally Revealed As An Activist Investor As Twitter Announces His Appointment To Its Board**

93.     On the morning of April 5, 2022, prior to the start of trading, Twitter filed a Form 8-K press release that announced the Company would appoint Musk to its Board of Directors. Shortly after filing the Form 8-K, Agrawal and Musk took to Twitter to announce Musk's appointment to the Board.  Agrawal disclosed that "[t]hrough conversations with Elon in recent weeks, it became clear to us that he would bring great value to our Board."  Musk responded that

he was "[l]ooking forward to working with Parag & Twitter board to make significant improvements to Twitter in coming months!"



94.     Investors reacted strongly to learning Musk's true involvement in Twitter and his activist intentions.  Indeed, Twitter's stock price closed at $50.98 per share on April 5, 2022, on unusually high trading volume, up from $49.97 on April 4, 2022—a total increase of nearly 30% since Musk first publicly disclosed his ownership stake in Twitter on April 4, 2022.  Twitter's stock continued to react positively to this news on April 6, 2022, after accounting for market-wide stock price movements.

95.     After the market closed on April 5, 2022, McDermott Will & Emery LLP amended Musk's Schedule 13G and filed a Schedule 13D that disclosed both Musk's ownership stake in Twitter and the fact that he was joining the Board.  The Schedule 13D revealed that all Twitter

shares beneficially owned by Musk are held by the Elon Musk Revocable Trust dated July 22, 2003 and further admitted that "Musk is the sole Trustee" of the Musk Trust. *See* Exhibit 2.

96.     A timeline of major events is set forth below in Figure 1.



**VII.    POST-CLASS PERIOD EVENTS**

**A.     Regulatory Investigations Surrounding Musk's 13G And 13D Filings**

97.     On May 11, 2022, in an article entitled, "Elon Musk's Belated Disclosures of Twitter Stake Triggers Regulators' Probes," *The Wall Street Journal* reported that the SEC was investigating Musk regarding his failure to timely file the required Schedule 13D form.

98.     Musk's failure to properly disclose his activist ownership in Twitter also drew scrutiny from other financial regulators.   For example, the Hart-Scott-Rodino Antitrust

Improvements Act of 1976, 15 U.S.C. § 18a ("HSR"), requires activist investors like Musk to alert the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") of large-scale acquisitions of voting securities, and then delay further acquisition pending agency review. This is because it is "often impossible to restore competition fully once a merger takes place" and "any attempt to reestablish competition after the fact is usually very costly for the parties and the public." Notwithstanding this statutory obligation, Musk did not do so with respect to his acquisition of Twitter shares.

99.    Musk's attitude toward the FTC is apparently similar to his contempt for the SEC. As reported by *The Verge* on November 10, 2022 in an article entitled, "Elon Musk is Putting Twitter at Risk of Billions in Fines, Warns Company Lawyer," a legal staffer at Twitter "heard Alex Spiro (current head of Legal) say that Elon is willing to take on a huge amount of risk in relation to this company and its users, because 'Elon puts rockets into space, ***he's not afraid of the FTC***.'"

100.    Per an exposé from *The Information*, the FTC opened an inquiry in April 2022 into "whether Musk should have reported his initial Twitter share purchases to the agency and the Justice Department" under the HSR. The FTC is reportedly "looking to examine the communications between Musk and Twitter's Board as he accumulated his stake to determine whether he wanted to have an active role in the company." According to the article, "[i]f the FTC determines that Musk was investing in Twitter to influence decisions at the company, he could be penalized for not notifying antitrust regulators about his initial Twitter investment."

**B.      Musk Agrees To Acquire Twitter, Appears To Have Second Thoughts, And Then Proceeds With The Takeover On Its Original Terms**

101.      In the months following the Class Period, Musk continued to demonstrate reckless behavior that undermined the interests of Twitter shareholders.  Indeed, it now appears that Musk is intent on destroying the Company.

102.      On April 9, 2022, through a private conversation with Agrawal, Musk finally revealed his plan to buy the Company outright.  On April 13, 2022, Musk delivered an official non-binding proposal to purchase Twitter to the Board for $54.20 per share.

