**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC BAIN RASELLA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ELON R. MUSK and ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, <br><br> Defendants. | No. 1:22-cv-03026-ALC-GWG |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**TO DISMISS THE COMPLAINT ON BEHALF OF DEFENDANTS**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Alex Spiro
Jacob J. Waldman
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
alexspiro@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

      A.     Parties ..................................................................................................................... 3

      B.     Plaintiff's Key Allegations Concerning Musk's Twitter Purchases ................................. 4

            1.     Musk's Twitter Purchases ..................................................................... 4

            2.     Musk's Twitter-Related Discussions and Messages ............................... 5

            3.     Plaintiff's Causes of Action ................................................................. 5

LEGAL STANDARD ............................................................................................................... 6

ARGUMENT ......................................................................................................................... 7

I.     PLAINTIFF'S CAUSE OF ACTION UNDER SECTION 10(B) FAILS ................................... 7

      A.     Plaintiff Has No Cause of Action for Damages Under Section 10(b) Arising from Section 13(d) .......................................................................................... 7

      B.     This Court Should Not Broaden the Remedy for Alleged Breaches of 13(d) ................. 11

      C.     Plaintiff Fails to Plead That Musk Formed Any Intent to Control or Acquire Twitter During the Class Period .............................................................. 13

      D.     Plaintiff Fails to Plead That Musk Acted With Scienter .................................... 15

II.    PLAINTIFF CANNOT PLEAD THAT MUSK ENGAGED IN INSIDER TRADING UNDER SECTION 20(A) ................................................................................. 19

III.   PLAINTIFF'S LOSS CAUSATION ALLEGATIONS ARE PURE SPECULATION .................. 20

CONCLUSIONS ................................................................................................................... 21

i

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021) ............................................................. 2, 7, 19

*In re AIG Advisor Grp.*,
  2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ............................................................. 21

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ............................................................. 11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................. 6, 20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................. 12

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................. 6

*Barrios v. Bello*,
  2021 WL 1630594 (S.D.N.Y. Apr. 27, 2021) ............................................................. 3, 6, 20

*Berman v. Richford Indus., Inc.*,
  26 Fed. R. Serv. 2d 10 (S.D.N.Y. 1978) ............................................................. 10

*Boswell v. Skywest Airlines, Inc.*,
  361 F.3d 1263 (10th Cir. 2004) ............................................................. 12

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ............................................................. 16

*City of Rancho Palos Verdes, Cal. v. Abrams*,
  544 U.S. 113 (2005) ............................................................. 12

*Dreiling v. Am. Online Inc.*,
  578 F.3d 995 (9th Cir. 2009) ............................................................. 8

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016) ............................................................. 20

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015) ............................................................. 6, 7

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
   286 F.3d 613 (2d Cir. 2002) ...................................................................1, 6, 8, 9, 11, 12

*Issen v. GSC Enter., Inc.*,
   508 F. Supp. 1278 (N.D. Ill. 1981) ...........................................................................9

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
   2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ................................................................18

*Kamerman v. Steinberg*,
   891 F.2d 424 (2d Cir. 1989) ...................................................................... 1, 6, 9, 11

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ....................................................................16

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...................................................................................20

*Liberty Nat'l Ins. Holding Co. v. Charter Co.*,
   734 F.2d 545 (11th Cir. 1984) ..................................................................................8

*Medina v. Tremor Video, Inc.*,
   2015 WL 1000011 (S.D.N.Y. Mar. 5, 2015) ............................................................18

*Motient Corp. v. Dondero*,
   529 F.3d 532 (5th Cir. 2008) .................................................................................8, 9

*U.S. v. O'Hagan*,
   521 U.S. 642 (1997) ...............................................................................................19

*In re Penn Cent. Sec. Litig. M.D.L.*,
   Docket No. 56, 494 F.2d 528 (3d Cir. 1974) ............................................................9

*Pierce v. Fordham Univ., Inc.*,
   2016 WL 3093994 (S.D.N.Y. June 1, 2016) ...........................................................18

*Rhyne v. Omni Energy Svc. Corp.*,
   2009 WL 1844474 (W.D. La. June 23, 2009) ...........................................................9

*S.E.C. v. Yin*,
   2018 WL 1582649 (S.D.N.Y. Mar. 27, 2018) .........................................................20

*Sanders v. Thrall Car Manu. Co.*,
   582 F. Supp. 945 (S.D.N.Y. 1983) ...........................................................................8

*SEC v. AT&T, Inc.*,
   2022 WL 4110466 (S.D.N.Y. Sept. 8, 2022) ........................................................2, 19

*In re Shanda Games Ltd. Sec. Litig.*,
 2022 WL 992794 (S.D.N.Y. Mar. 31, 2022) ....................................................... 6, 7, 19

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
 33 F. Supp. 3d 401 (S.D.N.Y. 2014) .......................................................................10

*Srebnik v. Dean*,
 2006 WL 2790408 (D. Colo. Sept. 26, 2006) ...........................................................10

*Starr Int'l Co. v. AIG, Inc.*,
 648 F. Supp. 2d 546 (S.D.N.Y. 2009) ........................................................................8

*State of California v. Sierra Club*,
 451 U.S. 287 (1981).................................................................................................12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148 (2008).................................................................................................12

*Takata v. Riot Blockchain, Inc.*,
 2022 WL 1058389 (D.N.J. Apr. 8., 2022) .............................................................9, 11

*In re Take-Two Interactive Sec. Litig.*,
 551 F. Supp. 2d 247 (S.D.N.Y. 2008) .......................................................................7

*TCS Cap. Mgmt., LLC v. Apax Partners, L.P.*,
 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ..........................................................13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..............................................................................................7, 15

