**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC BAIN RASELLA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ELON R. MUSK and ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003,<br><br>Defendants. | No. 1:22-cv-03026-ALC-GWG<br><br>Honorable Andrew L. Carter, Jr. |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ............................................................................................1

II. SUMMARY OF RELEVANT FACTS ...........................................................................4

    A.  Background ........................................................................................................4

    B.  Musk Deceived Twitter Investors Who Sold During The Class Period .................5

III. ARGUMENT ...................................................................................................................7

    A.  Defendants Concede Key Elements Of This Action.................................................7

    B.  The Complaint States A Valid §10(b) Claim...........................................................8

        1.  The §10(b) Claim Is Well-Established And Defendants' Attacks
            Fail ............................................................................................................8

            (a)  Plaintiff's §10(b) Claim Follows Settled Law ................................8

            (b)  Defendants Misstate Plaintiff's §10(b) Claim And The Law ........10

        2.  The Complaint Alleges An Overwhelming Inference Of Scienter............13

            (a)  Musk Concealed His Over-5% Ownership Stake With
                Scienter ......................................................................................13

            (b)  Musk Concealed His Activist Interest In Twitter With
                Scienter ......................................................................................15

            (c)  Musk Had Motive To Omit Disclosure .........................................18

            (d)  Defendants' Cursory Scienter Challenges Are Meritless ..............19

                (i)  Musk's Excuses For His Ownership Omission Fail .............19

                (ii)  Musk's Excuse For His Activist Intent Omission Fails........21

         3.  The Complaint Adequately Pleads Loss Causation ...................................23

    C.  The Complaint States A Valid 20(a) Claim...........................................................24

    D.  The Complaint States A Valid 20A Claim .............................................................24

IV. CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*In re AIG Advisor Grp.*,
  2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ........................................................................24

*Azurite Corp. v. Amster & Co.*,
  52 F.3d 15 (2d Cir. 1995) ..................................................................................................9, 12

*Boswell v. Skywest Airlines, Inc.*,
  361 F.3d 1263 (10th Cir. 2004) ...............................................................................................13

*Burt v. Maasberg*,
  2014 WL 1291834 (D. Md. Mar. 28, 2014) ..............................................................................9

*Buxbaum v. Deutsche Bank A.G.*,
  2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000) .......................................................................18

*Chevron Corp. v. Pennzoil Co.*,
  974 F.2d 1156 (9th Cir. 1992) ................................................................................................16

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ....................................................................................14

*City of Rancho Palos Verdes, Cal. v. Abrams*,
  544 U.S. 113 (2005) ................................................................................................................13

*Dreiling v. Am. Online Inc.*,
  578 F.3d 995 (9th Cir. 2009) ..................................................................................................10

*E.ON AG v. Acciona, S.A.*,
  2007 WL 316874 (S.D.N.Y. Feb. 5, 2007) .............................................................................22

*In re EZCorp, Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016) ...............................................................................23, 24

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ....................................................................................18

*GAF Corp. v. Milstein*,
  453 F.2d 709 (2d Cir. 1971) .....................................................................................................8

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) ..............................................................................................13, 19

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ............................................................... *passim*

*Gruber v. Gilbertson*,
    2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019), *modified on unrelated grounds*,
    2021 WL 3524089 (S.D.N.Y. Aug. 10, 2021) ............................................................12

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    286 F.3d 613 (2d Cir. 2002) ..................................................................................10, 11

*Issen v. GSC Enters., Inc.*,
    508 F. Supp. 1278 (N.D. Ill. 1981) ...............................................................................10

*In re Ivan F. Boesky Sec. Litig.*,
    848 F. Supp. 1119 (S.D.N.Y. 1994) ................................................................................9

*Kamerman v. Steinberg*,
    891 F.2d 424 (2d Cir. 1989) .............................................................................9, 10, 11

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
    2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) ..............................................................14

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012) ......................................................................20, 21

*Levie v. Sears Roebuck & Co.*,
    2006 WL 756063 (N.D. Ill. Mar. 22, 2006) ..................................................................12

*Levie v. Sears, Roebuck & Co.*,
    496 F. Supp. 2d 944 (N.D. Ill. 2007) ............................................................................23

*Liberty Nat'l Ins. Holding Co. v. Charter Co.*,
    734 F.2d 545 (11th Cir. 1984) ..............................................................................10, 11

*Lou v. Belzberg*,
    728 F. Supp. 1010 (S.D.N.Y. 1990) ..............................................................................10

*In re MCI Worldcom, Inc. Sec. Litig.*,
    93 F. Supp. 2d 276 (E.D.N.Y. 2000) .............................................................................18

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245, 250 (2d Cir. 2014) ..................................................................................16

*Motient Corp. v. Dondero*,
    529 F.3d 532 (5th Cir. 2008) .........................................................................................10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..........................................................................................16

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ...................................................7, 8, 9, 11

*Puddu v. 6D Glob. Techs., Inc.*,
   742 F. App'x 553 (2d Cir. 2018) ................................................................. *passim*

*Puddu v. NYGG (Asia) Ltd.*,
   2022 WL 2304248 (S.D.N.Y. June 27, 2022), *reconsideration denied*, 2022
   WL 2789250 (S.D.N.Y. July 15, 2022) ................................................................12

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................................................15, 20

*Rhyne v. Omni Energy Servs. Corp.*,
   2009 WL 1844474 (W.D. La. June 23, 2009) ...............................................10, 11

*Rondeau v. Mosinee Paper Corp.*,
   422 U.S. 49 (1975) ................................................................................................8

*Rosen v. Brookhaven Cap. Mgmt. Co.*,
   113 F. Supp. 2d 615 (S.D.N.Y. 2000) ..................................................................23

*In re Rsrv. Fund Sec. & Derivative Litig.*,
   *732* F. Supp. 2d 310 (S.D.N.Y. 2010) ...............................................................20

*Rubin v. Posner*,
   701 F. Supp. 1041 (D. Del. 1988) .........................................................................9

*S.E.C. v. Lund*,
   570 F. Supp. 1397 (C.D. Cal. 1983) ...................................................................25

*Sanders v. Thrall Car Mfg. Co.*,
   582 F. Supp. 945 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984) ................10

*Schnell v. Schnall*,
   1981 WL 1618 (S.D.N.Y. Mar. 30, 1981) ..............................................................9

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ..................................................................................14

*Seagoing Unif. Corp. v. Texaco, Inc.*,
   705 F. Supp. 918 (S.D.N.Y. 1989) ...........................................................9, 11, 22

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021) ..................................................................................15

*Shih v. Petal Card, Inc.*,
   2020 WL 5659429 (S.D.N.Y. Sept. 23, 2020) ......................................................19

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................13, 15

iv

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ................................................................18

*Starr Int'l Co. v. Am. Int'l Grp., Inc.*,
    648 F. Supp. 2d 546 (S.D.N.Y. 2009) ................................................................10

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ...........................................................................................13

*Takata v. Riot Blockchain, Inc.*,
    2022 WL 1058389 (D.N.J. Apr. 8, 2022) ...........................................................12

*TCS Cap. Mgmt., LLC v. Apax Partners, L.P.*,
    2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ........................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .....................................................................................13, 19

*TransAmerica Mortg. Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979) .............................................................................................13

*U.S. v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2755 (2021) ...................4, 25

*U.S. v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ..............................................................................8

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ................................................................................9

