**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, <br><br> Plaintiff, <br><br> v. <br><br> ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL, <br><br> Defendants. | No. 1:22-cv-03026-ALC-GWG <br><br> <u>CLASS ACTION</u> <br><br> FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I.  JURISDICTION AND VENUE .............................................................. 9

II.  PARTIES ................................................................................................ 10

    A.  Lead Plaintiff ............................................................................. 10

    B.  Defendants Musk, the Musk Trust, and Excession ............................ 11

    C.  Defendant Jared Birchall .................................................................... 12

    D.  Relevant Nonparties ........................................................................... 13

III.  RELEVANT BACKGROUND .......................................................... 14

    A.  Musk's Contempt For The SEC And The United States Securities Laws ........... 14

    B.  SEC Rule 13 Disclosures Are Critically Important To Investors ......................... 20

        1.  Rule 13 Was Enacted To Ensure Full Disclosure Of Substantial Ownership Interests And Flag Potential Takeovers For Investors ........... 20

        2.  Investors Pay Close Attention To Schedule 13 Filings As They Typically Result In Stock Price Increases For Target Companies .......... 22

        3.  Relevant Distinctions Between Schedule 13D And 13G Forms .............. 24

    C.  Musk's Specific Knowledge Of Rule 13 And History Of Filing Schedule 13 Forms ............................................................................................... 25

IV.  DEFENDANTS' SCHEME TO DECEIVE INVESTORS WHO SOLD TWITTER SECURITIES DURING THE CLASS PERIOD ........................................... 27

    A.  ████████████████████████████████████ ........... 31

        1.  ████████████████████████████ .............. 34

        2.  ████████████████████████ .................... 36

    B.  ██████████████████████████████ ....... 39

i

1.    ███████████████████████████████████████ ..... 40

2.    ████████████████████████ .......................... 44

C.    ████████████████████████████████████████████ ..... 46

D.    March 14, 2022: Musk Crosses The 5% Threshold, Which Triggered His
      Obligation To Disclose His Twitter Stake Within 10 Days ................................. 48

E.    March 25, 2022: At The Start Of The Class Period, Musk Continued To
      Conceal His Twitter Interest And Secretly Continued To Acquire Twitter
      Shares At Artificially Low Prices ........................................................ 49

F.    During the Class Period: Instead Of Disclosing His Twitter Stake,
      Defendant Musk Teases The Investing Public, ████████████████ ................ 51

      1.    ████████████████████████████████ ......... 53

      2.    Musk Issues Misleading Statements On Twitter To Conceal His
            Activist Interest In Twitter ........................................................ 54

G.    During The Class Period: Musk Covertly Discusses His Plans With Senior
      Twitter Executives And Others While Hiding His Growing Ownership
      Stake From Investors ............................................................................ 60

H.    During The Class Period: Musk Secretly Purchases Nearly 15 Million
      Shares of Twitter Stock at Artificially Depressed Prices ....................................... 62

V.    THE TRUTH EMERGES ..................................................................... 65

A.    On April 4, 2022, Musk Attempts To Hide His Activist Intentions And
      Files A Misleading Schedule 13G, Eleven Days Late .......................................... 65

B.    Musk Is Finally Revealed As An Activist Investor As Twitter Announces
      His Appointment To Its Board .............................................................. 68

VI.   POST-CLASS PERIOD EVENTS ................................................................. 70

A.    ████████████████████████████████████████ ......... 70

B.    Regulatory Investigations Surrounding Musk's 13G And 13D Filings ............... 71

C.    Musk Agrees To Acquire Twitter, Appears To Have Second Thoughts,
      And Then Proceeds With The Takeover On Its Original Terms ........................ 72

VII.     ADDITIONAL ALLEGATIONS OF SCIENTER ........................................................ 75

VIII.   DEFENDANT MUSK'S MATERIALLY FALSE AND MISLEADING
       STATEMENTS AND HALF-TRUTHS............................................................. 82

     A.     Musk's Scheme To Secretly Buy A Massive Stake In Twitter  And
           Mislead Investors .................................................................................... 82

     B.     Musk's Misleading Affirmative Statements In Furtherance Of His Scheme ....... 82

IX.      LOSS CAUSATION........................................................................................... 85

X.       PRESUMPTION OF RELIANCE ...................................................................... 86

XI.      CLASS ACTION ALLEGATIONS ................................................................... 87

XII.     COUNTS......................................................................................................... 88

COUNT I ................................................................................................................ 88

For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against All
     Defendants ...................................................................................................... 88

              (a)     Discovery Has Revealed Acts in Furtherance of
                     Defendants' Scheme to Defraud Investors In Violation of
                     Plaintiff's Section 10(b) Claim Specifically Under Rules
                     10b-5(a) And (c). ............................................................. 89

              (b)     Defendants' Affirmative Misrepresentations In Violation of
                     Plaintiff's Section 10(b) Claim Specifically Under Rule
                     10b-5(b)....................................................................... 91

COUNT II ............................................................................................................... 92

For Violation Of Section 20(a) Of The Exchange Act  Against Defendants Elon Musk
     and Jared Birchall ........................................................................................... 92

XIII.    PRAYER FOR RELIEF ................................................................................... 92

XIV.   JURY DEMAND ............................................................................................. 93

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff"), by and through its undersigned counsel, brings this federal securities class action (the "Action") on behalf of investors who sold the securities of Twitter, Inc. ("Twitter" or the "Company") between March 25, 2022 and April 4, 2022, inclusive (the "Class Period"), and who were damaged as a result of Defendants' scheme to defraud and related misrepresentations as alleged in this Complaint (the "Class"). The securities claims asserted in this Complaint are alleged against Defendants Elon R. Musk, the Elon Musk Revocable Trust dated July 22, 2003, Excession LLC (collectively, "Musk"), and Jared Birchall ("Birchall" and, together with Musk, "Defendants").

## **INTRODUCTION**

1.      This securities class action is about a billionaire tech mogul, Elon Musk, and his wealth manager, Jared Birchall, who together schemed to violate Musk's disclosure obligations so they could secretly build a massive position in Twitter at artificially low prices while deceiving investors. Discovery has shown that ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ The truth is that Musk and Birchall knew that they had to disclose Musk's massive interest in Twitter shortly after crossing the 5% ownership threshold—indeed, Musk had previously admitted to having this knowledge under oath to the SEC. But they nevertheless decided to conceal Musk's interests in Twitter—and mislead

investors—until Musk ████████████████████████████ was ready to unveil his plan.

2.      When Musk belatedly disclosed his Twitter interests, the price of Twitter's stock predictably skyrocketed. But everyone who sold Twitter securities before then—while Musk and Birchall concealed Musk's ownership of, and activist interests in, the Company—was misled and deprived of critical information affecting the value of their securities, including that Musk owned over 5% of Twitter and the Company was the target of a potential takeover by Musk. These investors suffered enormous damages.

3.      Musk now owns Twitter. Following his infamous takeover of the Company, he rebranded it to "X," a decades-long culmination of Musk's vision for "X.com," a company he founded in 1999.

4.      Musk is a repeat violator of SEC rules and regulations and has faced multiple penalties and investigations by the SEC. Musk makes no secret of his contempt for the SEC and its rules. For example, he has publicly belittled the federal agency (such as calling it the "Shortseller Enrichment Commission"), he openly proclaimed, "I do not respect the SEC," and he called the SEC office that prosecuted him "bastards" and "shameless puppets of Wall St shortseller sharks."

5.      During the Class Period (March 25, 2022 to April 4, 2022), Defendants' scheme violated Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5(a), (b), and (c) promulgated thereunder by concealing, and misleading investors regarding, Musk's massive ownership stake and interests in Twitter in violation of Section 13 of the Exchange Act and Rule 13(d) promulgated thereunder ("Rule 13") and through Musk's dissemination of misleading statements in furtherance of this fraudulent scheme.

6.      Rule 13 requires that investors who obtain 5% or more beneficial ownership of a company's stock publicly disclose that interest, as well as their intentions to change or influence control of the company. In particular, within 10 days after passing the 5% threshold, an investor must file one of two forms disclosing their holdings in a target company and stating whether they intend to "chang[e] or influenc[e] the control of the issuer"—in which case they must file a Schedule 13D—or whether they intend to be a passive investor, in which case they can file a Schedule 13G. The default is to file a Schedule 13D.

7.      The timely filing of a Schedule 13D is important to investors as it reports critical information regarding significant ownership interests in, and potential takeovers of, a company. As noted when Congress enacted Rule 13, "[T]he disclosure provisions of 13(d) are 'the only way that corporations, their shareholders and others can adequately evaluate . . . the possible effect of a change in substantial shareholdings.'"

8.      Defendants are well aware of Rule 13 and its requirements.



9.      Musk's past testimony to the SEC in connection with different violations of the federal securities laws also reveals his personal knowledge of the 5% reporting threshold. For

example, Musk testified under oath to his knowledge of the 5% disclosure requirement at an August 29, 2018 SEC deposition, stating that: "***U.S. reporting requirements start at 5 percent***."[1] He further testified that acquiring anything higher than 4.99% ownership "***would create a splash because of the reporting requirement***."

10. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

11.     Further, Musk has a long history of filing both Schedules 13D and 13G, including by having personally filed and signed no less than ***twenty*** Schedule 13 forms (eight Schedule 13Ds and twelve Schedule 13Gs) from 2011 through the Class Period.

12.     Musk's Twitter stock buying spree and eventual takeover of the Company started in early 2022. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1] Unless otherwise noted, all internal citations and punctuation are omitted, and all emphasis is added.

13. 

14.

15.

On March 14, 2022, Musk crossed the 5% threshold in his Twitter holdings, which triggered his obligation to disclose his interests by filing a Schedule 13D form within 10 days. On March 24, 2022, the last day of the 10-day deadline to disclose, Defendants continued with their scheme and concealed Musk's interests in Twitter from investors, which, *inter alia*, violated Defendants' legal obligation to make the required disclosures under Rule 13.

16.    The Class Period starts on March 25, 2022—the first day after Defendants started violating the federal securities laws by concealing Musk's interests in Twitter and misleading investors. By that time, Musk had secretly purchased close to 60 million shares of Twitter stock at a cost of over $2 billion. For the next eleven days, while Musk concealed his stake in Twitter and misled the market, investors sold tens of millions of Twitter shares and traded other Company securities without knowing about Musk's ownership interest or that the Company was "in play" for a potential takeover by Musk. All the while, Musk continued to secretly purchase tens of millions of dollars of Twitter shares each trading day—increasing his Twitter stake by $1.2 billion at a significant discount.

17.    Although Musk hid his purchases of Twitter stock during the Class Period, he did not remain silent. Instead, in service of Defendants' scheme, Musk misleadingly represented to the public that he was "giving serious thought" to "building a new social media platform," which helped further conceal that he was pursuing an active role at Twitter and also aided his scheme by keeping the price of Twitter securities artificially low. In reality, Musk had already secretly purchased over $2 billion dollars of Twitter securities—and was continuing to buy huge amounts of additional stock each day—and of course he had no intention of █████████████████████ building a new social media platform. After all, Musk was secretly spending billions buying up Twitter stock—he was not going to waste that massive investment by building a rival. Musk's

statements on Twitter were intended to further misdirect the public and allow Musk to continue to purchase Twitter securities at artificially deflated prices. ████████████████████

████████████████████████████████████████████████████████

18.    Musk has made clear that he does not believe that his public statements should be restrained by accuracy or truth. In a defamation lawsuit accusing Musk of falsely linking a Jewish man to a neo-Nazi group, Musk testified that he sees his "incorrect" public statements as the price of his First Amendment rights. For example, Musk testified: "There's some risk that what I say is incorrect, but one has to balance that against having a chilling effect on free speech in general[.]"

