## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, | No. 1:22-cv-03026-ALC-GWG |
| Plaintiff, | |
| | Honorable Andrew L. Carter, Jr. |
| v. | |
| | ORAL ARGUMENT REQUESTED |
| ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.   PRELIMINARY STATEMENT .................................................................................1

II.  SUMMARY OF RELEVANT FACTS .................................................................5

    A.   Discovery Further Revealed Defendants' Scheme ...................................5

    B.   Relevant Procedural History ..................................................................9

III. ARGUMENT .......................................................................................................9

    A.   The AC States A Valid Rule 10b–5(a) and (c) Scheme Claim.............................9

        1.   The AC Alleges Numerous Deceptive Acts In Furtherance Of Defendants' Scheme ...........................................................................9

        2.   The AC Alleges An Overwhelming Inference Of Defendants' Scienter ......................................................................14

    B.   The AC States A Valid Rule 10b–5(b) Misrepresentation Claim..........................23

        1.   The AC Alleges Falsity...........................................................................23

        2.   The AC Alleges A Strong Inference Of Scienter.......................................24

        3.   The 10b–5(b) Misrepresentation Claim Is Timely....................................25

    C.   The AC States A Valid Section 20(a) Control Person Claim ..............................25

IV.  CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanced Battery Techs., Inc.*,
    781 F.3d 638 (2d Cir. 2015)........................................................................22

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)..........................................................................3, 12, 13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................11

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
    2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...........................................18

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ("*Bear Stearns*").............................3

*In re Bed Bath & Beyond Corp. Sec. Litig.*,
    687 F. Supp. 3d 1 (D.D.C. 2023) .............................................................23

*Carpenters Health & Welfare Fund of Phila. v. Coca-Cola Co.*,
    2002 WL 34089163 (N.D. Ga. Aug. 20, 2002) .......................................17

*Cement & Concrete Workers Dist. Council Pension Fund v. HP Co.*,
    964 F. Supp. 2d 1128 (N.D. Cal. 2013) ...................................................19

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)....................................................................................2

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)......................................................................25

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)......................................................11

*Constr. Laborers Pension Tr. for S. California v. CBS Corp*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................19

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................20, 21

*In re: EZCorp, Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016)......................................................25

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................16

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)....................................................................................21

*In re GeoPharma, Inc. Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006).....................................................................20

*In re Glob. Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004).....................................................................16

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
2021 WL 3491779 (D. Del. Aug. 9, 2021) .............................................................25

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
2023 WL 2072227 (D. Del. Feb. 17, 2023) ............................................................25

*Green Star Energy Sols., LLC v. Edison Properties, LLC*,
2022 WL 16540835 (S.D.N.Y. Oct. 28, 2022) .......................................................21

*Gruber v. Gilbertson*,
2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ...........................................10, 14, 16

*Gruber v. Gilbertson*,
2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)........................................................12

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
95 F. Supp. 2d 169 (S.D.N.Y. 2000).......................................................................15

*Handal v. Tenet Fintech Grp. Inc.*,
2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023) .......................................................21

*Harris v. City of New York*,
186 F.3d 243 (2d Cir. 1999)......................................................................................3

*Hensley v. IEC Elecs. Corp.*,
2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)........................................................22

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
309 F. Supp. 3d 100 (S.D.N.Y. 2018).....................................................................19

*Kairalla v. Advanced Med. Optics, Inc.*,
2008 WL 2879087 (C.D. Cal. June 6, 2008) ..........................................................24

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001).....................................................................22

*Lorenzo v. S.E.C.*,
587 U.S. 71 (2019)..........................................................................................3, 9, 13

*Lozada v. Taskus, Inc.*,
    2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ................................................................23

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)........................................................................................13, 14, 24

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014)........................................................................22

*In re MCI Worldcom, Inc. Sec. Litig.*,
    93 F. Supp. 2d 276 (E.D.N.Y. 2000) .......................................................................17

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*,
    2015 WL 12723054 (N.D. Tex. Mar. 12, 2015) ......................................................23

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010).................................................................................................25

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014).....................................................................................24

*Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    939 F. Supp. 2d 445 (S.D.N.Y. 2013) .....................................................................21

*Pampena v. Musk*,
    2024 WL 3678002 (N.D. Cal. Aug. 5, 2024) ..........................................................17

*In re Parmalat Sec. Litig.*,
    383 F. Supp. 2d 616 (S.D.N.Y. 2005)......................................................................12

*Puddu v. NYGG (Asia) Ltd.*,
    2022 WL 2304248 (S.D.N.Y. June 27, 2022) .........................................................12

*In re Refco Cap. Markets, Ltd. Brokerage Customer Sec. Litig.*,
    586 F. Supp. 2d 172 (S.D.N.Y. 2008)......................................................................24

*S.E.C. v. AgFeed Indus., Inc.*,
    2016 WL 10934942 (M.D. Tenn. July 21, 2016) ....................................................11

*S.E.C. v. Czarnik*,
    2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010)..........................................................18

*S.E.C. v. DeFrancesco*,
    683 F. Supp. 3d 367 (S.D.N.Y. 2023)......................................................................23

*S.E.C. v. Enterprises Sols., Inc.*,
    142 F. Supp. 2d 561 (S.D.N.Y. 2001)......................................................................16

*S.E.C. v. ITT Educ. Servs., Inc.*,
  303 F. Supp. 3d 746 (S.D. Ind. 2018) ...................................................................11

*S.E.C. v. Kearns*,
  691 F. Supp. 2d 601 (D.N.J. 2010) ......................................................................11

*S.E.C. v. Rio Tinto plc*,
  41 F.4th 47 (2d Cir. 2022) ........................................................................... 9-10, 13

*S.E.C. v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020)...................................................................14

*S.E.C. v. Stubos*,
  634 F. Supp. 3d 174 (S.D.N.Y. 2022)...................................................................10

*In re Segue Software, Inc. Sec. Litig.*,
  106 F. Supp. 2d 161 (D. Mass. 2000) ...................................................................22

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015).....................................................................23

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)..................................................................................21

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) .......................................................17

*Small v. Arch Cap. Grp., Ltd.*,
  2006 WL 2708448 (S.D.N.Y. Sept. 20, 2006)......................................................21

*State Farm Mut. Automobile Ins. Co. v. CPT Med. Servs., P.C.*,
  2008 WL 4146190 (E.D.N.Y. 2008)......................................................................22

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008)...............................................................................................12

*T.H.C., Inc. v. Fortune Petrol. Corp.*,
  1999 WL 182593 (S.D.N.Y. Mar. 31, 1999) ........................................................19

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008)..................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................14

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*,
  612 F. Supp. 2d 267 (S.D.N.Y. 2009)...................................................................13

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)..................................................................12, 13

*United States ex rel. Rose v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*,
    2008 WL 4056601 (E.D. Tex. Aug. 25, 2008) ........................................................20

*United States v. Kwok*,
    2024 WL 1407057 (S.D.N.Y. Apr. 2, 2024)...........................................................13

*United States v. Wey*,
    2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .....................................................10, 11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)....................................................................................24

## STATUTES AND RULES

15 U.S.C. §78m ......................................................................................... *passim*

15 U.S.C. §78r ........................................................................................... *passim*

15 U.S.C. §78t(a) ........................................................................................9, 25

17 C.F.R. §240.10b–5 ............................................................................... *passim*

17 C.F.R. §240.13d–1 ............................................................................... *passim*

Fed. R. Civ. P. 9(b) ...........................................................................................23

Fed. R. Civ. P. 12(b)(6)......................................................................................12

Fed. R. Civ. P. 15(a) ..........................................................................................25

