**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,<br><br>            Plaintiff,<br><br>      v.<br><br>ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, and JARED BIRCHALL,<br><br>            Defendants. | No. 1:22-cv-03026-ALC-GWG |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>MOTION TO APPROVE CONFLICT SCREENING PROCEDURES</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ...................................................................................2

A.  Mr. Tenreiro Was Enforcement Counsel to the Chair of the SEC During the Agency's Investigation of Mr. Musk's Acquisition of Twitter Stock. ...............2

B.  Mr. Tenreiro Oversaw the SEC's Decision to File an Action Against Mr. Musk Based on the Same Conduct Alleged in this Case. ...............................................3

C.  Shortly After Filing the SEC Action, Mr. Tenreiro Communicated with Plaintiff's Counsel in this Case About Potential Employment at BLB&G. .........................4

D.  While Seeking Employment by BLB&G, Mr. Tenreiro Has Engaged with Social Media Posts Disparaging Mr. Musk, Including by a BLB&G Partner. ...............5

E.  BLB&G Provided Limited Information to Defense Counsel About Mr. Tenreiro. ............6

F.  BLB&G's Moving Papers Make New Disclosures About Mr. Tenreiro's Conflicts and Contacts with Lead Counsel. ......................................................................8

LEGAL STANDARD ...........................................................................................10

ARGUMENT ........................................................................................................11

I.  BLB&G'S ASSOCIATION WITH MR. TENREIRO CREATES A CONFLICT OF INTEREST AND APPEARANCE OF IMPROPRIETY. ..........11

A.  Mr. Tenreiro Participated Personally and Substantially in this Matter as the SEC's Chief Litigation Counsel and Enforcement Counsel to the Chair. ......................................................11

B.  Mr. Tenreiro Acquired Confidential Government Information Regarding Defendants When He Was the SEC's Chief Litigation Counsel. ..................................................14

II.  BLB&G'S PROCEDURES FAIL TO RESOLVE THE CONFLICT OF INTEREST AND APPEARANCE OF IMPROPRIETY. ....................................15

A.  There Is Substantial Reason to Doubt the Efficacy of BLB&G's Hypothetical Screening Procedures. ...........................................................15

B.  BLB&G's Association with Mr. Tenreiro Immediately After the Filing of the SEC Action Was Filed Creates an Appearance of Impropriety. ............................................................18

CONCLUSION .....................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Arroyo v. City of Buffalo,*
    2017 WL 3085835, at *12 (W.D.N.Y. July 20, 2017), *R&R adopted*, 2018 WL
    488943 (Jan. 20, 2018)..................................................................................................12

*Baird v. Hilton Hotel Corp.,*
    771 F. Supp. 24 (E.D.N.Y. 1991) ...............................................................................16

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,*
    1996 WL 66130 (S.D.N.Y. Feb. 15, 1996)....................................................10, 13, 19

*Bennett Silvershein Assocs. v. Furman,*
    776 F. Supp. 800 (S.D.N.Y.1991)...............................................................................11

*Cheng v. GAF Corp.,*
    631 F.2d 1052 (2d Cir. 1980), *vacated on other grounds,* 450 U.S. 903 (1981)....................19

*Crudele v. New York City Police Dep't,*
    2001 WL 1033539 (S.D.N.Y. Sept. 7, 2001)..............................................................16

*Decker v. Nagel Rice LLC,*
    716 F. Supp. 2d 228 (S.D.N.Y. 2010)..........................................................................11

*Eberle Design, Inc. v. Reno A & E,*
    354 F. Supp. 2d 1093 (D. Ariz. 2005) ...................................................................10, 13

*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.,*
    809 F. Supp. 1383 (N.D. Cal. 1992) ............................................................................17

*Essex Equity Holdings USA, LLC v. Lehman Bros.,*
    29 Misc. 3d 371 (N.Y. Sup. Ct. 2010) ..............................................10, 12, 16, 18

*Garber v. Off. of Comm'r of Baseball,*
    2017 WL 752183 (S.D.N.Y. Feb. 27, 2017)...............................................................14

*Goodwine v. City of New York,*
    2016 WL 379761 (S.D.N.Y. Jan. 29, 2016) ................................................................10

*Google LLC v. NAO Tsargrad Media,*
    2024 WL 4844799 (N.D. Cal. Nov. 19, 2024) ...........................................................15

*Green v. City of New York,*
    2011 WL 2419864 (S.D.N.Y. June 7, 2011) .........................................................12, 13

*Hull v. Celanese Corp.*,
   513 F.2d 568 (2d Cir. 1975)..........................................................................11, 16

*Huntington v. Great W. Res., Inc.*,
   655 F. Supp. 565 (S.D.N.Y. 1987)...............................................................15

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   No. 1:11-md-02262-NRB, Dkt. #1618 (S.D.N.Y. filed Oct. 25, 2016)....................18

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   No. 1:11-md-02262-NRB, Dkt. #1668 (S.D.N.Y. filed Dec. 8, 2016)............10, 18

*Murtaugh v. Cnty. of Oswego*,
   2012 WL 12991206 (N.D.N.Y. July 31, 2012) ........................................12, 13, 14

*SEC v. Musk*,
   No. 1:25-cv-00105 (D.D.C.) ..........................................................................4, 8

*In re Sunbum5 Enters., LLC*,
   2011 WL 4529648 (M.D. Fla. Sept. 30, 2011) ...........................................10, 13

*Tornetta v. Musk*,
   C.A. No. 2018-0408-KSJM (Del. Ch. filed March 1, 2024) ....................................5

*Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*,
   2010 WL 1172947 (N.D. Tex. Mar. 25, 2010)...........................................10, 13

*Yaretsky v. Blum*,
   525 F. Supp. 24 (S.D.N.Y. 1981)....................................................................16, 17

**Statutes**

Federal Securities Laws ¶ 20 ...........................................................................4

Securities Exchange Act of 1934 § 13(d) .................................................................2, 4