103.      Although the offer was initially conditioned on "customary due diligence and financing," by the end of April 2022, Musk grew impatient.  Accordingly, Musk renounced any right to due diligence before closing the deal.  On April 25, 2022, Twitter announced that it accepted Musk's proposal to acquire the company at $54.20 per share.  A joint press release announcing the buyout included Musk's personal promise to "make Twitter better" by "defeating the spam bots."

104.      The funding for the $44 billion deal was linked to the value of Musk's Tesla shares. Musk was expected to sell approximately 20 million shares of his Tesla stock to fund the transaction, so long as Tesla stock traded at approximately $1,000 per share.  The day after the deal was announced, on April 26, 2022, Tesla stock declined by more than 12%.  By the end of April, Musk reported to the SEC that he had sold 9.6 million of his personal Tesla shares.

105.      As the price of Tesla shares continued to decline, so did Musk's inclination to continue selling his Tesla shares to fund the Twitter transaction.  Musk began concocting excuses to purportedly stall or even back out of the deal.  As revealed in a text message partially unsealed in the *Twitter* Action*, on May 8, 2022, in reference to the acquisition, Musk sent a text message to Morgan Stanley's Head of Global Technology Investment Banking, Michael Grimes, stating,

"Let's slow down [on pursuing the acquisition of Twitter for] just a few days.  Putin's speech tomorrow is really important.  It won't make sense to buy Twitter if we're heading into World War III."

106.    As Tesla's stock price continued to decline, Musk manufactured a new theory to purportedly scuttle the deal or secure a lower price: he claimed that Twitter had misled him about the number of spam/bots on the platform.  Although Musk had specifically waived due diligence, on May 13, 2022, Musk tweeted that his $44 billion deal to buy Twitter was "temporarily on hold" to learn more about Twitter's estimate that spam and fake accounts make up less than 5% of total users.

107.    On July 8, 2022, Musk claimed that he was terminating the deal.

108.    On July 12, 2022, Twitter filed a complaint in Delaware Court of Chancery alleging breach of Musk's contractual obligations under the merger agreement, seeking specific performance of Musk's obligations under the agreement.  In its complaint, Twitter noted: "Musk apparently believes that he—unlike every other party subject to Delaware contract law—is free to change his mind, trash the company, disrupt its operations, destroy stockholder value, and walk away."

109.    After months of chaos and intense trial preparation, on October 4, 2022, Musk announced that he would abandon his battle with Twitter and pay shareholders the originally offered $54.20 per share.  Musk simply performed an about-face and reaffirmed the original deal terms.

110.    On October 28, 2022, Musk and Twitter closed the deal.

111.    After the deal closed, Musk went on to terminate roughly half of Twitter's workforce, including by ousting top executives like Twitter CEO Agrawal and the Company's

Board of Directors, leaving Musk as the sole director of the Company.  As reported in the *New York Times* on November 11, 2022, in an article entitled "Two Weeks of Chaos: Inside Elon Musk's Takeover of Twitter," Twitter executives warned Musk that his mass firing plan "could violate employment laws and breach contracts with workers, leading to employee lawsuits . . . . But Mr. Musk's team said he was used to going to court and paying penalties, and was not worried about the risks."

112.    Most recently, on November 10, 2022, the *Financial Times* reported that Musk has been telling Twitter employees that "bankruptcy was a possibility."

## VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER

113.    As set forth in this Complaint, numerous facts give rise to the strong inference that, throughout the Class Period, Musk knew or recklessly disregarded that his omissions and misrepresentations were materially false and misleading when made.  The information in this section summarizes and/or supplements certain allegations that detail Musk's scienter.

114.    First, Musk is intimately familiar with the filing requirements and law underpinning Rule 13.  In litigation related to his infamous $420 tweet, Musk testified, under oath, that "***U.S. reporting requirements start at 5 percent***" and anything higher than 4.99% ownership "would create a splash ***because of the reporting requirement***."