*Touche Ross & Co. v. Redington*,
 442 U.S. 560 (1979).................................................................................................11

*TransAmerica Mort. Adv., Inc. v. Lewis*,
 444 U.S. 11 (1979)...................................................................................................12

## Rules / Statutes

15 U.S.C. § 18(a) ........................................................................................................16, 17

15 U.S.C. § 18(c)(9) ...........................................................................................................17

15 U.S.C. § 78r(a) ...............................................................................................................8

Fed. R. Civ. P. 9(b) .........................................................................................................6, 7

Fed. R. Civ. P. 12(b)(6) .......................................................................................................3

Defendants Elon Musk ("Musk") and the Elon Musk Revocable Trust Dated July 22, 2003 (the "Trust," and with Musk, "Defendants") respectfully submit this Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure ("FRCP") 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"):

## PRELIMINARY STATEMENT

Plaintiff tries to harness the spectacle around Musk, his Twitter acquisition, and prior, unrelated public statements to obscure the straightforward fact that Plaintiff's causes of action have no legal basis.

Plaintiff's keystone claim is that Musk failed to make timely disclosure, under Section 13(d) of the Securities Exchange Act of 1934 (the "1934 Act"), of his acquisition of more than 5% of Twitter's outstanding shares and his supposed intentions around controlling that company. There is, however, no private right of action for damages under Section 13(d) itself, and Plaintiff has not cited a single case awarding damages for a breach of Section 13(d) pursuant to Section 10(b) or Rule 10b-5. Plaintiff must, in fact, look to Section 18(a) of the 1934 Act, which provides the exclusive, private damages remedy for breaches of Section 13(d). *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989) ("One complaining of a false or misleading statement in a Schedule 13D may seek damages only under Section 18(a) of the Act.") (end citation omitted); *see also Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002) ("[T]here is no private damages remedy for issuers under § 13(d).").

Plaintiff's failure to assert a cause of action under Section 18(a) is not an oversight. That provision requires a plaintiff to plead *actual* reliance on alleged misstatements or omissions within documents filed with the Securities and Exchange Commission ("SEC"). In other words, each member of Plaintiff's putative class—allegedly "so numerous that joinder of all members is

impracticable," Compl. ¶ 138—would have to allege the circumstances under which that member specifically and directly relied on the omissions alleged here.

For the foregoing reasons alone, as well as the following, Plaintiff's Complaint should be dismissed with prejudice:

*First*, as discussed above, the Second Circuit has made clear that Plaintiff cannot recover for a breach of Section 13(d) by seeking damages under Section 10(b) or Rule 10b-5. Rather, Plaintiff can seek damages, if at all, under Section 18(a) of the 1934 Act. Plaintiff has not asserted such a claim, however, because Section 18(a) requires a plaintiff to plead and prove *direct* reliance, on an individual basis, which is effectively impossible for a putative class of investors.

*Second*, Plaintiff cannot plead that Defendants engaged in insider trading of Twitter stock under Section 20(A) of the 1934 Act. The only purported material non-public information ("MNPI") Musk allegedly possessed "concern[ed] his ownership of Twitter common stock and intentions for Twitter." Compl. ¶ 153. Insider trading claims, however, arise only where (i) a company insider, such as an officer or director, trades company stock while possessing MNPI in violation of a duty to the company; or (ii) a non-insider misappropriates information in breach of a duty to the source of the information. *See, e.g.*, *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 176 (S.D.N.Y. 2021); *SEC v. AT&T, Inc.*, 2022 WL 4110466, at *36 (S.D.N.Y. Sept. 8, 2022). Plaintiff does not even try to plead that Musk was a Twitter insider, fails to identify MNPI about Twitter he supposedly possessed, and cannot plead that he breached a duty to the source of the information—which sources was himself.

*Third*, Plaintiff's allegations negate any potential inference of scienter. The inference Plaintiff seeks—that Musk deliberately, and with intent to mislead, failed to make timely disclosure of his acquisition of 5% of Twitter stock or his purported intentions around control—is

not remotely cogent or compelling.  Plaintiff alleges that Musk's practice—on at least 20 previous occasions—was to make timely 13(d) disclosures, and that he was, at the time, CEO of at least three major companies, including Tesla and Space-X, such that this single failure compels an inference of inadvertence on the part of Musk or his organization.  And Plaintiff fails to plead a cogent reason for embarking upon a scheme to conceal the acquisition of Twitter shares beginning on March 25, 2022, only to *disclose* that purported scheme 10 days later, on April 4, 2022. Although Plaintiff provides a laundry list of purported scienter allegations, none of them is sufficient to overcome that the far more compelling inference, based on Plaintiff's own allegations, is non-fraudulent inadvertence.

*Finally*, Plaintiff's loss causation assertions rely necessarily on rank speculation that in a counterfactual, hypothetical world in which Musk disclosed his acquisition of Twitter stock at a different, earlier time, the stock would have experienced the same rise it allegedly experienced in response to his ultimate disclosure (or would have risen at all).  Plaintiff's speculation is insufficient to meet even the basic plausibility burden under FRCP 12(b)(6).

For the foregoing reasons, the Complaint should be dismissed with prejudice.

## BACKGROUND[1]

### A.    Parties

Defendant Elon Musk is a well-known investor and Chief Executive Officer of multiple companies, including Twitter and Tesla, and is "also the CEO and founder of several other technology companies, including Space-X, and the Boring Company."  Compl. ¶ 23.

The Defendant Trust is a revocable trust of which Musk is the sole trustee.  *Id.* ¶ 25.