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009), *aff'd sub nom.*, *Thesling v. Bioenvision,*
    *Inc.*, 374 F. App'x 141 (2d Cir. 2010) ...........................................................10, 11

**STATUTES AND REGULATIONS**

15 U.S.C. §78j(b) .................................................................................... *passim*

15 U.S.C. §78m .......................................................................................... *passim*

15 U.S.C. §78r ............................................................................................ *passim*

15 U.S.C. §78t-1 ...............................................................................................4

17 C.F.R. §240.10b5 ........................................................................................9

17 C.F.R. §240.13d-1 ..............................................................................15, 17

## CITATION CONVENTIONS

| Term | Definition |
|------|-----------|
| Class | Investors who sold the securities of Twitter, Inc. during the Class Period excluding Defendant Musk; affiliates and members of the immediate family of Defendant Musk; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which Defendant Musk has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity. |
| Class Period | March 25, 2022 - April 4, 2022, inclusive |
| Complaint | ECF No. 33, *Rasella v. Musk*, 1:22-cv-03026-ALC-GWG (S.D.N.Y.) |
| Defendants | Defendants Elon Musk and Elon Musk Revocable Trust dated July 22, 2003 |
| Exchange Act | Securities and Exchange Act of 1934, 15 U.S.C. §78a, *et seq.* |
| FTC | Federal Trade Commission |
| HSR | Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §18a |
| MNPI | Material non-public information |
| Musk | Elon Musk |
| Plaintiff | Oklahoma Firefighters Pension and Retirement System |
| Trust | Elon Musk Revocable Trust dated July 22, 2003. Musk is the beneficial owner of the Trust, which is also a named defendant. |
| Rule 10b-5 | SEC Rule 10b-5, 17 C.F.R. §240.10b5 |
| Rule 13(d) | SEC Rule 13(d)-1, 17 C.F.R. §240.13d-1 |
| SEC | U.S. Securities and Exchange Commission |
| §10(b) or Section 10(b) | §10(b) of the Exchange Act, 15 U.S.C. §78j(b) |
| §13 or Section 13 | §13 of the Exchange Act, 15 U.S.C. §78m |
| §18 or Section 18 | §18 of the Exchange Act, 15 U.S.C. §78r |
| §20(a) or Section 20(a) | §20(a) of the Exchange Act, 15 U.S.C. §78t(a) |
| §20A or Section 20A | §20A of the Exchange Act, 15 U.S.C. §78t-1 |
| Tesla | Tesla, Inc. |
| Twitter or the "Company" | Relevant nonparty Twitter, Inc., which Musk now owns. |
| Williams Act | 15 U.S.C. §78m(d) |

## I.     PRELIMINARY STATEMENT

This securities class action is brought on behalf of investors who sold their Twitter securities while Elon Musk concealed his material ownership stake in the Company.[1] During the Class Period (March 25 to April 4, 2022, inclusive), Musk deliberately concealed his acquisition of more than 5% of Twitter stock by failing to file disclosures required by the SEC. In furtherance of his scheme, Musk also hid and misrepresented his intent to change or influence the control of Twitter (referred to as "activist intent"). Musk's misconduct deprived investors who sold Twitter securities during the Class Period of material information regarding the true value of their securities.

The truth regarding Musk's misrepresentations and omissions began to be revealed after Twitter privately invited Musk to join its Board on April 3, 2022. Knowing that Twitter would soon disclose this information, on April 4, 2022, Musk rushed to file a belated short-form Schedule 13G announcing his then-9.2% ownership stake. But Musk continued to deceive the market by falsely stating that he had no activist intent and omitting his intention to join Twitter's Board. That day, the SEC privately questioned Musk about his misstatements and launched an investigation that is still ongoing. On April 5, 2022, Musk's true activist intent was revealed when Twitter disclosed that he had agreed to join its Board. In response to these disclosures, Twitter's stock price soared ***nearly 40%***. Investors who sold during the Class Period suffered enormous damages.

Musk was well aware of his disclosure obligations during the Class Period. He previously testified under oath that "***U.S. reporting requirements start at 5 percent***" and that acquiring 5% or more of a company's stock "***would create a splash because of the reporting requirement***."

---

[1] Unless noted, emphasis is added, internal citations and punctuation are omitted, cites to "¶_" refer to paragraphs in the Complaint (ECF No. 33), and cites to "Mot." refer to Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint (ECF No. 41).

Musk has also personally filed many Schedule 13 forms for his other public companies. Despite this knowledge, Musk omitted disclosure of his true ownership stake and interests in Twitter to avoid public scrutiny and artificially depress the price of Twitter's securities. Musk saved approximately $200 million by misrepresenting and concealing his interests in Twitter.

These particularized facts easily plead a *prima facie* case establishing Defendants' §10(b) liability. Defendants do not even dispute that: (i) Musk had a duty to disclose his ownership under §13; (ii) Musk knew of his duty to disclose; (iii) the omitted information was material; and (iv) Musk did not timely disclose his ownership interest. These core elements of Plaintiff's claim are unchallenged.

Defendants, however, advance four flawed arguments seeking to dismiss the Complaint in its entirety. ***First***, they argue that there is no private right of action for violations of §13 of the Exchange Act or, if there is, it is only under §18. Defendants attack a straw man. There is no §13 claim in the Complaint. Plaintiff asserts a §10(b) claim based on Musk's knowing or reckless omission and misrepresentation of information that he was legally required to disclose—a classic securities fraud. *Puddu v. 6D Glob. Techs.*, *Inc.*, 742 F. App'x 553, 555 (2d Cir. 2018) (summary order) ("*Puddu I*"); *see infra* Section III(B)(1)(a).

***Second***, Defendants' scienter attacks fail. Defendants concede that Musk knew he had a duty to disclose his ownership stake. And there is no question that Musk knew he had crossed the 5% threshold in his Twitter holdings, including because he specifically discussed his 5%-plus ownership stake in a series of confidential meetings with Twitter during the Class Period. Musk also knew he had not disclosed his ownership as required. During the Class Period, Musk repeatedly tweeted critical comments about Twitter, while omitting that he had purchased, and was continuing to purchase, an enormous number of its shares. Musk's deliberate concealment raises

a strong inference of scienter. Plus, Musk knew that there was no public commentary about his ownership stake and that Twitter's stock price had held steady as he bought over a half-billion dollars of additional shares. These were glaring red flags to a sophisticated individual such as Musk, who knew that if his purchases were disclosed it would cause a "splash"—i.e., spark much publicity and cause the price of Twitter stock to soar. Additionally, as noted above, Musk had a powerful financial motive to conceal his 5% stake in Twitter, saving hundreds of millions of dollars on his personal purchases of Twitter stock during the Class Period.

Musk's intent to influence control of the Company by either joining its Board or taking it private is also clear. On multiple occasions during the Class Period, Musk discussed with other Twitter insiders taking the Company private, he campaigned to join the Board, and he ***agreed*** to join Twitter's Board on April 4, 2022—while falsely representing that he was a passive investor in his Schedule 13G filing that same day. *See infra* Section III(B)(2)(b).