19.    While he was deceiving investors regarding his Twitter interests—and investors were unwittingly trading Twitter securities at artificially depressed prices—behind the scenes Musk was meeting with Twitter's senior-most executives regarding his plans to influence Twitter and join its Board. For example, as Twitter revealed *after* the Class Period in a filing with the SEC, Musk held a series of private meetings during the Class Period with Parag Agrawal (Twitter's then-CEO) and other Company insiders like Jack Dorsey (Twitter's founder and then-director) and Bret Taylor (then-Chair of Twitter's Board). At these meetings, Musk discussed "joining the Twitter Board," Musk's "significant stake of more than five percent" in the Company, and that Musk was also "considering the possibility of taking Twitter private"—*the very information about Musk's Twitter ownership and activist intentions that he was legally obligated to disclose under Rule 13 (but did not)*.

20.    By deceiving investors regarding his interests in Twitter, Musk reaped the benefit of substantial savings when purchasing Twitter stock. By keeping his scheme to acquire a massive ownership interest in Twitter secret and by surreptitiously buying the stock so as to go unnoticed,

████████████████████ kept the prices of Twitter's securities artificially low. Indeed, Musk ultimately saved over an estimated $200 million. But Twitter investors who sold their Company shares (or traded options) during the Class Period were cheated out of the true value of their securities, because they sold at prices that were kept artificially low by Musk's secret scheme, misleading statements, and violation of his disclosure obligations.

21.    On April 3, 2022, Twitter formally offered Musk a position on its Board. On April 4, 2022, Musk and Twitter entered into a letter agreement stating that Musk would be appointed to Twitter's Board. █████████████████████████████████████████ ████████████████████████████████████████

22.    Also on April 4, 2022, recognizing that his undisclosed buying spree would likely soon come to light as he was joining Twitter's Board, ███████████████████████ █████████████████████████████████████ Although Musk's Schedule 13G did disclose his ownership interest in Twitter, this filing only partially fulfilled Musk's reporting obligations—and was itself materially misleading. This "short-form" Schedule 13G—as opposed to a Schedule 13D—falsely signaled to investors that Musk was a "passive" investor. And it said nothing about Musk joining Twitter's Board.

23.    Further, Musk and his co-conspirators had their ████████████████████ ██ Schedule 13G form. Instead of certifying that Musk "[h]as **not** acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer," as required for a proper Schedule 13G, they deliberately deleted the certification language and replaced it with the words "Not Applicable." ████████████████████████████████████ ██████████████████████████████████████ As was later revealed, the improprieties in Musk's Schedule 13G form prompted the SEC to write to Musk

the same day to ask "why . . . you determined that the [requisite certification] was not applicable." The SEC also asked why Musk's disclosure was not "made within the required 10 days."

24.     In the morning on April 5, 2022, before the markets opened, Twitter filed a Form 8-K with the SEC announcing that Musk had agreed to join its Board. Later that same day, after the SEC's inquiry forced their hand, Musk's attorneys amended his misleading Schedule 13G by filing the requisite Schedule 13D form, through which Musk (finally) disclosed both his ownership stake and his activist intentions. Given that it finally revealed the entire truth that had been previously concealed, Musk's lawyers apparently determined that it was safe for them to sign the 13D form, which they did on Musk's behalf.

25.     In response to these disclosures, Twitter's stock price skyrocketed. Twitter's stock price ballooned by more than $10 per share, or 27%, to close at $49.97 per share on April 4, 2022 (up from $39.31). Then, Twitter's stock price responded with another increase on April 5, 2022—spiking to $54.57 per share before closing at $50.98 per share—and continued to react positively on April 6, 2022 (after accounting for market-wide movements). Thus, everyone who sold Twitter stock or traded its other securities while Musk illegally withheld his interest in and intentions for Twitter were fraudulently deprived of enormous value for their securities.

26.     This action seeks to recover the damages caused by Defendants' scheme to defraud and deceive investors, including by refusing to timely and properly meet Musk's disclosure obligations under the law.

## I.    JURISDICTION AND VENUE

27.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rules 10b-5(a), 10b-5(b), 10b-5(c), and 10b-5(1) promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction

over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28.     This Court has personal jurisdiction over Defendants because Defendants have sufficient contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. During the Class Period, Defendants purchased shares of Twitter on the New York Stock Exchange, which is in this District, while making materially misleading misrepresentations.

29.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Twitter's securities were listed and traded on the New York Stock Exchange during the Class Period, and many of the acts and transactions alleged in this Complaint, including the dissemination of materially false and misleading statements, occurred in substantial part in this District. Defendants also transact business in this District.

30.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Musk, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## II.     PARTIES

### A.     Lead Plaintiff

31.     Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma. Currently, Lead Plaintiff manages approximately $3.4 billion in assets on behalf of over 26,000 participants. As set forth in its previously filed Certification, Lead Plaintiff sold more than 14,000 shares of Twitter stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

B.    **Defendants Musk, the Musk Trust, and Excession**

32.    Defendant Musk acquired Twitter (now "X") following a $44 billion takeover transaction that closed on October 27, 2022 after an intense legal battle. After acquiring Twitter, Musk dubbed himself the Company's "Chief Twit," ousted Twitter's top executives, and gutted Twitter's workforce, including firing most of the "fact checkers" responsible for ensuring the accuracy of public statements on Twitter. Musk is also the CEO and self-anointed "Technoking" of Tesla, Inc. ("Tesla"), a public automotive and clean energy company.

33.    Musk has a current estimated net worth of approximately $180 billion, though it fluctuates based on the stock price of his companies. Musk's biggest asset is his massive stake in Tesla, which accounts for a significant majority of his wealth, and Space-X. Indeed, "[a]s much as 99% of Musk's wealth is held in shares of [Tesla and Space-X]," leading *The Wall Street Journal* in a May 8, 2020 article to dub Musk "Tech's Cash-Poor Billionaire."

34.    As noted above, Musk's trust, the "Elon Musk Revocable Trust dated July 22, 2003" (the "Musk Trust") is a named defendant in this Action. According to Musk's Schedule 13D filed on April 5, 2022, the Twitter common stock beneficially owned by Musk is "held by the [Musk Trust]." Further, Musk is the "sole Trustee" of, and controls, the Musk Trust.

35.    In addition, Excession LLC ("Excession") is a named defendant in this Action. Excession is Musk's family office, and *Bloomberg* indicates that Excession "is responsible for a range of wealth and investment management activities" on behalf of Musk—including, for example, Musk's purchases of Twitter stock and ultimate purchase of Twitter.

C.    **Defendant Jared Birchall**

36.    Jared Birchall is a former banker who is known as Musk's "right hand man." Since 2016, Birchall has been Musk's wealth manager and managing director of Musk's family office, Defendant Excession LLC, and ██████████████████████████████████████ ██████ Additionally, Birchall holds various leadership positions within Musk's companies and charitable foundation. Specifically, he is a director at the Boring Company, CEO of Neuralink, CFO and board Secretary of xAI, and secretary, treasurer, and director of the Musk Foundation (Musk's personal charity).

37.    Prior to his tenure managing billions in assets for Musk, Mr. Birchall worked as a financial analyst at Goldman Sachs, a private wealth adviser at Merrill Lynch & Co. until 2010 (when he was reportedly fired for "sending correspondence to a client without management approval"), and finally as a senior vice president of private banking at Morgan Stanley until Musk hired him in 2016.

38.    Birchall is devoutly loyal to Musk and has repeatedly gone to extraordinary lengths to protect Musk and serve Musk's interests. For example, a British rescue diver who helped rescue children stranded in a cave in Thailand brought a defamation lawsuit against Musk, who had publicly termed the cave rescue diver a "pedo guy" after the diver criticized Musk's suggestion to use a miniature SpaceX submarine to rescue the children as a "PR stunt." Birchall used an assumed name to secretly hire a private detective to follow and gather information on the diver to undermine his claims.

39.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



D.      **Relevant Nonparties**

40.     **Twitter/X**. Twitter or X (collectively "Twitter") is a global social media company whose stock traded on the New York Stock Exchange during the Class Period. Twitter users interacted with each other by publishing "tweets" of up to 280 characters that could be liked, commented on, or reposted to other users. Twitter users also could "follow" each other to view and interact with each other's tweets more readily. After its origin in 2006, Twitter became one of the biggest and most influential names in social media. After Musk acquired Twitter, he renamed it to "X". Once the deal closed, Musk went on to gut Twitter's workforce. Twitter's valuation has dropped dramatically since Musk's takeover. According to current shareholder Fidelity, as of November 2023, "X" is worth 71.5% less than Twitter was at the time of Musk's purchase.

41.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

42.     Maintaining Musk's lucrative business is paramount to Morgan Stanley. ████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

███████████████████████████████████████████████████ Indeed, after

Musk announced that he would take Twitter private, ██████████████████████████████

██████████████████████████████████████████████████████

████████ Musk secure $25.5 billion in funding for the deal (by contrast, Musk has sought to fire

other advisors for perceived betrayals, including a Cooley LLP lawyer who worked for the SEC).

The Twitter take private deal included $12.5 billion in loans that used Musk's Tesla stock as

collateral and, as discussed below, ultimately closed for $44 billion. ███████████████████

████████████████████████████████████████████████ Morgan

Stanley is further incentivized to continue its courtship with Musk should he decide, for example,

to take his privately held companies—SpaceX, The Boring Company, or Neuralink—public.

## III.     RELEVANT BACKGROUND

### A.     Musk's Contempt For The SEC And The United States Securities Laws

43.     The present Action is the latest episode in Musk's history of disregard for the

federal securities laws and contempt for the SEC and its rules and regulations. Indeed, Musk has

long used his bully pulpit on Twitter to flout SEC regulations at will. Musk himself admitted in an

October 7, 2022 interview with the *Financial Times* that, while using Twitter, he "often shoot[s]

[him]self in the foot and cause[s] [him]self all sorts of trouble."

14

44.    A prime example of Musk's use of Twitter to violate the securities laws occurred on August 7, 2018, when Musk tweeted that he was "considering taking Tesla private at $420" with "[f]unding secured."



45.    The market reacted swiftly, with Tesla's shares soaring seven percent within 90 minutes of Musk's post, as reported by the *New York Times* in an August 16, 2018 article titled "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil." Shortly after Musk's tweet, the Nasdaq stock exchange had to halt trading in Tesla stock. In an interview from the same *New York Times* article, Musk was asked how he chose the price, to which he replied, "It seemed like better karma at $420 than at $419." In reality, "420" is a slang reference to marijuana.

46.    The SEC immediately commenced an investigation into Musk's tweet. As reported by the *New York Times* in the above-cited article: "[o]rdinarily, such material information about a public company's plans is laid out in detail after extensive internal preparation and issued through official channels"—not the shotgun-blast of a tweet. This led to an SEC enforcement action against Musk, charging him with falsely indicating that "it was virtually certain that he could take Tesla private at a purchase price that reflected a substantial premium over Tesla stock's then-current share price" when, "[i]n truth[,] Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential funding source."