## GLOSSARY OF CITATION CONVENTIONS

| Term | Definition |
|---|---|
| AC or Amended Complaint | ECF No. 99, *Rasella v. Musk*, 1:22-cv-03026-ALC-GWG (S.D.N.Y.). Partially unsealed per the Court's May 20, 2024 Order. *See* ECF No. 95. |
| Advisor A | Managing Director at Morgan Stanley and "the lead on all things at MS [Morgan Stanley] related to Elon." ¶41. On May 20, 2024, the Court sealed the identity of Advisor A. ECF No. 95. For ease of reference in this public filing, Plaintiff refers to this individual as "Advisor A." |
| Birchall | Jared Birchall. Musk's "right hand man," including as Musk's wealth manager and managing director of Musk's family office, Excession. ¶¶36-39. Birchall has power of attorney over the Trust, which is also a named Defendant. ¶36. |
| Class | Investors who sold the securities of Twitter, Inc. during the Class Period excluding Defendants; affiliates and members of the immediate families of Defendants; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which Defendants have a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity. |
| Class Period | March 25, 2022 - April 4, 2022, inclusive. |
| Defendants | Defendants Elon Musk, Elon Musk Revocable Trust dated July 22, 2003, Jared Birchall, and Excession LLC. |
| Excession | Excession LLC. Excession is "Musk's family office" and "responsible for a range of wealth and investment management activities" on behalf of Musk. ¶35. |
| Exchange Act | Securities and Exchange Act of 1934, 15 U.S.C. §78a, *et seq.* |
| FTC | Federal Trade Commission. The FTC "opened an inquiry in April 2022 into whether Musk should have reported his initial Twitter share purchases to the agency and the Justice Department under the HSR [defined below]." ¶¶192-95. |
| HSR | Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §18a. |
| Musk | Elon Musk, including the Elon Musk Revocable Trust dated July 22, 2003 and Excession LLC. ¶¶32-35. |
| Mot. or Motion | Defendants' motion to dismiss the Amended Complaint. ECF No. 108. |

| Term | Definition |
|---|---|
| Op. or Opinion | Opinion and Order sustaining in full the 10(b)-5 claims in Plaintiff's Prior Complaint. ECF No. 49. |
| Plaintiff | Oklahoma Firefighters Pension and Retirement System. ¶31. |
| Prior Complaint | ECF No. 33. |
| Rule 10b–5 | SEC Rule 10b–5, 17 C.F.R. §240.10b–5. |
| Rule 13(d) | SEC Rule 13(d)–1, 17 C.F.R. §240.13d–1. |
| SEC | U.S. Securities and Exchange Commission. |
| SEC Investigation | The SEC's ongoing investigation into Musk's refusal to timely disclose his interests in Twitter. The SEC Investigation was launched on April 4, 2022—the same day that Musk filed his misleading Schedule 13G. ¶¶179-84, 192. |
| §10(b) or Section 10(b) | §10(b) of the Exchange Act, 15 U.S.C. §78j(b). |
| §13 or Section 13 | §13 of the Exchange Act, 15 U.S.C. §78m. |
| §18 or Section 18 | §18 of the Exchange Act, 15 U.S.C. §78r. |
| §20(a) or Section 20(a) | §20(a) of the Exchange Act, 15 U.S.C. §78t(a). |
| Tesla | Tesla, Inc. |
| Trust | Elon Musk Revocable Trust dated July 22, 2003. Musk is the beneficial owner of the Trust, which is also a named defendant. ¶34. |
| Twitter | Relevant nonparty Twitter Inc., which Musk now owns. ¶40. |

## I.    PRELIMINARY STATEMENT

This securities class action is brought on behalf of investors who sold their Twitter securities while Elon Musk and his wealth manager, Jared Birchall, were engaged in a scheme to buy Twitter stock at the lowest price possible by hiding Musk's massive ownership stake and activist interest in Twitter.[1] During the Class Period, Defendants concealed Musk's acquisition of more than 5% of Twitter stock—which they were legally required to disclose—and misrepresented Musk's intent to control Twitter. Defendants' scheme deprived investors who sold Twitter securities during the Class Period of critical information regarding the true value of their securities.

The truth began to be revealed only after Musk had spent the money he had earmarked to build his position in Twitter and Twitter had privately invited Musk to join its Board. Knowing that Twitter would soon disclose Musk's massive ownership interest on April 4, 2022, Defendants strategized about how to manufacture "plausible den[iability]" that their scheme was a mistake. However, Musk was still not ready to disclose his true activist intent, so Defendants filed a misleading SEC disclosure that announced Musk's then-9.2% ownership stake but falsely represented that Musk was merely a passive investor in Twitter. This prompted the SEC to launch an investigation into Musk's violation of his disclosure obligations that is still ongoing today (the "SEC Investigation"). On April 5, 2022, Musk's activist intent was revealed when Twitter disclosed that he had agreed to join its Board. With the SEC investigating, his position secured, and the truth out, Musk had his attorneys quickly file a corrected Schedule 13D. In response to these disclosures, Twitter's stock price soared ***nearly 40%***.

---

[1] Unless noted, emphasis is added, internal citations and punctuation are omitted, cites to "¶__" refer to the Amended Complaint (ECF No. 99) (the "AC"), capitalized terms are defined in the AC or the Glossary, and cites to "Motion" or "Mot." refer to Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint (ECF No. 108).

Discovery has shed new light on Defendants' scheme. Internal documents show that Defendants crafted an illicit trading scheme through Advisor A designed to "get in under the radar" to artificially maintain the price of Twitter securities as Musk secretly acquired tens of millions of shares building his position in Twitter. Defendants imposed a regime of total secrecy to ensure "[n]o one knows what is going on and why." Birchall received over 200 daily or hourly trading updates, and he kept Musk apprised of the success of the trading strategy through weekly meetings. Throughout, as Advisor A repeatedly emphasized the importance of getting legal counsel to understand the SEC disclosure laws, Birchall falsely assured him that Musk's attorneys had approved of Defendants' refusal to disclose Musk's interests.

Discovery has further confirmed the already strong inference of Defendants' scienter. For example, Musk testified in the SEC Investigation that he knew the "5 percent mark [] means something" and "the first point at which one starts to notice investors is above the 5 percent number." Likewise, Birchall testified in the SEC Investigation that "[w]e knew that five percent meant something . . . *we knew that that would trigger something where at some point we would have to disclose something*." Coupled with Defendants' deliberate refusal to seek counsel and, indeed, their outright lies to Advisor A that lawyers had blessed the scheme, there is a strong inference that Defendants engaged in conscious misbehavior or, at minimum, were reckless.

Defendants' second effort to dismiss this case on the pleadings should be denied. *First*, Defendants' Motion improperly seeks to relitigate the Court's prior holdings. The Court has sustained the Prior Complaint's scheme, misrepresentation, and control claims against Defendants Musk and the Trust. *See* Op. at 4-17, 17-18, 22-39. This forms the law of the case, and "courts should be loathe [to revisit prior decisions] in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). There is no reason to

reverse course when the claims have only been strengthened by 40 pages of new facts.

*Second*, Defendants' Motion raises factual disputes that can only be resolved on a full record at trial. Defendants invite the Court to use ***their*** disputed (and implausible) version of the facts, as opposed to the well-pled allegations of the AC. This defies the fundamental precepts that "the court must accept as true the factual allegations in the complaint" and grant the motion "only if, after viewing plaintiff's allegations in the most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts" entitling him or her to relief. *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999). If anything, Defendants' denials and alternative explanations establish that their Motion raises "factual disputes [that] are inappropriate for disposition on a motion to dismiss." *Bear Stearns*, 763 F. Supp. 2d 423, 496 (S.D.N.Y. 2011); Op. at 34.