**Other Authorities**

17 C.F.R. § 200.735-8.................................................................................3, 12

Dave Michaels, *SEC Ousts Top Litigator Who Battled with Crypto Giants*, WALL
   ST. J. (Feb. 5, 2025) .................................................................................2, 19

*Elon Musk*, THE CLS BLUE SKY BLOG (Mar. 6, 2025),
   https://clsbluesky.law.columbia.edu/2025/03/06/dont-undermine-delawares-
   judiciary-at-the-behest-of-elon-musk/ ...........................................................5

*Elon Musk's Twitter Acquisition Resigns, Cites 'Heartbreaking' Decision*,
Fortune (Apr. 9, 2025 3:37 PM EDT), https://fortune.com/
2025/04/09/securities-exchange-commission-elon-musk-lawsuit-twitter-x-
resign-concerns .................................................................................................................6

Jorge G. Tenreiro, Jorge G. Tenreiro's LinkedIn Profile, LinkedIn,
https://www.linkedin.com/in/jorge-g-tenreiro-0a40862b/ .........................................3

N.Y. Rules of Prof'l Conduct, Rule 1.11 ............................................................ *passim*

N.Y. Rules of Prof'l Conduct, Rule 1.11(a)(2)..........................................................13

SEC Release No. 2024-182, *SEC Chair Gensler to Depart Agency on January 20*,
U.S. Securities and Exchange Commission (Nov. 21, 2024),
https://www.sec.gov/newsroom/press-releases/2024-182. .........................................3

Defendants Elon R. Musk, Elon Musk Revocable Trust dated July 22, 2003, Excession LLC, and Jared Birchall ("Defendants") respectfully oppose the motion of lead plaintiff's counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") for approval of conflict screening procedures for Jorge G. Tenreiro (the "Motion") (Dkt. #123).

## INTRODUCTION

BLB&G's purported conflict screening procedures do not cure the troubling conflict of interest and appearance of impropriety created by its proposed hiring of Mr. Tenreiro. Lead counsel seeks approval to hire a former senior SEC official who, in his capacity as Chief Litigation Counsel and previously Enforcement Counsel to the Chair, played a personal and substantial role in recommending and advancing an enforcement action against Elon Musk based on the very same conduct alleged in this litigation.

Mr. Tenreiro oversaw the approval of the SEC's civil enforcement action against Mr. Musk on January 14, 2025, less than a week before the new administration was inaugurated. He then began engaging with lead counsel *in this case* and other litigation against Mr. Musk just three weeks later. While seeking employment by BLB&G, Mr. Tenreiro publicly endorsed a BLB&G partner's social media post deriding Mr. Musk as a "billionaire autocrat." In other words, Mr. Tenreiro seeks to move from a position at the SEC where he had unique information, access, and involvement in one of SEC's latest witch hunts against Mr. Musk into private practice, where he will capitalize on that unique knowledge to promote BLB&G's equally baseless fraud litigation.

Notably, when BLB&G first sought undersigned counsel's consent to Mr. Tenreiro's hiring, the firm insisted his role was limited to reviewing a single memo. Over time, it became evident that Mr. Tenreiro's involvement was much deeper than that, and that standard conflict screening procedures will be inadequate to protect Mr. Musk's interests.

Bringing Mr. Tenreiro into BLB&G's tightknit securities fraud practice and its relatively small New York office will make effective screening impossible. Moreover, there is already substantial reason to doubt the assurances provided to Defendants. Most notably, BLB&G failed to disclose to defense counsel the extent of Mr. Tenreiro's conflicts, which it seeks to minimize in its moving papers. BLB&G also omitted to disclose that Mr. Tenreiro's first contacts were with lead counsel in this case (who has not submitted a declaration).

Neither hypothetical screening procedures nor Mr. Tenreiro's professed non-recollection of his recent discussions about Mr. Musk can cure the appearance of impropriety and risk of disclosure present here.

## FACTUAL BACKGROUND

**A.      Mr. Tenreiro Was Enforcement Counsel to the Chair of the SEC During the Agency's Investigation of Mr. Musk's Acquisition of Twitter Stock.**

From late August 2021 through September 2022, Mr. Tenreiro was Enforcement Counsel to SEC Chair Gary Gensler. Declaration of Jorge G. Tenreiro ¶ 4, Dkt. #124-2 ("Tenreiro Decl.").

Mr. Tenreiro became known as "the key man for a litigation strategy that was hatched under former Chair Gary Gensler." Dave Michaels, *SEC Ousts Top Litigator Who Battled with Crypto Giants*, WALL ST. J. (Feb. 5, 2025), https://www.wsj.com/finance/currencies/sec-ousts-top-litigator-who-battled-with-crypto-giants-558548a8.

During Mr. Tenreiro's tenure in the Office of the Chair, the SEC investigated Mr. Musk's purchase of shares of Twitter, Inc. ("Twitter") and related disclosures pursuant to Section 13(d) of the Securities Exchange Act of 1934 (the "SEC Investigation"). *See* Tenreiro Decl. ¶¶ 4-6.

Mr. Tenreiro acknowledges that he "would have likely participated in any meetings with the Chair that may have occurred discussing the SEC Investigation." BLB&G's Memorandum of Law 4 n.2 (Dkt. #124) ("Mem."); *see* Tenreiro Decl. ¶ 9(a).

Mr. Musk closed his acquisition of Twitter on October 27, 2022. Despite having conducted the SEC Investigation, the SEC did not bring an enforcement action against Mr. Musk in the matter in 2022, 2023, or 2024.

In October 2022, Mr. Tenreiro was appointed Deputy Chief of the SEC's Crypto Assets and Cyber Unit, a role that he held through November 2024.[1]

**B.    Mr. Tenreiro Oversaw the SEC's Decision to File an Action Against Mr. Musk Based on the Same Conduct Alleged in this Case.**

On November 21, 2024, Chair Gensler announced that he would step down from the SEC on January 20, 2025, the day of President Donald J. Trump's inauguration.[2]

On December 1, 2024, Mr. Tenreiro became the SEC's Chief Litigation Counsel within the Division of Enforcement. Tenreiro Decl. ¶ 5. Soon after Mr. Tenreiro became Chief Litigation Counsel, the SEC approved its civil enforcement action against Mr. Musk. *See id.* ¶ 6.