115.    Musk's knowledge of Rule 13's disclosure requirements is further demonstrated by the fact that, since 2011, Musk has personally filed and signed twelve Schedule 13G forms and eight Schedule 13D forms for his companies.

116.    Second, Musk knowingly filed a manipulated Schedule 13G form filed on April 4, 2022, instead of the proper Schedule 13D given his substantial holdings and intentions to influence Twitter (or effect of doing so).  At the outset, the fact that Musk filed and personally signed a Schedule 13G for passive investors—and not the correct Schedule 13D for activist investors—

reveals that he knowingly engaged in a cover-up to disguise his activist intentions. This is especially true given that Musk had already engaged in numerous discussions and meetings with senior Twitter leadership and other insiders about influencing control of the Company, including by joining Twitter's Board or taking the Company private. Musk's cover-up is further evidenced by his omission of the requisite certification on the Schedule 13G—and, instead, Musk affirmatively (and falsely) indicated that the certification was "Not Applicable." Musk removed this certification because he knew he could not certify to being a passive investor without perjuring himself and to falsely signal a passive investment to the market to continue to artificially depress the price of Twitter stock and further reap substantial savings.

117. Further, Musk admitted that the "Date of Event" that required filing the Schedule 13G is March 14, 2022—an acknowledgement that this filing was required precisely *because* Musk knew he had crossed 5% ownership of Twitter as of March 14, 2022, but willfully chose to belatedly disclose his interest.

118. Third, Musk's private conversations with senior Twitter leadership further reveal Musk's knowledge during the Class Period that his ownership in Twitter exceeded 5%. For example, as only disclosed after the Class Period in the Proxy, Musk spoke with Egon Durban (Twitter director) on March 26 and 27, 2022 about "the potential of Mr. Musk joining the Twitter Board, *as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock*." Proxy at 42.

119. Fourth, Musk's violation of the HSR reporting requirements further underscores Musk's intention in concealing his acquisition of Twitter shares during the Class Period. Musk disregarded the FTC's statutory mandate because it would have delayed his Twitter stock buying spree pending the agency's review of antitrust concerns.

40

120.     Fifth, Musk's private interactions with senior Twitter leadership (disclosed after the Class Period) make clear that Musk was purchasing Twitter securities for the purpose of or with the effect of changing or influencing the control of Twitter from the outset.  For example, on March 24, 2022, Musk texted that he would "Maybe buy [Twitter] and change it to properly support free speech."  Also, Musk spoke with Egon Durban (Twitter director) on March 26 and 27, 2022 about "the potential of Mr. Musk joining the Twitter Board."  Proxy at 42.  Likewise, on March 27, 2022, Musk privately spoke with Bret Taylor (then-Chair of Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about his "various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private."  Id.  And on March 31, 2022, Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter."  Id.  These secret discussions were borne out in the following weeks, as Musk agreed to join Twitter's Board on April 4, 2022 and then privately told Agrawal he would make an offer to purchase Twitter on April 9, 2022.  Musk's discussions with senior Twitter management reveal his activist intentions to change or influence the control of Twitter during the Class Period, although such intentions were carefully guarded from investor scrutiny until later.

121.     Sixth, Musk's failure to satisfy his statutory disclosure obligation under Rule 13 is the latest episode in his long history of reckless disregard and disdain for SEC regulations.  As set forth above, Musk has sought to escape his SEC settlement and has continued to publicly denigrate the SEC as "bastards," the "Shortseller Enrichment Commission," or worse—and he has made "clear" that he "do[es] not respect the SEC."

122.     Seventh, leading up to the Class Period, Musk went from owning zero shares of Twitter to spending over $2 billion to purchase nearly 60 million shares of the Company on a near-

daily basis over six weeks.  These purchases continued during the Class Period, culminating in over $2.6 billion of stock purchases.  Such a volley of high-volume and high-cost purchases requires great intentionality and coordination.  Musk plainly knew how much Twitter stock he owned—and when—due to spending billions of dollars and orchestrating a highly-coordinated purchasing schedule—yet he decided to consciously disregard his statutory disclosure obligations under Rule 13.