---

[1] Solely for purposes of this Motion to Dismiss, and without waiver of any rights or arguments, Defendants accept as true well-pleaded allegations in the Complaint.  *See Barrios v. Bello*, 2021 WL 1630594, at *2 (S.D.N.Y. Apr. 27, 2021) (noting well-pleaded allegations accepted as true for purposes of a motion to dismiss).

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund that allegedly manages nearly $4 billion in assets. *Id.* ¶ 22. Lead Plaintiff represents a putative class that claims to have been damaged by selling shares of Twitter during the Class Period. *Id.* Neither Lead Plaintiff, nor the putative class, claims to have suffered out-of-pocket losses, but instead claims that, in a hypothetical world in which Musk disclosed his ownership of Twitter shares at some point between March 14 and March 24, 2022, Lead Plaintiff and the putative class would have sold Twitter shares at some point between March 25, 2022 and April 4, 2022 for *more* than they actually did.

**B.     Plaintiff's Key Allegations Concerning Musk's Twitter Purchases**

**1.     Musk's Twitter Purchases**

The Complaint's central assertion is that Musk failed timely to disclose, by filing a Schedule 13D, that he had acquired 5% or more of Twitter's outstanding common shares, as required under Section 13(d) of the 1934 Act and SEC Rule 13d-1(a) promulgated thereunder. *See, e.g.*, *id.* ¶¶ 2, 4. Notably, Plaintiff highlights that Musk had previously complied with the requirements of Section 13(d) on at least 20 different occasions over the prior decade, and had even advised others accurately about the reporting requirements. Compl. ¶¶ 57-59.

Although Plaintiff emphasizes Musk's Class Period purchases, they are only part of a longer string of acquisitions dating back to January 31, 2022. *See id.* ¶ 63. As pleaded, between January 31, 2022 and March 24, 2022—before the Class Period begins—Musk acquired more than 59 million shares. His purchases allegedly included various single-day acquisitions larger than those he made during the Class Period, including several that were well above 2 million shares, a purchase of 3.6 million shares on February 3, and a purchase of 4.8 million shares on February 7. Indeed, the 4.8 million-share purchase was the single largest alleged purchase. *See id.* ¶¶ 63, 82. Notably, during the Class Period Musk made just five of his 42 alleged purchases, specifically

4

between March 25, 2022 and April 1, 2022.  *See id.*

Plaintiff further alleges that on March 14, 2022, Musk's Twitter holdings crossed the 5% threshold, after which he had until March 24, 2022 to disclose his holdings pursuant to Section 13(d).  The Class Period therefore is alleged to run from March 25, 2022 to April 4, 2022—respectively the first day Plaintiff alleges Musk was required to disclose his interest in Twitter and the day Plaintiff alleges Musk made that disclosure.

### 2.      Musk's Twitter-Related Discussions and Messages

Plaintiff includes various allegations about Musk's messages and discussions before and during the Class Period, none of which indicates, as discussed below, that he had formed an intent as to his course of action concerning Twitter.  For instance, Plaintiff alleges that Musk issued Tweets about Twitter's current operations, including asking if a "*new* platform is needed" and that he was considering "building a *new* social media platform."  *Id.* ¶¶ 73-75 (emphasis added). Plaintiff alleges that Musk sent an instant message to his ex-wife—who Plaintiff nowhere alleges had any involvement in the alleged transactions or related companies—that he could "[m]aybe buy" Twitter.  *Id.* ¶ 67.  Plaintiff points to discussions between Musk and Twitter executives in which Musk offers to "help," and that he generally supports changes to Twitter, as well as non-committal communications about "potentially" joining the board and that he was "considering various options."  *Id.* ¶¶ 78-80.  On April 3, 2022, Plaintiff claims Twitter invited Musk to join its board, though Plaintiff alleges that Musk responded by noting that "important paperwork" was not yet complete that would "allow for me to hopefully join" Twitter's board.  *Id.* ¶ 84.  On April 4, 2022, Musk allegedly agreed to join Twitter's board, and on April 5, 2022 (after the Class Period) Twitter publicly announced that Musk had joined.  *Id.* ¶¶ 84, 93.

### 3.      Plaintiff's Causes of Action

Plaintiff asserts causes of action arising from the foregoing under Section 10(b) of the 1934

Act and Rule 10b-5.  Plaintiff also asserts a cause of action under Section 20(A) of the 1934 Act, claiming Musk traded Twitter stock while in possession of MNPI about his own "ownership of Twitter common stock and intentions for Twitter." *Id.* ¶ 153.  And Plaintiff alleges that Musk is a control person of the Trust under Section 20(a).

## LEGAL STANDARD

To avoid dismissal, a complaint "must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Barrios*, 2021 WL 1630594, at *2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "However, the Court need not credit '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *2 (S.D.N.Y. Mar. 31, 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As discussed above and herein, Plaintiff may not resort to Section 10(b) and Rule 10b-5 to seek damages for alleged breaches of Section 13(d).  *Kamerman*, 891 F.2d at 430; *Hallwood*, 286 F.3d at 620.  Regardless, claims under Section 10(b) and Rule 10b-5 require, *inter alia*, "a material misrepresentation or omission," "scienter," and "loss causation."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 630 (S.D.N.Y. 2017) (citation omitted).  Further, this cause of action "is subject to the heightened pleading requirements of [FRCP 9(b)] and the [PSLRA]."  *Shanda Games*, 2022 WL 992794, at *2.  "FRCP 9(b) requires that the complaint 'state with particularity the circumstances constituting fraud or mistake,'" *id.* (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015)), while the PSLRA "holds private securities plaintiffs to an even more stringent pleading standard" for asserting misrepresentations or omissions that requires plaintiff to "'(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id.*

(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). Indeed, "[t]o determine that an inference of scienter is strong, the court must decide whether 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 324).