In response, the only competing inference Defendants advance is their vague assertions that Musk's omissions were "inadvertent" because he is "busy" and delegated his disclosure obligations to others. But these are belied by the Complaint. For example, Musk "personally signed and filed" the misleading Schedule 13G (as well as his prior §13 filings in connection with other public companies). And Musk had sufficient time and ability to focus on Twitter to repeatedly tweet critical comments about the Company, meet with Twitter insiders, and purchase millions of shares for over a half billion dollars. Regardless, Musk purportedly being too busy to comply with federal law is neither relevant nor an excuse. Musk does not get a "busy billionaire" exemption from the laws that apply to every other American citizen.

***Third***, the Complaint's loss causation allegations demonstrate that Musk's omissions and misrepresentations "induced a disparity between the transaction price and the true investment

quality of the securities," which easily satisfies "the "minimal burden of pleading loss causation." *Gruber v. Gilbertson*, 2018 WL 1418188, at *8 (S.D.N.Y. Mar. 20, 2018). *See infra* Section III(B)(3).

***Finally***, Defendants attack Plaintiff's §20A insider trading claim by arguing that Musk was not a Twitter insider. They are wrong. Musk held multiple confidential meetings with Twitter insiders to discuss *inter alia* his ownership stake, plans for the Company, and his joining the Board. These meetings held while Musk had a duty to disclose his interests make Musk a temporary insider who was "forbidden from trading … without the requisite disclosure." *U.S. v. Kosinski*, 976 F.3d 135, 144-45 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2755 (2021). *See infra* Section III(D).

## II.   SUMMARY OF RELEVANT FACTS

### A.   <u>Background</u>

Elon Musk now owns Twitter. ¶110. He has loudly proclaimed his disdain for the securities laws as well as their primary regulator, the SEC, stating "I do not respect the SEC." ¶¶27-39. He also has repeatedly mocked the federal agency, calling its civil-servant employees "bastards" and "shameless puppets of Wall St shortseller sharks." ¶¶3, 32, 34, 37.

Section 13 of the Exchange Act was enacted to "alert the marketplace to every large, rapid aggregation or accumulation of securities" that "might represent a potential shift in corporate control." ¶¶42-43. For nearly 90 years, §13 has required investors who obtain 5% or more beneficial ownership of a company's stock to publicly disclose their interest as well as their intentions for the company. ¶¶40-50. Within 10 days after passing the 5% threshold, an investor ***must*** file a Schedule 13D disclosing their ownership stake and intentions for the target company. ¶¶40, 51-52. As one narrow exception to this rule, investors can file a Schedule 13G on the basis that they have not acquired the securities with activist intent to "chang[e] or influenc[e] the control" of the company. ¶¶4, 5, 41-54. Congress determined this disclosure provides material

information for investors given its impact on the value of a company's securities. ¶¶41-50.

Musk knows and understands the SEC reporting requirements under §13. He has personally signed and filed twenty Schedule 13 forms (eight Schedule 13Ds and twelve Schedule 13Gs) since 2011. ¶¶59-60. Further, Musk has confirmed his direct knowledge of the Schedule 13 requirements. At a 2018 deposition taken by the SEC in an enforcement action related to Tesla, Musk testified under oath that "*U.S. reporting requirements start at 5 percent*." ¶¶56-58. He also elaborated on the market effect of the required disclosure, testifying that anything higher than 4.99% ownership "*would create a splash because of the reporting requirement.*" ¶¶10, 55-58.

### B.    Musk Deceived Twitter Investors Who Sold During The Class Period

Musk began acquiring Twitter stock on January 31, 2022. What followed was a flurry of acquisitions (nearly every day) ultimately valued in the billions. By March 14, 2022, Musk's Twitter holdings passed the 5% threshold at a cost of more than $1.36 billion. ¶¶7-8, 62-71, 82-83. This started the 10-day clock for Musk to publicly disclose his 5% ownership stake in Twitter. ¶¶7, 40, 65. The 10-day disclosure window closed on March 24, 2022. ¶¶7-8, 65, 66, 126. Instead of complying with his legal obligations, Musk chose to remain silent. ¶¶7-8, 126-29.

The Class Period starts on March 25, 2022—the first day that Musk's omissions started violating the federal securities laws. ¶¶8, 63, 68. By that time, Musk had secretly purchased nearly 60 million shares of Twitter stock at a cost of over $2 billion. ¶¶8, 62-63, 122. Over the next ten days, Musk amassed over 13 million additional Twitter shares at a cost of over half a billion dollars. ¶¶82-83. Knowing that disclosure of his interests in Twitter would cause a "splash" driving up the price of its stock, Musk hid his ownership stake and activist plans to control Twitter so he could avoid public scrutiny and continue to buy at artificially discounted prices. ¶¶68-71.

Musk knew his savings would be substantial. He was right—his omissions saved him approximately *$200 million*. ¶¶11, 68-71. While Musk secured a significant discount for himself,

it came at a cost to Twitter shareholders who sold when their securities were in reality worth far more due to Musk's ownership stake and plans for Twitter. ¶¶16, 68-71, 130, 144.

During the Class Period, Musk held a series of private meetings with Parag Agrawal (Twitter's then-CEO) and other Company insiders like Jack Dorsey (Twitter's founder and then-director) and Bret Taylor (then-Chair of Twitter's Board). ¶¶10, 76-83, 120. At these meetings, Musk discussed his "significant stake of more than five percent" in Twitter—as well as him "joining the Twitter Board" or "taking Twitter private." ¶¶10, 78-80, 83. Musk also publicly tweeted about Twitter, including criticizing its free speech practices—but publicly Musk conspicuously said nothing about his massive ownership stake or activist intent. ¶¶10, 36, 73-75. On April 3, Twitter formally invited Musk to join its Board, which Musk determined to accept, and, on April 4, they entered into a written agreement for Musk to join Twitter's Board. ¶84.

Knowing that Twitter would soon publicly reveal his Board membership, Musk rushed to disclose the ownership information that he knew he had hidden to date. ¶¶13, 83-96. Musk's effort was already too late for many investors—by April 4, tens of thousands of Twitter investors (or more) who sold their Twitter securities had already sold at prices artificially depressed by Musk's deception (some of these investors' shares had been bought by Musk himself). ¶¶68-71. On April 4, 2022, Musk further misled investors by filing a "short-form" Schedule 13G representing that he had no activist intent and omitting disclosure of his agreement to join the Twitter board. ¶¶13-14, 82-92. The market believed Musk's misstatements, with analysts noting that a Schedule 13G "indicates the investor isn't seeking to acquire control, or to influence who controls it." ¶92.

In private recognition that filing the Schedule 13G was improper, Musk had deleted required language certifying that he had no intent to "chang[e] or influenc[e] the control" of Twitter, replacing it with "Not Applicable." ¶¶14, 89. That same day, the SEC (in a non-public

communication) asked Musk "why … you determined that the [certification] was [n]ot [a]pplicable," and why Musk's ownership disclosure was not "made within the required 10 days." ¶¶14, 90. The SEC and other federal agencies are investigating Musk for this misconduct. ¶¶90, 97-100. Before the markets opened on April 5, 2022, Twitter filed a Form 8-K announcing that Musk had agreed to join its Board. ¶93. Later that day, Musk had his lawyers file the requisite Schedule 13D form, which finally made a full disclosure of both Musk's ownership stake and his activist intentions. ¶¶95-96.