47.     Musk agreed to settle the SEC enforcement action on September 29, 2018. Among other corporate governance and oversight overhauls, the SEC settlement required that Musk and Tesla each pay a separate $20 million penalty, Musk step down as Tesla's Chairman, and he was "required to have Tesla-related tweets that contain material company information approved by an attorney before posting them"—a so-called "Twitter Sitter."

48.     During a later *Ted Talk* interview published on YouTube.com dated April 14, 2022, Musk called the SEC "**bastards**" who "**unlawfully**" forced him to settle. He also refused to accept responsibility for the misconduct with which the SEC charged him, and even claimed he was forced to lie to save Tesla. Specifically, Musk stated that he was "forced to concede[] to the SEC, unlawfully, those bastards" and asserted that "I was forced to admit that I lied . . . to save Tesla's life." By making these statements, Musk violated the terms of his settlement with the SEC, which provides:

> "Defendant: (i) will not take any action to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis . . ."

49.     Since then, Musk has repeatedly attempted to wriggle out of his SEC settlement. For example, on March 8, 2022, Musk filed a motion seeking to terminate the SEC settlement in *United States Securities and Exchange Commission v. Musk*, Case No. 1:18-cv-08865-LJL (S.D.N.Y.). There, Musk argued, *inter alia*, that the SEC had misused the settlement to "harass him and to launch investigations of his speech." In an order issued April 27, 2022, the Honorable Lewis J. Liman of this Court rejected Musk's argument as "meritless," explaining (ECF No. 81 at 21-22):

> "Musk cannot now seek to retract the agreement he knowingly and willingly entered by simply bemoaning that he felt like he had to agree to it at the time but now—once the specter of the litigation is a distant memory and his company has become, in his estimation, all but invincible—wishes that he had not."

50.    On May 15, 2023, the Second Circuit rejected Musk's appeal of Judge Liman's ruling. *Sec. & Exch. Comm'n v. Musk*, No. 22-1291 (2d Cir. May 15, 2023) (summary order). The Second Circuit found that there was "no evidence to support Musk's contention that the SEC has used the consent decree to conduct bad-faith, harassing investigations of his protected speech." *Id.* at 4. The Court concluded that "the district court was well within its sound discretion to deny Musk's motion to modify the terms of the consent decree," particularly given "the importance of the public's interest in the enforcement of federal securities laws." *Id.* at 5-6.

51.    In multiple public statements, Musk has openly mocked and derided the SEC. For example, days after settling the SEC charges, Musk sarcastically called the SEC "the Shortseller Enrichment Commission."



Two months later, in a 60 Minutes interview on December 9, 2018, Musk stated "***I want to be clear. I do not respect the SEC. I do not respect them***."

52.    Undeterred by the SEC sanctions, Musk continued to tweet with abandon and has flouted the requirements of the SEC settlement that he obtain preapproval of his tweets. For example, Musk testified at the trial in *Tornetta v. Musk*, C.A. No. 2022-0408-JRS (Del. Ch.) (the "*Tornetta* Action") that the Twitter Sitter "does not routinely review [his] tweets before" Musk

publishes them. Instead, Musk "self-regulates"—*i.e.,* he selects and submits his own tweets for

Twitter Sitter approval, "wait[s] for some period of time and see[s] if there's any response," and

"if not, I post the tweet."

53.     Musk's disregard for the SEC settlement terms has had disastrous consequences for

investors, including in the following instances:

- On February 19, 2019, without getting pre-approval, Musk tweeted that "Tesla made 0 cars in 2011, but will make around 500k in 2019" without getting pre-approval. Hours later, Musk tweeted a pre-approved, corrected message: "Meant to say annualized production rate at end of 2019 probably around 500k, [*i.e.*,] 10k cars/week. Deliveries for year estimated to be about 400k." This tweet caused Tesla's stock to fall 3% in premarket trading. The SEC initiated an investigation and brought contempt charges, which Musk resolved by agreeing to more restrictive review of his tweets.

- On May 1, 2020, Musk tweeted that "Tesla stock price is too high imo [*i.e.,* in my opinion]." That day, as reported in a May 1, 2020 *Wall Street Journal* article, Musk was "asked . . . if he'd had his tweet vetted before posting it," and he replied: "No." Musk's tweet caused Tesla's stock to fall 10%, erasing $14 billion of shareholder value.

- On November 6, 2021, Musk tweeted a poll asking whether he should sell 10% of his Tesla stock. In response, 58% of the 3.5 million responses voted yes. This caused Tesla's stock to fall 4.9% the next trading day, erasing over $59 billion in shareholder value. Conspicuously, Musk's brother sold $108 million in Tesla shares the day ***before*** Musk's tweet. This led to another SEC investigation.

54.     Musk has continued to make his disdain for the SEC clear. For instance, on April

25, 2022, Musk lashed out at the San Francisco office of the SEC (which opened the investigation

into Musk's "$420" tweet) by calling it a "shameless puppet[] of Wall St shortseller sharks" that

does "nothing to protect actual shareholders." Musk further proclaimed that he had "lost all respect

for them."



55.    Musk has even published tweets with more overtly offensive and explicit sentiments regarding the SEC, including a July 2, 2020 tweet yet again ridiculing the SEC's acronym. When Ross Gerber, a leading investment advisor and one of Musk's followers, labelled this tweet "Dangerous," Musk responded "But sooo satisfying."

56.    Additionally, on October 5, 2023, the same day the SEC filed suit to compel Musk to appear for further testimony concerning his disclosures regarding his purchases of Twitter securities, Musk called for a "comprehensive overhaul" of government agencies, including the SEC, as "sorely needed":



57.    Musk has become so well-known for his disregard for shareholder interests and SEC regulation that UCLA Law has a course entitled "Law of Elon Musk." This course examines how "Musk constantly faces the temptation to pursue his own interests and goals rather than focusing on the welfare of those who have entrusted him with their savings" and "some of the ways in which law constrains (or fails to) Musk's divergences from shareholder interests."

**B.    SEC Rule 13 Disclosures Are Critically Important To Investors**

58.    Rule 13 requires that investors who obtain 5% beneficial ownership or more of a company's stock file a Schedule 13 with the SEC within 10 calendar days of passing the 5% threshold. As summarized below, Rule 13 and the Schedule 13 disclosure forms play a critical role in disseminating to investors material information about substantial share acquisitions and potential company acquisitions.

**1.    Rule 13 Was Enacted To Ensure Full Disclosure Of Substantial Ownership Interests And Flag Potential Takeovers For Investors**

59.    Rule 13 was enacted as part of an amendment to the Securities and Exchange Act of 1934, known as the Williams Act (the "Act"). The Act was passed in 1968, in response to

concerns that cash-tender offer corporate takeovers were depriving shareholders of necessary information regarding corporate control and valuation.

60.     When Congress enacted the Act, its purpose and importance were clear. For example, a 1968 House of Representatives Report noted, "The [Act] would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with . . . techniques for accumulating large blocks of equity securities of publicly held companies." Senator Harrison Williams, sponsor of the Act, stated the disclosure provisions of 13(d) are "the only way that corporations, their shareholders and others can adequately evaluate . . . the possible effect of a change in substantial shareholdings."

61.     The SEC has likewise explained that significant stock ownership, such as holdings reported in adherence to Rule 13, "contains market-moving information related to potential changes of corporate control which could influence investors' decision making," and that "Section 13(d) was enacted with the intention to 'alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.'"

62.     Subsequent case law has confirmed this purpose. As the Second Circuit explained in *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971), "[S]ection 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing. ***Disclosure which is false or misleading subverts this purpose***." Relatedly, the Court in *Puddu v. 6D Glob. Techs., Inc*., 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021), succinctly highlighted how misleading it is to disregard Rule 13 disclosure obligations, stating, "[A]n intentional failure to disclose beneficial ownership

information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose."

63.    The SEC has continued to recognize the critical materiality of Schedule 13 filings. On October 10, 2023, the agency adopted a rule change that, among other things, shortened the reporting period from 10 days to 5 days. As part of promulgating this rule, the SEC explained that:

> During *any delay* between a market-moving event and the Schedule 13D filing, *securities are likely to be mispriced* relative to a full-information benchmark, and information asymmetry between Schedule 13D filers and those with whom they share the information, and the rest of the market, is greater than otherwise. The prolonged delay could, therefore, *harm the investors who happen to sell their shares during the 10-day window* . . . . If an initial Schedule 13D were required to be filed more promptly, those investors might be able to sell their shares at a higher price, or they may re-evaluate their investment decisions. Timelier reporting would also allow other market participants, such as analysts and investment advisers, to better value the securities and make better recommendations."

64.    In a press release regarding the SEC's then-pending rule shortening Rule 13's 10-day window, SEC Chair Gary Gensler re-affirmed the importance of Rule 13, stating "The filing of [a] Schedule 13D can have a material impact on a company's share price, so it is important that shareholders get that information sooner." Dozens of institutions submitted comment letters in support of the proposed rule, including the Nasdaq stock exchange, which submitted an April 12, 2022 letter stating: "Information contained in unnecessarily delayed 13D or 13G filings is clearly important for informing investors and the market regarding the value and potential control of the affected company."

### 2.    Investors Pay Close Attention To Schedule 13 Filings As They Typically Result In Stock Price Increases For Target Companies

65.    Schedule 13 filings are carefully tracked by investors, including because they signal that a company is "in play" for a potential takeover, which in turn will likely result in a stock price increase for the target company. As explained in the *Columbia Law Review*, there are a "large number of 13D tracking websites, which provide readers with information about recent 13D filings

by prominent investors" and which "supports the notion that these [Schedule 13D] filings can prompt copy-cat investor behavior" that drives up stock prices. Experienced market participants have stated that the filing of a Schedule 13 is "like blood in the water" that "***driv[es] up the price***" of a target company's securities.

66.    Indeed, Schedule 13D filings have a predictable and positive impact on target company stock prices. As the SEC recently noted, "It is well documented in the academic literature that economically significant price changes occur in response to news about changes in corporate control, such as the initial filing of a Schedule 13D. For example . . . the filing of a Schedule 13D is associated with large positive average abnormal returns, in the range of 7% to 8%, during the [–20,+20] announcement window, and about 2% during the filing day and the following day."

67.    As such, for any investor, the filing of a Schedule 13D would represent a red flag that the Company is the target of a potential takeover and that the stock price will likely go up.

As such, an investor would invariably want to know the information reported on a Schedule 13 form, especially if they had any plans to sell given the expected price impact. Indeed, an investor may decide not to sell at all or at least would take advantage of a higher price when selling their securities based on Schedule 13 disclosures. And for quantitative trading strategies that use systematic trading algorithms, a Schedule 13D filing would likely trigger an automatic stop to any campaign of selling a company's securities.

68.    Given the importance of Schedule 13 filings to investors, broker-dealers will customarily inform their clients as their purchases approach the 5% threshold necessary for disclosure under Rule 13. These notifications are provided as a matter of course and are particularly common amongst large-scale broker-dealers with shareholder reporting programs. █████████

███████████████████████████████████████████████████████████████████████████

### 3.    Relevant Distinctions Between Schedule 13D And 13G Forms

69.    Schedule 13 forms reveal the name, ownership stake, and the stated intentions of the filer. As noted above, the specific type of Schedule 13 that must be filed—Schedule 13D or Schedule 13G—largely depends on the investor's intentions for the target company.