*Third*, Defendants wrongly argue the scheme claim lacks a deceptive act. Defendants executed an illicit trading scheme that hid Musk's massive purchases and artificially maintained the price of Twitter securities during the Class Period, all while refusing to heed Advisor A's warnings about their disclosure obligations and pleas to seek legal counsel. Instead, Defendants lied to Advisor A about the legality of this trading strategy in order to coerce his continued involvement in the scheme. To ensure the public was kept in the dark, Defendants disseminated false statements to further obfuscate Musk's activist interest in Twitter. *See Lorenzo v. S.E.C.*, 587 U.S. 71, 78-79 (2019). These acts concealed Musk's interests in Twitter from the market and are thus entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) (sustaining Rule 10b–5(a) and (c) scheme claims).

*Fourth*, Defendants' scienter arguments fare no better. The Court already found a strong inference of scienter based on the facts alleged in the Prior Complaint. Op. at 31-36. Discovery has revealed additional facts confirming scienter, including sworn testimony from Defendants that

the "*5 percent mark [] means something*," and crossing 5% ownership would "*trigger*" their disclosure obligations. In addition, Birchall's internal emails reveal that Advisor A repeatedly pleaded that Defendants have lawyers confirm Defendants' "reading of the rule" requiring disclosure of Musk's interests and the "timing of [Section 13] filing." Defendants not only disregarded these pleas but falsely assured Advisor A that Defendants' scheme ***had*** been blessed by counsel. Meanwhile, despite unlimited access to lawyers, Defendants refused to retain disclosure counsel until the final trading day of the scheme. Before that date, Defendants were motivated to keep the price of Twitter's stock low, allowing Musk to "cost effectively" maximize his ownership stake. Even once Musk determined after building his position to disclose his ownership, Defendants deliberately doctored the Schedule 13G to conceal Musk's activist intentions for another day while Musk negotiated his Board membership.

Defendants' main rebuttal is that they simply made a "mistake"—which is not credible given their knowledge of Rule 13, disregard for repeated pleas to retain disclosure counsel, and outright lies to trading advisors that the scheme ***had*** been blessed by lawyers. Regardless, this Court has already rejected Defendants' "innocent mistake" argument in the last motion to dismiss. Op. at 34-36. At best, Defendants' mistake argument serves only to raise a genuine issue of material fact that must be left for trial. *See id.* at 37-38.

*Fifth*, Defendants argue that the misrepresentation claim lacks falsity and scienter. They are wrong. Musk's statements that he was, for example, giving "serious thought" to creating a rival platform and his improper Schedule 13G misled investors about Musk's true intentions for Twitter. In truth, Musk had spent over $2 billion to build a secret stake in Twitter and was planning to join the Board or take over the Company—not create a rival platform or be a merely passive investor.

Defendants' rehashed arguments and counter-factual narratives should be rejected.

Defendants' Motion should be denied, and this case should return to discovery.

## II.    SUMMARY OF RELEVANT FACTS

### A.    <u>Discovery Further Revealed Defendants' Scheme</u>

*Background.* Section 13 of the Exchange Act was enacted to "alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." ¶¶60-61. During the Class Period, Section 13 required investors who surpass 5% ownership in a company to publicly disclose their interest in and intentions for the company within 10 days on a Schedule 13D form. ¶¶58, 63-72. As a narrow exception, investors could file a Schedule 13G form if they are passive investors, which they must certify. ¶¶69-72.

Discovery has confirmed Defendants' knowledge of these disclosure obligations. ¶¶67, 78-79, 83-136. For instance, Musk's testimony in the SEC Investigation revealed that he knew the "5 percent mark [] means something" and "the first point at which one starts to notice investors is above the 5 percent number." ¶¶74, 79, 129, 210. Musk further confirmed that he was "aware from [his] personal experience at Tesla that there is some SEC reporting by investors in Tesla after they cross 5 percent ownership but not before." ¶¶74, 210. Musk testified that when his Twitter ownership was made public it "would definitely generate press" and "***there was a good chance that the price of Twitter might go up***." ¶¶67, 145-46. Birchall testified in the SEC Investigation that "five percent meant something . . . ***we knew that that would trigger something where at some point we would have to disclose something***." ¶¶74, 79, 129, 210; *see also* ¶¶75-77 (Musk's 2018 deposition testimony that "U.S. reporting requirements start at 5 percent"). Further, Musk has filed and signed at least twenty Schedule 13 forms from 2011 through the Class Period. ¶80.

*Defendants' Scheme.* In January 2022, Defendants devised a scheme for Musk to use his proceeds from selling Tesla options to secretly acquire a massive activist interest in Twitter. ¶¶82-87, 111, 153, 170, 200-02, Table 3. Together with Advisor A, Defendants crafted an elaborate

trading strategy designed to "***get in under the radar***" and "***not press the price.***" ¶¶67, 87, 92-110, 216, 253. To help Musk buy as much stock as possible at the lowest prices, Defendants had Advisor A keep Musk's purchases secret to ensure that "***No one knows what is going on and why*** . . . Not [Morgan Stanley compliance] not anyone." ¶¶87-89, 99-110. Musk testified that he "wanted to avoid as long as possible" making his Twitter interest public. ¶¶82, 99.

Defendants began acquiring Twitter stock using this secret trading strategy on January 31, 2022. Tables 1 & 2; ¶¶91-98, 107, 174. Ultimately, Musk spent over $2.6 billion from his Tesla proceeds to secretly acquire over 70 million shares of Twitter (at substantially discounted prices) through the end of the Class Period on April 4, 2022. ¶¶82, 91, Table 1. As part of this scheme, Advisor A kept Defendants apprised through daily (and often hourly) trading updates concerning Musk's purchases, including the "***Money Saved***" by hiding these trades from the market. ¶¶89-110, 112-25, 133, 142, 216, 253. Birchall privately informed Musk on the execution of the scheme through at least weekly Friday meetings. ¶¶39, 82, 97, 113, 137, 262.

Advisor A issued prominent cautions to Birchall about Musk crossing the 5% threshold. ¶¶112-29; 213-14, 254. For example, Advisor A wrote that "we should figure [out] ***how close we want to get to 5%*** but not exceed, unless.. you want to exceed." ¶¶113, 213. Advisor A also told Birchall to retain counsel, stating: "[y]ou'll want to have your counsel confirm the reading of the rule" (¶¶119, 213), and "***[h]ave counsel confirm timing of [Section 13] filing*** around recent / future statements. Can discuss offline" (¶121). To avoid any doubt, Advisor A expressly inserted into his emails to Birchall bright red disclaimers that Morgan Stanley advisors "***do not provide tax or legal advice***," which Advisor A testified were "to make sure that it was very clear to [Birchall] . . . that this is a topic that ***required*** him to seek ***advice from counsel***." ¶¶115-17, 123-28.

In response, Birchall falsely assured Advisor A that Defendants that their trading strategy

*had* been blessed by counsel. ¶¶82-83, 111-29, 213-14, 254. But Musk's and Birchall's testimony in the SEC Investigation and internal documents confirm that Defendants refused to retain counsel until they had built Musk's position in Twitter and Defendants' scheme was completed—even though Musk has virtually unlimited resources and had routinely retained multiple law firms. ¶¶111, 126-28, 153, 170, 182.

On or around March 7, 2022, Defendants confirmed that "Musk is okay with [exceeding five precent]" and ordered Advisor A to "continue moving forward with [] passing the five percent." ¶¶83, 90, 130-33. On March 14, 2022, Musk's Twitter holdings crossed the 5% threshold, which triggered his obligation to disclose his ownership and activist interests by filing a Schedule 13D form within 10 days. ¶¶112, 125, 137-40, 179, 214, 219.