As Chief Litigation Counsel, Mr. Tenreiro "was responsible for participating in . . . discussions concerning the SEC Investigation and the then-potential SEC civil enforcement action" against Mr. Musk, "and for reviewing and commenting on documents relating to the decision of whether to file the then-potential civil enforcement action." *Id.* ¶ 9(b). These documents included a memorandum recommending that the Commissioners approve the enforcement action.

---

[1]    Jorge G. Tenreiro, Jorge G. Tenreiro's LinkedIn Profile, LinkedIn, https://www.linked in.com/in/jorge-g-tenreiro-0a40862b/ (last visited May 6, 2025). Mr. Tenreiro's declaration is notably silent regarding this two-year period of his tenure at the SEC. In this role, Mr. Tenreiro likely would have attended regular Senior Officer meetings with the Director of Enforcement and Closed Commission Meetings at which the SEC Investigation may have been discussed. Mr. Tenreiro's purported lack of memory concerning such meetings does not mean that he was not personally and substantially involved. *See* 17 C.F.R. § 200.735-8 (SEC ethics rules on post-employment conflicts of interest provide no exception for a former employee's purported non-recollection).

[2]    SEC Release No. 2024-182, *SEC Chair Gensler to Depart Agency on January 20*, U.S. SECURITIES AND EXCHANGE COMMISSION (Nov. 21, 2024), https://www.sec.gov/newsroom/press-releases/2024-182.

On January 14, 2025, less than a week before Chair Gensler stepped down and the new administration was inaugurated, the SEC filed a single-count civil action against Mr. Musk in the Twitter matter, captioned *SEC v. Musk*, No. 1:25-cv-00105 (D.D.C.) (the "SEC Action").

The SEC Action asserts that Elon Musk violated Section 13(d) of the Securities Exchange Act of 1934—a non-fraud based claim—by allegedly failing to timely report his beneficial ownership of shares of Twitter. The SEC alleges that Mr. Musk's alleged violation "allow[ed] him to underpay by at least $150 million for shares he purchased after his beneficial ownership report was due."[3]

Similarly, the plaintiff in this case alleges that "Musk ultimately saved over an estimated $200 million" "[b]y deceiving investors regarding his interests in Twitter." First Amended Complaint for Violations of the Federal Securities Laws ¶ 20, Dkt. #73.

Mr. Musk's motion to dismiss the SEC Action is due June 6, 2025.[4]

**C.    Shortly After Filing the SEC Action, Mr. Tenreiro Communicated with Plaintiff's Counsel in this Case About Potential Employment at BLB&G.**

Effective February 3, 2025, the SEC's new leadership reassigned Mr. Tenreiro to a role in the agency's Office of Information Technology. Tenreiro Decl. ¶ 13. The same day, Mr. Tenreiro began "exploring employment options with plaintiffs' side firms." *Id.* ¶ 14.

On February 6, 2025, Mr. Tenreiro contacted Katherine M. Sinderson, a BLB&G partner who is lead counsel for the plaintiff in this case, and another BLB&G partner, to discuss potential employment at BLB&G. *See id.* ¶¶ 14–16; Declaration of Salvatore J. Graziano ¶ 2, Dkt. #124-3 ("Graziano Decl.").

---

[3]    Complaint ¶ 1, *SEC v. Musk*, No. 1:25-cv-00105 (D.D.C. filed Jan. 14, 2025).

[4]    *See* Minute Order, No. 1:25-cv-00105 (D.D.C. Apr. 1, 2025).

Mr. Tenreiro had multiple Zoom meetings with Ms. Sinderson and the second BLB&G partner during the week of February 10, 2025. Tenreiro Decl. ¶ 16. During the ensuing weeks, Mr. Tenreiro had calls and meetings with several of Ms. Sinderson's colleagues "to discuss the possibility of joining [BLB&G]." *Id.* ¶¶ 17–18.

On or about March 14, 2025, BLB&G extended a conditional offer to Mr. Tenreiro to join the firm. *Id.* ¶ 20.

### D.   While Seeking Employment by BLB&G, Mr. Tenreiro Has Engaged with Social Media Posts Disparaging Mr. Musk, Including by a BLB&G Partner.

In March 2025, while seeking employment at BLB&G, Mr. Tenreiro met with BLB&G partner Jeroen van Kwawegen. *See* Graziano Decl. ¶ 5. Mr. Kwawegen is co-leading a stockholder's challenge to Mr. Musk's compensation package from Tesla, Inc. Mr. Kwawegen sought a fee award of $5.6 billion on behalf of BLB&G and co-counsel in that case.[5]

Around the time of his meeting(s) with Mr. Kwawegen, Mr. Tenreiro liked a social media post by Mr. Kwawegen which labeled Mr. Musk as a "billionaire autocrat" who is "hostile to the rule of law." Declaration of Jesse Bernstein ("Bernstein Decl."), Ex. E .

The same month, Mr. Tenreiro liked a social media post by a partner at another plaintiff's law firm, who shared a blog post criticizing Mr. Musk. Bernstein Decl., Ex. F. The blog post asserted that, if Delaware enacted proposed legislation: "Controlling stockholders such as Musk would be empowered to engineer transactions that extract wealth from public stockholders without accountability in a courtroom."[6]

---

[5]   *See* Plaintiff's Opening Brief in Support of Application for an Award of Fees and Expenses, *Tornetta v. Musk*, C.A. No. 2018-0408-KSJM (Del. Ch. filed March 1, 2024).

[6]   Joel Friedlander, *Don't Undermine Delaware's Judiciary at the Behest of Elon Musk*, THE CLS BLUE SKY BLOG (Mar. 6, 2025), https://clsbluesky.law.columbia.edu/2025/03/06/dont-undermine-delawares-judiciary-at-the-behest-of-elon-musk/.