123.   Eighth, Musk owes his wealth largely to his shares of Tesla stock, and *The Wall Street Journal* dubbed him "Tech's Cash-Poor Billionaire."  In an article entitled "Why Elon Musk Is Cash Poor (For A Billionaire)," *Forbes* reported that Musk even testified as much in a 2018 defamation trial arising from his tweets.  According to *Forbes*, Musk testified: "Some people think I have a lot of cash.  I actually don't."  Indeed, "[a]s much as 99% of Musk's wealth is held in shares of [Tesla and Space-X]," and Musk's wealth is overwhelmingly subject to the unpredictable hills and valleys of the stock market.  In fact, Robyn Denholm, Chair of the Board and Audit Committee of Tesla, recently testified in the *Tornetta* Action that: "Tesla has a philosophy of paying … a lower cash compensation and then paying … individuals with options or equity, stock options or RSUs."

124.   To protect his unstable wealth, Musk was motivated in part to intentionally delay disclosure of his interest in Twitter so he could secure artificially depressed pricing for his purchases of Twitter stock during the Class Period, which ultimately saved Defendant Musk over an estimated $200,000,000.

125.   Musk knew throughout the Class Period that he was buying Twitter shares at artificially depressed prices and likely saving significant sums of money due to his failure to make

the required disclosure—however, at the time, he did not know with precision exactly how much money he was saving.

## IX.    DEFENDANT MUSK'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

126.    On March 14, 2022, after dedicating vast sums to purchase Twitter shares, Musk acquired more than 5% of Twitter.  Under Rule 13, Musk had 10 days—or until March 24, 2022— to publicly disclose his interest and intentions for Twitter in a Schedule 13 form.  Instead of disclosure, Musk kept silent and refused to comply with his statutory reporting obligation.

127.    Each day of the Class Period (March 25, 2022 to April 4, 2022), Musk willfully disregarded this statutory obligation and knowingly omitted the material fact of his steadily increasing ownership in Twitter, as required under Rule 13.  He also omitted disclosure of his plans to potentially takeover Twitter.  Musk's silence was a materially misleading omission each day of the Class Period because, from at least the start of the Class Period, Musk knew he owned an interest greater than 5% in Twitter and intended to, or did, change or influence the control of the Company as set forth above in Paragraphs 68-83.

128.    On April 4, 2022, before the market opened, Musk personally signed and filed a Schedule 13G for passive investors that disclosed his 9.2% interest as Twitter's largest shareholder—11 days after the statutory disclosure deadline mandated by Rule 13.  Musk indicated that he was filing the Schedule 13G pursuant to the exemption in 17 C.F.R. § 240.13d-1(c), which is the exception to Schedule 13D that indicates the filer is "passive."  Musk's Schedule 13G also omitted any mention of Musk joining Twitter's Board.  Further, Musk falsely and misleadingly omitted the required certification under Item 10 of the Schedule 13G that the investor "[h]as not acquired the securities *with any purpose, or with the effect, of changing or influencing the control of the issuer*," and instead affirmatively stated that this certification was "Not Applicable."

43

Musk also "certif[ied] that the information set forth in" the Schedule 13G was "true, complete and correct."

129.     The statements in Musk's April 4, 2022 Schedule 13G set forth above were materially false and misleading and omitted material facts because, before filing this Schedule 13G, Musk engaged in numerous discussions with Twitter leadership, including about joining Twitter's Board or taking Twitter private; Musk had agreed to join Twitter's Board on April 4, 2022 (the same day he filed the misleading Schedule 13G), and Musk soon carried out his plan to take over Twitter by making an offer to purchase the Company on April 14, 2022.  Musk was a far cry from a "passive" investor, and he was subject to a statutory obligation to adequately disclose his activist intentions and ownership via a Schedule 13D, as set forth above in Paragraphs 68-83, 84-92.

## X.     LOSS CAUSATION

130.     Musk's wrongful conduct, as alleged in this Complaint, directly and proximately caused Lead Plaintiff and the Class to suffer substantial damages.  During the Class Period, Musk's materially false and misleading statements and omissions as set forth above artificially depressed the price of Twitter's securities below the price at which Twitter securities would have traded absent those material omissions and misrepresentations.