Insider trading claims under Section 20(A) are likewise subject to FRCP 9(b) and the PSLRA. *See In re Aegean*, 529 F. Supp. 3d at 175. "In order to state a claim under Section [20(A)], plaintiffs must: (1) plead a predicate insider trading violation of the Exchange Act and (2) allege sufficient facts showing 'that the defendant traded the security at issue contemporaneously with the plaintiff.'" *Shanda Games*, 2022 WL 992794, at *7 (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008)).

Plaintiff fails to satisfy the pleading requirements for their asserted causes of action.

## ARGUMENT

## I.  PLAINTIFF'S CAUSE OF ACTION UNDER SECTION 10(b) FAILS

### A.  Plaintiff Has No Cause of Action for Damages Under Section 10(b) Arising from Section 13(d)

Plaintiff effectively alleges a single omission: Musk's failure timely to file a Schedule 13D disclosing his Twitter stake pursuant to Section 13(d) of the 1934 Act and Rule 13d-1(a). Plaintiff claims that this alleged omission is also a breach of Section 10(b) and Rule 10b-5 that entitles the putative class to damages equivalent to the difference between the transaction price of Twitter shares sold during the Class Period, and the allegedly greater price for which those shares *would* have sold during the Class Period had Musk filed a Schedule 13D at some point between March 14 and March 24, 2022.

Plaintiff's cause of action fails because Plaintiff cannot seek damages under Section 10(b) or Rule 10b-5 for a breach of Section 13(d). To start, it is well-settled that "there is no private

damages remedy for issuers under § 13(d)." *Hallwood*, 286 F.3d at 620.  "[N]or is there a private

damages remedy for shareholders under that provision." *Starr Int'l Co. v. AIG, Inc.*, 648 F. Supp.

2d 546, 573-74 (S.D.N.Y. 2009) (end citation omitted); *see also Sanders v. Thrall Car Manu. Co.*,

582 F. Supp. 945, 961 (S.D.N.Y. 1983) ("To the extent that plaintiff suggests that a private remedy

for damages is implicit in the recognition of a private right of action for injunctive relief, the cases

that have addressed that question in the context of § 13(d) are to the contrary."), *aff'd*, 730 F.2d

910 (2d Cir. 1984).  Each other Circuit to address this point has reached the same conclusion.  *See*

*Dreiling v. Am. Online Inc.*, 578 F.3d 995, 1003 (9th Cir. 2009) ("We note that Sections 16(b) and

13(d) were not devised to provide private litigants with another means of litigating securities

fraud."); *Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008) ("[T]here is no private cause

of action for money damages under Section 13(d)."); *Liberty Nat'l Ins. Holding Co. v. Charter*

*Co.*, 734 F.2d 545, 564 n.41 (11th Cir. 1984) ("[T]he Exchange Act provides for private rights of

action expressly in several other places . . . [w]e may infer from this that when it chose to do so,

Congress knew how to create explicitly a private right of action on behalf of the issuer.").

Rather, a plaintiff seeking damages for a breach of Section 13(d) must resort, if at all, to

Section 18(a) of the 1934 Act.  Section 18(a) provides an express remedy for alleged misstatements

or omissions within documents filed publicly with the SEC:

> Any person who shall make or cause to be made any statement in any application,
> report, or document filed pursuant to this chapter or any rule or regulation
> thereunder . . . which statement was at the time and in the light of the circumstances
> under which it was made false or misleading with respect to any material fact, shall
> be liable to any person . . . who, in reliance upon such statement, shall have
> purchased or sold a security at a price which was affected by such statement . . . .

15 U.S.C. § 78r(a).

The Second Circuit has expressly endorsed that Section 18(a) is the exclusive private

damages remedy for breaches of Section 13(d), explaining that "[o]ne complaining of a false or

8

misleading statement in a Schedule 13D may seek damages only under Section 18(a) of the Act." *Kamerman*, 891 F.2d at 430; *see also Hallwood*, 286 F.3d at 619 ("[C]ourts have found significant the existence of an express remedy under § 18(a) of the Williams Act." 286 F.3d at 619.  And recently, in *Takata v. Riot Blockchain, Inc.*, 2022 WL 1058389 (D.N.J. Apr. 8., 2022), after expressly requesting briefing on this issue, the District of New Jersey thoroughly reviewed applicable caselaw and reached the conclusion that a "Section 13(d) violation may not give rise to a private right of action for damages under Section 10(b)." *Id.* at *10; *see also id.* ("The trend in Section 13(d) cases indicates a strong reluctance of, if not an absolute bar to, allowing suits for damages, both under 10(b) and 18(a).").

Numerous other courts have likewise concluded that Section 18(a) provides the exclusive damages remedy for breaches of Section 13 of the 1934 Act.  *See Motient*, 529 F.3d at 536 ("Section 18(a) provides the sole basis for a private right of action for damages resulting from a violation of Section 13(d)."); *Rhyne v. Omni Energy Svc. Corp.*, 2009 WL 1844474, at * 9 (W.D. La. June 23, 2009) ("Plaintiffs have made no claim under Section 18(a), and their claims for damages under Section 13(d) must be dismissed."); *Issen v. GSC Enter., Inc.*, 508 F. Supp. 1278, 1295 (N.D. Ill. 1981) ("[A]lthough a private right to injunctive relief may exist by implication in favor of injured individual investors under section 13(d) . . . it is clear that section 18(a) of the [1934 Act] . . . provides the sole basis for a private right of action for damages resulting from a violation of section 13(d).").