As Musk had anticipated, a "*splash*" followed these disclosures. Twitter's stock price skyrocketed by more than $10 per share, or 27%, to close at $49.97 per share on April 4, 2022. ¶¶16, 91, 131. And the price kept increasing on April 5, 2022—spiking to $54.57 per share before closing at $50.98 per share—and increased still on April 6, 2022. ¶¶94-96. Twitter shareholders who sold their shares (or traded options) at artificially depressed prices during the Class Period were cheated out of the true value of their securities and suffered enormous damages. ¶¶16, 130.

On October 28, 2022, Musk ultimately purchased Twitter at $54.20 per share—or over 40% more than investors were able to sell their stock for during the Class Period. ¶¶83, 101-12.

## III.    ARGUMENT

### A.    Defendants Concede Key Elements Of This Action

Defendants' motion to dismiss concedes key elements of Plaintiff's claims. ***First***, Defendants do not dispute that Musk had a duty to disclose his 5%-plus ownership stake in Twitter, which is the "touchstone" of the "alleged 10b-5 violation." *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021) (Nathan, J.) (*"Puddu II"*). ***Second***, Defendants also concede that Musk knew about his duty to disclose. They had to, given Musk's testimony that "***U.S. reporting requirements start at 5 percent***" and ownership above 4.99% "***would create a splash because of the reporting requirement***." ¶¶57-58. ***Third***, Defendants do not challenge

7

materiality and, **fourth**, Defendants do not claim that Musk timely disclosed his 5% ownership interest. These concessions underscore the strength of Plaintiff's claims.

    B.    <u>The Complaint States A Valid §10(b) Claim</u>

        1.    <u>The §10(b) Claim Is Well-Established And Defendants' Attacks Fail</u>

            (a)    <u>Plaintiff's §10(b) Claim Follows Settled Law</u>

It is settled law that a failure to disclose the information required under §13(d) gives rise to liability under §10(b) for damages due to material omissions. In *Puddu I*, the Second Circuit reversed the dismissal of a §10(b) damages claim premised on a failure to disclose a defendant's beneficial ownership of "more than 5%" of a company's securities. 742 Fed. App'x at 555-56. In vacating the district court's dismissal, the Second Circuit emphasized that the securities laws "require[] [disclosure of] beneficial owners of more than 5% of [a company's] securities" and held that the complaint stated a valid §10(b) claim by plausibly alleging that defendants had "failed to disclose [a defendant's] beneficial ownership." *Id.* at 555-56. On remand and reassignment, Judge Nathan (then on the district court) held that "the allegation that [defendant] was obligated to file the Schedule 13D—and opted not to do so—is enough to adequately plead a material omission for purposes of [p]laintiffs' 10(b) claim." *Puddu II*, 2021 WL 1198566, at *6.

*Puddu I* and *II* are two of the latest in a long line of authorities endorsing §10(b) claims for damages arising from omissions in the face of §13 duties of disclosure. *E.g., Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58-60 (1975) ("delay in filing the Schedule 13D constituted a violation of the Williams Act" to be pursued under §10(b) and "those persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages"); *U.S. v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[A] false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of §10(b)"); *GAF Corp. v. Milstein*, 453 F.2d 709, 720 n.22 (2d Cir. 1971) (where information is omitted that must be disclosed under

§13(d) involving "a purchase or sale of securities," then "section 10(b) will apply"); *cf. Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 16, 18 (2d Cir. 1995) (upholding then-Judge Sotomayor's summary judgment analysis of "a section 10(b) claim founded solely upon an alleged section 13(d) violation"); *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989) (accepting validity of "derivative claim under section 10(b) of the Act" for failure to comply with duty to disclose under §13(d)). This precedent accords with the Second Circuit's long-held recognition that "a duty to disclose under [§]10(b) [or Rule 10b–5] can derive from statutes or regulations that obligate a party to speak." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 n.8 (2d Cir. 2016).

Indeed, courts routinely sustain §10(b) damages claims arising from a failure to timely satisfy the disclosure requirements of §13—the same claim Musk faces here. *E.g.*, *Puddu II*, 2021 WL 1198566, at *6; *Gruber*, 2018 WL 1418188, at *13-14 ("The omission concerning [defendants'] ownership interest is actionable [under Rule 10b5-1] because they had a duty to disclose it"); *In re Ivan F. Boesky Sec. Litig.*, 848 F. Supp. 1119, 1121, 1124-25 (S.D.N.Y. 1994) ("failure to file disclosures under Section 13(d) of the Exchange Act" gave rise to 10b-5 liability) (cleaned up); *Seagoing Unif. Corp. v. Texaco, Inc.*, 705 F. Supp. 918, 926-27 (S.D.N.Y. 1989) (omission of §13(d) duty to disclose "can be maintained under section 10(b)"); *Schnell v. Schnall*, 1981 WL 1618, at *3 (S.D.N.Y. Mar. 30, 1981) ("Plaintiff is provided a remedy for [violation of §13(d) duty] under Rule 10b-5."); *Burt v. Maasberg*, 2014 WL 1291834, at *17 (D. Md. Mar. 28, 2014) ("The failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b–5(b)."); *Rubin v. Posner*, 701 F. Supp. 1041, 1046 (D. Del. 1988) (sustaining §10(b) damages claim based on Schedule 13D omission).[2]

---

[2] Even courts that do not ultimately sustain §10(b) claims arising from §13(d) disclosure failures ***still accept the existence of such §10(b) claims***—including in cases relied upon by Defendants. *See, e.g.*, *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 473, 490-91 (S.D.N.Y. 2009), *aff'd sub*

**(b)**     <u>**Defendants Misstate Plaintiff's §10(b) Claim And The Law**</u>

Unwilling or unable to address this mountain of authority, Defendants argue that there is no private right of action under §13(d) or, if there is such a right, then damages are only available under §18. Mot. at 8-11. Defendants are wrong.

*Defendants Misstate Plaintiff's §10(b) Claim*. As a threshold matter, Defendants' principal argument rests entirely on a mischaracterization of the Complaint. Plaintiff asserts a §10(b) claim—not a §13(d) claim. As discussed above, such §10(b) claims are well-accepted by courts in this Circuit and nationwide. Thus, Defendants' authorities concerning a private damages remedy under §13(d) are wholly irrelevant. *See* Mot. at 8-9 (citing *Kamerman*, 891 F.2d at 430 (discussing "The Section 13(d) Claim"); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619 (2d Cir. 2002) (analyzing "a cause of action for shareholders under § 13(d)")).[3] Defendants have merely set up and knocked down a strawman—which should be flatly rejected.

*Defendants Misstate The Law*. Defendants also mischaracterize the law under §18. ***First***, virtually every court to consider this issue—including Defendants' authorities—have recognized

---

*nom.*, *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010) ("There is no private right of action under section 13(d) of the Exchange Act, but a plaintiff can point to a violation of section 13(d) as the predicate for a 10b–5 claim."); *Lou v. Belzberg*, 728 F. Supp. 1010, 1020 (S.D.N.Y. 1990); *see also* Mot. at 8-9 (citing *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 565 n.41 (11th Cir. 1984) (recognizing but dismissing 10(b) claims arising from allegedly "false and misleading schedule 13D" because no stock purchase or sale alleged); *Rhyne v. Omni Energy Servs. Corp.*, 2009 WL 1844474, at *8-9, *12 (W.D. La. June 23, 2009) (recognizing but dismissing §10(b) claims for "violations of Section 13(d)" where defendant made full disclosures)).