70.    The default presumption for investors that hit the 5% beneficial ownership threshold is that they are active investors and must file a Schedule 13D that discloses the purpose of their acquisition. *See* Rule 13d-1(a).

71.    However, if certain exceptions apply, an investor may disclose an over-5% interest in a company via a Schedule 13G, which is a "short-form" filing with fewer requirements. As relevant here, an investor may file a Schedule 13G if they acquired the securities ***without*** a purpose or effect "of changing or influencing the control of the issuer." As such, a Schedule 13G filing signals to the market that the investor is taking a passive interest in the target company. Indeed, when filing a Schedule 13G form pursuant to this exception, an investor must expressly certify that they have "not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect." *See* 17 C.F.R. § 240.13d-1(c).

72.    In Question and Answer 103.04 of the SEC's *Questions and Answers of General Applicability* for Section 13(d), the SEC explained that reaching the 5% threshold while becoming a member of a target company's board presumptively qualifies as acquiring securities "with the effect of, changing or influencing the control of the issuer," and thus "eliminate[s] . . . eligibility to file on Schedule 13G pursuant to Rule 13d-1(c)."

### C.    Musk's Specific Knowledge Of Rule 13 And History Of Filing Schedule 13 Forms

73.    Musk is well aware of Rule 13 and its requirements. Indeed, ███████████████ ███████████████████████████████████████████ and, further, has a long history of filing Schedule 13 forms.

74.    

75.    ████████████████████ As discussed above, in 2018 the SEC brought an enforcement action against Musk relating to his tweet about taking Tesla private. The SEC deposed Musk in connection with the enforcement proceeding on August 29, 2018. Excerpts of Musk's deposition

testimony given to the SEC were subsequently made public in connection with *In re Tesla, Inc. Securities Litigation*, Case No. 18-cv-04865-EMC (N.D. Cal. 2020) (the "*Tesla Securities Litigation*"), a related suit brought by Tesla investors in the Northern District of California.

76.    As relevant here, during this SEC deposition, Musk revealed that he had engaged with the PIF, Saudi Arabia's sovereign wealth fund, to invest in Tesla. Musk explained that he advised the PIF to buy a significant stake in Tesla, but under 5%, to show that it was serious. According to the district court's summary judgment opinion, Musk testified that the reason he suggested 5% as a ceiling was because "***U.S. reporting requirements start at 5 percent***."

77.    Similarly, an excerpt from the transcript published on the docket of the *Tesla Securities Litigation* shows that Musk specifically discussed the 5% reporting requirement with a representative of the PIF. For example, Musk testified:

> "[The representative of the PIF] mentioned that he had invested 5 percent--he purchased 5 percent of the company already, just on the open market, and that the only thing that was inhibiting a higher ownership ***was the reporting requirements***, 4.99 percent***. And he wanted to go considerably higher but did not want to do that without checking with me. And obviously, ***this would create a splash because of the reporting requirement***."[2]

78.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

79.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[2] *See, e.g.*, ECF No. 438-13 at 11, *Tesla Securities Litigation*, No. 18-cv-04865-EMC (N.D. Cal. June 15, 2022).

████████████████████████████████████████████████████

80. In addition, Musk has a long history of filing Schedule 13s with the SEC. In fact, as detailed in the below chart, as of the Class Period Musk had personally filed and signed (or directed his attorneys to do so) *twenty* Schedule 13 forms—including twelve Schedule 13Gs and eight Schedule 13Ds—since 2011.

| Form | Date | Filer/Preparer | Issuer |
|------|------|----------------|--------|
| Schedule 13D | Dec. 20, 2012 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Feb. 7, 2014 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Feb. 13, 2015 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Jan. 29, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Feb. 16, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | June 21, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | July 31, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13D | Nov. 21, 2016 | Elon Musk c/o SolarCity Corporation | SolarCity |
| Schedule 13G | Feb. 3, 2011 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2012 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2013 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2014 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 13, 2015 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 12, 2016 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 9, 2017 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2018 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2019 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2020 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 12, 2021 | Elon Musk c/o Tesla Motors | Tesla |
| Schedule 13G | Feb. 14, 2022 | Elon Musk c/o Tesla Motors | Tesla |

81. As such, Defendants have personal knowledge of the purpose, timing, and requirements for both Schedule 13D and Schedule 13G.

## IV. DEFENDANTS' SCHEME TO DECEIVE INVESTORS WHO SOLD TWITTER SECURITIES DURING THE CLASS PERIOD

82. Beginning in January 2022, Defendants devised a scheme to secretly acquire a massive active ownership interest in Twitter. ████████████████████████████████████

████████████████████████████████████████████████████



83.

Defendants' deception continued through the Class Period, as Defendants secretly acquired Twitter shares at artificially discounted prices while concealing and deceiving investors regarding Musk's ownership interest and other plans for Twitter. During the Class Period, Musk misled the market about Twitter, including by falsely representing that he may be interested in building a rival platform to compete with Twitter, to divert attention from his undisclosed interests and keep Twitter's stock price low.

84.    Musk's takeover of Twitter, and his subsequent transformation of Twitter into "X," was the culmination of decades of aspirations. As documented in Walter Isaacson's 2023 biography of Musk, Musk founded "X.com" in 1999. Musk originally envisioned X.com to be "a banking service and a social network," or an "everything app that would handle all of a person's financial transactions and social connections." In 2000, X.com merged with PayPal. However,

Musk's then-colleagues rejected his effort to rebrand PayPal to "X.com" or "X-PayPal" due to the letter X's explicit connotations. In 2017, Musk purchased the "X.com" domain back from PayPal.

85.      Musk decided to execute upon his long-standing ambitions in 2022. According to Isaacson's biography, after exercising expiring stock options in Tesla, Musk had several billion in cash and he decided to use those funds to buy Twitter stock.



86.      As Musk later explained, he determined to buy Twitter to address his concern about the so-called "woke mind virus," and secure ███████████████████████████████████ ██████████ As Defendant Musk told Isaacson, "Twitter could become what X.com should have been . . . we can help save free speech in the process," and "[i]f you combine a social network with a payments platform, you could create what I wanted X.com to be." ██████████████

87.     ███████████████████████████████████████████████

88.     ███████████████████████████████████████████████

29



89.

90.

91.    Ultimately, Musk went from owning zero shares of Twitter stock as of January 28, 2022 to spending over $2.6 billion to secretly acquire over 70 million shares of the Company (at a reduced price) through the end of the Class Period on April 4, 2022. Musk's pre-Class Period acquisitions of Twitter stock are set forth below in Table 1.

**TABLE 1: Musk's Pre-Class Period Purchases of Twitter Stock**
January 31, 2022—March 24, 2022

| Date | Shares bought | Price | Cost to Defendant Musk | Percent of Outstanding Twitter Shares Owned by Musk |
|---|---|---|---|---|
| 1/31/2022 | 620,083 | $36.828 | $22,836,416.72 | 0.08% |
| 2/1/2022 | 542,496 | $37.549 | $20,370,182.30 | 0.15% |
| 2/2/2022 | 850,373 | $36.748 | $31,249,507.00 | 0.25% |
| 2/3/2022 | 3,649,957 | $34.391 | $125,525,671.19 | 0.71% |
| 2/4/2022 | 1,070,429 | $36.184 | $38,732,402.94 | 0.84% |

| Date | Shares bought | Price | Cost to Defendant Musk | Percent of Outstanding Twitter Shares Owned by Musk |
|---|---|---|---|---|
| 2/7/2022 | 4,839,507 | $36.515 | $176,714,598.11 | 1.45% |
| 2/8/2022 | 730,000 | $35.733 | $26,085,090.00 | 1.54% |
| 2/9/2022 | 638,283 | $36.886 | $23,543,706.74 | 1.62% |
| 2/10/2022 | 2,604,907 | $36.642 | $95,449,002.29 | 1.94% |
| 2/11/2022 | 1,291,432 | $36.523 | $47,166,970.94 | 2.11% |
| 2/14/2022 | 958,849 | $35.920 | $34,441,856.08 | 2.23% |
| 2/15/2022 | 371,075 | $36.511 | $13,548,319.33 | 2.27% |
| 2/16/2022 | 655,000 | $35.814 | $23,458,170.00 | 2.35% |
| 2/17/2022 | 731,581 | $35.891 | $26,257,173.67 | 2.44% |
| 2/18/2022 | 1,331,040 | $34.506 | $45,928,866.24 | 2.61% |
| 2/22/2022 | 1,256,751 | $33.231 | $41,763,092.48 | 2.77% |
| 2/23/2022 | 1,063,170 | $32.806 | $34,878,355.02 | 2.90% |
| 2/24/2022 | 838,793 | $33.765 | $28,321,845.65 | 3.00% |
| 2/25/2022 | 695,849 | $34.784 | $24,204,411.62 | 3.09% |
| 2/28/2022 | 1,025,518 | $35.320 | $36,221,295.76 | 3.22% |
| 3/1/2022 | 897,656 | $35.326 | $31,710,595.86 | 3.33% |
| 3/2/2022 | 992,785 | $34.575 | $34,325,541.38 | 3.45% |
| 3/3/2022 | 1,211,426 | $33.971 | $41,153,352.65 | 3.61% |
| 3/4/2022 | 1,016,259 | $33.376 | $33,918,660.38 | 3.73% |
| 3/7/2022 | 1,779,530 | $33.067 | $58,843,718.51 | 3.95% |
| 3/8/2022 | 2,228,858 | $33.769 | $75,266,305.80 | 4.23% |
| 3/9/2022 | 1,005,125 | $34.154 | $34,329,039.25 | 4.36% |
| 3/10/2022 | 1,228,833 | $33.932 | $41,696,761.36 | 4.51% |
| 3/11/2022 | 2,927,000 | $33.238 | $97,287,626.00 | 4.88% |
| **Musk Reaches 5% Ownership:** <br> **41,822,849 shares at a cost of $1,365,228,535.27** | | | | |
| 3/14/2022 | 2,770,284 | $33.082 | $91,646,535.29 | 5.22% |
| 3/15/2022 | 1,966,000 | $33.791 | $66,433,106.00 | 5.47% |
| 3/16/2022 | 2,978,376 | $34.992 | $104,219,332.99 | 5.84% |
| 3/17/2022 | 1,500,000 | $37.089 | $55,633,500.00 | 6.03% |
| 3/18/2022 | 2,858,340 | $38.252 | $109,337,221.68 | 6.39% |
| 3/21/2022 | 1,942,482 | $37.280 | $72,415,728.96 | 6.63% |
| 3/22/2022 | 2,476,000 | $38.542 | $95,429,992.00 | 6.94% |
| 3/23/2022 | 2,502,140 | $38.149 | $95,454,138.86 | 7.25% |
| 3/24/2022 | 1,926,764 | $38.675 | $74,517,597.70 | 7.49% |
| **Total Shares Purchased: 59,972,951** <br> **Total Cost: $2,130,315,688.73** | | | | |

**A.** ███████████████████████████████████████████████████████

92. █████████████████████████████████████████████████████████

████████ When a buyer pursues stock purchases at the massive level Musk intended to pursue, the

increased demand typically causes the stock price to increase.



93.



94.

95.

96. 



98.

**2.** 

99.

100.

101.



102.

103.

104. 

105.

106.

107.

108.



109.

110.

**B.**

111.



114.

115.

116.

117.

118.







125. 

2.

126. 



127.

128.

129. 