The Class Period starts on March 25, 2022—the first day after Defendants violated the legal requirement to disclose Musk's interests in Twitter. ¶141, Table 3. Over the next ten days, Musk secretly amassed over 13 million additional Twitter shares. ¶¶141-46, 174-75, Table 3. Defendants' refusal to disclose Musk's interests kept the prices of Twitter's stock artificially low, which allowed Musk to maximize his ownership stake during the Class Period and ultimately saved him over $200 million. ¶¶83-96, 141-46, 157, 159, 174-75. But Twitter investors who sold their shares during the Class Period were cheated out of the true value of their shares. ¶¶146-47.

While Defendants hid Musk's purchases of Twitter stock during the Class Period, Musk's inner circle grew concerned that the market was "gonna figure something out" and uncover Defendants' scheme. ¶¶148-54. Amidst those concerns, Musk issued misleading tweets, including falsely stating that he was "giving serious thought" to "building a new social media platform" and asking "is a new platform needed?"—without disclosing that he had taken no steps to explore a different platform and, in fact, had built a $2 billion position in Twitter. ¶¶83, 86, 148, 155-67.

Further, far from building a rival platform, Musk was holding secret meetings with Twitter's leaders concerning his ownership and activist intentions for the Company. ¶¶166-73, 191, 216-22, 233, Table 3. At these meetings, Musk discussed "joining the Twitter Board," Musk's "significant stake of more than five percent" in the Company, and that Musk was also "considering the possibility of taking Twitter private." ¶¶168-9, 220, 233, Table 3. On April 3, 2022, Twitter offered Musk a Board position, which Musk accepted the next day. ¶¶171, 176-78, Table 3.

Recognizing that Defendants' undisclosed buying spree would soon come to light as Musk was likely joining Twitter's Board—and having spent the money earmarked for buying Twitter shares to build Musk's position in the Company—Defendants decided to disclose Musk's ownership in Twitter stock (but not his activist interests for the Company). Advisor A and Birchall strategized on how to manufacture "plausible den[iability]" concerning Defendants' scheme. ¶177. Musk and Birchall authorized filing a Schedule 13G on April 4, 2022 that disclosed Musk's 9.2% ownership of Twitter. ¶¶179, 185, 232, 235, Table 3. But this "short-form" Schedule 13G falsely represented to investors that Musk was a "passive" investor, disclosed nothing about Musk joining Twitter's Board, and deliberately deleted a required certification that Musk had no intent to "chang[e] or influenc[e] the control" of Twitter, replacing it with "Not Applicable." ¶¶69-72, 179-86, 218, 232-33, Table 3. Tellingly, Musk's lawyers apparently refused to sign the misleading 13G and, instead, applied Musk's signature. ¶218. The SEC immediately commenced an investigation into Defendants' misleading filing. ¶¶184, 192. Before the markets opened on April 5, Twitter announced that Musk had agreed to join its Board. ¶¶187-90, Table 3. Later that day, Defendants' attorneys finally filed the requisite Schedule 13D form. ¶¶187-90, 262, Table 3.

Twitter's stock price skyrocketed by more than 27% to close at $49.97 per share on April 4, 2022. ¶¶185, 188. Twitter's stock price again increased on April 5, 2022—spiking to $54.57 per

share before closing at $50.98 per share—and continued to react positively on April 6, 2022 (after accounting for market-wide movements). ¶188. Investors who sold Twitter stock or traded its other securities while Defendants schemed to conceal Musk's interests in Twitter were fraudulently deprived of enormous value. ¶¶146-47, 234-36.

### B.    Relevant Procedural History

On September 29, 2023, the Court sustained Plaintiff's claims under Sections 10(b) and 20(a) in the Prior Complaint, which included scheme claims under Rules 10b–5(a) and (c) (ECF No. 33 at ¶¶143-50 (Count I)). Op. at 4, 23-39. Discovery then commenced, and Defendants and third parties produced internal emails, texts, and testimony transcripts. Plaintiff timely filed the AC on May 1, 2024 (ECF No. 73), which contains over 40 pages of new factual allegations elicited from discovery, including additional support for Plaintiff's scheme liability and misstatement claims, two new defendants, and additional misstatements.

## III.    ARGUMENT

### A.    The AC States A Valid Rule 10b–5(a) and (c) Scheme Claim

Defendants' scheme for Musk to secretly acquire a $2 billion interest in Twitter is a classic violation of Rules 10b–5(a) and (c). These provisions prohibit "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. §240.10b–5.[2] The Supreme Court has long recognized that this "expansive" language "capture[s] a wide range of conduct." *Lorenzo*, 587 U.S. at 78-79.

#### 1.    The AC Alleges Numerous Deceptive Acts In Furtherance Of Defendants' Scheme

Plaintiffs can plead scheme liability by alleging a deceptive act "beyond misstatements and

---

[2] It is not disputed that the scheme was "in connection with" transactions of Twitter securities.

omissions, such as dissemination." *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022). Courts regularly find deceptive acts arising from failures to comply with Section 13. *See, e.g.*, *Gruber v. Gilbertson*, 2018 WL 1418188, at *14 (S.D.N.Y. Mar. 20, 2018) (sustaining scheme claim where defendants failed to disclose stock ownership on Form 13D); *United States v. Wey*, 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017) (same). The AC alleges numerous deceptive acts to defraud investors. ¶¶83-96, 141-47, 157-73, 191, 213-26, 251-56, Table 3.

***Illicit trading strategy in violation of Section 13***. Defendants executed an illicit trading strategy that artificially maintained deflated prices of Twitter securities during the Class Period. ¶¶82-125, 137-147, 174-75, Table 3. Defendants enlisted Advisor A and jointly operated a trading strategy that kept Musk's purchase of over $2 billion of Twitter securities "under the radar" until he had spent the money planned for acquiring Twitter shares. *Id.*; ¶¶153-55 ("***[Musk] can't announce before building most of the position***"), ¶170 (Birchall's testimony regarding "exhaust[ing] all of the proceeds from selling the Tesla shares"). By March 25, 2022, Defendants' cover-up of Musk's interest in violation of Section 13 artificially deflated the value of Twitter securities, thereby securing a substantial discount for Musk. ¶¶137-39, 141-45, 174-75, Table 3.

Any trading strategy that artificially maintains or otherwise manipulates a company's stock price for fraudulent purposes constitutes a "deceptive act." *See S.E.C. v. Stubos*, 634 F. Supp. 3d 174, 201 (S.D.N.Y. 2022) (defendant "conceal[ed] his majority ownership," "broke [his] ownership into blocks of less than 5% to avoid market scrutiny," "directed [traders] via encrypted messages to strategically buy stock to inflate its price," and "secretly sold his stock without making the disclosures required by federal law"); *Wey*, 2017 WL 237651, at *8 ("substantial affirmative conduct designed specifically to circumvent Rule 13d-1's reporting requirements and to 'obscure' [defendant's] beneficial ownership and control of [companies] from the investing public").