Mr. Tenreiro has engaged with other social media posts critical of Mr. Musk.  Last month, for example, Mr. Tenreiro liked a LinkedIn post by the former Chief of Staff to Chair Gensler. Referring to incoming SEC Chair Paul Atkins, the post stated: "[W]hen asked who was in charge of the US Government, he did agree that it was President Trump, though he seemed nervous to dismiss the role of Elon Musk even when asked questions leading him to do so."  Bernstein Decl., Ex. G.

On April 4, 2025, Mr. Tenreiro resigned from the SEC,[7] the same day as SEC's lead trial counsel in the SEC Action, Robin Andrews.[8]  Mr. Tenreiro liked a LinkedIn post by Mr. Andrews announcing his "excruciating" decision to resign.  Bernstein Decl., Ex. H.

**E.    BLB&G Provided Limited Information to Defense Counsel About Mr. Tenreiro.**

On April 3, 2025, defense counsel conferred with BLB&G regarding BLB&G's anticipated motion that "BLB&G's hiring of [Mr. Tenreiro] presents no obstacle to [BLB&G's] continuing to serve as lead counsel in this case."  Bernstein Decl., Ex. B.  During the meet-and-confer, defense counsel sought information regarding Mr. Tenreiro's work at the SEC, his contacts with BLB&G, and the firm's proposed screening procedures.

During the meet-and-confer, a BLB&G attorney stated that Mr. Tenreiro's role in the SEC's proceedings against Mr. Musk was limited to reviewing a single memo on the proposed SEC Action before the case was referred to the SEC Commissioners.  Bernstein Decl. ¶ 8.

---

[7]  Tenreiro Decl. ¶¶ 3, 24.

[8]  *See* Leo Schwartz, *SEC Lawyer Heading Case on Elon Musk's Twitter Acquisition Resigns, Cites 'Heartbreaking' Decision*, FORTUNE (Apr. 9, 2025 3:37 PM EDT), https://fortune.com/ 2025/04/09/securities-exchange-commission-elon-musk-lawsuit-twitter-x-resign-concerns/.

BLB&G did not disclose Mr. Tenreiro's participation in discussions with Chair Gensler regarding the SEC Investigation, or any other facts concerning Mr. Tenreiro's involvement in proceedings against Mr. Musk.  *Id.*

Asked when BLB&G had begun discussions with Mr. Tenreiro, BLB&G did not disclose that Ms. Sinderson—who is one of the primary counsel in this case—was first contacted by Mr. Tenreiro on February 6, 2025.[9]  *Id.* ¶ 8; *see also* Graziano Decl. ¶ 2.

Following the meet and confer, on April 16, 2025, defense counsel informed BLB&G that based on the representations BLB&G had made (including that Mr. Tenreiro's "played no role in the SEC investigation (SF-4519) regarding Mr. Musk's ownership or disclosure of his Twitter stake or the filing of the action captioned SEC v. Musk, 25-cv-105 (D.D.C.), apart from reviewing a memo") defense counsel understood that:

> Mr. Tenreiro did not participate in Senior Officer discussions concerning the potential filing of the action or take any actions necessary for the filing of the SEC action beyond reviewing the memo, e.g., he did not approve the memo as Chief Trial Counsel, participate in meetings with the Director of Enforcement or Acting Director of Enforcement concerning the matter, assign supervisory trial counsel or other staff to the litigated matter, or appear before the Commission in his capacity as Chief Trial Counsel when the action was approved by the Commission to be filed.

Bernstein Decl., Ex. C.  Defense counsel asked BLB&G to confirm their understanding was correct and that, if so, defense counsel did not intend to oppose BLB&G's anticipated motion.  *Id.*

In response, BLB&G did not confirm their prior representation.  Instead, they explained that "Mr. Tenreiro did not take any action that was necessary for the filing of the SEC action and was not assigned to conduct or supervise the SEC investigation (SF-4519) regarding Mr. Musk's ownership or disclosure of his Twitter stake or the filing of the action captioned SEC v. Musk, 25-

---

[9]  Tenreiro Decl. ¶¶ 15–16; Graziano Decl. ¶ 2.

cv-105 (D.D.C.), and played no role in that investigation, ***apart from, in the routine course of his duties as Enforcement Counsel to the Chair or Chief Litigation Counsel, reviewing documents relating to the decision of whether to file an action and participating in discussions concerning the potential filing of the action***." Bernstein Decl., Ex. C (emphasis added).

Given this disclosure, defense counsel emailed follow-up inquiries to BLB&G regarding Mr. Tenreiro's involvement in the SEC's proceedings against Mr. Musk. Bernstein Decl., Ex. C. In response, BLB&G repeatedly invoked attorney-client privilege and asserted that Mr. Tenreiro lacked any recollection of confidential government information concerning Mr. Musk. Bernstein Decl., Ex. D.

**F.    BLB&G's Moving Papers Make New Disclosures About Mr. Tenreiro's Conflicts and Contacts with Lead Counsel.**

On April 22, 2025, Ms. Sinderson filed a letter on behalf of BLB&G seeking a pre-motion conference regarding the firm's potential hiring of Mr. Tenreiro. Pre-Motion Letter (Dkt. #121). The letter did not acknowledge Ms. Sinderson's personal contact with Mr. Tenreiro shortly after the filing of the SEC Action. Ms. Sinderson stated to the Court:

> On February 6, 2025, Mr. Tenreiro first reached out to BLB&G due to his interest in potential employment at a plaintiff-side securities law firm. Over the next several weeks, Mr. Tenreiro met with multiple BLB&G partners to discuss his legal background, his career aspirations, and BLB&G's litigation record.

*Id.* at 2.

On April 22, 2025, BLB&G filed its Motion together with three attorney declarations. Dkt. #123–124-3. BLB&G's moving papers acknowledge Mr. Tenreiro's personal and substantial role in the SEC's proceedings against Mr. Musk.

Mr. Tenreiro's declaration confirms that he "would have likely participated in discussions with the Chair that may have occurred discussing the SEC Investigation" and "was responsible for participating in certain discussions concerning the SEC Investigation and the then-potential SEC

civil enforcement action," including "the decision of whether to file [the SEC Action]."  Tenreiro Decl. ¶ 9.