131.     For example, on April 4, 2022, in reaction to the news of Musk's 9.2% ownership in Twitter set forth in his otherwise misleading Schedule 13G form, Twitter's stock price soared by approximately 27%—a statistically significant increase of $10.66 per share—to close at $49.97 from a close of $39.31 on the prior trading day (*i.e.*, Friday, April 1, 2022).  And on news of Musk joining Twitter's Board the following day, the Company's stock price underwent another statistically significant increase to close at $50.98.  Then, Twitter's stock price continued to

increase in a statistically significant reaction to these disclosures on April 6, 2022, after accounting for market-wide movements.

132.    Because of Musk's fraudulent scheme and disregard for his statutory obligations discussed above at Section V, investors were kept in the dark about Musk's ownership stake in Twitter.  Had investors known the full truth about Musk's ownership in Twitter during the Class Period, Twitter's stock price would have traded at higher prices during the Class Period.  Musk's materially false and misleading statements and omissions of material fact operated as a fraud or deceit on the Class and induced the Class to sell Twitter shares at prices that were below the actual value of those securities, and thereby caused damage to the Class.  As a result of their sales or trading of Twitter's securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## XI.    <u>PRESUMPTION OF RELIANCE</u>

133.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this Complaint against Musk are predicated in part upon material omissions of fact that Musk had a duty to disclose.

134.    In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Musk's material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Twitter securities was open, efficient, and well developed for the following reasons, among others:

(a)    Twitter stock met the requirements for listing and its stock was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Twitter filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Twitter regularly and publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Twitter was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

135.    As a result of the foregoing, the market for Twitter securities promptly digested current information regarding Twitter from all publicly available sources and reflected that information in the price of Twitter securities.  Under these circumstances, all sellers of Twitter securities (or traders of options) during the Class Period suffered similar injury through their sale of Twitter securities at artificially deflated prices, and the presumption of reliance applies.

136.    Accordingly, Lead Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Twitter securities and to a presumption of reliance on Musk's materially false and misleading statements and omissions during the Class Period.

## XII.    CLASS ACTION ALLEGATIONS

137.    Lead Plaintiff bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Twitter securities during the Class Period. Excluded from the Class is Defendant Musk; affiliates and members of the immediate family of Defendant Musk; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which Defendant Musk has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

138.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 10, 2022, Twitter had 800,641,166 shares of common stock outstanding and held by non-insiders.

139.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

(a)   Whether Musk violated the Exchange Act;

(b)   Whether Musk omitted and/or misrepresented material facts;

(c)   Whether Musk violated his statutory obligation of disclosure under Rule 13;

(d)   Whether Musk knew or recklessly disregarded that his statements and/or omissions were false and misleading;

(e)   Whether the price of Twitter securities was artificially deflated;

(f)   Whether Musk's conduct caused the members of the Class to sustain damages; and

(g)   The extent of damage sustained by Class members and the appropriate measure of damages.

140.   Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Musk's wrongful conduct.

141.   Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

142.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII.  <u>COUNTS</u>

### COUNT I

### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### Against All Defendants

143.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth in this Count.

144.    During the Class Period, Musk carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged in this Complaint; and (ii) cause Lead Plaintiff and other members of the Class to sell Twitter stock and trade other Twitter securities at artificially depressed prices.

145.    Musk (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Twitter securities and avoid public scrutiny of his acquisition of Twitter stock and plans to acquire Twitter for as long as possible in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

146.    Musk, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal his ownership of Twitter in defiance of his statutory obligations, including under Rule 13.

147.    During the Class Period, Musk omitted material facts required to be disclosed by statutory obligation, including under Rule 13, and made the materially misleading omissions and statements specified above, which he knew or recklessly disregarded to be false or misleading in

that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Namely, Musk made materially false and misleading omissions each day of the Class Period by refusing to report his Twitter holdings and plans on a Schedule 13D form, as well as made materially false and misleading omissions and statements in the Schedule 13G he personally signed and filed with the SEC on April 4, 2022, as discussed above at Paragraphs 68-92.