Other courts have concluded that Section 18(a) provides the exclusive damages remedy for Section 13(a) of the 1934 Act, a provision similar to Section 13(d) that also requires certain filings and disclosures.  *See In re Penn Cent. Sec. Litig. M.D.L. Docket No. 56*, 494 F.2d 528, 540 (3d Cir. 1974) ("We have not been cited, nor have we found, any appellate decisions concerning

the possible existence of a private right of action under 13(a).  We believe the district court correctly held that § 18(a) is the exclusive remedy for alleged violations of § 13(a).”); *Srebnik v. Dean*, 2006 WL 2790408, at *3 (D. Colo. Sept. 26, 2006) (endorsing the view that “a plaintiff’s sole remedy for violations of § 13(a) is § 18(a) of the Exchange Act, which provides a right of action for individuals who have purchased or sold securities in reliance on false or misleading information contained in § 13(a) reports.”

Plaintiff’s failure to rectify this deficiency by simply asserting a cause of action under Section 18(a) is not an oversight.  It is well-settled that “[u]nlike Section 10(b)’s relaxed standard for pleading reliance . . . Section 18 requires that plaintiffs allege actual reliance on specific statements in covered Exchange Act filings.” *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 440 (S.D.N.Y. 2014) (internal quotation omitted); *see also Berman v. Richford Indus., Inc.*, 26 Fed. R. Serv. 2d 10 (S.D.N.Y. 1978) (“Section 18(a) has been construed as requiring direct or ‘eyeball’ reliance, which means that plaintiff must aver that he personally reviewed and was induced to act upon specific misrepresentations contained in documents filed with the SEC.”) (end citations omitted).  By contrast, Plaintiff alleges only that it is entitled to “presumption[s] of reliance.” *See* Compl. ¶¶ 133-136.  Absent these presumptions, Plaintiff would have to plead that each individual class member relied specifically on the alleged omissions here, and address each individual’s trading in a hypothetical world where Musk disclosed his Twitter position between March 14 and March 24, 2022, but each individual sold *during* the Class Period.  This is all but impossible for a putative class who allegedly are “so numerous that joinder of all members is impracticable.” *Id.* ¶ 138. Plaintiff should not be permitted to create a right to damages where none exists in order to assert

claims that are not appropriate for class treatment.[2]

**B.      This Court Should Not Broaden the Remedy for Alleged Breaches of 13(d)**

This Court should decline the invitation to expand the damages remedies available under Section 13(d) by permitting recovery pursuant to Section 10(b) and Rule 10b-5. *Hallwood* noted not only the "absence of legislative intent to imply a right of action under § 13(d)," but also that "courts have found significant the existence of an express remedy under § 18(a) of the Williams Act." 286 F.3d at 619 (quotation omitted). *Takata* affirmed this view, explaining that a "private[] plaintiff's right to damages for a failure to disclose is not apparent in the legislative purpose," and also that courts are "'extremely reluctant to imply a cause of action . . . that is significantly broader than the remedy Congress chose to provide.'" *Id.* at *9-10 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 574 (1979)).

These conclusions are consistent with, among others', the Supreme Court's restrictive approach to deriving private remedies where none are expressly provided. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). Indeed, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right ***but also a private remedy***." *Id.* at 286 (emphasis added). Absent such intent, "a cause of

---

[2] Based upon Plaintiff's letter dated December 21, 2022 (ECF No. 37), the Opposition might raise authorities that Plaintiff claims establish a private right of action for damages under Section 10(b) arising from breaches of Section 13(d). *See, e.g.*, *Gruber v. Gilbertson*, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018); *Puddu v. 6D Glob. Techs. Inc.*, 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021); *Seagoing Uniform Corp. v Texaco, Inc.*, 705 F. Supp. 918 (1989). But neither *Gruber* nor *Puddu* addresses Section 18(a), *Hallwood*, or *Kamerman*, and *Seagoing* predates the Second Circuit's *Kamerman* opinion by nearly a year. Should Plaintiff rely on this or other authority from the letter, Defendants will address it at the appropriate time.

action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286-87.

As addressed in *Hallwood* and *Takata*, the legislative intent to provide an expansive, private remedy under Section 10(b) is absent here. Among other things, Section 13(d)—which, as alleged, is merely a reporting provision—lacks "'rights-creating' language," *Sandoval*, 532 U.S. at 288, and it is well-settled that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons." *Id.* at 289 (quoting *State of California v. Sierra Club,* 451 U.S. 287, 294 (1981)).

Further, the "express provision of one method of enforcing a substantive Rule"—here, Section 18(a), as provided by the 1934 Act as a damages remedy for Section 13(d)—suggests that Congress intended to preclude others." *Id.* at 289; *see also TransAmerica Mort. Adv., Inc. v. Lewis*, 444 U.S. 11, 21 (1979) (noting Section 18(a) as an example where "Congress provided an express damages remedy for misrepresentations," and rejecting such a remedy for Section 206 of the Investment Advisors Act of 1940, because Congress "enacted no analogous provisions" for that section); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008) (recognizing that Congress' endorsement of aiding and abetting liability in some areas, but not for private actions under Section 10(b), weighs against recognizing such liability, and noting that "the § 10(b) private right should not be extended beyond its present boundaries.").[3] The Court should not go out of its way to expand the remedy already available for breaches of Section 13(d).

---

[3] *Cf. Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1270 (10th Cir. 2004) ("Congress's creation of specific means of enforcing the statute indicates that it did not intend to allow an additional remedy—a private right of action—that it did not expressly mention at all."); *see also, e.g.*, *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 121 (2005) ("[T]he existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not.").