[3] *See also* Mot. at 8-9 (citing *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 648 F. Supp. 2d 546, 573-74 (S.D.N.Y. 2009) (addressing §13(d) claim, not a §10(b) claim); *Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 961 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984) (same); *Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008) (same); *Liberty Nat'l Ins. Holding Co.*, 734 F.2d 564, 565 n.41 (11th Cir. 1984) (same); *Rhyne*, 2009 WL 1844474, at * 9 (same); *Issen v. GSC Enters., Inc.*, 508 F. Supp. 1278, 1295 (N.D. Ill. 1981) (same); *see also Dreiling v. Am. Online Inc.*, 578 F.3d 995, 1003 (9th Cir. 2009) (addressing §16(b) claim, not §10(b))).

that, while §18 may be the only damages remedy available for §13(d) claims, §10(b) claims are distinct. For example, Defendants misleadingly claim that *Kamerman* stands for the proposition that damages for a §13(d) disclosure failure are available "only under Section 18(a) of the Act." *See* Mot. at 8-9. But Defendants' cherry-picked quotation is taken from the part of the opinion concerning "The Section 13(d) Claim" (891 F.2d at 430)—which, again, is irrelevant here.[4] Notably, the *Kamerman* court then evaluated the merits of the **separate** §10(b) claim based on a violation of §13(d) obligations—which it found was not established. *Id.* at 430-31 (10b-5's element of reliance not met where plaintiff "**concedes that [the company] was not deceived**"). In other words, the Second Circuit did not suggest that the §10(b) claim was invalid—quite the opposite, it accepted this claim was valid. Thus, *Kamerman* **supports** the rule that aggrieved investors may pursue §10(b) claims for damages based on violations of §13(d) disclosure obligations. And any question is eliminated by the Second Circuit's recent *Puddu I* decision (which Defendants conspicuously ignore)—and the authorities above, which are in accord with *Kamerman*.[5]

Similarly, Defendants' claim that Plaintiff seeks to "assert claims that are not appropriate for class treatment" (Mot. at 10-11) is false, because §10(b) claims like those presented here are

---

[4] Defendants criticize the *Gruber*, *Puddu II*, and *Seagoing* courts for their purported failure to "address[] Section 18(a), *Hallwood,* or *Kamerman*." Mot. at 10, 11 n.2. But these courts did not address these authorities precisely because direct claims under §13(d) and §18(a) remedies have no relevance to §10(b) claims like the one raised here. Defendants' invitation to liken §13(d) remedies to §13(a) remedies (Mot. at 9-10) makes the same false comparison. Defendants similarly quote dicta from the *Hallwood* opinion regarding the viability of "a private cause of action under § 13(d)" that has no relevance to this Action. *See* Mot. at 9.

[5] *See also Seagoing*, 705 F. Supp. at 926–27 ("[E]ven though plaintiff is foreclosed from asserting a private cause of action for damages under section 13(d), and even though plaintiff has not asserted a similar private action under section 18, the court finds that this action can be maintained under section 10(b)."); *Vladimir*, 606 F. Supp. 2d at 490-91; *see also* Mot. at 8-9 (citing *Liberty Nat'l Ins. Holding Co*., 734 F.2d at 564 (finding no private right of action under §13(d) but recognizing a private right of action under §10(b) for a violation of §13(d) and dismissing on other grounds); *Rhyne*, 2009 WL 1844474, at *9 (same)).

routinely certified on behalf of a class of investors. *See, e.g.*, *Puddu v. NYGG (Asia) Ltd*., 2022 WL 2304248, at \*5 (S.D.N.Y. June 27, 2022), *reconsideration denied*, 2022 WL 2789250 (S.D.N.Y. July 15, 2022) (certifying §10(b) class seeking damages for failure to timely file a Schedule 13D); *Gruber v. Gilbertson*, 2019 WL 4439415, at \*9 (S.D.N.Y. Sept. 17, 2019), *modified on unrelated grounds*, 2021 WL 3524089 (S.D.N.Y. Aug. 10, 2021) (same).

**Second**, the solitary case Defendants have identified denying that a §10(b) claim can be based on a violation of §13(d)'s duty to disclose is inapposite. Mot. at 9 (citing *Takata v. Riot Blockchain, Inc*., 2022 WL 1058389, at \*10 (D.N.J. Apr. 8, 2022)). *Takata* involved issues of whether "an undisclosed control group" collectively owned over 5% of the target and whether it collectively engaged in "undisclosed insider sales." *Id*. at \*5. Here, unlike *Takata*, it is undisputed that Musk acted alone, owned over 5% of Twitter by March 14, 2022, and that he **purchased** shares of Twitter during the Class Period. And, critically, the *Takata* court distinguished its holding from the Second Circuit law discussed above (which controls here) by acknowledging that "when disclosure is vital" in the case of transactions involving potential changes in corporate control, like here, then "a plaintiff can point to a violation of §13(d) as the predicate for a 10b–5 claim." *Id.* at \*5, \*9 n.11 (quoting *Vladimir* and citing *Azurite Corp*, discussed *supra* 9-10). The limited, out-of-circuit *Takata* holding therefore acknowledges the controlling law cited above and, to the extent it struck a different path, cannot displace the overwhelming in-Circuit authority in Plaintiff's favor.

**Third**, because Plaintiff's claim is largely that Musk **failed to make** requisite §13 disclosures, §18 could not apply. *See Levie v. Sears Roebuck & Co*., 2006 WL 756063, at \*4 (N.D. Ill. Mar. 22, 2006) ("Because plaintiff's claims are based on a **failure by defendants to file** required documents rather than on documents that were misleading when filed, the court concludes that §18(a) is inapplicable and that plaintiff can maintain a claim under §10(b).").

**Finally**, Defendants argue that permitting investors to pursue a claim under §10(b) would "expand the damages remedies available under Section 13(d)." Mot. at 11. But it is **Defendants** who invite this Court to forge a new path by disregarding decades of Second Circuit cases sustaining such claims, including most recently in *Puddu I*.[6]

### 2.   The Complaint Alleges An Overwhelming Inference Of Scienter

Scienter may be established by showing "motive and opportunity to commit fraud" or "conscious misbehavior or recklessness." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 169 (2d Cir. 2000). While "accept[ing] all factual allegations in the complaint as true," courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 323 (2007) (emphasis in original). The inference of scienter "need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences," and need only be "cogent and at least as compelling as any opposing inference." *Id*. at 324. Thus, "a tie on scienter goes to the plaintiff." *See, e.g., Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020).

The Complaint pleads numerous facts that collectively give rise to a cogent inference, which is at least as compelling as any competing inference, that Musk acted with scienter when: (i) he concealed his over-5% Twitter interest; and (ii) he misrepresented his activist intentions.

### (a)   Musk Concealed His Over-5% Ownership Stake With Scienter

The facts support an overwhelming inference that Musk acted "consciously" or

---

[6] Defendants' invitation to consider decisions concerning completely different subject matters should be disregarded. *See* Mot. at 12 (citing *TransAmerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 21 (1979) (analyzing §206 of the Investment Advisors Act of 1940); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008) (analyzing aiding and abetting liability); *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1270 (10th Cir. 2004) (analyzing Air Carrier Access Act); *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 121 (2005) (analyzing Telecommunications Act and 42 U.S.C. §1983).