And in litigation related to his infamous $420 tweet, Musk testified, under oath, that "**U.S. reporting requirements start at 5 percent**" and anything higher than 4.99% ownership "would create a splash **because of the reporting requirement**."

C.

130.

131.

132.





**D.**    <u>**March 14, 2022**</u>**: Musk Crosses The 5% Threshold, Which Triggered His Obligation To Disclose His Twitter Stake Within 10 Days**

137.    On Monday, March 14, 2022, Defendants' acquisitions of Twitter stock crossed the 5% ownership threshold. By this day, Musk had purchased 41,822,849 shares of Twitter stock. This represented over 5.2% of Twitter's 800,641,166 shares of common stock outstanding as of February 10, 2022 as reported in Twitter's Annual Report on Form 10-K for the year ended December 31, 2022.

138.    By crossing the 5% threshold, Defendants triggered the start of the 10-day window to satisfy his Rule 13 disclosure obligations. Indeed, Defendant Musk later admitted in an SEC filing that March 14, 2022 was the "Date of the Event" that required submission of a Schedule 13.

139.    On March 24, 2022, the last day of the 10-day window, Defendants did not file the requisite Schedule 13D. Instead, Defendants violated Rule 13, omitted their reporting obligations, continued to secretly amass an ever-increasing ownership stake in Twitter and knowingly or recklessly deceived investors, who were not trading in a fair market given that Musk and his collaborators illegally had their thumb on the scale in Musk's favor.

140.    That same day, according to texts subsequently made public through *Twitter, Inc. v. Musk*, C.A. No. 2022-0613-KSJM (Del. Ch.) (the "*Twitter* Action"), Musk texted with "TJ" (which news reports subsequently revealed to be Musk's ex-wife) that Musk would "Maybe buy [Twitter] and change it to properly support free speech."

**E.    March 25, 2022: At The Start Of The Class Period, Musk Continued To Conceal His Twitter Interest And Secretly Continued To Acquire Twitter Shares At Artificially Low Prices**

141.    The Class Period starts on March 25, 2022—the first day after Defendants violated their statutory obligation to file a Schedule 13D. That day alone, over 20.7 million Twitter shares changed hands on the New York Stock Exchange, as Twitter investors sold or traded their Company securities without knowing about Musk's significant ownership interest or that Twitter was in play for a potential takeover by Musk.

142.





143. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

144.    Defendants' refusal to comply with their legal disclosure obligations allowed them to continue to acquire Twitter shares at artificially low prices and for Defendant Musk to continue his takeover campaign free of public scrutiny for the time being. Because the public was unaware that Musk was buying up Twitter stock, Twitter's stock price was artificially depressed by Musk's deception.

145.    Defendants knew they were saving a considerable amount of money by omitting disclosure of Defendant Musk's Twitter interest, but at the time they did not know exactly how much they were saving. Defendants also knew that these savings would end as soon as Defendant Musk disclosed his growing stake in Twitter to the public—as investors would know that the Company was in play for a takeover, would stop selling their shares at artificially low prices, and many investors would start buying—thereby driving up Twitter's stock price. ██████████

In the end, Defendants' secret scheme ***saved Musk over $200 million*** on his acquisitions of Twitter shares from March 25, 2022 to April 4, 2022.

146.     In contrast to Musk, who benefitted from substantial savings due to his omissions and misstatements, investors who sold Twitter securities during the Class Period were cheated out of the true value of the securities that they traded. As discussed above, the filing of a Schedule 13D predictably drives up the price of a company's stock. During the Class Period, Twitter's daily trading volume averaged approximately 48 million shares a day and peaked as high as 269 million shares on April 4, 2022. Every single one of these trades occurred at artificially depressed prices due to Defendants' willful concealment of Musk's Twitter interests, misleading statements in service of this scheme, and refusal to comply with Rule 13.

147.     For example, on March 28, 2022, Lead Plaintiff sold 14,367 shares of Twitter stock at $39.09 per share. If Defendants had timely adhered to his statutory reporting obligations under Rule 13, that sale would have generated significantly more money for the benefit of firefighters in Oklahoma.

F.     <u>During the Class Period</u>: **Instead Of Disclosing His Twitter Stake, Defendant Musk Teases The Investing Public.**

148.     At the start of the Class Period, instead of disclosing his growing stake in Twitter, Musk polled and teased the public about potential changes to Twitter's platform, including exactly the sort of changes to Twitter's infrastructure and ethos that would typically be implemented by

the Company's management or Board. Musk's teasing comments were issued to his over 70,000,000 followers on Twitter, and picked up by news reports to be viewed by countless more. All the while, Musk continued to secretly amass more Twitter stock.

149.    For example, on March 24, 2022, Musk tweeted "I'm worried about de facto bias in 'the Twitter algorithm' having a major effect on public discourse" and asked, "How do we know what's really happening?" After publicly voicing these concerns, Musk polled Twitter users on whether the "Twitter algorithm should be open source." Over a million Twitter users voted in Musk's poll.





150.    Musk continued to solicit public opinion on Twitter. On March 25, 2022, the first day of the Class Period, Musk posted a poll to Twitter, stating "Free Speech is essential to a functioning democracy. Do you believe Twitter rigorously adheres to this principle?" He later tweeted: "The consequences of this poll will be important. Please vote carefully." After more than 2,035,000 votes, over 70% of the participants responded "No."

151.    Musk's views on Twitter were very important to the public, as evidenced by the millions of users that participated in Musk's polls and numerous others that viewed his critiques of Twitter. Musk's tweets on March 24 and March 25, 2022 revealed to millions that he was focused on perceived shortcomings in Twitter's infrastructure and ethos.

**1.**

152.



153. 

154.

### 2. Musk Issues Misleading Statements On Twitter To Conceal His Activist Interest In Twitter

155.

Musk's statements intentionally (or, at the very least, recklessly) downplayed his true interest in Twitter and gave the false impression that he was considering the creation of a new platform. Musk's misstatements include a public poll about Twitter where he then queried his millions of followers "is a new platform needed" and that he was "giving serious thought" to "building a new social media platform" as an alternative to Twitter. These statements were false as Musk had already

invested over $2 billion in Twitter securities in preparation of his takeover—and he was not going to waste that massive investment by building an alternative platform.

156.    On March 26, 2022, Musk tweeted "Given that Twitter serves as the de facto public town square, failing to adhere to free speech principles fundamentally undermines democracy," and then asked "*Is a new platform needed*?" as an alternative to Twitter.



157.    Musk's question "is a new platform needed?" statement was materially misleading. It was designed to, and did, distract the public from Musk's already-massive ownership stake in Twitter. Musk's tweet also falsely indicated that Musk was considering building an alternate social media platform to rival Twitter and, as such, kept the price of Twitter's securities low while Musk and Birchall continued buying at artificially depressed prices.

158.    Musk also misleadingly suggested that he could hypothetically buy Twitter, while leaving out the critical information that he *already owned* nearly ten percent of the Company. Twitter user @WSBChairman sent Defendant Musk a tweet in response to his Twitter poll stating, "just buy twitter…and change the bird logo to a doge" to which Musk responded, "Haha that would be sickkk."



159.    Musk's statement was also misleading as it treated the prospect of him buying Twitter as a hypothetical possibility—when, in reality, Musk already owned over 7.9% of Twitter's outstanding stock and was actively engaged in a secret effort to take over Twitter. Again,

this misrepresentation allowed Musk to continue to save many millions of dollars by keeping the price of Twitter's securities artificially depressed.

160.    Later the same day, as a follow up to his Twitter criticisms which initiated a firestorm of discussion online about Twitter's shortcomings, Musk tweeted that he was "giving serious thought" to "building a new social media platform" to rival Twitter.



161.    Musk's tweets were false and misleading as they gave the impression that he was contemplating building a new social media platform to serve as an alternative to Twitter—when in truth, Musk was secretly engaged in purchasing Twitter outright. Like the statements outlined above, this misrepresentation allowed Musk to continue to save millions by keeping the price of Twitter's securities artificially depressed.

162.    Market commentators and news outlets paid close attention to Musk's polls and tweets criticizing Twitter about its highly publicized practices regarding free speech and references

to starting a competitor to Twitter. For example, on the following Monday, *Axios* published an article titled "Musk giving 'serious thought' to building a Twitter rival" that reported "Elon Musk this weekend told his 79 million Twitter followers he's giving 'serious thought' to building a social media platform to compete with Twitter." This reaction, as well as the specific context of Musk's tweet in a discussion about Twitter, makes it clear that Musk's tweet was intended as a criticism and commentary on his plans with respect to Twitter.



G.    <u>During The Class Period</u>: **Musk Covertly Discusses His Plans With Senior Twitter Executives And Others While Hiding His Growing Ownership Stake From Investors**

166.    While Musk actively misled the public via his statements on Twitter, behind the scenes, he leveraged his undisclosed ownership interests to privately meet with senior Twitter executives regarding his plans for the Company, including his growing ownership stake and potential takeover of Twitter.

167.    As Twitter later revealed in the May 14, 2022 proxy statement filed on Form PREM14A (the "Proxy"), Musk contacted Jack Dorsey (Twitter's founder, former CEO, and then-current director) on March 26, 2022—the second day of the Class Period and the same day Musk tweeted that he was "giving serious thought" to creating a rival social media platform to Twitter. *See* Proxy at 42. Musk and Dorsey privately "discuss[ed] the future direction of social media, including the benefits of open social protocols." *Id.* In one specific exchange unknown to investors, Dorsey privately texted Musk that "Twitter started as a protocol. It should have never been a company. That was the original sin." Musk responded, "***I'd like to help if I am able to*** ... I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized." Musk's response confirmed that his intention was to change or influence the control of the Company.

168.    On both March 26 and 27, 2022, as only revealed after the Class Period in the Proxy, Musk spoke with Egon Durban (Twitter director) about "the potential of Musk joining the Twitter Board, ***as well as the fact that Musk had purchased a significant stake of more than five***

***percent of [Twitter's] common stock*.**" Proxy at 42



170.    Also on March 27, 2022, Musk spoke with Bret Taylor (then-Chair of Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about "Musk's interest in Twitter and potentially joining the Twitter Board." *Id.* During this discussion, "Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private." *Id.* That same day, Egon Durban texted Musk as well as Agrawal, Taylor, and Martha Lane Fox (former Head of Twitter's Nominating and Governance Committee) and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board. Next step is for you to chat w three of them so we can move this forward quickly." Meanwhile, according to

171.

172.    On March 31, 2022, Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter." Proxy at 42.

173.    Also on March 31, 2022, in a series of private text messages with Agrawal and Taylor, Musk internally determined that he wanted to ***buy*** Twitter to rid it of "crypto spam." Still, Musk disclosed nothing about his interest in or plans for Twitter to the investing public.

### H.    <u>During The Class Period</u>: Musk Secretly Purchases Nearly 15 Million Shares of Twitter Stock at Artificially Depressed Prices

174.    During the Class Period, Musk purchased 2,000,000 to nearly 3,500,000 shares of Twitter stock on a near-daily basis, marking the highest overall volume of Twitter shares Musk purchased since his buying spree started on January 31, 2022. All told, Musk purchased approximately 13,000,000 shares of Twitter stock during the Class Period, representing almost 20% of his total holdings. By disregarding his statutory disclosure obligations under Rule 13, Musk secured artificially depressed pricing for his purchases of Twitter stock during the Class Period, ***ultimately saving over $200,000,000*** by intentionally concealing his interests in the Company.