Defendants argue that Plaintiff does not plead that Defendants' illicit trading strategy "sen[t] a false pricing signal to the market" and tries to "dress up ordinary market trading into manipulative conduct." Mot. at 8-10. Not so. Plaintiff does not allege that "advanced trading strategies" are *per se* unlawful.[3] Defendants' trading scheme allowed Musk to keep his ownership interest secret and the stock price low—which became an illegal scheme when Defendants violated Section 13 at the start of the Class Period. As Judge Nathan wrote, "[defendant's] purported intentional failure to disclose beneficial ownership information when disclosure was expressly required was . . . both a communicative and deceptive act: ***it signaled falsely to investors that there was no such ownership to disclose***." *Wey*, 2017 WL 237651, at \*7-8.[4]

***False statement of legal blessing***. Defendants lied to Advisor A that their illicit trading strategy had been blessed by counsel. ¶¶82-83, 111-29, 213-17, 254. Misrepresenting legality or otherwise lying to an outside advisor constitutes a deceptive act. *See, e.g.*, *S.E.C. v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 765-66 (S.D. Ind. 2018) ("evidence of deceptive acts" included "not informing auditors regarding outside counsel telling Defendants that [payment scheme] likely was prohibited"); *S.E.C. v. AgFeed Indus., Inc.*, 2016 WL 10934942, \*15-16 (M.D. Tenn. July 21, 2016) (giving "outside auditor, outside disclosure counsel, and the new CFO the false impression" that investigation did not suggest the fraud was material); *S.E.C. v. Kearns*, 691 F. Supp. 2d 601, 618 (D.N.J. 2010) ("affirmatively misleading" auditors "that there were no allegations of fraud").

Defendants argue that this allegation of a deceptive act is not "logical," rhetorically asking

---

[3] Defendants' cases sustaining "ordinary market trading" are thus inapposite. *See* Mot. at 8-9.

[4] The disparate pleadings in Defendants' cases show the strength of Plaintiff's allegations. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 103-04 (2d Cir. 2007) ("[plaintiff] pleads no particular connection between the negative reaction of the stock price and anything the defendants did"); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 426 (S.D.N.Y. 2010) ("there are no allegations in the AC that the entirely undefined short selling alleged here was manipulative in any respect").

"why would [Birchall] ask [Advisor A] if he agreed with his reading of Rule 13G?" and "[w]hy would [Birchall] provide [Advisor A] with an article [concerning Section 13 disclosure requirements]?" Mot. at 10. *First*, Defendants' musings are inappropriate for a 12(b)(6) motion as they rest on credibility and factual determinations that cannot be made here. *Second*, Birchall's deception aligns with Plaintiffs' theory of fraud. By the time these exchanges occurred, Birchall had repeatedly lied to Advisor A about legal counsel, and Musk had almost exhausted the funds allotted to build his Twitter position and was nearly ready to announce his Board membership.[5]

Finally, Defendants wrongly claim that lying to Advisor A fails as to reliance because these lies were "unknown to the public." Mot. at 10-11. As an initial matter, Defendants do not challenge reliance as to Defendants' illicit trading strategy and dissemination of misleading statements—thus, Defendants concede reliance for the overall scheme. Moreover, "positive proof of reliance is not a prerequisite to recovery" for scheme liability claims "involving primarily a failure to disclose." *Affiliated Ute*, 406 U.S. at 153-54; *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 158 (2008) (scheme liability does not require "a specific oral or written statement"). Because Defendants' scheme arises from their illegal concealment of Musk's interests, no positive proof of reliance is required. *See, e.g.*, *Puddu v. NYGG (Asia) Ltd.*, 2022 WL 2304248, at *4 (S.D.N.Y. June 27, 2022) (applying *Affiliated Ute* presumption to scheme claims based on a failure to disclosure defendant's beneficial ownership in the company); *Gruber v. Gilbertson*, 2019 WL 4439415, at *6 (S.D.N.Y. Sept. 17, 2019) (same).[6] Notably, Defendants ignore the Supreme

---

[5] Defendants' reliance on *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022) is misplaced. There, the court found that defendants' "sham investigation" that reported "to the very persons allegedly engaged in the fraud" was not a deceptive act—essentially, a finding that the fraudsters could not defraud themselves. In contrast, Birchall's false assurances deceived an outside advisor in order to induce him to help carry out Defendants' scheme.

[6] None of Defendants' authorities involve scheme liability for a breached duty of disclosure. *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 625 (S.D.N.Y. 2005) ("lawyers allegedly designed and

Court's holding in *Affiliated Ute* entirely. *Cf.* ¶¶237-40.

 ***Dissemination of misleading statements***. To further protect the secrecy of his activist interest, Musk disseminated his misleading Schedule 13G and tweets. ¶¶155-65, 176-86. *First,* the Court has already sustained Musk's Schedule 13G as misleading. *See, e.g.*, Op. at 32-38. *Second*, as discussed *infra* at III.A.2(c), Musk's tweets gave the misleading impression that he was considering building a rival platform to Twitter, or that buying Twitter was a fantasy. ¶¶83, 155-67, 228-29, Table 3. Musk's "disseminati[on] [of] false or misleading information to prospective investors with the intent to defraud" is standard deceptive conduct. *Lorenzo*, 587 U.S. at 78; *United States v. Kwok*, 2024 WL 1407057, at *8 (S.D.N.Y. Apr. 2, 2024) ("dissemination of the misstatements by posting videos to his large following on social media" was a deceptive act per *Rio Tinto*). Defendants' argument (Mot. at 8) that Musk's dissemination of these false statements is not a separate deceptive act "beyond misstatements and omissions" misstates *Rio Tinto*. *See* 41 F.4th at 49 ("misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond . . . **such as dissemination***").

 Defendants claim that the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257 (2024), forecloses scheme liability under 10b–5 based on "pure omissions." Mot. at 7-8. Putting aside that there are affirmative misstatements here, Defendants flatly mischaracterize the law. In *Macquarie*, the Supreme Court held that "Rule 10b–5***(b)*** does not proscribe pure omissions." The Court expressly ***excluded*** scheme claims under 10b–

---

helped perpetrate transactions intended to misrepresent a client's financial situation"); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 276 (S.D.N.Y. 2009) ("[lawyer] passed along statements made by [principals from third-party company] to representatives of [plaintiffs]"); *Turquoise Hill*, 625 F. Supp. 3d at 252 ("Plaintiffs argue that the Rio Defendants provided the false statement to Turquoise Hill, who then decided to publish it").

5(a) and (c) from its holding. *See, e.g.*, *id.* at 266 n.2.[7]

Finally, Defendants argue that the AC does "not distinguish between each Defendant's alleged conduct." Mot. at 7. This fails. *First*, the AC alleges Musk's supervisory role over the whole scheme (¶¶82-110, 113-27, 148-65, 176-86, 255), Birchall's role as trading manager in charge of implementing Musk's orders (¶¶36-39, 92-110, 111-29), and they used the Trust and Excession to defraud investors. ¶¶34-36, 39, 177, 189, 261-62. *Second*, a "[c]omplaint need not establish that [defendants] participated in each and every aspect of the fraudulent scheme' to withstand a Rule 12(b)(6) motion." *S.E.C. v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020).

### 2.  The AC Alleges An Overwhelming Inference Of Defendants' Scienter

A strong inference of scienter may be established by "motive and opportunity to commit fraud" or "conscious misbehavior or recklessness." *Gruber*, 2018 WL 1418188, at *11. While "accept[ing] all factual allegations in the complaint as true," courts must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 323 (2007). The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences," and need only be "cogent and at least as compelling as any opposing inference." *Id.* at 324. Considered holistically, the facts in the AC plead a strong inference of scienter.