Despite these facts, BLB&G's brief seeks to label Mr. Tenreiro's senior-level involvement as "minimal" and "limited."  Mem. 4.  Mr. Tenreiro's supporting declaration repeats BLB&G's "limited to" language.  Tenreiro Decl. ¶ 9.

Mr. Tenreiro further seeks to further downplay his role by noting that he "was one of as many as several dozen reviewers who typically review Enforcement staff recommendations to the Commission …."  *Id.* ¶ 5.

Mr. Tenreiro also professes to "have no recollection of any content regarding any discussion of the SEC Investigation that may have occurred during my detail as Enforcement Counsel to the Chair."  *Id.* ¶ 9(a).  Tracking the language of Rule 1.11(c) of New York's Rules of Professional Conduct, Mr. Tenreiro states:

> I have no recollection of any confidential government information underlying the allegations in *SEC v. Musk* or relating to the SEC Investigation, or of any allegations in this case, or, to the best of my knowledge, of any other information that could be used to the material disadvantage of Mr. Musk in any matter.

*Id.* ¶ 10.  Notably, Mr. Tenreiro does not state that he lacks such information about the other Defendants in this case, including Mr. Birchall.  *See id.*

Regarding his contact with BLB&G, Mr. Tenreiro's declaration does not specifically acknowledge his contact with Ms. Sinderson, the BLB&G partner with day-to-day responsibility for lead counsel's work on this case.  *See id.* ¶¶ 15–16.

Ms. Sinderson, who has appeared in this case and signed BLB&G's pre-motion letter (Dkt. #121), had not submitted a declaration in support of the Motion.

Regarding Mr. Tenreiro's direct communications with Ms. Sinderson, Mr. Graziano declares that: "I understand from speaking with Ms. Sinderson and Mr. [James A.] Harrod that

they discussed with Mr. Tenreiro what it was like to work at BLB&G generally and their respective experience at the Firm."  Graziano Decl. ¶ 2.[10]

## **LEGAL STANDARD**

There is limited precedent for a law firm's "motion to approve conflict screening procedures" for an unhired attorney.[11]  Nevertheless, in adjudicating conflicts issues, it is well-settled that "a court may consult the disciplinary rules of the American Bar Association and New York State," although "those rules are not binding authority."  *Goodwine v. City of New York*, 2016 WL 379761, at *2 (S.D.N.Y. Jan. 29, 2016) (collecting cases).

Rule 1.11 of New York's Rules of Professional Conduct govern conflicts that arise "when a government official leaves public service to work at the firm" where "(1) the official had acquired confidential government information which could be used to the material disadvantage of an adverse party," or "(2) the official has participated personally and substantially in the same matter." *Essex Equity Holdings USA, LLC v. Lehman Bros.*, 29 Misc. 3d 371, 372 (N.Y. Sup. Ct. 2010) (citing N.Y. Rules of Prof'l Conduct, 22 NYCRR part 1200).

The Rule forbids a law firm associated with a conflicted former government attorney from continuing the representation unless: "(1) the firm acts promptly and reasonably to, *inter alia*

---

[10]   A third declaration, from Bruce A. Green, relies on the above-quoted declarations from Messrs. Tenreiro and Graziano.  *See* Declaration of Bruce A. Green ¶ 10 (Dkt. #124-1).

[11]   The cases cited by BLB&G did not deal with motions to approve screening procedures but rather considered the prospective disqualification of a law firm. *See In re Sunbum5 Enters., LLC*, 2011 WL 4529648, at *1 (M.D. Fla. Sept. 30, 2011) (reversing bankruptcy court's "determination that a law firm did not have a conflict of interest"); *Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*, 2010 WL 1172947, at *9 (N.D. Tex. Mar. 25, 2010) (granting "Motion for Declaration that Counsel Is Not Subject to Disqualification" based on lack of a conflict and waiver); *Eberle Design, Inc. v. Reno A & E*, 354 F. Supp. 2d 1093, 1094 (D. Ariz. 2005) ("potential disqualification issue"); *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 66130, at *1 (S.D.N.Y. Feb. 15, 1996) (law firm's "employment of … associate attorney will not require [its] disqualification"); *see also* Letter, *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 1:11-md-02262-NRB, Dkt. #1668 (S.D.N.Y. filed Dec. 8, 2016) (withdrawing motion to approve screening procedures).

"implement effective screening procedures;" and "(2) there are no other circumstances in the particular representation that create an appearance of impropriety." N.Y. Rules of Prof'l Conduct, Rule 1.11(b) (McKinney). The Rule recognizes:

> Nevertheless, there may be circumstances where, despite screening, representation by the personally disqualified lawyer's firm could still undermine the public's confidence in the integrity of the legal system[,] … for example, where the personally disqualified lawyer occupied a highly visible government position prior to entering private practice, or where other facts and circumstances of the representation itself create an appearance of impropriety.

*Id.* cmt.6. "Where the particular circumstances create an appearance of impropriety, a law firm must decline the representation." *Id.*

In the Second Circuit, "any doubt is to be resolved in favor of disqualification." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975). Motions to disqualify are "'viewed with disfavor in this Circuit because they are often interposed for tactical reasons' and may have significant adverse consequences to the client."[12] No prejudice can arise in this case, however, because the motion is *not for disqualification* of a law firm, but rather for a ruling related to the prospective hiring of a personally disqualified attorney.

## ARGUMENT

### I.    BLB&G'S ASSOCIATION WITH MR. TENREIRO CREATES A CONFLICT OF INTEREST AND APPEARANCE OF IMPROPRIETY.

#### A.    Mr. Tenreiro Participated Personally and Substantially in this Matter as the SEC's Chief Litigation Counsel and Enforcement Counsel to the Chair.

BLB&G does not dispute that its association with Mr. Tenreiro creates a potential ethical conflict.[13] A disqualifying conflict arises in any "matter in which the lawyer participated

---

[12]    *Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010) (quoting *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y.1991)).