148.    Musk had actual knowledge of the misrepresentations and omissions of material fact set forth in this Complaint, or recklessly disregarded the true facts that were available to him. Musk engaged in this misconduct to conceal his true ownership and interest in Twitter from the investing public for as long as possible and to support the artificially low prices of the Company's securities.

149.    As a direct and proximate result of Musk's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's stock and/or trading of other securities during the Class Period.

150.    By virtue of the foregoing, Musk violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations Of Sections 10(b) And 20A Of The Exchange Act And Rule 10b-5 Promulgated Thereunder For Insider Trading Against All Defendants

151.    This Count is asserted for violations of §20A of the Exchange Act, 15 U.S.C. § 78t(a) on behalf of Lead Plaintiff and all other members of the Class who sold or traded Twitter securities contemporaneously with the purchase of Twitter common stock by Musk, while he was in possession of material, nonpublic information as alleged herein including concerning his ownership of Twitter common stock and intentions for Twitter.

152.    Section 20A(a) of the Exchange Act provides that:

Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable … to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

153.    As set forth herein, Musk violated Exchange Act Section 10(b), Rule 10b-5 and Section 20(a) for the reasons stated in the above.  Additionally, Musk further violated Exchange Act Section 10(b), Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by purchasing shares of Twitter common stock while in possession of material, nonpublic information concerning his ownership of Twitter common stock and intentions for Twitter which he omitted to disclose, which information Musk had a duty to disclose, and which Musk failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

154.    Musk's purchases occurred on the following dates and for the following amounts:

| Date(s) | Shares Purchased | Amount |
|---------|------------------|--------|
| Friday, March 25, 2022 | 3,491,274 | $133,373,649.35 |
| Monday, March 28, 2022 | 2,603,779 | $100,953,719.39 |
| Tuesday, March 29, 2022 | 2,875,934 | $115,903,016.13 |
| Thursday, March 31, 2022 | 2,000,000 | $77,636,000.00 |
| Friday, April 1, 2022 | 2,171,100 | $85,413,245.10 |

155.    Contemporaneously with Musk's purchases of Twitter common stock, Lead Plaintiff and the other Class members sold or traded Twitter securities on a national securities exchange, while Musk was in possession of material, nonpublic information he had a duty to disclose, but failed to disclose, as alleged herein, including information concerning his ownership

of Twitter common stock and intentions for Twitter.  This included Lead Plaintiff's sale of 14,367 shares of Twitter common stock at $39.09 per share on March 28, 2022.

156.    Lead Plaintiff and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

157.    This action was brought within five years after the date of the last transaction that is the subject of Musk's violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by Defendant Musk.

**COUNT III**

**For Violation Of Section 20(a) Of The Exchange Act<br>Against Defendant Elon Musk**

158.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth in this Count.

159.    Elon Musk acted as the controlling person of the Elon Musk Revocable Trust dated July 22, 2003 within the meaning of Section 20(a) of the Exchange Act.  In the Schedule 13D filed with the SEC on April 5, 2022, Musk admitted that he is "the sole Trustee" of the Elon Musk Revocable Trust dated July 22, 2003.  As such, Musk had the power and ability to control the actions of the Elon Musk Revocable Trust dated July 22, 2003.  Thus, Musk is liable pursuant to Section 20(a) of the Exchange Act.

**XIV.   PRAYER FOR RELIEF**

160.    WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against Musk, for all damages sustained as a result of Musk's wrongful conduct, in an amount to be proven at trial, including interest;

(c)     Awarding Lead Plaintiff's reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(d)     Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## XV.     JURY DEMAND

161.    Lead Plaintiff demands a trial by jury.

Dated: November 18, 2022

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson

John C. Browne
Avi Josefson
Katherine M. Sinderson
Jeremy P. Robinson
Jonathan G. D'Errico
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
avi@blbglaw.com
katie@blbglaw.com
jeremy@blbglaw.com
jonathan.derrico@blbglaw.com

*Lead Counsel for Lead Plaintiff Oklahoma Firefighters Pension and Retirement System*

52