The absence of a private right of action for damages under Section 10(b) for breaches of Section 13(d) disposes of Plaintiff's claims (including those under Section 20(a)).  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (failure to plead a cause of action under Section 10(b) requires dismissal of claims under Section 20(a)).

### C.   Plaintiff Fails to Plead That Musk Formed Any Intent to Control or Acquire Twitter During the Class Period

Plaintiff claims that, under Section 13(d), Musk was required to disclose his intent to "change or influence the control of the Company" no later than March 14, 2022, and that his failure to make that disclosure likewise breached his reporting obligations under Section 13(d).  *See, e.g.*, Compl. ¶ 77.  It is well-established, however, that "[u]nder the [1934 Act], until a course of action is definite, it need not be disclosed as a 'plan' or 'proposal' under 13D."  *TCS Cap. Mgmt., LLC v. Apax Partners, L.P.*, 2008 WL 650385, at *21 (S.D.N.Y. Mar. 7, 2008).

Plaintiff fails to plead that Musk had a "definite" "course of action" regarding any control or acquisition of Twitter until at least the end of the Class Period.  Plaintiff's allegations amount to, at best, that Musk had inconclusive ideas about how to proceed, if at all.  Musk's messages and discussions at this time, as alleged in the Complaint, included references to a "building a ***new*** social media platform" and a "***rival*** social media platform to Twitter," *id.* ¶¶ 74-75, 77 (emphasis added)—which strongly suggests a lack of intent to purchase or control Twitter.  Plaintiff also reports a text message that Musk would "[m]aybe buy" Twitter, *id.* ¶ 67, his offer to "help" at Twitter, *id.* ¶ 77, and general assertions that Twitter should undergo unspecified change.  *See id.* ¶¶ 73-77.  Musk also allegedly discussed "potentially" joining Twitter's board and that he was

13

"considering various options." *Id.* ¶¶ 78-80.[4]  None of these assertions comes close to pleading that Musk had a definite course of action or goal.

Plaintiff likewise alleges that Musk's communications with Twitter about the company's board did not come to fruition until the Class Period concluded.  Indeed, Plaintiff cites Twitter's Schedule 14A, filed May 17, 2022, as indicating that even during the Class Period Musk was "'giving serious thought'" to creating the *rival* platform noted above, and otherwise addresses Musk's non-committal discussion about "help[ing]," while still also discussing "doing something *new*." *See id.* ¶ 77 (emphasis added).  It was not until April 3, 2022—the day before the end of the Class Period—that Plaintiff alleges Twitter even invited Musk to join its board.  *Id.* ¶ 83. Plaintiff pleads that Musk responded not by accepting, but by noting that "important paperwork" was not yet complete that would "allow for me to hopefully join" Twitter's board.  *Id.*; *Cf. TCS*, 2008 WL 650385, at *21 ("Prior to signing the purchase and sale agreement, Telecom Italia could have withdrawn from the negotiations for any reason, so there was nothing definitive to disclose."). Finally, on April 4, 2022—the last day of the Class Period—Musk allegedly agreed to join Twitter's board, which Twitter disclosed the following day.  *Id.* ¶¶ 84, 93-94.  Plaintiff thus fails to plead that Musk had definite plans in connection with his investment until, at the earliest, the end of the Class Period.  And the foregoing scattered notions plainly fail to plead that Musk had formed the intent or a plan to *acquire* Twitter by this time.  Indeed, the Complaint alleges indecision as to the acquisition even *after* it was underway.  *Id.* ¶¶ 101-112.

---

[4] Plaintiff also claims that a "nonpublic document" cited in a different complaint (but not in this one) indicated that "Musk internally determined" that he wanted to purchase Twitter. Compl. ¶ 81.  Plaintiff fails to allege the nature or, critically, the *date* of the document, the meaning of "internally determined," or any other particularized facts that could support Plaintiff's allegations around Musk's intent.

Plaintiff's Section 10(b) claim thus fails for the additional reason that Plaintiff fails to plead the need to disclose, in a Schedule 13D, a definitive course of action or intent to exert control over Twitter, much less to buy it outright, until after the Class Period.

### D.   Plaintiff Fails to Plead That Musk Acted With Scienter

"A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  As alleged, however, the Complaint suggests that inadvertence, oversight, or other non-culpable explanation is the far more compelling inference for the failure timely to disclose Musk's stake in Twitter.  None of Plaintiff's enumerated, makeweight, and contradictory assertions support the compelling inference necessary to plead this requisite element under Section 10(b) and Rule 10b-5.

To start, and as addressed above, Plaintiff's assertion that Musk successfully complied with Section 13(d) on 20 separate, prior occasions, his familiarity with Section 13(d) reporting requirements, and even his advice that *others* would have to follow those same requirements, call for the inference that any failure was an aberration and unintentional.  *See* Compl. ¶¶ 57-59; 114-115.  Supporting this inference are Plaintiff's allegations that Musk is "famous for owning and controlling several high value tech companies," and is currently CEO of Tesla, Space-X, *and* The Boring Company.  *Id.* ¶¶ 2, 23.  The Complaint itself therefore strongly suggests that Musk is one of the busiest people on the planet, and further that disclosure and filing requirements are in any case delegated, and that therefore any failure was unintentional.  Plaintiff also pleads no confidential witnesses, internal communications, or any other sources that support with particularity their claims concerning Musk's intent.  In fact, Plaintiff pleads expressly that a law firm—not Musk—filed the Schedule 13D about Twitter on April 5, 2022 that Plaintiff claims should have been filed earlier, which supports that such tasks are delegated.  *Id.* ¶ 95.