"recklessly" in omitting disclosure of his over-5% ownership stake in Twitter. ***First***, it is undisputed that Musk knew about his duty to disclose. Indeed, Musk's sworn testimony confirms his knowledge that "***U.S. reporting requirements start at 5 percent***". ¶¶6, 57, 114. He also has personally signed twenty Schedule 13 forms. ¶59. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("defendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness"); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 WL 4482151, at *4 (S.D.N.Y. Sept. 30, 2021) ("scienter can be sufficiently pleaded through 'facts that suggest [that defendants] knew they had a duty to disclose' information they withheld").

***Second***, Musk also knew that his Twitter ownership had crossed the 5% threshold. During the Class Period, Musk held a series of non-public meetings where Musk specifically discussed his "***significant stake of more than five percent***" in Twitter. ¶¶62, 77, 79, 83, 118; *see Kirkland Lake*, 2021 WL 4482151, at *4 (scienter based on company's "nondisclosure of its potential [target company] acquisition" where defendants concealed "active discussions to acquire [target company]"). And Musk ***admitted*** his knowledge when he signed a Schedule 13G confirming March 14, 2022 as the relevant "Date of Event" triggering his filing obligation. ¶117.

***Third***, Musk knew that he had not disclosed his over-5% ownership interest. While repeatedly tweeting about Twitter, Musk said nothing about his newly acquired, massive ownership stake in Twitter. ¶¶72-75. This "incongruity between word and deed establishes a strong inference of scienter." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010).

Nor was there any press or Twitter commentary on Musk's new Twitter stake. If Musk believed the Schedule 13 form had been timely filed, he would have necessarily been struck by this conspicuous absence of commentary. And Musk bought millions of Twitter shares during the Class Period on a near-daily basis for over half a billion dollars. ¶¶62-63, Table 1, 82, Table 2,

122. The timing and massive amounts of money involved ensured that Musk was laser focused on his Twitter buying spree—and thus knew that the price of Twitter's stock had not materially increased. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) (holding that "large size" of transactions, coupled with their "recurrent pattern and unusual nature," contributed to scienter). The lack of public commentary and no stock price spike were clear red flags to Musk—who knew that a "splash" would result from disclosure (¶58)—that his ownership stake had ***not*** been disclosed during the Class Period. ¶¶62-63, Table 1, 82, Table 2, 122.

*Finally*, Musk's refusal to comply with his disclosure duties is consistent with his record of contempt for federal law and the SEC. ¶¶27-39. And the fact that Musk is under investigation by the SEC (and other regulators) for the same misconduct also "add[s] circumstantial evidence of conscious misbehavior or recklessness and bolster[s] the inference of manipulative intent." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81 (2d Cir. 2021).

### (b)    Musk Concealed His Activist Interest In Twitter With Scienter

The Complaint also alleges facts that give rise to a strong inference that Musk "consciously" or "recklessly" concealed his activist intentions for Twitter. Musk violated §10(b) by omitting disclosure of his activist intentions under Section 13 throughout the Class Period. He also made an affirmative misstatement by filing a Schedule 13G on April 4, expressly stating that he was a passive investor. *See* ¶128 (Schedule 13G filed pursuant to Rule 13d-1(c) for passive investors); ¶92 (analysts noted that Musk's Schedule 13G "indicates the investor isn't seeking to acquire control, or to influence who controls it"). The filing of Schedule 13G affirmatively misled the market. *Skiadas*, 2020 WL 3268495, at *7 ("A statement is misleading if a reasonable investor would have received a false impression from the statement.").

*First*, Musk does not dispute the falsity of the ***affirmative misrepresentation*** made in the April 4 Schedule 13G that he had "no intent to influence or control" Twitter. ¶128. It is ***also***

undisputed that he knew the material facts that rendered that statement misleading—his campaign to join the Board or take the Company private—which any investor would have considered material. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth"). Thus, Musk's scienter for the April 4 misstatement is established—even putting aside his independent duty to disclose on the required Schedule 13D. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

**Second**, the private meetings and communications held between Musk and Twitter insiders during the Class Period confirm his scienter for his failure to file a Schedule 13D as required. Musk repeatedly discussed with Twitter directors and executives that Musk was interested in joining the Twitter Board. ¶¶76-81, 120. For example, on March 26, 27, and 31, Musk communicated with multiple Twitter insiders about, *inter alia*, the potential of "Mr. Musk joining the Twitter Board." ¶¶78-80. It is well-established that an intent to join a company's board of directors will suffice for scienter purposes. *E.g., Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992) ("a reasonable inference could be drawn that Pennzoil's Schedule 13(d) statement was materially misleading because it failed to adequately disclose Pennzoil's intent to obtain a board position and exert some level of management influence over Chevron's operations"); *see also Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting*, Sec. & Exch. Comm. (last updated Oct. 7, 2022) ("Notwithstanding any specific control intent, the fact that officers and directors have the ability to directly or indirectly influence the management and policies of an issuer will generally render officers and directors

unable to certify to the requirements of Rule 13d-1(c)(1).”). Also, Musk repeatedly privately discussed “taking Twitter private.” ¶¶76-81, 120. By March 31, 2022, as confirmed by a document cited by Twitter in its complaint against Musk, Musk had determined to buy Twitter. ¶81, Table 2. These facts confirm that, throughout the Class Period, Musk’s intention was to change or influence the control of the Company by joining its Board or taking it private.

*Third*, the facts unequivocally show that Musk intended to join Twitter’s Board by April 3, 2022. On April 3, 2022, Musk’s discussions about joining the Board came to fruition when Twitter issued a formal invitation for Musk to join its Board. ¶84. That same day, Musk texted his financial advisor and noted the “important paperwork to be done to allow for me to hopefully join the Twitter Board.” *Id*. Then, on April 4, 2022, Musk entered into a written agreement to be appointed to the Board. *Id.* Defendants themselves admit that Musk had a “definite” intention to join the Board as of April 4, 2022, when he formally agreed to do so. *See* Mot. at 14 (“Musk had definite plans … [at] the end of the Class Period”). But Musk did not disclose it. Rather, the first disclosure of Musk joining the Board did not occur until *after* the Class Period, when Twitter announced it pre-market open on April 5, 2022. ¶93. In other words, it is undisputed between the Parties that Musk had scienter for the last day of the Class Period, i.e., the entire trading day of April 4, 2022.

*Fourth*, by deliberately deleting the Schedule 13G’s certification of non-activist intent, Musk privately acknowledged to himself that he in fact *had* activist intent. ¶¶87-89.

*Fifth*, Musk’s repeated violation of the securities laws and the SEC investigation also contribute to the inference of scienter for this omission. *See supra* at 15. The same is true of Musk’s violation of his reporting obligations under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (¶¶97-99, 119) and the FTC’s ongoing investigation. ¶¶98-100.

(c)     **Musk Had Motive To Omit Disclosure**

The already strong inference of Musk's scienter is bolstered by the fact that he also had motive and opportunity to conceal his Twitter ownership and activist intentions. The law is clear that "[m]otive is not required to plead scienter" (*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010))—so its presence here only strengthens the inference of scienter.