175.    Musk's acquisitions of Twitter stock and other key events during the Class Period are set forth below in Table 3.

**TABLE 3: Key Events During The Class Period**

| Date(s) | Key Events |
|---|---|
| Thursday, March 24, 2022 | • Ten-day deadline for compliance with Rule 13 expires.<br>• Musk files nothing and fails to satisfy his reporting requirements under Rule 13.<br>• Musk teases the public with critiques about "de facto bias in 'the Twitter algorithm'" and polls Twitter users on whether the "Twitter algorithm should be open source." |
| Friday, March 25, 2022 | • **Beginning of Class Period.**<br>• Musk purchased 3,491,274 shares of Twitter stock for $133,373,649.35.<br>• Musk again teases the public with a poll on whether Twitter "rigorously adheres" to Free Speech and warns that "[t]he consequences of this poll will be important." |
| Saturday, March 26, 2022 | • Musk and Jack Dorsey (founder and then-director of Twitter) privately "discuss[ed] the future direction of social media, including the benefits of open social protocols."<br>• Dorsey privately texted Musk that "Twitter started as a protocol. It should have never been a company. That was the original sin."<br>• Musk responded, "***I'd like to help if I am able to*** ... I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized."<br>• Musk tweets a public poll querying "is a new platform needed" as an alternative to Twitter and that he was "giving serious thought" to "building a new social media platform" to rival Twitter and bury any indication of Musk's $2 billion interest in Twitter. |
| Saturday, March 26, 2022<br>Sunday, March 27, 2022 | • Musk spoke with Egon Durban (Twitter director) about the potential of Musk joining the Twitter Board, ***as well as the fact that Musk had purchased a significant stake of more than five percent of [Twitter's] common stock***." |
| Sunday, March 27, 2022 | • Musk spoke with Bret Taylor (then-Chair of Twitter's Parag Agrawal (Twitter's then-CEO) about "Musk['s] interest in Board) and Twitter and potentially joining the Twitter Board." During this discussion, "Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private." |

| Date(s) | Key Events |
|---|---|
| | • Egon Durban texted Musk as well as Agrawal, Taylor, and Martha Lane Fox, Head of Nominating and Governance Committee, and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board." |
| Monday, March 28, 2022 | • Musk purchased 2,603,779 shares of Twitter stock for $100,953,719.39. |
| Tuesday, March 29, 2022 | • Musk purchased 2,875,934 shares of Twitter stock for $115,903,016.13. |
| Thursday, March 31, 2022 | • Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter['s] business as a director of Twitter."<br>• In a private text message with Parag Agrawal and Bret Taylor, Musk internally determined that he wanted to **buy** Twitter to rid it of "crypto spam," which he viewed as a "major blight on the user experience."<br>• Musk purchased 2,000,000 shares of Twitter stock for $77,636,000.00 |
| Friday, April 1, 2022 | • Musk purchased 2,171,100 shares of Twitter stock for $85,413,245.10. |
| Sunday, April 3, 2022 | • Twitter formally invited Musk to join its Board of Directors.<br>• Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "Jared, there is important paperwork to be done to allow for me to hopefully join the Twitter Board. |
| Monday, April 4, 2022 (see details below) | • Before the market opened, Musk partially disclosed his interest in Twitter and falsely filed a Schedule 13G with the SEC. The Schedule 13G revealed Musk's 9.2% ownership in Twitter.<br>• The SEC privately probes Musk about inconsistences in his Schedule 13G.<br>• **End of Class Period.** |

| Date(s) | Key Events |
|---|---|
| Tuesday, April 5, 2022 (see details below) | • Before market open, Twitter filed a Form 8-K that announced the Company would appoint Musk to its Board of Directors. <br> • Before market open, Musk and Agrawal announced Musk's appointment to Twitter's Board on Twitter. <br> • After market close, Musk belatedly filed a Schedule 13D disclosing his 9.1% ownership of Twitter and activist intentions. |

## V.    THE TRUTH EMERGES

### A.    On April 4, 2022, Musk Attempts To Hide His Activist Intentions And Files A Misleading Schedule 13G, Eleven Days Late

176.    On Sunday, April 3, 2022, unknown to investors, Twitter formally invited Musk to join its Board of Directors. That same day, as revealed in a text message partially unsealed in the *Twitter* Action, Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "there is important paperwork to be done to ***allow for me to hopefully join the Twitter Board***."

177.



178.    On April 4, 2022, Musk and Twitter entered into a letter agreement providing, *inter alia,* that Musk would be appointed to Twitter's Board.

179.    Knowing that Twitter would disclose that Musk was joining its Board, which would likely lead to the disclosure of his ownership in the Company, Musk understood that his secret

65

buying scheme had to come to an end. On April 4, 2022, Musk belatedly provided investors with a partial disclosure of his interest in Twitter when he ███████████████ the filing of a Schedule 13G with the SEC. *See* Exhibit 1. This Schedule 13G reported that Musk owned 9.2% of Twitter's common stock, although it was filed 11 days after the disclosure window mandated by Rule 13, which ended March 24, 2022. In this filing, Musk admitted that the "Date of Event" that required the submission of the filing was March 14, 2022, confirming beyond question that it was 11 days late, and 21 days after his Twitter interest had crossed the 5% threshold.

180.    With his ownership stake now revealed, the public learned for the first time that Musk was Twitter's largest shareholder. As *The Wall Street Journal* reported on May 11, 2022, the "lag" allowed Musk "to buy more stock without alerting other shareholders to his ownership."

181.    However, Musk's Schedule 13G filing only partially revealed the truth. In order to delay the full disclosure of his activist intentions, ███████████████ affirmatively deceived investors through his filing of the Schedule 13G. As a threshold matter, they chose the Schedule 13G form, which is reserved for passive investors (which Musk was not). Also, Musk's Schedule 13G omitted any mention of Musk joining Twitter's Board.

182.    Further, Defendants ████████████████████ the Schedule 13G form to omit a required certification. This deliberate act underscores that they knew, or at minimum was reckless as to, the misleading nature of his Schedule 13G filing. It is equally telling that Musk's lawyers did not sign the misleading Schedule 13G (but they signed later, corrected filings).

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

183.    If Musk were truly a passive investor—which he was not—he would have had to provide the below sworn certification as part of his Schedule 13G. Indeed, Musk claimed he was filing a Schedule 13G pursuant to the exemption in 17 C.F.R. § 240.13d-1(c), which requires the filer to swear to the below certification as a condition of filing:

Item 10. Certifications

By signing below I certify that, to the best of my knowledge and belief, the securities referred to above *were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities* and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect, other than activities solely in connection with a nomination under § 240.14a-11.

To be sure, the SEC publishes a standard form that has this certification language included by default (available here: https://www.ecfr.gov/current/title-17/chapter-II/part-240/section-240.13d-102). However, ███████████████████████████████████████████████████ Schedule 13G that Musk's signature was applied to and filed on April 4, 2022. They replaced the certification language with the words "Not Applicable."

184.    Later that same day, unknown to investors at the time, the SEC's Office of Mergers and Acquisitions sent Musk a letter inquiring about improprieties in his Schedule 13G. *See* Exhibit 3. Specifically, the SEC's questions included the following:

(a)    "Please advise us why the Schedule 13G does not appear to have been made within the required 10 days from the date of acquisition as required by Rule 13d-1(c), the rule upon which you represented that you relied to make the submission."

(b)    "Given that a beneficial owner relying upon Rule 13d-1(c) to make a filing on Schedule 13G in lieu of Schedule 13D must provide a response to Item 10(c) of the form, please advise us why the response provided in Item 10 of this Schedule 13G, titled 'Certifications,' indicates that you determined the line item was '[n]ot [a]pplicable.'"

(c)    "Please provide us with a brief analysis of the bases upon which you determined that you were eligible to rely upon Rule 13d-1(c) to make the filing on Schedule 13G. Your response should address, among other things,

> your recent public statements on the Twitter platform regarding Twitter
> (the issuer), including statements questioning whether Twitter (the issuer)
> 'rigorously adheres to' 'free speech principles.'"

The SEC's letter was not publicly filed until April 6, 2022, after the full truth about Musk's activist

ownership of Twitter stock had already been disclosed.

185.    Although they still did not know the full truth regarding Musk's plans for Twitter,

investors reacted strongly to the revelation of Musk's 9.2% interest in Twitter on April 4, 2022. In

response, Twitter's stock price increased precipitously, soaring approximately 27% on unusually

high trading volume—an increase of $10.66 per share—to close at $49.97 on April 4, 2022 (from

the prior close of $39.31 on Friday, April 1, 2022). ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

186.    Analysts noted Musk's substantial stake in Twitter but believed that it was passive

given the Schedule 13G filing. For instance, Bank of America analysts stated that they "expect[ed]

the news to drive significant retail investor interest in, and activity for, the stock" and "highlight

platform value to potential acquirers"—but explained that "[t]he type of form used (13G) often

indicates the investor isn't seeking to acquire control, or to influence who controls it."

**B.    Musk Is Finally Revealed As An Activist Investor As Twitter Announces His
Appointment To Its Board**

187.    On the morning of April 5, 2022, prior to the start of trading, Twitter filed a Form

8-K press release that announced the Company would appoint Musk to its Board of Directors.

Shortly after filing the Form 8-K, Agrawal and Musk took to Twitter to announce Musk's

appointment to the Board. Agrawal disclosed that "[t]hrough conversations with Elon in recent

weeks, it became clear to us that he would bring great value to our Board." Musk responded that

he was "[l]ooking forward to working with Parag & Twitter board to make significant improvements to Twitter in coming months!"



188.    Investors reacted strongly to learning Musk's true involvement in Twitter and his activist intentions. Indeed, Twitter's stock price closed at $50.98 per share on April 5, 2022, on unusually high trading volume, up from $49.97 on April 4, 2022—a total increase of nearly 30% since Musk first publicly disclosed his ownership stake in Twitter on April 4, 2022. Twitter's stock continued to react positively to this news on April 6, 2022, after accounting for market-wide stock price movements.

189.    After the market closed on April 5, 2022, Musk's lawyers (on April 1, 2022, Defendants had hired McDermott Will & Emery LLP), amended Musk's Schedule 13G and filed a Schedule 13D that disclosed both Musk's ownership stake in Twitter and the fact that he was joining the Board. The Schedule 13D revealed that all Twitter shares beneficially owned by Musk

are held by the Elon Musk Revocable Trust dated July 22, 2003 and further admitted that "Musk is the sole Trustee" of the Musk Trust. *See* Exhibit 2 It is telling that, as the truth was finally revealed, McDermott Will & Emery LLP was willing to sign the Schedule 13D on Musk's behalf.

190.    A timeline of major events is set forth below in Figure 1.



## VI.    POST-CLASS PERIOD EVENTS

**A.** ████████████████████████████████████████████

191.    ████████████████████████████████████████

████████████████████████████████████████████████

**B.    Regulatory Investigations Surrounding Musk's 13G And 13D Filings**

192.    On May 11, 2022, in an article entitled, "Elon Musk's Belated Disclosures of Twitter Stake Triggers Regulators' Probes," *The Wall Street Journal* reported that the SEC was investigating Musk regarding his failure to timely file the required Schedule 13D form.