### (a)  The Court Previously Sustained Plaintiff's Scienter Allegations

The Court sustained Plaintiff's scienter allegations based on the facts alleged in the Prior Complaint. Op. at 31-36. ***One***, the Court found scienter because "Musk knew of his duty to disclose" as demonstrated by "his sworn deposition testimony" that "U.S. reporting requirements

---

[7] Defendants note that this Court has already rejected their argument that Section 18(a) provides the exclusive remedy for a violation of Section 13(d). Mot. at 8 n.5; Op. at 23-30. Defendants' attempt to revive this argument in light of *Macquarie* fails for the reasons discussed herein.

start at 5 percent." *Id.* at 32. ***Two***, the Court also cited Musk's extensive history with Rule 13, noting that Musk has "personally filed and signed twelve Schedule 13G forms and eight Schedule 13D forms." *Id.* ***Three***, the Court credited the fact that "Defendant knew that his Twitter ownership had crossed the 5% threshold because he held several non-public meetings . . . where he specifically discussed his stake." *Id.* ***Four***, the Court also found scienter based on the fact that Musk "confirmed March 14, 2022 as the 'Date of Event' triggering his filing obligation." *Id.* at 32-33. The Court held that these facts "suggest [that defendants] knew they had a duty to disclose information they withheld." *Id.* at 33. Because these same facts are still alleged in the AC, the Court's prior finding of scienter should stand.

### (b)    The Additional Facts Alleged In The AC Buttress The Already Strong Inference Of Scienter

Discovery has strengthened the already strong inference of scienter. *First*, Defendants' testimony in the SEC Investigation further confirms their knowledge of the Section 13 disclosure obligations, including that the "***5 percent mark [] means something***," and crossing 5% ownership would "***trigger***" their disclosure obligations. ¶¶74, 79, 129, 210. Courts have found a strong inference of scienter based on less compelling facts. *E.g., Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 95 F. Supp. 2d 169, 174 (S.D.N.Y. 2000) (finding scienter because "[n]o[] one could seriously question . . . that sophisticated investors such as these knew of their [Section 13 disclosure obligations]").

*Second*, Defendants repeatedly refused to heed Advisor A's pleas to have lawyers confirm Defendants' "reading of the rule" and the "timing of [Section 13] filing"—and even lied to Advisor A that their scheme ***had*** been blessed by lawyers. ¶¶112-25, 126-36, 213-17. Defendants' disregard of these warnings and overt deception of an outside advisor gives rise to an overwhelming inference of conscious misbehavior or, at minimum, recklessness. *In re Glob.*

15

*Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 351 (S.D.N.Y. 2004) (scienter where defendants "actively quashed" auditor who questioned propriety of fraudulent accounting schemes); *S.E.C. v. Enterprises Sols., Inc.*, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001) (CEO's "failure to ensure that [a material fact] was disclosed demonstrates reckless disregard for the truth" where CEO "never sought specific advice from counsel with respect to disclosure").

*Third*, Defendants consciously executed an illicit trading strategy that enabled Defendants to acquire Twitter stock at artificially maintained prices. ¶¶82-125, 111, 137-47, 153-55, 174-75, 213-223, 229, 255. Defendants' close oversight and execution of this "under the radar" strategy, which violated their Section 13 disclosure obligations, supports a strong inference of scienter. *Gruber*, 2018 WL 1418188, at *12 ("obtain[ing] information about the stock manipulation scheme" involving "suspicious trading activity" amid Section 13 violation supported scienter).

*Fourth*, while "motive is not required to plead scienter," *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010), it is alleged here. Defendants were motivated to hide Musk's trading to keep the price of Twitter's stock low while he built his position so they could maximize Musk's ownership with funds designated for that purpose. ¶¶85, 111, 153, 170, Table 3. Musk and Birchall testified that they knew that disclosure of Musk's interests would very likely increase Twitter's stock price. ¶¶99, 143, 145, 225. As such, "the goal" of Defendants' illicit trading strategy was to "***get[] [Musk] ownership [of Twitter] cost effectively***." ¶¶82-110. Tellingly, it was not until ***after*** Musk had "buil[t] most of the position" in Twitter (¶153) and had "exhausted all of the proceeds from selling the Tesla shares" (¶170) that Defendants finally relented in hiring counsel and took steps to make the legally required disclosures (¶¶126-28). These newly discovered facts concerning motive further support Defendants' willful disregard of their disclosure obligations. *See Gruber*, 2018 WL 1418188, at *14 (motive for scheme to violate

16

Section 13 established where "[a]ll of [defendants'] decisions were exclusively designed to advance their self-interest, often to the detriment of the [c]ompany's financial condition"). In the end, Musk saved **over $200 million**. ¶145. Together, these allegations establish motive. *See In re MCI Worldcom, Inc. Sec. Litig.,* 93 F. Supp. 2d 276, 284 (E.D.N.Y. 2000) ("[B]eing able to acquire a company for a significantly reduced price is a sufficient economic benefit to satisfy" motive).

In sum, the inference that Defendants knowingly or recklessly deceived investors in connection with their scheme is cogent and at least as compelling as any opposing inference. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) ("a tie on scienter goes to the plaintiff").

### (c)    Defendants' Scienter Challenges Fail

Defendants' scienter challenges fail and, at most, raise issues of disputed fact that must be left for resolution on a full record at trial. As a threshold matter, Defendants rehash the same arguments that the Court considered and rejected in its prior Opinion, when the Court found scienter based upon Musk's prior compliance with Section 13 (Op. at 32), his manipulation of the Schedule 13G (Op. at 31-32),[8] his secret meetings with Twitter leadership (Op. at 32), and his opinions of the SEC (Op. at 36). There is no basis to reverse course now. *See Pampena v. Musk*, 2024 WL 3678002 (N.D. Cal. Aug. 5, 2024) (denying Musk's motion for judgment on the pleadings "based on the law of the case doctrine" because "the Court explicitly considered and rejected these arguments in its motion to dismiss order").

---

[8] Defendants try to revive this argument by contending that Musk's lack of share purchases during the period between the original and corrected filings undercuts scienter. Mot. at 10. Not so. Defendants did not purchase additional Twitter shares because Defendants had exhausted the funds designated for Twitter. ¶¶88, 111, 145. Defendants' argument that they "quickly filed a correct filing" (Mot. at 18) is likewise unpersuasive. *Carpenters Health & Welfare Fund of Phila. v. Coca-Cola Co.*, 2002 WL 34089163, at *15 (N.D. Ga. Aug. 20, 2002) ("[A] short-time frame between an allegedly fraudulent statement and a later disclosure of seemingly inconsistent information can be probative of fraudulent intent in a securities case.")

(i)         **Conscious Misbehavior or Recklessness**

*Defendants' knowledge of Rule 13.* Defendants now concede that they knew about Rule 13 and its disclosure requirements, as well as the fact that Musk had crossed the 5% threshold—as they must—but argue that they did not know of the specific ***timing*** of disclosure required by Rule 13. Mot. at 13-15. This fails for several reasons. *First*, it is not credible for Defendants to claim that they knew about the 5% disclosure requirement (*see supra* at III.A.2(a)-(b)), but they somehow did not know about its ***timing*** requirement, which is a key element of Rule 13. Birchall's knowledge of the 10-day disclosure rule is further confirmed by his circulation of an article that highlighted the 10-day filing requirement in **bold**. ¶120; Ex. C, ECF No. 109-3 at 8.