[13]    *See* Mem. 11 (asserting that "the Court need not decide whether Mr. Tenreiro participated in the same 'matter' at the SEC").

11

personally and substantially as a public officer or employee[.]" N.Y. Rules of Prof'l Conduct, Rule 1.11(a)(2); *see also* 17 C.F.R. §§ 200.735-8(b), 8(d) (addressing disqualification of former SEC employees). Mr. Tenreiro's potential association with BLB&G clearly implicates these rules.

*First*, it is beyond dispute that the SEC Investigation and SEC Action involved the same "matter" as this litigation. *See Green v. City of New York*, 2011 WL 2419864, at *2 (S.D.N.Y. June 7, 2011) ("For the purpose of Rule 1.11, N.Y. Rules, the matters are the same" where "the scope of the representation in the first matter included advice on subjects highly relevant to the second matter."). This is so even where the government work and the current representation "pertain to different lawsuits with different parties." *Id.*; *see Essex Equity*, 29 Misc. 3d at 376 ("Rule 1.11 is not limited to cases where the Government agency is itself a party.").[14]

*Second*, Mr. Tenreiro's involvement in the SEC's proceedings against Mr. Musk was of a kind that courts routinely find creates a disqualifying conflict. *See Green*, 2011 WL 2419864, at *2 (granting motion to disqualify where, "[i]n the prior governmental representation the lawyers reviewed . . . materials . . . that may become central in the present case"). BLB&G concedes that "Mr. Tenreiro was responsible for participating in … discussions regarding the SEC Investigation," likely including discussions with Chair Gensler. Mem. 4 & n.2. "He was also responsible for reviewing and commenting on certain documents relating to the decision of whether to file the SEC Action." *Id.* at 4–5.

---

[14]    *See also* N.Y. Rules of Prof'l Conduct, Rule 1.11 cmt. 10 ("In determining whether two particular matters are the same, the lawyer should consider the extent to which (i) the matters involve the same basic facts, (ii) the matters involve the same or related parties, and (iii) time has elapsed between the matters."); *Arroyo v. City of Buffalo*, 2017 WL 3085835, at *12 (W.D.N.Y. July 20, 2017), *R&R adopted*, 2018 WL 488943 (Jan. 20, 2018) (no dispute that cases concerning the "actionability" of the same transactions and occurrences were "essentially the same matter"); *Murtaugh v. Cnty. of Oswego*, 2012 WL 12991206, at *5 (N.D.N.Y. July 31, 2012) (finding "there is a substantial relationship between the prior issues concerning the [same site] during [lawyer's] involvement at the [government agency] and the issues in this case").

Based on these facts alone, Mr. Tenreiro "participated personally and substantially" in the SEC's actions against Mr. Musk in this matter. N.Y. Rules of Prof'l Conduct, Rule 1.11(a)(2); *see Murtaugh*, 2012 WL 12991206, at *6 (former government attorney "was directly involved and personally participated in referring the … matter to" enforcement division).

BLB&G would have the Court discount Mr. Tenreiro's substantial involvement in this matter by asserting that it was "limited to his supervisory role as Chief Litigation Counsel." Mem 4. Mr. Tenreiro's "supervisory" authority *increases*, not lessens, the substantial character of his involvement, however. *See, e.g.*, *Green*, 2011 WL 2419864, at *2 ("a disqualifying conflict arises" where the lawyer "attended discussions with" senior officials and stating "[i]t is relevant [if] the lawyer … served as a counselor and advisor on the broad subject at hand").

The cases that BLB&G seeks to rely upon do not support its Motion. Mem. 9. In *Sumbum5*, the Court *reversed* the bankruptcy court's finding that the law firm had no conflict of interest. 2011 WL 4529648, at *8. The cited cases finding no conflict are readily distinguishable. In *Vinewood*, the Court found no apparent relation between [defense counsel's] former representation of [plaintiff] and the subject matter of this case" and that any claim for disqualification "has been waived." 2010 WL 1172947, at *6, *9. In *Eberle*, the Court found that an associate attorney played no "substantial role" in a prior representation where he only "recorded a total of 9.2 hours over a nine-day period drafting proposed voir dire questions." 354 F. Supp. 2d at 1097. In *Bank Brussels*, the law firm planned to hire an "associate attorney" whose prior work consisted "largely of document review and some participation in depositions" and who "was, plainly, not a strategy-maker." 1996 WL 66130, at *1. Also, "more than a year" had passed since the prior work. *Id.*

Here, by contrast, Mr. Tenreiro was involved at the highest level in deliberations about the SEC's eleventh-hour decision to bring the SEC Action against Mr. Musk following a nearly three-

year investigation.  Mr. Tenreiro reached out to BLB&G only three weeks after commencing the

SEC Action, apparently with Mr. Tenreiro's personal approval.

> **B.     Mr. Tenreiro Acquired Confidential Government Information Regarding**
> **Defendants When He Was the SEC's Chief Litigation Counsel.**

A disqualifying conflict also arises when a former government lawyer has "confidential

government information about a person, acquired when the lawyer was a public officer or

employee," which "could be used to the material disadvantage of that person."  N.Y. Rules of

Prof'l Conduct, Rule 1.11(c).  Confidential government information includes any "information

that has been obtained under government authority … and that is not otherwise available to the

public." *Id.*

Given Mr. Tenreiro's personal role in recommending that the SEC proceed with its

enforcement action following a three-year investigation of Mr. Musk, there is little doubt that Mr.

Tenreiro acquired information about Defendants that is not public and could be used to his material

disadvantage. *See Murtaugh*, 2012 WL 12991206, at *7 (former government attorney "must have

reviewed [agency] information about … the same issues involved in this case, when he received

the … memo with the case report").

BLB&G tacitly concedes that Mr. Tenreiro acquired nonpublic information about Mr.

Musk, asserting only that he "has no present recollection" of it.  Mem. 5.  Notably, Mr. Tenreiro

does not assert that he lacks sensitive information about the other Defendants in this case. *See*

Tenreiro Decl. ¶ 10.