Second, Plaintiff contorts the April 4, 2022 filing of a Schedule 13G into supposed evidence that Musk "knowingly engaged in a cover-up." *Id.* ¶ 116. Plaintiff claims the purported cover-up is "evidenced by his omission of the requisite certification on the Schedule 13G," which certification would have provided that Musk had not "acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer." *Id.* ¶¶ 116, 128. Plaintiff claims that Musk "affirmatively (and falsely) indicated" on the Schedule 13G "that the certification was 'Not Applicable.'" *Id.* ¶ 116. In other words, Plaintiff pleads that the April 4, 2022 13G filing *omitted*, as inapplicable, language that Plaintiff alleges would have been untrue. *See* Compl. ¶ 14. The Complaint therefore fails to plead the 13G was misleading at all, much less intentionally.

Plaintiff also claims that Musk acknowledged, within the Schedule 13G, that the "Date of Event" was March 14, 2022, which somehow demonstrates that he "willfully chose to belatedly disclose his own interest." *Id.* ¶ 117. At best, this disclosure indicates that whoever prepared the Schedule 13G was aware, *as of April 4, 2022*, that Musk's Twitter holdings had crossed the 5% threshold on that date. Further, Musk's quick, public acknowledgment of the "date of event" is contrary to an inference that any failure to file the Schedule 13D was deliberate or omitted with fraudulent intent. *See, e.g.*, *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) ("It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures."), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013). Similarly, and contrary to the inference that Plaintiff demands, Musk's alleged discussions with a *Twitter director*, prior to the Class Period, in which Musk purportedly freely acknowledged that his Twitter stake had exceeded 5%, likewise indicates that the most compelling inference is that any failure to disclose was inadvertent. *See* Compl. ¶ 118.

Fourth, Plaintiff's allegations concerning reporting requirements under the Hart-Scott-Rodino Act ("HSR"), and specifically 15 U.S.C. § 18(a), do not support scienter. Even if such reporting were required, Plaintiff fails to plead that Musk was aware of the requirement (which is necessary, though far from sufficient, to plead intent). Plaintiff claims instead that Musk "disregarded" this alleged requirement "because it would have delayed his Twitter stock buying spree," Compl. ¶ 119, which assertion does nothing more than assume the purported cover-up that Plaintiff is trying to prove. Regardless, 15 U.S.C. § 18(a) *exempts* from its reporting provisions "acquisitions, solely for the purpose of investment, of voting securities, if, as a result of such acquisition, the securities acquired or held do not exceed 10 per centum of the outstanding voting securities of the issuer." 15 U.S.C. § 18(c)(9). Plaintiff alleges that Musk's stake remained below 10% during the Class Period, and, as discussed above, Plaintiff fails to plead that Musk had determined to acquire Twitter shares for purposes other than investment during the Class Period.

Fifth, Plaintiff fails to plead that Musk's discussions with Twitter demonstrate that he was "purchasing Twitter securities for the purpose of or with the effect of changing or influencing the control of Twitter." Compl. ¶ 120. As discussed above, the alleged communications indicate, at most, that Musk had come to no conclusions concerning his investment or his next steps.

Sixth, Plaintiff's allegations concerning Musk's supposed "disregard and disdain for SEC regulations" are contradictory (and irrelevant). *See* Compl. ¶ 121. Plaintiff bloats the Complaint with unrelated allegations concerning Tesla, and other communications with, or public statements about, the SEC to establish Musk's purported "contempt," which supposedly bolsters Plaintiff's scienter allegations. Compl. ¶¶ 27-39. Yet Plaintiff claims that Musk's previous *compliance*, on 20 occasions over the prior decade, with reporting requirements under Section 13(d) and SEC Rule 13d-1(a), is *also* evidence of scienter. *Id.* ¶¶ 57-59. Plaintiff's confused allegations—that Musk

simultaneously disregarded and fastidiously observed SEC regulations—are incoherent and should be disregarded as implausible.  "[A] court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss."  *Pierce v. Fordham Univ., Inc.*, 2016 WL 3093994, at *2 n.1 (S.D.N.Y. June 1, 2016) (internal quotations omitted), *aff'd*, 692 F. App'x 644 (2d Cir. 2017).

Seventh, Plaintiff alleges that Musk's "volley of high-volume and high-cost purchases requires great intentionality and coordination" and therefore he "plainly knew how much Twitter stock he owned—and when."  Compl. ¶ 122.  But this allegation lacks any particularity as to Musk's mechanisms and organization for purchasing Twitter shares—including how the orders were entered, when the instructions to purchase were issued and even by whom, as well as who executed the trades and how.  Plaintiff essentially claims that it is complicated to purchase a lot of stock in a short period of time—which does not begin to allege what Musk knew or when, much less that any failure to make disclosures under 13(d) was deliberate.  Indeed, if anything, Plaintiff's acknowledgement that the process is complicated and difficult, combined with the allegations that Musk had been undertaking this process since January, only adds to the plausibility of the inference that the alleged failure to timely disclose his Twitter stake was inadvertent.