The Complaint explains that Musk had a powerful financial motive to omit the required disclosures. Musk knew that he would save an enormous amount of money by concealing his interests in Twitter because hiding his interests kept the prices of Twitter's securities artificially low during his buying spree. ¶¶11, 63, Table 1, 70, 82, Table 2, 124-25. In the end, Musk's omissions saved him **over $200 million**. *Id.*; *see also Buxbaum v. Deutsche Bank A.G.*, 2000 WL 33912712, at \*19 (S.D.N.Y. Mar. 7, 2000) (scienter where "it was clearly in a purchaser's interest that the quoted public price of the asset to be acquired was as low as possible."); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557-58 (S.D.N.Y. 2010) (financial incentives to effectuate anticipated merger "transcend a generic corporate desire to negotiate favorable terms" and establish motive); *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 284 (E.D.N.Y. 2000) ("[B]eing able to acquire a company for a significantly reduced price is a sufficient economic benefit to satisfy the motive requirement for scienter."). Such savings are substantial to anyone— even to Musk. This is especially true given that Musk is famously "cash poor" as his wealth is tied up in shares of his companies. ¶123 (Musk: "I actually don't" have "a lot of cash").

Relatedly, Musk also was motivated to avoid public scrutiny of his acquisition of Twitter stock. Musk's prior testimony to the SEC confirms his expectation that there would be "a splash because of the reporting requirement," which he wanted to avoid including to keep prices low. ¶¶57-58. In sum, Musk's motive makes the inference of scienter overwhelming.

**(d)**      **Defendants' Cursory Scienter Challenges Are Meritless**

Defendants attack each scienter fact in isolation, which is contrary to the holistic approach mandated by the Supreme Court in *Tellabs*. None of their arguments withstands scrutiny.

**(i)**      **Musk's Excuses For His Ownership Omission Fail**

***First***, Defendants argue that Musk's omission of his over-5% ownership stake was due to "inadvertence," "oversight," or some unidentified "other non-culpable explanation." Mot. at 15-19. Even if correct (they are not), Defendants' proposed inference is still consistent with Musk being reckless, which suffices to establish scienter. *Ganino*, 228 F.3d at 169.

Defendants offer two bases for their "inadvertence" inference: (i) Musk is "one of the busiest people on the planet" and (ii) his "disclosure and filing requirements are … delegated." Mot. at 15-19. These assertions fail because they are contrary to the facts alleged in the Complaint. Defendants' delegation claim is belied by the fact that Musk himself "***personally signed and filed***" the Schedule 13G—and has done so multiple times in the past. ¶¶6, 13, 59, 89, 115, 128, 147. Musk's being supposedly "too busy" to comply with the securities laws is both irrelevant and contradicted by Musk's availability to constantly post on Twitter. ¶¶73-74. He also had time to repeatedly meet to discuss his plans for Twitter (¶¶76-81) and to spend well over a half a billion dollars on Twitter stock. ¶82, Table 2. If Musk had time to do these things, he surely had sufficient time to comply with his legal obligations. Defendants' counter-factual assertions necessarily fail. *Shih v. Petal Card, Inc.*, 2020 WL 5659429, at *14 (S.D.N.Y. Sept. 23, 2020) (defendant's counterfactual argument inappropriate where complaint alleged the opposite).

In any event, it is telling that Musk did not make any contemporaneous public disclosure that his omissions were purportedly due to the failings of a subordinate. Instead, confirming that this is a "made for litigation" argument, Musk had his attorneys make this unsupported assertion for the first time in his Motion—not on Twitter, where he routinely provides personal updates

regarding his business and legal dealings. At minimum, Musk's argument confirms that discovery is needed to resolve this issue. *See In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 321 (S.D.N.Y. 2010) ("[t]he Second Circuit has held that where a defendant alleges that it acted in good faith and on advice of counsel, that defense generally presents a triable issue of fact").

Relatedly, Defendants claim that Musk's "complicated" share purchasing scheme makes their inadvertence theory more plausible. Mot. at 18. Not so. As explained above, the massive volume and amounts of money involved ensured that Musk knew exactly what was going on. *See supra* at 14-15 (citing *Refco*, 503 F. Supp. at 658 (the "large size" and "recurrent pattern" of transactions contributed to a strong inference of scienter)).

***Third***, Defendants suggest that Musk was forthcoming with his disclosures, arguing for example that he removed false language from his misleading Schedule 13G. Mot. at 15-16. But Defendants disregard the fact that it was materially misleading for Musk to file a Schedule 13G in the first place—as it signaled that his interest was passive and omitted his activist intent. ¶¶53, 87-89. Indeed, market analysts understood the filing to mean that Musk was not "seeking to acquire control." ¶92. Musk cannot justify his omissions by touting other misstatements he did not make.

Defendants also claim that Musk's confidential discussions with Twitter directors regarding his 5% ownership are "forthcoming." Mot. at 16. But these private conversations were not "forthcoming" to ***investors*** and represent exactly the kind of lopsided informational advantage §13 was meant to prevent. Defendants likewise wrongly claim Musk's eventual admission that March 14, 2022 was the triggering date is exculpatory. *Id*. at 16 (citing *Kuriakose v. Fed. Home Loan Mortg. Corp*., 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012)). Musk's acknowledgement of this fact was too late and nothing akin to the facts of *Kuriakose*—where the defendants made a "bevy" of "truthful" and "extensive disclosures" throughout the relevant period that enabled investors,

"with little effort," to "take [their] own measure of risk." 897 F. Supp. 2d at 182.

**Fourth**, Defendants label Plaintiff's allegations "contradictory" because the Complaint alleges Musk's history of violating the securities laws as well the fact that he has filed Schedule 13 forms in the past. Mot. at 17-18. There is no contradiction. Plaintiff does not have to allege that Musk violates every law at every moment to establish him as a repeat violator of the securities laws—particularly where it did not provide Musk a benefit to delay or misrepresent those prior filings. The reality is that Musk violates the securities laws when it suits his interests to do so—as it did here to save vast sums of money and avoid public scrutiny.

**Fifth**, Defendants argue that Musk could only know that he would be saving money "through hindsight." Mot. at 18-19. Defendants are wrong. Their argument ignores practical reality and the facts alleged in the Complaint, which explains that Musk knew throughout the Class Period that his savings would be substantial—and he ultimately saved $200 million through his deceit. ¶¶70, 82, 124. Indeed, it is well-accepted that the filing of a Schedule 13 typically drives up the price of a target company's securities. ¶¶47-49. And Musk admitted in sworn testimony that he knew that compliance with the 5% reporting obligation would create "a splash." ¶58.

**Sixth**, Defendants dispute that Musk violated HSR, arguing that his stock purchases were exempt. Mot. at 17. Defendants' claim that Musk's buying spree was exempt because it was "solely for the purpose of investment"—the precise point that the FTC is investigating (¶100)—simply assumes the conclusion they are trying to prove.

Relatedly, Defendants do not address at all the fact that the SEC is investigating Musk for the exact same misconduct at issue here. *See supra* at 7. Thus, they have waived any rebuttal.

**(ii)**        **Musk's Excuse For His Activist Intent Omission Fails**

Defendants' sole argument regarding his activist intent omission is that Musk's intent to change or influence the control of Twitter was not sufficiently definite until "the end of the Class

Period." Mot. at 13-14. This fails for several reasons. ***First***, a March 31, 2022 document confirms that Musk had internally determined to buy Twitter, which he then did. ¶81, Table 2. Defendants' only response is relegated to a footnote where they claim that Plaintiff failed to allege "the date of the document" and other particularized facts. Mot. at 14, n.4. This is facially incorrect—the Complaint pleads that the document is dated March 31, 2022, and includes confirming details such as direct quotes that Musk had determined to buy Twitter to rid it of "crypto spam," which Musk viewed as a "major blight on the user experience." ¶81.