193.    Musk's failure to properly disclose his activist ownership in Twitter also drew scrutiny from other financial regulators. For example, the Hart-Scott-Rodino Antitrust 35 Improvements Act of 1976, 15 U.S.C. § 18a ("HSR"), requires activist investors like Musk to alert the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") of large-scale acquisitions of voting securities, and then delay further acquisition pending agency review. This is because it is "often impossible to restore competition fully once a merger takes place" and "any attempt to reestablish competition after the fact is usually very costly for the parties and the public." Notwithstanding this statutory obligation, Musk did not do so with respect to his acquisition of Twitter shares.

194.    Musk's attitude toward the FTC is apparently similar to his contempt for the SEC. As reported by *The Verge* on November 10, 2022 in an article entitled, "Elon Musk is Putting Twitter at Risk of Billions in Fines, Warns Company Lawyer," a legal staffer at Twitter "heard Alex Spiro (current head of Legal) say that Elon is willing to take on a huge amount of risk in

relation to this company and its users, because 'Elon puts rockets into space, *he's not afraid of the FTC*.'"

195.    Per an exposé from *The Information*, the FTC opened an inquiry in April 2022 into "whether Musk should have reported his initial Twitter share purchases to the agency and the Justice Department" under the HSR. The FTC is reportedly "looking to examine the communications between Musk and Twitter's Board as he accumulated his stake to determine whether he wanted to have an active role in the company." According to the article, "[i]f the FTC determines that Musk was investing in Twitter to influence decisions at the company, he could be penalized for not notifying antitrust regulators about his initial Twitter investment."

### C. Musk Agrees To Acquire Twitter, Appears To Have Second Thoughts, And Then Proceeds With The Takeover On Its Original Terms

196.    Following the Class Period, Musk continued to demonstrate reckless behavior for investors leading up to his purchase of Twitter.

197.    On April 9, 2022, through a private conversation with Agrawal, Musk finally revealed his plan to buy the Company outright. On April 13, 2022, Musk delivered an official non-binding proposal to purchase Twitter to the Board for $54.20 per share.

198.

199.    Although the offer was initially conditioned on "customary due diligence and financing," by the end of April 2022, Musk grew impatient. Accordingly, Musk renounced any right to due diligence before closing the deal. On April 25, 2022, Twitter announced that it accepted Musk's proposal to acquire the company at $54.20 per share. A joint press release announcing the buyout included Musk's personal promise to "make Twitter better" by "defeating the spam bots."

200.    The funding for the $44 billion deal was linked to the value of Musk's Tesla shares. Musk was expected to sell approximately 20 million shares of his Tesla stock to fund the transaction, so long as Tesla stock traded at approximately $1,000 per share. The day after the deal was announced, on April 26, 2022, Tesla stock declined by more than 12%. By the end of April, Musk reported to the SEC that he had sold 9.6 million of his personal Tesla shares.

201.    As the price of Tesla shares continued to decline, so did Musk's inclination to continue selling his Tesla shares to fund the Twitter transaction. Musk began concocting excuses to purportedly stall or even back out of the deal. As revealed in a text message partially unsealed in the *Twitter* Action, on May 8, 2022, in reference to the acquisition, Musk sent a text message to Morgan Stanley's Head of Global Technology Investment Banking, Michael Grimes, stating, "Let's slow down [on pursuing the acquisition of Twitter for] just a few days. Putin's speech tomorrow is really important. It won't make sense to buy Twitter if we're heading into World War III."

202.    As Tesla's stock price continued to decline, Musk manufactured a new theory to purportedly scuttle the deal or secure a lower price: he claimed that Twitter had misled him about

the number of spam/bots on the platform. Although Musk had specifically waived due diligence, on May 13, 2022, Musk tweeted that his $44 billion deal to buy Twitter was "temporarily on hold" to learn more about Twitter's estimate that spam and fake accounts make up less than 5% of total users.

203.    On July 8, 2022, Musk claimed that he was terminating the deal.

204.    On July 12, 2022, Twitter filed a complaint in Delaware Court of Chancery alleging breach of Musk's contractual obligations under the merger agreement, seeking specific performance of Musk's obligations under the agreement. In its complaint, Twitter noted: "Musk apparently believes that he—unlike every other party subject to Delaware contract law—is free to change his mind, trash the company, disrupt its operations, destroy stockholder value, and walk away."

205.    After months of chaos and intense trial preparation, on October 4, 2022, Musk announced that he would abandon his battle with Twitter and pay shareholders the originally offered $54.20 per share. Musk simply performed an about-face and reaffirmed the original deal terms.

206.    On October 28, 2022, Musk and Twitter closed the deal.

207.    After the deal closed, Musk went on to terminate roughly half of Twitter's workforce, including by ousting top executives like Twitter CEO Agrawal and the Company's Board of Directors, leaving Musk as the sole director of the Company. As reported in the *New York Times* on November 11, 2022, in an article entitled "Two Weeks of Chaos: Inside Elon Musk's Takeover of Twitter," Twitter executives warned Musk that his mass firing plan "could violate employment laws and breach contracts with workers, leading to employee lawsuits . . . But

Musk's team said he was used to going to court and paying penalties, and was not worried about the risks."

208.    Twitter's valuation has dropped dramatically since Musk's takeover. As of November 2023, current shareholder, Fidelity, believes that X (formerly Twitter) is worth 71.5% less than at the time of purchase.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

209.    As set forth in this Complaint, numerous facts give rise to the strong inference that, throughout the Class Period, Musk and Birchall knew or recklessly disregarded that their scheme to secretly buy a massive stake in Twitter and conceal it from investors was deceptive, deceitful and operated to defraud investors. The information in this section summarizes and/or supplements certain allegations that detail Defendants' scienter.

210.    *First*, Defendants are intimately familiar with the filing requirements and law underpinning Rule 13.



211.    In addition, in litigation related to his infamous $420 tweet, Musk testified under oath, that "***U.S. reporting requirements start at 5 percent***" and anything higher than 4.99%

ownership "would create a splash *because of the reporting requirement*."

212.    Finally, Musk's knowledge of Rule 13's disclosure requirements is further demonstrated by the fact that, since 2011, Musk has personally filed and signed (or directed his attorneys to do so) twelve Schedule 13G forms and eight Schedule 13D forms for his companies.

213.

214. 

215.

216.    *Third*, leading up to the Class Period, Musk went from owning zero shares of Twitter to spending over $2 billion to purchase nearly 60 million shares of the Company on a near-daily basis over six weeks.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████ Defendants plainly knew how much Twitter stock Musk owned—and

when—due to Musk spending billions of dollars and ████████████████████████████

██████████████████████ yet Defendants decided to consciously and/or recklessly

disregard the statutory disclosure obligations under Rule 13. ███████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

217.    *Fourth*, █████████████████████████████████████████████

███████████████████████████████████████████████████████
█████████████████████████████████████████████████ Musk

misdirected the public through a series of false impressions on March 26, 2022 that he was giving

"serious thought" to "building a new social media platform." These misleading statements

concealed that Musk had already spent over $2 billion to secretly amass an outsized ownership

interest in Twitter. Instead of revealing his interest, Musk intentionally (or, at the very least,

recklessly) misled the public about his ownership of and true intentions for Twitter so Defendants

could capitalize on artificially discounted prices for Twitter securities.

218.    *Fifth*, ████████████████████████ knowingly filed a manipulated Schedule

13G form filed on April 4, 2022, instead of the proper Schedule 13D given Musk's substantial

holdings and intentions to influence Twitter (or effect of doing so). At the outset, the fact that

Musk filed and authorized his signature to be applied to a Schedule 13G form for passive investors—and not the correct Schedule 13D for activist investors— reveals that he knowingly engaged in a cover-up to disguise his activist intentions. This is especially true given that Musk had already engaged in numerous discussions and meetings with senior Twitter leadership and other insiders about influencing control of the Company, including by joining Twitter's Board or taking the Company private. Musk's cover-up is further evidenced by Defendants' ███████ ████ deliberate deletion of the requisite certification on the Schedule 13G form—and, instead, their insertion of the affirmative (and misleading) statement that the certification was "Not Applicable." They removed this certification because they knew Musk could not certify to being a passive investor without perjuring himself and to falsely signal a passive investment to the market to continue to artificially depress the price of Twitter stock and further reap substantial savings.

███████████████████████████████████████████████████████████

219.    Further, Musk admitted that the "Date of Event" that required filing the Schedule 13G is March 14, 2022—an acknowledgement that this filing was required precisely ***because*** Musk knew he had crossed 5% ownership of Twitter as of March 14, 2022, but willfully chose to conceal his interest.

220.    *Sixth*, Musk's private conversations with senior Twitter leadership further reveal Musk's knowledge during the Class Period that his ownership in Twitter exceeded 5%. For example, as only disclosed after the Class Period in the Proxy, Musk spoke with Egon Durban (Twitter director) on March 26 and 27, 2022 about "the potential of Musk joining the Twitter Board, ***as well as the fact that Musk had purchased a significant stake of more than five percent of [Twitter's] common stock***." Proxy at 42. █████████████████████████████



221.    *Seventh*, Musk's violation of the HSR reporting requirements further underscores Musk's intention in concealing his acquisition of Twitter shares during the Class Period. Musk disregarded the FTC's statutory mandate because it would have delayed his Twitter stock buying spree pending the agency's review of antitrust concerns.

222.    *Eighth*, Musk's private interactions with senior Twitter leadership (disclosed after the Class Period) make clear that Musk was purchasing Twitter securities for the purpose of or with the effect of changing or influencing the control of Twitter from the outset. For example, on March 24, 2022, Musk texted that he would "Maybe buy [Twitter] and change it to properly support free speech." Also, Musk spoke with Egon Durban (Twitter director) on March 26 and 27, 2022 about "the potential of Musk joining the Twitter Board." Proxy at 42. Likewise, on March 27, 2022, Musk privately spoke with Bret Taylor (then-Chair of Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about his "various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private." *Id*. And on March 31, 2022, Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter." *Id.* These secret discussions were borne out in the following weeks, as Musk agreed to join Twitter's Board

on April 4, 2022 and then privately told Agrawal he would make an offer to purchase Twitter on April 9, 2022. Musk's discussions with senior Twitter management reveal his activist intentions to change or influence the control of Twitter during the Class Period, although such intentions were carefully guarded from investor scrutiny until later.

223.    *Ninth*, Musk's scheme to conceal his interests in Twitter and violate his statutory disclosure obligations under Rule 13 is the latest episode in his long history of reckless disregard and disdain for SEC regulations. As set forth above, Musk has sought to escape his SEC settlement and has continued to publicly denigrate the SEC as "bastards," the "Shortseller Enrichment Commission," or worse—and he has made "clear" that he "do[es] not respect the SEC."

224.    *Tenth*, Musk owes his wealth largely to his shares of Tesla stock, and *The Wall Street Journal* dubbed him "Tech's Cash-Poor Billionaire." In an article entitled "Why Elon Musk Is Cash Poor (For A Billionaire)," *Forbes* reported that Musk even testified as much in a 2018 defamation trial arising from his tweets. According to *Forbes*, Musk testified: "Some people think I have a lot of cash. I actually don't." Indeed, "[a]s much as 99% of Musk's wealth is held in shares of [Tesla and Space-X]," and Musk's wealth is overwhelmingly subject to the unpredictable hills and valleys of the stock market. In fact, Robyn Denholm, Chair of the Board and Audit Committee of Tesla, recently testified in the *Tornetta* Action that: "Tesla has a philosophy of paying ... a lower cash compensation and then paying ... individuals with options or equity, stock options or RSUs."