*Second*, Defendants' timing argument cannot be credited given that Advisor A repeatedly warned them to "have counsel confirm ***timing*** of [Section 13] filing." ¶¶112-25, 213. Defendants argue that Birchall's text message to Advisor A (Ex. B, ECF No. 109-2) demonstrates his confusion over Rule 13 and that Advisor A agreed with Birchall's mistaken interpretation. Mot. at 15. On the contrary, Advisor A responded to Birchall's suggestion that Musk would do a year-end filing by ***urging Birchall yet again to seek legal advice so they would have a correct interpretation of the disclosure timing.*** Ex. B. ("have your counsel confirm the reading of the rule"). Even in the face of his own supposed confusion and Advisor A's urging to seek legal counsel, Birchall chose instead to barrel ahead with the path of nondisclosure. ¶¶117-29. This alone establishes Defendants' "refusal to see the obvious, or to investigate the doubtful," which is classic recklessness. *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig*., 2011 WL 3211472, at *9-10 (S.D.N.Y. July 29, 2011) (scienter where defendant "had unfettered access to experienced counsel" but "sought no legal advice as to [disclosure obligations]"); *S.E.C. v. Czarnik*, 2010 WL 4860678, at *9 (S.D.N.Y. Nov. 29, 2010) (one cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand"). In truth, Defendants knew the requisite timing

18

but refused to disclose until after Musk had "buil[t] most of the position." *E.g.*, ¶153.

    ***Defendants' secret trading scheme***. Defendants acknowledge that they sought to, and did, keep their trading scheme secret to keep Twitter's stock price low. Mot. at 16-17. However, they claim that Plaintiff "does not identify anything improper about the trading strategy" (Mot. at 16-17) and that Musk's desire to avoid publicity is innocuous (Mot. at 13, 15). Defendants are wrong. Once Defendants started ***breaking the law*** to conceal Musk's interest in Twitter, their knowledge of, and deliberate intent to use, a secret trading strategy contributes to the strong inference of conscious or reckless misconduct. *See T.H.C., Inc. v. Fortune Petrol. Corp.*, 1999 WL 182593, at *4 (S.D.N.Y. Mar. 31, 1999) (defendants' trading patterns raised "strong inference of fraudulent intent"). Defendants also argue that Musk was unaware of "any specifics" regarding the trading strategy (Mot. at 17), but Musk supervised and directed the trading strategy through at least weekly meetings with Birchall. ¶¶92-98 ("***ERM*** [Musk] ***is nervous we are moving the stock price***").[9]

    ***Defendants' refusal to get legal advice***. Defendants argue that Plaintiff does not allege that "Musk himself refused" or "was even told" to "seek legal advice." Mot. at 15. *First*, this is a strawman, as Musk's agent, Birchall, was repeatedly told to seek legal advice and refused to do so. *See supra* at II.A, III.A.2(c); *see also Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 551 (S.D.N.Y. 2020). *Second*, Defendants ignore that Musk engaged in weekly meetings concerning Defendants' disclosure obligations and the scheme's progress. ¶113 (Birchall told Musk that "they were approaching the 5% threshold"), ¶117 (Advisor A asked if Birchall and Musk had "come to a conclusion" regarding their share purchases). Defendants next

---

[9] Defendants' cases lack the specificity of the AC. *Cement & Concrete Workers Dist. Council Pension Fund v. HP Co.*, 964 F. Supp. 2d 1128, 1143 (N.D. Cal. 2013) (no allegations that defendant "intended to mislead investors or knew (or should have known) that failing to disclose his conduct would artificially inflate [stock]"); *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc*., 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) (isolated allegations concerning desire to profit).

wrongly assert that the AC does not explain why their failure to seek legal advice was highly unreasonable. Mot. at 15. The AC explains that it was highly unreasonable for Defendants not to seek legal advice given their admitted knowledge of their Rule 13 disclosure obligations once they had crossed 5% and because they were repeatedly told to get legal advice. ¶¶73-81, 126-29.[10]

***Defendants' lies about getting legal advice***. Defendants dispute the AC's allegations that Birchall lied to Advisor A, claiming that there is no "contemporaneous document where Birchall claimed he had spoken to counsel." Mot. at 16; *see also* 14 n.6, 15. As a threshold matter, this is an improper factual dispute on a pleadings motion. In any event, Defendants are wrong. Advisor A testified that Birchall was "simply very clear . . . that he was talking to counsel." ¶¶14, 124, 214; *see also* ¶124 ("[Birchall] relayed to me that he had approached Elon's senior counsel about whether or not there was a reporting requirement should they pass five percent ownership"). In contemporaneous emails, Advisor A confirmed his understanding that Birchall was obtaining legal advice—and Birchall said nothing to correct that assumption. *E.g.*, ¶125 ("Re the 13 filing you may want to reconfirm (again) with outside counsel (not that you haven't already a few times . . . . you will want to confirm or have final guidance—as you have been getting—from your outside counsel"). The fact that Birchall lied must be accepted as true on this Motion—and Defendants' attempt to dispute this fact cannot be credited.

Defendants next argue that it "defies logic" that Birchall would send Advisor A an article spelling out Rule 13's 10-day filing deadline for activist investors. Mot. at 16. Birchall's action demonstrates his knowledge of the 10-day rule (¶¶117-29), which ***confirms*** his scienter and

---

[10] Defendants' cases are inapposite. *United States ex rel. Rose v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 2008 WL 4056601, at *9 (E.D. Tex. Aug. 25, 2008) (defendants received legal advice from attorneys at partnership organization, which the court found reasonable); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 447 (S.D.N.Y. 2006) (no allegations regarding failure to seek legal advice or false assurances defendants had done so); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (same).

renders Defendants' counter-factual narrative incorrect. In any event, Defendants' argument again "merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and therefore is not enough to defeat th[e] inference of scienter." Op. at 34 (cleaned up).

*Musk's misleading tweets*. Defendants argue that Musk's tweets undercut scienter because they "brought unwanted attention." Mot. at 17. This is wrong. Musk's inner circle was concerned that the public might discover Musk's interests in Twitter, so Musk tweeted the misleading statements about building a rival platform to "deceive the public about, or distract the public from looking further into" Defendants' secret scheme. *Handal v. Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at *17 (E.D.N.Y. Sept. 25, 2023); *see also* ¶¶148-54.[11]

### (ii)    Motive and Opportunity to Commit Fraud

Defendants wrongly repaint Plaintiff's theory of fraud as limited to Musk's desire to save money and "protect" his wealth. Mot. at 12-13. The AC does allege that Defendants were motivated to conceal Musk's interests to keep the price of Twitter's stock low to save money—but also so that they could "cost effectively" maximize Musk's ownership with the money generated from Tesla shares. *See supra* at II.A, III.A.2(b). These allegations are far more detailed than Defendants' cases. *See*, *e.g.*, *Small v. Arch Cap. Grp., Ltd.*, 2006 WL 2708448, at *12 (S.D.N.Y. Sept. 20, 2006) (no allegations of "concrete benefits" defendant obtained through alleged misconduct).[12] Defendants' challenge to Birchall's reward of $100,000 Tesla shares for

---

[11] Defendants' claim that the AC "alleges nothing" about the HSR Violation ignores that Plaintiff details the FTC's inquiry into Musk's apparent failure to timely report his purchases of Twitter securities to the Justice Department, which further supports Musk's scienter. ¶¶192-95. *Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 453 (S.D.N.Y. 2013).

[12] Defendants' other authorities are unrelated. *Green Star Energy Sols., LLC v. Edison Properties, LLC*, 2022 WL 16540835 (S.D.N.Y. Oct. 28, 2022) (scheme to save money involved withholding payments to subcontractors); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) (no allegations of disclosure violation); *ECA*, 553 F.3d at 200-01 (motive allegations based on inflated stock price or improved corporate performance); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) (motive allegations based on executive's public statements).

executing the scheme also fails. ¶34. Monetary rewards for executing schemes allege motive. *State Farm Mut. Automobile Ins. Co. v. CPT Med. Servs., P.C.*, 2008 WL 4146190, at *12 (E.D.N.Y. 2008).