Mr. Tenreiro's asserted non-recollection is implausible, as he reviewed documents and

supervised the SEC's decision to approve its action against Mr. Musk *less than 5 months ago*,

"[b]etween approximately December 1, 2024 and the filing of the SEC Action" on January 14,

2025.  Mem. 4–5 (emphasis added); *see Garber v. Off. of Comm'r of Baseball*, 2017 WL 752183,

at *6 n.13 (S.D.N.Y. Feb. 27, 2017) ("[Lawyer] purported to have no recollection whether [objector] had received any funds from [lawyer's] settlement of … objections in other class action cases. The Court finds [lawyer's] purported lack of recollection not credible.").

Mr. Tenreiro's professed non-recollection of his recent tenure as Chief Litigation Counsel is also couched in conditional and conclusory language. Mr. Tenreiro's declaration merely tracks the language of Rule 1.11(c), stating that he does not recall any "confidential government information" or "to the best of [his] knowledge, of any other information that could be used to the material disadvantage of Mr. Musk in any matter." Tenreiro Decl. ¶ 10. Mr. Tenreiro provides no factual basis for the Court to credit this conclusory assertion.

"Courts often view declarations in disqualification matters with some skepticism as they are 'unavoidably self-serving.'" *Google LLC v. NAO Tsargrad Media*, 2024 WL 4844799, at *11 (N.D. Cal. Nov. 19, 2024) (citation omitted). Here, BLB&G's representation that Mr. Tenreiro cannot recall very recent and prominent work events is plainly self-serving and strains credulity. It is therefore insufficient to rebut the presumption of a disqualifying conflict. *See Huntington v. Great W. Res., Inc.*, 655 F. Supp. 565, 576 (S.D.N.Y. 1987) ("[T]he naked denial is insufficient to rebut the presumption that [lawyer] shared in such information.").

## II.    BLB&G'S PROCEDURES FAIL TO RESOLVE THE CONFLICT OF INTEREST AND APPEARANCE OF IMPROPRIETY.

### A.    There Is Substantial Reason to Doubt the Efficacy of BLB&G's Hypothetical Screening Procedures.

The Rules of Professional Conduct forbid a law firm associated with a former government lawyer from continuing a representation related to the lawyer's prior work unless "the firm acts promptly and reasonably to," *inter alia*, "implement effective screening procedures to prevent the flow of information about the matter between the personally disqualified lawyer and the others in the firm[.]" N.Y. Rules of Prof'l Conduct, Rule 1.11(b); *accord id.* cmt. 7A. The Rules recognize,

however, that "[i]f a personally disqualified lawyer is working on other matters with lawyers who are participating in a matter requiring screening, it may be impossible to maintain effective screening procedures." *Id.* cmt. 7. In the Second Circuit, "any doubt is to be resolved in favor of disqualification." *Hull*, 513 F.2d at 571.

Such dangers clearly arise here. BLB&G seeks to bring Mr. Tenreiro into its relatively small New York office, with approximately twenty partners. Given Mr. Tenreiro's background in securities fraud litigation, he will necessarily have frequent interactions with plaintiff's counsel and their colleagues. *See Yaretsky v. Blum*, 525 F. Supp. 24, 30 (S.D.N.Y. 1981) (disqualifying firm with "less than thirty lawyers in its New York office"); *Essex Equity*, 29 Misc. 3d at 392 (disqualifying law firm with "approximately twenty lawyers working on one floor of an office building in New York").

Whatever the theoretical merit of BLB&G's proposed ethical screen, there is no reason to credit BLB&G's assurances that Mr. Musk and other Defendants will not be discussed. While seeking employment at BLB&G, Mr. Tenreiro met with at least two BLB&G partners leading civil litigation against Mr. Musk, including Ms. Sinderson, one of the lead counsel in this case. Mr. Tenreiro then decided it was appropriate to engage with a BLB&G's partner's social media post calling Mr. Musk a "billionaire autocrat" who is "hostile to the rule of law," while that partner is co-leading civil litigation against Mr. Musk in Delaware. These and other daily contacts generate a danger of inadvertent disclosure and appearance of impropriety.[15]

---

[15] *See Crudele v. New York City Police Dep't*, 2001 WL 1033539, at *4 (S.D.N.Y. Sept. 7, 2001) ("[T]he degree of both past and present interaction … raises grave concerns about both the possibility of unintentional breaches of client confidences and about the appearance of impropriety such as to taint any trial in these actions."); *Baird v. Hilton Hotel Corp.*, 771 F. Supp. 24, 27 (E.D.N.Y. 1991) ("[I]n [lawyer's] daily contacts with plaintiffs' counsel there remains a danger of inadvertent disclosure of information …. The obvious appearance of impropriety coupled with a real danger that the forthcoming trial will be tainted require disqualification."); *Yaretsky*, 525 F.

Further undermining the credibility of BLB&G's representations, BLB&G was not promptly forthcoming about the full scope of Mr. Tenreiro's conflicts or his contacts with Ms. Sinderson.  On April 3, 2025, BLB&G represented to defense counsel that Mr. Tenreiro's role at the SEC was limited to reviewing a memo on the proposed SEC Action before the case went to the Commissioners.  BLB&G was then forced to qualify their representation by claiming Mr. Tenreiro played no role "***apart from, in the routine course of his duties as Enforcement Counsel to the Chair or Chief Litigation Counsel, reviewing documents relating to the decision of whether to file an action and participating in discussions concerning the potential filing of the action***."  Bernstein Decl., Ex. C (emphasis added).  And in response to further inquiry regarding what the "routine course" duties consisted of as it related to the investigation and action against Mr. Musk, BLB&G invoked privilege to avoid answering and claimed the questions were not relevant.  Bernstein Decl., Ex. D.

BLB&G similarly omitted to mention Mr. Tenreiro's contacts with Ms. Sinderson and Mr. Kwawegen or Mr. Tenreiro's subsequent engagement with Mr. Kwawegen's public disparagement of Mr. Musk.