Finally, Plaintiff's allegation that Musk wanted to save cash is insufficient to plead motive. To start, Plaintiff concedes that Musk "did not know with precision exactly how much money he was saving."  *Id.* ¶ 125.  Indeed, his alleged savings—or any savings at all—can be known only through hindsight, which is insufficient to plead scienter or fraud.  *See, e.g., In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) (rejecting inference that defendant knew of strategy change and its impact on company financials prior to an IPO where the change occurred shortly thereafter); *Medina v. Tremor Video, Inc.*, 2015 WL 1000011, at *2-

3 (S.D.N.Y. Mar. 5, 2015) ("[K]nowledge on day-120 does not mean Defendants[] 'knew' or 'must have known' on day-1."). Plaintiff also fails to plead that Musk himself considered or made any predictions, or had any knowledge, of the direction Twitter stock would move if his stake were disclosed in a counterfactual world at some point during the 10-day period between March 14, and March 24, 2022. Nor does Plaintiff anywhere allege Musk's actual cash on hand or that he was unable to generate additional cash through his vast equity holdings or credit. *See* Compl. ¶ 123. Plaintiff's speculation and hindsight allegations that Musk simply wanted to save money is insufficient to plead motive or scienter with the necessary particularity.

## II. PLAINTIFF CANNOT PLEAD THAT MUSK ENGAGED IN INSIDER TRADING UNDER SECTION 20(A)

A Section 20(A) claim requires (i) a "predicate insider trading violation" under the 1934 Act and (ii) that plaintiffs and defendant traded "contemporaneously." *Shanda Games*, 2022 WL 992794, at *7 (quotation omitted). The predicate act must consist of "unlawful trading in securities based on" MNPI. *In re Aegean*, 529 F. Supp. 3d at 175 (quotation omitted). Further, Plaintiff can assert insider trading only under one of two theories. Under the "classical theory," a "corporate insider is prohibited from trading shares of that corporation based on [MNPI] in violation of the duty of trust and confidence insiders owe to shareholders." *Id.* at 176. And according to the "misappropriation theory," a "corporate outsider breaches a duty of trust owed to the source of confidential information by trading on that information." *SEC v. AT&T, Inc.*, 2022 WL 4110466, at *36 n.53 (S.D.N.Y. Sept. 8, 2022); *see also U.S. v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

Plaintiff fails to plead that Musk engaged in insider trading under either theory. Plaintiff nowhere even tries to allege that Musk was an insider at Twitter during the Class Period. In fact, Plaintiff's allegations contrast Musk's position with that of actual insiders. *See, e.g.*, Compl. ¶ 10 ("Musk held a series of private meetings during the Class Period with Parag Agrawal (Twitter's

then-CEO) and other Company insiders like Jack Dorsey (Twitter's founder and then-director) and Bret Taylor (then-Chair of Twitter's Board).") (emphasis added); *id.* ¶ 116 ("Musk had already engaged in numerous discussions and meetings with senior Twitter leadership and other insiders"); *see also S.E.C. v. Yin*, 2018 WL 1582649, at *2 (S.D.N.Y. Mar. 27, 2018) ("The classical theory covers corporate insiders who trade using material non-public information about the company, in violation of the duty of trust and confidence owed to the company's shareholders.")  And Plaintiff does not, and cannot, assert under the "misappropriation theory" that Musk breached a duty to the source of his information, given the source was Musk himself.  *See id.* ("The misappropriation theory . . . includes outsiders who misappropriate confidential information, for trading purposes, in breach of a duty to the source of the information.").

Plaintiff therefore fails to state a cause of action under Section 20(A) for insider trading.

## III.   PLAINTIFF'S LOSS CAUSATION ALLEGATIONS ARE PURE SPECULATION

Plaintiff's allegations concerning loss causation are pure speculation.  Typically, to plead loss causation, Plaintiff must allege disclosures that "corrected a prior falsehood" and "precipitated a change" in the stock price.  *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (citation omitted); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (plaintiff must plead "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").

Under limited circumstances, a plaintiff can plead loss causation by claiming that shareholders who sold their shares were deprived of the opportunity to sell them for more.  Here, however, Plaintiff's claims are purely speculative and therefore insufficient even under basic plausibility pleading standards.  *See Barrios*, 2021 WL 1630594, at *2 (quoting *Iqbal*, 556 U.S. at 678).  Specifically, Plaintiff claims that the release of different news in a counterfactual world— *i.e.* Musk's disclosure of his acquisition of Twitter shares at some point between March 14, 2022

and March 24, 2022—would have caused the stock price to rise, and would have enabled investors who sold *during the Class Period* to sell their shares for more.  This hypothesis is insufficient to plead the element of loss causation.  *See In re AIG Advisor Grp.*, 2007 WL 1213395, at *10 (E.D.N.Y. Apr. 25, 2007) ("[P]laintiffs' hypothesis that they would have gotten a better deal on a different investment is too speculative to support a pleading of loss causation.").

The timing around these allegations renders Plaintiff's theories particularly speculative. Plaintiff alleges that Musk was obligated to disclose his stake in Twitter at some point between March 14, 2022 and March 24, 2022—the 10-day period following his alleged acquisition of 5% or more of Twitter's stock.  According to Plaintiff's allegations, however, had Musk disclosed his stake and purportedly driven up the price on, for instance, March 14, 2022—11 days before the start of the Class Period—investors would have taken advantage of the increase to sell Twitter shares.  But Plaintiff offers no allegations whatsoever as to how *class members—i.e.* investors who sold Twitter shares at artificially low prices *between March 25, 2022 and April 4, 2022*—would have traded Twitter shares during that same time period under the hypothetical scenario that Plaintiffs posit, nor what their price would have been, nor how any subsequent disclosures of additional Twitter purchases would have affected the price.  In other words, Plaintiff cannot demonstrate that Musk's omissions proximately caused injury to class members.

## CONCLUSIONS

For the foregoing reasons, Defendants respectfully request an Order dismissing the Complaint, with prejudice.

DATED:  New York, New York                    Respectfully submitted,
        January 30, 2023

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP

*/s/ Alex Spiro*
Alex Spiro
Jacob J. Waldman
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
alexspiro@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Attorneys for Defendants*