Relatedly, Defendants' attempt to manufacture an opposing inference by pointing to Musk's earlier statements about possibly building a new social media platform (Mot. at 13-14) also fail. Musk admitted on April 5, 2022 that he ***did*** have activist intent by having his lawyers file the correct Schedule 13D (¶¶95, 96); on April 9, 2022, Musk admitted that his plan was to buy Twitter (¶102); and, by April 25, 2022, he had Twitter's agreement. ¶¶102-03. In contrast, ***no facts*** suggest that Musk took any steps to build a different platform.

***Second***, as noted above, Defendants concede that Musk had sufficiently definite intent to influence control by joining the Board for at least the last full day of the Class Period—i.e., April 4, 2022. Mot. at 14. By then, Musk had received the formal invitation to join Twitter's Board and was setting into motion his acceptance. ¶84. At minimum, it is undisputed that Musk possessed the relevant scienter by April 4, 2022 when he agreed to join the Board, which renders his omission of this material information on that day actionable.

***Third***, Defendants wrongly claim that Musk's discussions prior to April 4, 2022 about joining the Board were too indefinite. Mot. at 13-14. Negotiations absent a signed agreement can constitute an intent to control necessary to disclose on a Schedule 13D. *E.g., Seagoing Unif. Corp.*, 705 F. Supp. at 926; *see also E.ON AG v. Acciona, S.A.*, 2007 WL 316874, at *8 (S.D.N.Y. Feb.

5, 2007).[7] Further, Defendants ignore that, faced with the SEC's inquiry on April 4, Musk admitted to his activist intent on April 5, 2022 when he had his attorneys correct his misleading Schedule 13G and file the requisite Schedule 13D form. ¶¶90, 95. Moreover, "discovery is appropriate to determine, among other things, whether [defendants'] actions indicate more than an investment intent; whether [defendants] intended to change or influence control; [and] whether the securities were purchased, as defendants alleged, for investment purposes only[.]" *Rosen v. Brookhaven Cap. Mgmt. Co.*, 113 F. Supp. 2d 615 (S.D.N.Y. 2000).

### 3.    The Complaint Adequately Pleads Loss Causation

It is well-established that loss causation is a highly intensive fact issue that does not impose a "great burden" on Plaintiff to plead. *In re EZCorp, Inc. Sec. Litig*., 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016) (Carter, J.). Here, this low threshold is readily met by the Complaint. Notably, Defendants **admit** that "a plaintiff can plead loss causation by claiming that shareholders who sold their shares were deprived of the opportunity to sell them for more" (Mot. at 20). That is exactly Plaintiff's allegation: Musk's material omissions and misstatement artificially depressed the price of Twitter's securities and, when the truth was revealed, it caused the price of Twitter's stock to skyrocket nearly 40%. ¶¶94, 130-32. These allegations "show[] that the defendants' misrepresentations [and omissions] induced a disparity between the transaction price and the true investment quality of the securities." *Gruber*, 2018 WL 1418188, at *8; *Levie v. Sears, Roebuck & Co*., 496 F. Supp. 2d 944, 948 (N.D. Ill. 2007) (endorsing loss causation theory "that investor would have profited from the disclosure by the difference between the share price actually realized and the higher price that would have been driven by the disclosure" for §10(b) seller cases).

---

[7] *TCS Cap. Mgmt., LLC v. Apax Partners, L.P.,* 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) (cited at Mot. at 13) is inapposite as, unlike here, the party there **had** disclosed its activist intentions on a Schedule 13D. Musk failed to inform investors of his activist intentions during the Class Period.

Defendants wrongly label this loss causation theory as "speculative." Mot. at 21. But it is well-known that the filing of a Schedule 13 drives up the price of a target company's securities (¶¶47-49), and Musk knew there would be a "splash" when his interest was revealed (¶¶57-58).[8] Defendants further mischaracterize Plaintiff's allegations as speculation that "investors would have taken advantage of this increase to sell Twitter shares" if Musk had disclosed his Twitter stake as required by March 24. Mot. at 21. There is nothing speculative about the Complaint's allegations—Class members did, in fact, sell their securities at artificially depressed prices during the Class Period. Finally, Defendants claim that Plaintiff does not allege what the "price would have been" or how "subsequent disclosures … would have affected the price." Mot. at 21. This is untrue. The Complaint pleads exactly what happened when the omitted information was finally revealed—it caused Twitter's stock price to spike by 40%. ¶¶94, 130-32.

### C.   The Complaint States A Valid 20(a) Claim

Control person liability is pled because Musk: (1) controlled the Trust, and (2) culpably participated in the fraud by acting with scienter. *See In re EZCorp, Inc.*, 181 F. Supp. 3d at 212.

### D.   The Complaint States A Valid 20A Claim

The Complaint alleges that during the Class Period, Musk engaged in multiple communications with Twitter directors and executives concerning material non-public issues, including his ownership interest in the Company, joining the Board, and plans for the Company. ¶¶76-81, Table 2. At the time, Musk was Twitter's largest shareholder and had a duty to disclose his ownership and activist interests in the Company under §13. ¶86. These facts allege Musk's role

---

[8] *In re AIG Advisor Grp.*, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) is inapposite. Mot. at 21. There, investors claimed they potentially would have made a better return had brokers not steered them to certain funds and the investors had instead invested in a different fund. Here, Twitter investors already owned Twitter shares and sold them at artificially depressed prices before the price of Twitter increased when Musk belatedly revealed his ownership stake and plans for Twitter.

as a "temporary insider" with confidential information—as well as a duty to disclose—who is "forbidden from trading … without the requisite disclosure." *Kosinski*, 976 F.3d at 144-45 (cleaned up); *see also Gruber*, 2018 WL 1418188 at *17 (defendant "possessed power over corporate affairs associated with significant equity ownership, which in turn implicated access to insider information and the potential for insider trading") (cleaned up). As a temporary insider trading on MNPI (Musk does not dispute he traded on MNPI), Musk violated the duty of trust and confidence he owed to Twitter's shareholders and its Board. *See S.E.C. v. Lund*, 570 F. Supp. 1397, 1403 (C.D. Cal. 1983) (defendant was temporary insider given inside information regarding company's business deal).

In response, Defendants' sole argument is to claim that the Complaint alleges that Musk was ***not*** an insider. Mot. at 19-20. Defendants point to allegations that Musk "held a series of private meetings during the Class Period with [the Twitter CEO] and other Company insiders" and "Musk had already engaged in numerous discussions and meetings with senior Twitter leadership and other insiders." *Id*. But, to the extent these allegations—distinguishing Musk from "other insiders"—prove anything, they ***support*** Plaintiff's theory that Musk was a temporary insider.

## IV.    CONCLUSION

Defendants' Motion should be denied. Should the Court grant any part of Defendants' Motion, Plaintiff respectfully requests leave to amend under Rule 15(a).

Dated: March 31, 2023

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson

John C. Browne
Katherine M. Sinderson
Jeremy P. Robinson
Jonathan G. D'Errico
Jasmine Cooper-Little
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
katie@blbglaw.com
jeremy@blbglaw.com
jonathan.derrico@blbglaw.com
jasmine.cooper-little@blbglaw.com

*Lead Counsel for Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*