225.    To protect his unstable wealth, Musk was motivated in part to intentionally delay disclosure of his interest in Twitter so he could secure artificially depressed pricing for his purchases of Twitter stock during the Class Period, which ultimately saved Defendant Musk over an estimated $200,000,000. ████████████████████████████████████

████████████████████████████████████████████████████████████



226.    Thus, Defendants knew throughout the Class Period that they were buying Twitter shares at artificially depressed prices and likely saving significant sums of money due to their scheme to deceive investors.

## VIII. DEFENDANT MUSK'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND HALF-TRUTHS

### A. Musk's Scheme To Secretly Buy A Massive Stake In Twitter And Mislead Investors

227.    As part of an elaborate scheme to control Twitter from March 25, 2022 to April 4, 2022, Musk and Birchall concealed Musk's steadily increasing ownership in Twitter and misled investors through misdirection and half-truths. Musk and Birchall also concealed Musk's plans to potentially takeover Twitter. Defendants' scheme misled investors each day of the Class Period because, from at least the start of the Class Period, Musk knew he owned an interest greater than 5% in Twitter and intended to, or did, change or influence the control of the Company as set forth above in Paragraphs 82-175.

### B. Musk's Misleading Affirmative Statements In Furtherance Of His Scheme

228.    On March 26, 2022, twelve days after Musk triggered his reporting obligations, he posted a poll on Twitter stating, "Given that Twitter serves as the de facto public town square,

failing to adhere to free speech principles fundamentally undermines democracy." The same day, Musk tweeted, "***Is a new platform needed?***" and that he was "***giving serious thought***" to "***building a new social media platform***" as an alternative to Twitter. As discussed above, the context of Musk's false statements—which were in reference to Twitter's supposed shortcomings, including a purported lack of free speech in Musk's view—makes clear that Musk's statements were necessarily about Twitter.

229.    Musk's above-referenced statements were materially false and misleading and omitted material facts necessary to make them not misleading. Musk misled the public by giving the false impression that he was "giving serious thought" to creating a rival platform when, in reality, he had already secretly spent over $2 billion to amass a substantial ownership interest (7.93%) in Twitter and was planning to take an active role in the Company. These misrepresentations diverted public attention away from Musk's true plans for Twitter and kept the price of Twitter artificially low, so Defendants could continue to reap substantial savings from the artificially depressed price of Twitter's securities.

230.    Then, on March 26, 2022, Twitter user @WSBChairman sent Defendant Musk a Tweet stating, "just buy twitter . . .and change the bird logo to a doge," a crypto currency logo to which Musk responded, "***Haha that would be sickkk***."

231.    Musk's above-referenced statement was materially false and misleading and omitted material facts necessary to make them not misleading because Musk falsely portrayed his purchase of Twitter as a hypothetical when, in truth, Musk had already secretly spent over $2 billion to amass a substantial ownership interest (7.93%) in Twitter and was planning to take over the Company. This misrepresentation helped divert public attention away from Musk's true plans

for Twitter and kept the price of Twitter artificially low, so Defendants could continue to reap substantial savings from the artificially depressed price of Twitter's securities.

232.    On April 4, 2022, before the market opened, Musk and Birchall ███████████████ apply Musk's signature to and file a misleading Schedule 13G for passive investors that disclosed his 9.2% interest as Twitter's largest shareholder—11 days after the statutory disclosure deadline mandated by Rule 13. Defendants stated that Musk was filing the Schedule 13G pursuant to the exemption in 17 C.F.R. § 240.13d-1(c), which is the exception to Schedule 13D that indicates the filer is "passive." Musk's Schedule 13G also omitted any mention of Musk joining Twitter's Board. Further, Defendants falsely and misleadingly deleted the required certification under Item 10 of the Schedule 13G that the investor "[h]as not acquired the securities ***with any purpose, or with the effect, of changing or influencing the control of the issuer***," and instead affirmatively stated that this certification was "Not Applicable." Musk also "certif[ied] that the information set forth in" the Schedule 13G was "true, complete and correct."

233.    The statements Musk made in his April 4, 2022 Schedule 13G filing were materially false and misleading and omitted material facts. Since January 2022, Defendants, ████████████████████████████████████████████████████ ████████████████████████████████ Further, before filing this Schedule 13G, Musk engaged in numerous discussions with Twitter leadership, including about joining Twitter's Board or taking Twitter private; Musk had agreed to join Twitter's Board on April 4, 2022 (the same day he filed the misleading Schedule 13G), and Musk soon carried out his plan to take over Twitter by making an offer to purchase the Company on April 14, 2022. Musk was a far cry from a "passive" investor, and he was subject to a statutory obligation to adequately disclose his activist intentions and ownership via a Schedule 13D, as set forth above in Paragraphs 58-72, 166-175, 181-186.

## IX.    <u>LOSS CAUSATION</u>

234.    Musk's wrongful conduct, as alleged in this Complaint, directly and proximately caused Lead Plaintiff and the Class to suffer substantial damages. During the Class Period, Musk's materially false and misleading statements as set forth above artificially depressed the price of Twitter's securities below the price at which Twitter securities would have traded absent those material misrepresentations.

235.    For example, on April 4, 2022, in reaction to the news of Musk's 9.2% ownership in Twitter set forth in his otherwise misleading Schedule 13G form, Twitter's stock price soared by approximately 27%—a statistically significant increase of $10.66 per share—to close at $49.97 from a close of $39.31 on the prior trading day (*i.e.*, Friday, April 1, 2022). And on news of Musk joining Twitter's Board the following day, the Company's stock price underwent another statistically significant increase to close at $50.98. Then, Twitter's stock price continued to increase in a statistically significant reaction to these disclosures on April 6, 2022, after accounting for market-wide movements.

236.    Because of Musk's fraudulent scheme and disregard for his statutory obligations discussed above at Section V, investors were kept in the dark about Musk's ownership stake in Twitter. Had investors known the full truth about Musk's ownership in Twitter during the Class Period, Twitter's stock price would have traded at higher prices during the Class Period. Musk's materially false and misleading statements of material fact operated as a fraud or deceit on the Class and led to the Class selling Twitter shares at prices that were below the actual value of those securities, and thereby caused damage to the Class. As a result of their sales or trading of Twitter's securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## X.    PRESUMPTION OF RELIANCE

237.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this Complaint against Musk are predicated in part upon Defendants' scheme to conceal and mislead investors regarding facts that Musk had a legal duty to disclose.

238.    In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Musk's material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Twitter securities was open, efficient, and well developed for the following reasons, among others:

(a)    Twitter stock met the requirements for listing and its stock was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Twitter filed periodic public reports with the SEC and the New York Stock Exchange;

(c)    Twitter regularly and publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Twitter was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

239.    As a result of the foregoing, the market for Twitter securities promptly digested current information regarding Twitter from all publicly available sources and reflected that information in the price of Twitter securities. Under these circumstances, all sellers of Twitter securities (or traders of options) during the Class Period suffered similar injury through their sale of Twitter securities at artificially deflated prices, and the presumption of reliance applies.

240.    Accordingly, Lead Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Twitter securities and to a presumption of reliance on Musk's materially false and misleading statements during the Class Period.

## XI.    CLASS ACTION ALLEGATIONS

241.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Twitter securities during the Class Period. Excluded from the Class is Defendant Musk; Defendant Birchall; affiliates and members of the immediate family of Defendants Musk or Birchall; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which Defendant Musk or Birchall has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

242.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 10, 2022, Twitter had 800,641,166 shares of common stock outstanding and held by non-insiders.

243.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether Musk violated the Exchange Act;

(b)    Whether Musk (i) employed any device, scheme, or artifice to defraud; (ii) made any untrue statement of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person;

(c)    Whether Musk violated Rule 13;

(d)    Whether Musk knew or recklessly disregarded that his statements were materially false and misleading;

(e)    Whether the price of Twitter securities was artificially deflated;

(f)    Whether Musk's scheme caused the members of the Class to sustain damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

244.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Musk's wrongful conduct.

245.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

246.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.    COUNTS

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against All Defendants**

247.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth in this Count.

248.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged in this Complaint; and (ii) cause Lead Plaintiff and other members of the Class to sell Twitter stock and trade other Twitter securities at artificially depressed prices.

249. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Twitter securities and avoid public scrutiny of his acquisition of Twitter stock and plans to acquire Twitter for as long as possible in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

250. Defendants, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal Musk's ownership of Twitter in defiance of his statutory obligations, including under Rule 13.

**(a)    Discovery Has Revealed Acts in Furtherance of Defendants' Scheme to Defraud Investors In Violation of Plaintiff's Section 10(b) Claim Specifically Under Rules 10b-5(a) And (c).**

251. During the Class Period, Defendants "devised a plan and induced [Lead Plaintiff and class members] to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell." *Affiliated Ute Citizens of Utah*, 406 U.S. at 153. Defendants' fraudulent scheme also artificially depressed the value of Twitter securities and caused investors to unwittingly trade Twitter securities at artificially depressed prices.

252. As part of their scheme to defraud investors in violation of SEC Rule 10b-5(a) and (c), Defendants, ██████████████████████████████████████ Musk's activist ownership of Twitter in violation of Musk's disclosure obligations under Rule 13.

253. ███████████████████████████████████████████████

███████████████████████████████████████████████



256.    Due to Defendants' scheme, Lead Plaintiff and other Class members were deprived of "material facts that reasonably could have been expected to influence their decisions to sell" and, as a result, sold its shares in Twitter stock at artificially depressed prices, among other things. *See Affiliated Ute Citizens of Utah*, 406 U.S. at 153.

**(b)    Defendants' Affirmative Misrepresentations In Violation of Plaintiff's Section 10(b) Claim Specifically Under Rule 10b-5(b).**

257.    Musk made the materially misleading statements specified above, which he knew or recklessly disregarded to be false or misleading in that they contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Namely, Musk made materially false and misleading statements on Twitter that misdirected the public regarding his true intentions for the Company, and in the Schedule 13G he personally signed and filed with the SEC on April 4, 2022, as discussed above at Paragraphs 148-165.

258.    During the Class Period, Musk made the materially misleading statements specified above, which he knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as discussed above at Paragraphs 227-233.

*                *                *

259.    As a direct and proximate result of Defendants' wrongful conduct that violated Section 10(b) of the Exchange Act, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's stock and/or trading of other securities during the Class Period.

260.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act
### Against Defendants Elon Musk and Jared Birchall

261.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth in this Count.

262.    Elon Musk and Jared Birchall acted as the controlling persons of the Elon Musk Revocable Trust dated July 22, 2003 and Excession within the meaning of Section 20(a) of the Exchange Act. In the Schedule 13D filed with the SEC on April 5, 2022, Musk admitted that he is "the sole Trustee" of the Elon Musk Revocable Trust dated July 22, 2003.



## XIII.  PRAYER FOR RELIEF

263.    WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against Defendants, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest;

(c)     Awarding Lead Plaintiff's reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(d)     Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## XIV.  **JURY DEMAND**

264.    Lead Plaintiff demands a trial by jury.

Dated: April 30, 2024

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
Salvatore J. Graziano
Katherine M. Sinderson
Jeremy P. Robinson
Jonathan G. D'Errico
Jasmine Cooper-Little
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
katie@blbglaw.com
jeremy@blbglaw.com
jonathan.derrico@blbglaw.com
jasmine.cooper-little@blbglaw.com

*Lead Counsel for Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System*