### (d)    Defendants' Competing Inference Fails

Defendants argue that their theory of inadvertent mistake is more compelling than the inference that Defendants acted with scienter. Mot. at 19-21. They are wrong. *First*, Defendants ignore that the Court has already rejected their "inadvertent mistake" theory in the prior motion to dismiss. Op. at 34-36 ("[E]ven in light of opposing inferences, the Complaint's allegations articulate Defendants' scienter"). *Second*, Defendants argue that Musk always knew his interests would be disclosed. *E.g.,* Mot. at 19. This misses the point. Defendants refused to disclose Musk's interests in Twitter until Musk had built his position so they could maximize Musk's ownership with the funds designated for that purpose. Defendants' claim that Musk planned to disclose ***after*** his scheme was carried out is irrelevant and, if anything, confirms his scienter.[13]

These allegations give rise to a strong inference of scienter—not mere negligence, as Defendants contend.[14] Defendants' counter-factual explanations all stand "in direct contravention of Plaintiff's factual allegation[s]" and "merely raise[] [] factual dispute[s] that the Court must resolve in plaintiff's favor" at this stage. Op. at 34.[15]

---

[13] Defendants' cases concerning accounting infractions are inapt. *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 169 (D. Mass. 2000) (restatement of earnings); *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *6 (S.D.N.Y. Sept. 11, 2014) ("highly technical" accounting error that "did not affect the company as a whole"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297 (S.D.N.Y. 2014) ("internal control weaknesses in dribs and drabs").

[14] *Compare with In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 426-27 (S.D.N.Y. 2001) (threat to resign and obtain third-party opinion was inconsistent with "passive acquiescence in the face of knowledge"); *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015) (auditor merely negligent where it failed to uncover nature of company's ownership interest).

[15] Musk's and Birchall's scienter is imputed to Excession and the Trust. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

**B.    The AC States A Valid Rule 10b–5(b) Misrepresentation Claim**

Defendants concede key elements of Plaintiff's Rule 10b–5(b) misrepresentation claim, including materiality, reliance, causation, and economic loss. *See Lozada v. Taskus, Inc.*, 2024 WL 68571, at *12 (S.D.N.Y. Jan. 5, 2024). Defendants' remaining falsity and scienter challenges fail.

**1.    The AC Alleges Falsity**

Under Rule 9(b) and the PSLRA, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *S.E.C. v. DeFrancesco*, 683 F. Supp. 3d 367, 372 (S.D.N.Y. 2023). To do this, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). The AC satisfies this standard.

***Schedule 13G.*** This Court already sustained Plaintiff's claim that Musk's "Schedule 13G form was misleading." Mot. at 24 (quoting Op. at 34). Defendants do not challenge that holding.

***Tweets.*** Musk's tweets misrepresented his intention to build an alternative platform to Twitter and misdirected public attention away from Musk's growing interest in Twitter.[16] Discovery revealed that Musk had taken ***no*** steps to create an alternative platform and actually had amassed $2 billion in Twitter stock through a secret trading strategy. ¶¶17, 82-91, 228-29, Table 3. Such statements are actionable. *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1, 11 (D.D.C. 2023) (defendant's moon-emoji tweet was actionable because it was "perceived as a rallying cry to buy Bed Bath's stock, even though [defendant] had soured on Bed Bath").

Even accepting Defendants' fact-based arguments (Mot. at 23), Musk's tweets are (at best)

---

[16] Defendants self-serving "attempt to dissect" Musk's tweets and analyze the parts separately is "unavailing." *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 2015 WL 12723054, at *7 (N.D. Tex. Mar. 12, 2015); Mot. at 22.

classic misleading "half-truths" that "omit[] critical qualifying information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). Once Musk spoke on this topic, he had "a duty to tell the whole truth"—including the highly material fact that he had expended $2 billion on Twitter stock. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *Macquarie*, 601 U.S. at 263 ("the difference between a pure omission and a[n actionable] half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert").

Defendants' arguments in response fail. *First*, their refrain that Musk's tweets created no "affirmative impression" regarding his $2 billion "ownership interest" in Twitter (Mot. at 21-23) relies on inapposite caselaw. In *Kairalla v. Advanced Medical Optics*, Inc., 2008 WL 2879087, at *3 (C.D. Cal. June 6, 2008), and *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, 586 F. Supp. 2d 172, 191 (S.D.N.Y. 2008), defendants made no affirmative statements. Next, Defendants' misreading of the AC should be rejected: the AC does not allege that Musk's free speech poll or "what should be done" tweet are misleading. ¶¶150, 156; *contra* Mot. at 22.[17] Instead, the AC alleges that Musk's rhetorical question—"Is a new platform needed?"—was misleading for the reasons discussed above. ¶156. Finally, Defendants cherry pick portions of Twitter insiders' texts to argue that Musk had not decided to buy Twitter at the time of his tweets. Mot. at 23. The AC pleads that Defendants' scheme was orchestrated well before Musk's tweets, and, in any event, this argument raises factual disputes that cannot be resolved now.

## 2.    The AC Alleges A Strong Inference Of Scienter

The Complaint alleges a strong inference that Musk "consciously" or "recklessly" misled the public with respect to the Schedule 13G and tweets. The Court already rejected Defendants' "mistake" inference. Op. at 33-34. Contrary to Defendants' new spin (Mot. at 24), the inference of

---

[17] Similarly, Musk's tweet that he was "giving serious thought to this" responds to a user's query of "Would you consider building a new social media platform[?]" ¶160; *contra* Mot. at 22 n.9.

scienter has only grown stronger, including based on Defendants' emails about manufacturing "plausible den[iability]" while Musk negotiated a spot on Twitter's Board. ¶¶85, 176-79. Defendants' argument that it does not "make sense" for Musk to lie is both incorrect and another improper factual dispute.[18] The remaining scienter arguments (Mot. at 17, 23) fail for the same reasons regarding Plaintiff's scheme claim. *Supra* at III.A.

### 3.    The 10b–5(b) Misrepresentation Claim Is Timely

Defendants wrongly claim that Plaintiff's allegations concerning Musk's tweets are time-barred. Mot. at 21. The AC was timely filed per the scheduling order. ECF No. 60. And Plaintiff only learned through discovery that Musk's misstatements were issued to mislead investors after he was warned that "[s]omeone is gonna figure something out", and that Musk had taken no steps to explore an alternate platform. ¶¶17, 148-54. Defendants have not identified any "particularized" facts that Plaintiff should have discovered "more than two years ago." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 175 (2d Cir. 2011) (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010)).

### C.    The AC States A Valid Section 20(a) Control Person Claim

Control person liability is pled. Musk and Birchall each controlled the Trust and Excession, and each culpably participated in the fraud by acting with scienter. *See, e.g.*, ¶¶34-36, 39, 177, 189, 262; *see also In re: EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016).

## IV.    CONCLUSION

Defendants' Motion should be denied. Should the Court grant any part of Defendants' Motion, Plaintiff respectfully requests leave to amend under Rule 15(a).

---

[18] Defendants' citation to *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2021 WL 3491779 (D. Del. Aug. 9, 2021) is unpersuasive. In a subsequent decision, the court sustained scienter because defendants "knew facts or had access to information contradicting specific false and misleading material misstatements"—just like here. 2023 WL 2072227, at *23 (D. Del. Feb. 17, 2023).

Dated: August 12, 2024

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
Salvatore J. Graziano
Katherine M. Sinderson
Jeremy P. Robinson
Jonathan G. D'Errico
Emily A. Tu
Jasmine Cooper-Little
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
katie@blbglaw.com
jeremy@blbglaw.com
jonathan.derrico@blbglaw.com
emily.tu@blbglaw.com
jasmine.cooper-little@blbglaw.com

*Lead Counsel for Plaintiff Oklahoma Firefighters Pension and Retirement System*