BLB&G's attempt to minimize the ethical considerations raised by this Motion casts further doubt on the reliability of its assurances, including through BLB&G's baseless use of words like "minimal" and "limited" to describe Mr. Tenreiro's role at the SEC, and its implausible assertion that Mr. Tenreiro does not recall anything he learned about Mr. Musk only several weeks ago.  *See Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1392–93 (N.D. Cal. 1992) ("The Court, reading the stack of declarations from Irell attorneys, all proclaiming their

---

Supp. at 30 (disqualifying law firm where "the conflicted attorney "is employed in the firm's health law section, which is also the section of the firm handling this case").

ignorance of Cygnus-related matters, is reminded of the words of Hamlet's mother: 'The lady doth protest too much, methinks.'").[16]

### B.    BLB&G's Association with Mr. Tenreiro Immediately After the Filing of the SEC Action Was Filed Creates an Appearance of Impropriety.

The Rules of Professional Conduct acknowledge circumstances "where, despite screening, representation by the personally disqualified lawyer's firm could still undermine the public's confidence in the integrity of the legal system." N.Y. Rules of Prof'l Conduct, Rule 1.11 cmt. 6. "Where the particular circumstances create an appearance of impropriety, a law firm must decline the representation." *Id.* For numerous reasons, BLB&G's association with Mr. Tenreiro creates such an appearance of impropriety.

*First*, Rule 1.11 specifically recognize that an appearance of impropriety arises where, as here, "the personally disqualified lawyer occupied a highly visible government position prior to entering private practice." *Id.*; *accord Essex Equity*, 29 Misc. 3d at 385. Mr. Tenreiro held highly visible positions, including as the SEC's Chief Litigation Counsel and Enforcement Counsel to the Chair, and he has long been known as "the key man for a litigation strategy that was hatched under former Chair Gary Gensler."[17]   Mr. Tenreiro was involved in discussions about the SEC's

---

[16]  BLB&G trivializes its ethical conflict by asserting: "Unsurprisingly, Quinn Emanuel has also previously hired former government attorneys." Mem. 14. Of course, former government attorneys are free to enter private practice. BLB&G fails to identify any comparable ethical issues raised by Quinn Emanuel's past hiring of Sarah Heaton Concannon and Alex Spiro. *Id.* BLB&G's hiring of Mr. Tenreiro is not comparable with Quinn Emanuel's hiring of Trevor Soames, who was "a European lawyer with no relationship to Quinn Emanuel's U.S. litigation practice," to be based in Quinn Emanuel's office in Brussels. Memorandum of Law in Support of Motion to Approve Conflict Screening Procedure 1, *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 1:11-md-02262-NRB, Dkt. #1618 (S.D.N.Y. filed Oct. 25, 2016). The motion to approve a conflict screening procedure for Mr. Soames was withdrawn. *See* Letter, *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 1:11-md-02262-NRB, Dkt. #1668 (S.D.N.Y. filed Dec. 8, 2016).

[17]  Dave Michaels, *SEC Ousts Top Litigator Who Battled with Crypto Giants*, WALL ST. J., Feb. 5, 2025, https://www.wsj.com/finance/currencies/sec-ousts-top-litigator-who-battled-with-crypto-giants-558548a8.

investigation of Mr. Musk with Chair Gensler and the ultimate decision to file the SEC Action. Mem. 4–5 & n.2.    These facts preclude BLB&G's attempted labeling of Mr. Tenreiro's involvement as "minimal" or "limited."  *Id.* at 4; *see Cheng v. GAF Corp.*, 631 F.2d 1052, 1054 (2d Cir. 1980), *vacated on other grounds,* 450 U.S. 903 (1981) (ordering disqualification where attorney "did participate in discussions with other members of the staff about the … case").

*Second*, the extremely short time that elapsed between the filing of the SEC Action and Mr. Tenreiro's outreach to Ms. Sinderson and Mr. Kwawegen create an appearance of impropriety. That Mr. Tenreiro sought employment at BLB&G only weeks after greenlighting litigation against Mr. Musk distinguishes this case from *Bank Brussels*, in which the Court pre-approved a law firm's hiring of an "associate attorney" where "more than a year" had passed since the attorney's prior work for an adversary, in which "he was, plainly, not a strategy-maker."  1996 WL 66130, at *1.

*Third*, the appearance of impropriety is enhanced because Mr. Tenreiro participated in the approval of the SEC Action just days before leaving the agency, even though the alleged conduct had occurred nearly three years earlier.  Mr. Tenreiro's public engagement with statements by BLB&G and other plaintiff's lawyers disparaging Mr. Musk—shortly after approving the SEC's lawsuit against him, while seeking employment by the plaintiff's bar, and despite BLB&G's representations about its vaunted screening procedures—adds to the appearance of impropriety. The public's confidence in government and the legal system is undermined when a former public official can so quickly and visibly seek personal gain based on his work in government.

## CONCLUSION

For the foregoing reasons, Defendants respectfully urge the Court to deny the Motion to approve BLB&G's proposed conflict screening procedures.

Dated: May 6, 2025
New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART
  & SULLIVAN, LLP**

*/s/ Alex Spiro*
Alex Spiro
Jesse Bernstein
Jacob J. Waldman
295 Fifth Avenue.
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
jessebernstein@quinnemanuel.com
jacobwaldman@quinnemanuel.com

Nathan Goralnik
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
Telephone: (212) 849-7049
Facsimile: (213) 443-3100
nathangoralnik@quinnemanuel.com

Rachel G. Frank
1300 I Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
rachelfrank@quinnemanuel.com

*Counsel for Defendants Elon R. Musk, the
Elon Musk Revocable Trust dated July 22,
2003, Excession, LLC, and Jared Birchall*

## **CERTIFICATE OF WORD COUNT COMPLIANCE**

I, Alex Spiro,  an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) that the above Memorandum of Law was prepared using Microsoft Word and the document contains 6,113 words as calculated by the application's word-counting function, excluding the parts of the document exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the forgoing statements are true and correct.

Executed on this 6th day of May, 2025 in New York, New York.

_/s/ Alex Spiro_
Alex Spiro