**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,<br><br>                    Plaintiff,<br>      v.<br><br>ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL,<br><br>                    Defendants. | No. 1:22-cv-03026-ALC-GWG |

**LEAD COUNSEL'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**MOTION TO APPROVE CONFLICT SCREENING PROCEDURES**

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ................................................................................................ 1

I.  ARGUMENT

    A.  BLB&G's Proposed Screening Measures Are Effective .......................................3

    B.  Defendants' Claim That BLB&G Is Too "Small" To Screen For Potential
            Conflicts Is Meritless ..........................................................................................6

    C.  There is No Appearance of Impropriety ..............................................................8

II.  CONCLUSION.................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Int'l Grp., Inc. v. Bank of Am. Corp.*,
827 F. Supp. 2d 341 (S.D.N.Y. 2011)..................................................................5, 13

*Am. Tax Funding, LLC v. City of Schenectady*,
2014 WL 6804297 (N.D.N.Y. Dec. 2, 2014)..............................................................6

*Arista Records LLC v. Lime Group LLC*,
2011 WL 672254 (S.D.N.Y. Feb. 22, 2011)..............................................................13

*Armstrong v. McAlpin*,
625 F.2d 433 (2d Cir. 1980)........................................................................................5

*Arroyo v. City of Buffalo*,
2017 WL 3085835 (W.D.N.Y. July 20, 2017)..........................................................11

*Baird v. Hilton Hotel. Corp.*,
771 F. Supp. 24 (E.D.N.Y. 1991) ...............................................................................7

*Brown v. City of Syracuse*,
2013 WL 2445050 (N.D.N.Y. June 4, 2013)..............................................................7

*Cayuga Indian Nation of New York v. Halftown*,
2005 WL 8171093 (N.D.N.Y. Mar. 31, 2005) .........................................................12

*Cheng v. GAF Corp.*,
631 F.2d 1052 (2d Cir. 1980)....................................................................................11

*Crudele v. New York City Police Dep't*,
2001 WL 1033539 (S.D.N.Y. Sept. 7, 2001)..............................................................7

*Dudhia v. Agarwal*,
66 Misc.3d 206 (N.Y. Sup. Ct. 2019), *aff'd*, 183 A.D.3d 537 (1st Dep't 2020) ....................12

*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*,
809 F. Supp. 1383 (N.D. Cal. 1992) .........................................................................15

*Essex Equity Holdings USA, LLC v. Lehman Bros.*,
29 Misc.3d 371 (N.Y. Sup. Ct. 2010) ..............................................................7, 8, 10

*Gabayzadeh v. Taylor*,
639 F. Supp. 2d 298 (E.D.N.Y. 2009) ........................................................................8

*GAF Corp. v. Heyman*,
559 F. Supp. 748 (S.D.N.Y. 1983) ...........................................................................10

*Green v. City of New York*,
2011 WL 2419864 (S.D.N.Y. June 7, 2011) ........................................................10

*Google LLC v. NAO Tsargrad Media*,
2024 WL 4844799 (N.D. Cal. Nov. 19, 2024) ....................................................14

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*,
409 F.3d 127 (2d Cir. 2005)....................................................................2, 4, 6, 7, 11

*Huntington v. Great W. Res., Inc.*,
655 F. Supp. 565 (S.D.N.Y. 1987) ....................................................................14

*Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*,
2010 WL 4720693 (D. Utah Nov. 12, 2010) ........................................................5

*Murtaugh v. Cnty. of Oswego*,
2012 WL 12991206 (N.D.N.Y. July 31, 2012) ....................................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2006 WL 6846702 (E.D.N.Y. Aug. 7, 2006)..........................................................5

*People v. Herr*,
86 N.Y.2d 638 (1995) ............................................................................................8

*S.E.C. v. Ryan*,
747 F. Supp. 2d 355 (N.D.N.Y. 2010)....................................................................6

*S.E.C. v. Musk*,
No. 3:23-mc-80253 (N.D. Cal. filed October 5, 2023)........................................10

*In re Sunbum5 Enters., LLC*,
2011 WL 4529648 (M.D. Fla. Sept. 30, 2011) ....................................................11

*Yaretsky v. Blum*,
525 F. Supp. 24 (S.D.N.Y. 1981) ..........................................................................7

## STATUTES AND RULES

New York Rules of Professional Conduct 1.11 ...................................................... *passim*

iii

## PRELIMINARY STATEMENT

The record demonstrates that BLB&G has acted proactively and in good faith concerning the potential hiring of Mr. Jorge Tenreiro, former Chief Litigation Counsel with the Securities and Exchange Commission. BLB&G voluntarily gave Defendants and the Court full disclosure as to Mr. Tenreiro's potential hiring and provided the specifics of its robust screening procedures, which have been endorsed by a renowned ethics expert (who was previously retained by counsel for Defendants). BLB&G even invited Defendants and the Court to propose any additional screening mechanisms.[1] In short, BLB&G's actions are entirely consistent with its ethical duties to the Court and to the Class.

In response, Defendants do not identify any flaws with BLB&G's proposed screening measures, nor do they suggest any potential additional procedures. In fact, they barely mention BLB&G's screening measures, notwithstanding the fact that Rule 1.11 of the New York Rules of Professional Conduct ("Rule 1.11") specifically provides for the use of appropriate screening measures to foster employment opportunities for former government lawyers. Instead, Defendants claim that BLB&G cannot be trusted as officers of the Court to abide by any screening measures

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added. References to (i) "Motion" or "Mot." are to Court-appointed Lead Counsel's Memorandum of Law in Support of Motion to Approve Conflict Screening Procedures (ECF No. 124); (ii) "Opposition" or "Opp." are to Defendants' Memorandum of Law in Opposition to Motion to Approve Conflict Screening Procedures (ECF No. 126); (iii) "Green Decl." are to the Declaration of Bruce A. Green in Support of Motion to Approve Conflict Screening Procedure (ECF No. 124-1); (iv) "Tenreiro Decl." are to the Declaration of Jorge G. Tenreiro in Support of Motion to Approve Conflict Screening Procedures (ECF No. 124-2); (v) "Graziano Decl." are to the Declaration of Salvatore J. Graziano in Support of Motion to Approve Conflict Screening Procedures (ECF No. 124-3); (vi) "Green Rebuttal Decl." are to the Rebuttal Declaration of Bruce A. Green in Support of Motion to Approve Conflict Screening Procedure attached hereto as Exhibit D; and (vii) "Ex. __" are to the Exhibits attached to the Motion, Lead Counsel's Reply Memorandum of Law in Further Support of the Motion, and the Reply Declaration of Salvatore J. Graziano submitted herewith. All other defined terms bear the same meaning as in Lead Counsel's Motion.

because BLB&G is purportedly too "small," complain about Mr. Tenreiro's social media "likes," and overstate Mr. Tenreiro's role in the SEC's action against Mr. Musk.

Defendants' attacks do not withstand scrutiny. ***First***, Defendants' claim that BLB&G is too "small" to comply with its ethical obligations is without basis. BLB&G is a firm of over 75 attorneys (and in total over 100 professionals, including lawyers and other professional employees) across five offices nationwide. Moreover, the Second Circuit has expressly ***rejected*** any attempt to impose a *per se* rule that small firms—which BLB&G is not—are unable to impose adequate screening mechanisms pursuant to Rule 1.11. *See Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 137-38 (2d Cir. 2005). In truth, Defendants' too "small" argument is sleight of hand seeking to distract from their inability to identify any flaws in BLB&G's proposed screening procedures.

***Second***, Defendants' attempts to manufacture a supposed "appearance of impropriety" likewise fail. Since BLB&G first considered hiring Mr. Tenreiro, BLB&G has made every effort to be as forthcoming as possible with Defendants, the SEC, and the Court concerning Mr. Tenreiro's prospective hiring, BLB&G's proposed screening measures, and the Firm's interactions with Mr. Tenreiro. Indeed, the record on this Motion shows that BLB&G voluntarily reached out to Defendants, met and conferred in depth, and then moved the Court for approval of the Firm's screening procedures. The numerous exhibits Defendants attached to their Opposition demonstrate Plaintiffs repeatedly following up with Defendants for their position and answering all of their questions (as appropriate) in a good faith process.

Defendants also argue that Mr. Tenreiro participated "personally and substantially" in the SEC Action and it is "implausible" for Mr. Tenreiro to declare that, if he did receive any confidential information, he does not recall it. Defendants' accusations fail. As an initial matter,

notwithstanding the fact that Quinn Emanuel has represented Mr. Musk in the SEC's investigation for over three years, Defendants and Quinn Emanuel were unable to identify a ***single*** instance where Mr. Tenreiro was involved in the SEC Action. Indeed, despite several years of litigation-related communications between Quinn Emanuel and the SEC, they apparently could not find an email relating to the SEC Action where Mr. Tenreiro was even ***copied***. Moreover, Defendants do not identify any purportedly confidential information that Mr. Tenreiro may possess—far less any information that might be used to prejudice Defendants. This is hardly surprising given that the SEC Action is premised on public information regarding the timing of Mr. Musk's Form 13 filings. Instead, all Defendants could find are Mr. Tenreiro's social media "likes," including in support of colleagues who were recently pressured to leave their government jobs and have nothing to do with ***any*** of the underlying substantive allegations of this action.

In sum, Defendants have failed to identify a single credible flaw in BLB&G's screening procedures. Above all, Defendants do not explain why BLB&G would undertake this extensive preemptive disclosure and request for input, if it intended to disregard its ethical obligations in the hope that Mr. Tenreiro might provide some secret informational advantage in this matter (and when Plaintiff is already in discovery). To date, across BLB&G's dozens of active cases, only counsel for Defendants in this Action have opposed Plaintiff's proposed screening measures. Defendants' attempt to further delay or, even worse, deny Mr. Tenreiro gainful employment in the private sector should be rejected, and the Motion to approve the proposed ethical screen should be granted.

## I.    ARGUMENT

### A.    BLB&G's Proposed Screening Measures Are Effective

BLB&G's proposed screening measures rebut any appearance of impropriety. Once the Firm determined that it was interested in potentially hiring Mr. Tenreiro, BLB&G promptly

consulted Professor Bruce A. Green regarding the adequacy of its screening measures. Graziano Decl. ¶¶16-17. These measures include prohibitions on Mr. Tenreiro accessing any non-public information or engaging in discussions at BLB&G concerning this Action, including "[b]arring Mr. Tenreiro from working on any engagements, assignments, matters, or service performed by BLB&G in connection with [this Action]." *See id.* ¶16. Professor Green—a legal ethics expert that Quinn Emanuel itself has retained in the past under similar circumstances—endorsed BLB&G's proposed screening procedures as fully compliant with NY Rule 1.11.[2] Green Decl. ¶17; Green Rebuttal Decl. ¶9. Then, in a continued effort to rebut any possible suggestion of impropriety, BLB&G provided advance notice to counsel for Defendants and the Court and even invited input on its proposed screening measures.

Tellingly, Defendants' Opposition fails to substantively address the central issue in this Motion: the adequacy of BLB&G's proposed screening measures. For example, Defendants do not challenge the timeliness or specifics of any of BLB&G's proposed screening measures. Nor do Defendants suggest any alternative procedures—indeed, they did not do so at any point during the weeks of meet and confers and do not do so in their opposition papers. Moreover, Defendants do not challenge or even address the fact that Professor Green has endorsed the adequacy of BLB&G's proposed screening procedures as removing any appearance of impropriety. Defendants' failure to meaningfully address the substance of BLB&G's proposed screening procedures confirms the adequacy of those procedures and undermines the credibility of Defendants' opposition to this Motion.

---

[2] Even if Mr. Tenreiro had substantial, day-to-day involvement in the investigation and litigation of the SEC Action—which he did not—BLB&G's proposed screening measures would still adequately eliminate any possible taint. *Hempstead*, 409 F.3d at 138 (an ethical screen that "effectively protects against any sharing of confidential information" will "adequately protect against taint").

Defendants also ignore that disqualification is particularly disfavored for lawyers who transition from government service to private practice and that Rule 1.11 was specifically created to facilitate such transitions. *See Armstrong v. McAlpin*, 625 F.2d 433, 443-44 (2d Cir. 1980) (sustaining screening measures for former government lawyer because "a decision rejecting the efficacy of screening procedures in this context may have significant adverse consequences . . . such disapproval may hamper the government's efforts to hire qualified attorneys; the latter may fear that government service will transform them into legal Typhoid Marys") (cleaned up); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2006 WL 6846702, at *2, *6 (E.D.N.Y. Aug. 7, 2006) (disqualifying attorney based on prior government service, including "some level of involvement" in a related antitrust investigation, would "plainly occasion harm to both the legal profession and to society"); *see also* Green Rebuttal Decl. ¶¶8-10. Rule 1.11 explains that the "rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government." *See id.* ¶¶6-7.

Finally, Defendants make no attempt to distinguish the numerous authorities cited in the Motion where courts have endorsed less stringent screening procedures to those proposed by BLB&G here. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 827 F. Supp. 2d 341, 344, 346 (S.D.N.Y. 2011) (rejecting motion to disqualify where a Quinn Emanuel attorney billed 5.8 hours on a conflicted matter because "flawed screens—including late screens—are not fatal"); *Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*, 2010 WL 4720693, at *5 (D. Utah Nov. 12, 2010) (rejecting motion to disqualify where Quinn Emanuel failed to "conduct an effective conflicts check and discover the conflict initially" because the firm later established an ethical screen).

In sum, BLB&G's proposed screen, which has been endorsed by a renowned legal ethics expert, is adequate to address any appearance of impropriety.

**B.      Defendants' Claim That BLB&G Is Too "Small" To Screen For Potential Conflicts Is Meritless**

Unable to substantively challenge the adequacy of BLB&G's proposed screening measures, Defendants pivot to argue that BLB&G is "relatively small" and thus its screening measures are necessarily and categorically inadequate. Opp. at 16. As an initial matter, Defendants' claim that BLB&G is a "small" firm because the Firm employs just "twenty partners" in the New York office (*id*.) is misleading—in truth, BLB&G employs over 75 attorneys (with over 100 lawyer and non-lawyer professional employees) across five offices.[3] *See also* Green Decl. ¶¶13-14. To the extent that any courts express conservative reservations about the ability of "small" firms to implement effective screening measures, "these courts view small law firms as those with less than thirty-five (35) lawyers." *Am. Tax Funding, LLC v. City of Schenectady*, 2014 WL 6804297, at *5 (N.D.N.Y. Dec. 2, 2014) (collecting cases).

Even assuming BLB&G is a small firm—it is not—Second Circuit and New York state courts have expressly rejected any *per se* rule that small firms cannot establish effective screening protocols. *Hempstead*, 409 F.3d at 137-38 (disclaiming "so categorical a rule"); *see also S.E.C. v. Ryan*, 747 F. Supp. 2d 355, 373 (N.D.N.Y. 2010) ("As long as the law firm exercises special care and vigilance," "a small law firm can erect appropriate and adequate isolation to protect the sharing of confidential information"); *Am. Tax Funding*, 2014 WL 6804297, at *5 (declining to impute a former law clerk's conflict onto his small firm because the attorney was adequately screened);

---

[3] BLB&G, *Attorneys and Professionals*, available at https://www.blbglaw.com/people; BLB&G, *Offices*, available at https://www.blbglaw.com/contact.

*Brown v. City of Syracuse*, 2013 WL 2445050, at *3 (N.D.N.Y. June 4, 2013) (declining to impute an attorney's conflict onto his four-person firm because the attorney was adequately screened).[4]

The ruling in *Essex Equity Holdings USA, LLC v. Lehman Bros.*, is worth quoting at length. 29 Misc.3d 371, 387 (N.Y. Sup. Ct. 2010). There, the court **rejected** any *per se* rule that small firms cannot implement adequate screening mechanisms, explaining:

> A per se rule against screening for small firms has not been the law heretofore in New York and would be impractical to adopt. Where would the line be drawn? Would it be inflexible? The better course, and the one the court chooses to follow, is the one outlined in Comment 7 to rule 1.11 which permits screening but cautions: "A small firm may need to exercise special care and vigilance to maintain effective screening but, if appropriate precautions are taken, small firms can satisfy the requirements of [rule 1.11]."

*Id*. at 387.[5]

In sum, BLB&G is **not** a small firm and, regardless, it has gone above and beyond to institute timely and appropriate screening measures pursuant to Rule 1.11. In the face of these facts—especially when combined with Defendants' inability to identify actual flaws with BLB&G's screening procedures—Defendants' meritless attacks fail.

---

[4] Defendants' authorities (Opp. at 16) are inapposite and pre-date the Second Circuit's governing ruling in *Hempstead Video, Inc*, 409 F.3d at 133. *Compare Yaretsky v. Blum*, 525 F. Supp. 24, 26-27, 29 (S.D.N.Y. 1981) (Opp. at 16) (conflicted lawyer at 30-lawyer office had "switched sides in the same lawsuit" and "served as one of the primary sources of legal counsel for plaintiffs since the inception of this lawsuit" in his previous position); *Crudele v. New York City Police Dep't*, 2001 WL 1033539, at *5-6 (S.D.N.Y. Sept. 7, 2001) (Opp. at 16, n.15) (conflicted attorney was the "lead attorney and played a substantial role" on related matters, subsequently "switched sides" to a 15-attorney firm, and, unlike Mr. Tenreiro, "never explicitly raised" the conflict of interest with his former government employers prior to his employment in private practice); *Baird v. Hilton Hotel. Corp.*, 771 F. Supp. 24, 26 (E.D.N.Y. 1991) (Opp. at 16, n.15) (conflicted lawyer at 9-attorney firm had "taken key depositions" for the defense before switching sides to the plaintiffs).

[5] In *Essex,* the court ultimately disqualified the 20-attorney firm because it waited "two months" after the disqualified attorney began working at the firm before establishing any formal written ethical walls. Thus, the court found that the "likelihood of inadvertent sharing of information is significant." *Essex Equity*, 29 Misc.3d at 389.

### C.      There is No Appearance of Impropriety

Defendants' remaining arguments seek to fabricate a purported "appearance of impropriety." None survives scrutiny. As a threshold matter, it is well-established that the "appearance of impropriety, standing alone," is not sufficient to warrant disqualification. *People v. Herr*, 86 N.Y.2d 638, 641 (1995); *Gabayzadeh v. Taylor*, 639 F. Supp. 2d 298, 305 (E.D.N.Y. 2009) (no appearance of impropriety warranting disqualification where "the proof is simply 'too slender a reed'"); *see also Essex Equity*, 29 Misc.3d at 385 (*cited at* Opp. at 10, 12, 16, 18) (appearance of impropriety arising from hiring of former federal prosecutor was, "without more," insufficient to disqualify firm).

Here, the record shows that BLB&G bent over backwards to disclose Mr. Tenreiro's prospective hiring to Defendants, the SEC, and the Court. To be sure, BLB&G voluntarily raised with both Defendants and the Court its interest in potentially hiring Mr. Tenreiro, provided Professor Green's declaration, detailed its proposed screening procedures, met and conferred extensively, answered Defendants' questions (as appropriate), and provided the fullest disclosure possible. By contrast, the exhibits submitted by Defendants with their Opposition only serve to demonstrate the delays they imposed on the meet and confer process and preventing Mr. Tenreiro from obtaining employment after leaving his position at the SEC. Moreover, it is hardly surprising that additional information was exchanged during the meet and confer process—that is exactly what the meet and confer process is supposed to facilitate and it is what Defendants' own exhibits further demonstrate.

On April 11, 2025, BLB&G provided counsel for Defendants with a draft of Professor Green's ethics opinion in order to give Defendants the opportunity to comment on the proposed screening procedures and suggest any additional screening measures. ECF No. 127-3 at 4. On April 16, 2025, based on a discussion with Mr. Tenriero earlier that day, BLB&G confirmed with

counsel for Defendants that Mr. Tenreiro had "review[ed] documents relating to the decision of whether to file an action and participat[ed] in discussions concerning the potential filing of the [SEC Action]." *Id.* at 2-3. On April 18, 2025, in response to further inquiries from Defendants, BLB&G sent Defendants an eight-paragraph email confirming the nature and substance of Mr. Tenreiro's roles at the SEC and his lack of recollection as to any confidential information (if he even received any, which is unclear as further discussed below). ECF No. 127-4 at 2-3. The SEC, which was notified of Mr. Tenreiro's potential hiring by BLB&G, has expressed no concern that he acquired any confidential information that would be put at risk. Green Rebuttal Decl. ¶11. And as stated in its Motion, BLB&G will not hire Mr. Tenreiro unless the Court approves the proposed screening measures. *See* Mot. at 6. These facts eviscerate any claim by Defendants that BLB&G did not act appropriately.

In response, Defendants attempt to raise a specter of "impropriety" through a series of scattershot attacks, each of which is baseless or otherwise irrelevant. Defendants' arguments fail.

***First***, Defendants baselessly assert that Mr. Tenreiro participated "personally and substantially" in the SEC Investigation and SEC Action and speculate that he must possess unidentified confidential information. Opp. at 11, 14. Defendants distort Mr. Tenreiro's role at the SEC to claim that he personally "recommend[ed] that the SEC proceed with its enforcement action" and, relying on this distortion, speculate that he must therefore have unidentified confidential information. *Id.* at 14 (claiming that Mr. Tenreiro "supervised the SEC's decision to approve its action against Mr. Musk"). In reality, as set forth in his uncontroverted declaration, Mr. Tenreiro was not involved in the "day-to-day work" of the SEC's investigation into Mr. Musk. Tenreiro Decl. ¶7. Instead, his role was limited to "likely" participating in discussions with the Chair about the SEC Investigation (though he has no recollection of the content of such

9

discussions) (*id.* ¶9a) and to "reviewing and commenting on" documents relating to the decision whether to file the SEC's claim (*id.* ¶9b). At most, Mr. Tenreiro played a peripheral role in the SEC proceedings, and Defendants' self-serving mischaracterizations of the record cannot suffice. *See GAF Corp. v. Heyman*, 559 F. Supp. 748, 751 (S.D.N.Y. 1983) (attorney not disqualified "when a lawyer plays a peripheral role in a matter").

Indeed, Quinn Emanuel—which represented Musk for years in the SEC Investigation and in defending the SEC Action—fails to identify a single instance in which Mr. Tenreiro appeared on a telephone call, discovery correspondence, or at a deposition in the SEC proceedings. Indeed, the SEC was forced to move to compel Musk's appearance at a deposition last year and, in doing so, attached numerous letters and email correspondence with Musk's counsel at Quinn Emanuel. *S.E.C. v. Musk*, No. 3:23-mc-80253 (N.D. Cal. filed October 5, 2023) (the "Misc Action"), ECF Nos. 2-1 to 2-9. Unsurprisingly, and confirming the truth of Mr. Tenreiro's descriptions of his limited roles in the SEC proceedings (Tenreiro Decl. ¶¶9, 10), Mr. Tenreiro does not appear on a single email between counsel. *See* Misc Action, ECF Nos. 2-1 to 2-9.

Next, Defendants claim that Mr. Tenreiro's "supervisory" role—*i.e.*, a role in which he had no involvement in the investigation and little involvement in the decision to prosecute—somehow ***increases*** the "substantial character of his involvement." Opp. at 12. Defendants rely exclusively on *Green v. City of New York* in support of this argument—but that case does not support them. There, unlike here, the lawyers in question had ***switched sides*** and, in doing so, were actively involved in challenging the same issue—*i.e.,* the lawfulness of strip searches—that they had previously defended. *Green v. City of New York*, 2011 WL 2419864, at *2 (S.D.N.Y. June 7, 2011). Given these extreme facts—entirely absent here—the court in *Green* granted the motion to disqualify. *Id.*; *see also Essex Equity*, 29 Misc.3d at 373, 376 (conflicted lawyer did not dispute

that he "participated personally and substantially in connection with the matter" where he "*led* a criminal investigation" into the defendant's auction rate securities which were "the subject of the pending Arbitration" at issue). Here, by contrast, Mr. Tenreiro did not switch sides (*e.g.*, he has never represented Musk), had only limited and peripheral involvement in the SEC proceedings, and will have zero involvement in this Action.[6]

Relatedly, Defendants claim that, regardless of his limited involvement in the SEC's prosecution, there is an appearance of impropriety because Mr. Tenreiro had a "highly visible" role at the SEC including because he led its "special crypto-enforcement unit." Opp. at 18-19. But Mr. Tenreiro's primary role in the "special crypto-enforcement unit" only reinforces the fact that he had no material role in the SEC's prosecution of Mr. Musk—and undermines Defendants' arguments to the contrary. It is undisputed that Mr. Tenreiro's crypto-cop role had nothing to do with Mr. Musk.[7]

---

[6] Defendants' remaining cases in fact undermine their arguments. *See Arroyo v. City of Buffalo*, 2017 WL 3085835, at *12 (W.D.N.Y. July 20, 2017), *report and recommendation adopted*, 2018 WL 488943 (W.D.N.Y. Jan. 20, 2018) (finding record was "barren of anything to support" that conflicted lawyer "substantially participated in" an investigation of the incident); *Murtaugh v. Cnty. of Oswego*, 2012 WL 12991206, at *1 (N.D.N.Y. July 31, 2012) (disqualification sought based on "lifetime ban" provisions of New York's Public Officers Law). Further, while Defendants note that the court in *In re Sunbum5 Enterprises* ultimately recognized an ethical conflict (Opp. at 13), Defendants ignore that the decision arose under highly disparate facts. *In re Sunbum5 Enters., LLC*, 2011 WL 4529648, at *5 (M.D. Fla. Sept. 30, 2011) (conflicted law firm simultaneously represented "scheduled creditors of Sunbum5" and defendants in "a cause of action that became property of the bankruptcy estate when Sunbum5 filed its Chapter 7 petition").

[7] The Second Circuit has since cabined its ruling in *Cheng v. GAF Corp.*, 631 F.2d 1052 (2d Cir. 1980), cited by Defendants (Opp. at 19), and noted that the Second Circuit "did not suggest any broad categorical rejection of the efficacy of isolation as protection against taint. We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from *de facto* separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint." *Hempstead*, 409 F.3d at 138.

**Second**, Defendants complain that "Mr. Tenreiro does not state that he lacks such [*i.e.,* non-public] information about the other Defendants in this case, including Mr. Birchall." Opp. at 9. This is flatly incorrect. Mr. Tenreiro's declaration states that he does not have "***any*** non-public information" that "could be used to the material disadvantage of ***any*** defendant in this case"— including Defendant Birchall and Musk's corporate entities that are named as Defendants in this Action. *See* Tenreiro Decl. ¶22. Defendants' apparent willingness to misstate the record belies the legitimacy of their arguments.

In any event, Defendants do not provide any specifics at all about the purportedly confidential information that Mr. Tenreiro supposedly possesses, which exposes their arguments as being premised on rank speculation. *Cayuga Indian Nation of New York v. Halftown*, 2005 WL 8171093, at *4 (N.D.N.Y. Mar. 31, 2005) (denying motion to disqualify where moving party merely "speculate[d]" that respondent "gained confidential information" that he could "now use" to the party's "disadvantage"); *Dudhia v. Agarwal*, 66 Misc.3d 206, 214 n.4 (N.Y. Sup. Ct. 2019), *aff'd*, 183 A.D.3d 537 (1st Dep't 2020) ("generalized, non-specific, and conclusory allegations that confidential information was imparted" insufficient to warrant disqualification). This is not surprising, as the core of the SEC Action is that Musk did not timely disclose his acquisition of more than five percent of Twitter stock, as required by the federal securities laws—all of which is ***public*** information. SEC Action, ECF No. 1. Defendants' complete failure to specify any purportedly confidential information in Mr. Tenreiro's possession powerfully belies their opposition to the Motion.

Next, Defendants contend that Mr. Tenreiro's "non-recollection is implausible" because he reviewed and commented on documents related to the filing of the SEC Action five months ago. Opp. at 14. But Defendants do not—and cannot—give any reason to discredit Mr. Tenreiro's

sworn declaration. Indeed, the fact that Mr. Tenreiro has no recollection of non-public information he may have received is unsurprising for multiple reasons. One, as noted, Defendants themselves are unable to identify any non-public information that Mr. Tenreiro purportedly possesses. Two, the SEC approved *40 enforcement actions* over the course of the short period when the SEC Action was brought (notably the SEC's "busiest start to a fiscal year" ever)—which included actions where Mr. Tenreiro *did* play a substantial role.[8]

Courts routinely credit lawyers' sworn representations that no confidential information was disclosed. *See, e.g., Am. Int'l Group*, 827 F. Supp. 2d at 346 (crediting affidavits from Quinn Emanuel personnel that no confidences were orally shared and also crediting the personally disqualified lawyer's representation that he remembered his previous work at only a high level of generality and did not remember any relevant confidential information); *Arista Records LLC v. Lime Group LLC*, 2011 WL 672254, at *5 (S.D.N.Y. Feb. 22, 2011) (crediting lawyers' representation that no confidences were shared). Defendants have not cited a single fact that undermines Mr. Tenreiro's credibility—instead, Defendants have done the opposite. They cite repeatedly to an article in which Mr. Tenreiro's opposing counsel at Morrison Cohen, which represented crypto firms in litigation with the SEC, attested to Mr. Tenreiro's ethical conduct: "He's a hell of a good litigator and a bulldog, *but an ethical bulldog*."[9]

---

[8] SEC, *SEC Announces Record Enforcement Actions Brought in First Quarter of Fiscal Year 2025* (Jan. 17, 2025), https://www.sec.gov/newsroom/press-releases/2025-26 ("The SEC filed more than 40 enforcement actions from Jan. 1, 2025, though Jan. 17, 2025.") (Ex. 1); *see also, e.g.*, SEC, *Ashford Inc. To Settle Negligence-Based Charges for Misleading Investors Regarding a Cyber Incident* (Jan. 13, 2025), https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26215 (announcing the SEC's investigation was supervised by Mr. Tenreiro) (Ex. 2); *SEC, SEC Charges Digital Currency Group and Soichiro "Michael" Moro, Former CEO of Genesis Global Capital, for Misleading Investors about Genesis's Financial Condition* (Jan. 17, 2025), https://www.sec.gov/newsroom/press-releases/2025-22 (same) (Ex. 3);

[9] *See* Dave Michaels, *SEC Ousts Top Litigator Who Battled With Crypto Giants*, Wall St. J. (Feb. 5, 2025).

Defendants' authorities are either inapposite or support approving BLB&G's screen. For example, *Google LLC v. NAO Tsargrad Media* supports Lead Counsel because the court there found that the conflicted law firm's declarations were ***not*** "self-serving" and that the law firm "genuinely tried to screen" the conflicted lawyer and its "screening efforts were more than just empty words." 2024 WL 4844799, at *11 (N.D. Cal. Nov. 19, 2024). The same is true here. In *Huntington v. Great W. Res., Inc.*, unlike here, there was no formal screening procedure at all. 655 F. Supp. 565, 575 (S.D.N.Y. 1987). Here, as discussed above, BLB&G's detailed screening procedures have been disclosed to Defendants and the Court and were endorsed by an expert in legal ethics, and Defendants were unable to find any flaws or missing procedures.

***Third***, Defendants accuse BLB&G of not being forthcoming about Mr. Tenreiro's role in the SEC Investigation and SEC Action. Opp. at 16-17. In fact, the record—including the many emails attached to the declaration submitted by Defendants—shows the opposite and reveals that the Firm engaged in extensive good faith efforts and sought to provide full disclosure at every step of the process. *See, e.g.*, Green Rebuttal Decl. ¶15. BLB&G promptly informed Defendants of its intention to potentially hire Mr. Tenreiro, subject to clearing any potential conflicts. *See* ECF No. 127-1. Then, BLB&G provided Defendants with the opportunity to review proposed screening procedures—and sent them a draft of Professor Green's declaration. ECF No. 127-3 at 3. BLB&G also responded to Defendants' numerous questions, during both meet and confers and over email, and specifically disclosed to Defendants that Mr. Tenreiro's involvement in the SEC Investigation and SEC Action involved "reviewing documents" and "participating in discussions." *See id.* at 1-2; *see also* ECF No. 127-4 at 1-2. That BLB&G did not initially volunteer the fact that Mr. Tenreiro's initial contact was with Ms. Sinderson and another BLB&G partner is unsurprising, given that those conversations were entirely irrelevant to this Action or the adequacy of BLB&G's

screening procedures. And in any event, no BLB&G partner, including Ms. Sinderson, discussed the SEC Investigation, the SEC Action, or this Action with Mr. Tenreiro except in the context of identifying potential conflicts which happened later in time, after his initial meeting with Ms. Sinderson. Tenreiro Decl. ¶29; Graziano Decl. ¶¶5, 6.[10]

**Fourth**, Defendants desperately resort to attacking Mr. Tenreiro's social media "likes." Opp. at 5-6, 16. Mr. Tenreiro's social media "likes" are wholly irrelevant. The posts to which Mr. Tenreiro reacted—which included an emotional departure announcement by an SEC colleague regarding the SEC's critical public service mission—had nothing to do with this action, the other related actions, or their underlying substantive allegations.

**Fifth**, Defendants attempt to manufacture suspicion by pointing to the timing between the institution of the SEC Action, Mr. Tenreiro's outreach to BLB&G, his departure from the agency, and his social media likes. Opp. at 19. Defendants' suspicions should be rejected out of hand. It ignores that Mr. Tenreiro's search for plaintiffs'-side employment came on the heels of the agency transferring him from his "highly visible positions" (Opp. at 18) in Enforcement, to a position in IT. Tenreiro Decl. ¶¶13-14. Importantly, Mr. Tenreiro's departure was supervised at all times, including by individuals at the SEC's Office of Ethics Counsel, Office of General Counsel, Office of Information Technology, and Division of Enforcement (Tenreiro Decl. ¶¶19, 26), and the SEC was informed of Mr. Tenreiro's anticipated departure and expressed no concern about Mr. Tenreiro's prospective hiring (Green Rebuttal Decl. ¶11). Defendants' argument would undermine

---

[10] *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.* is inapposite. There, the court disqualified the plaintiff patent holder's attorneys at Irell & Manella based on their prior representation of defendant where "twenty-nine different Irell partners and employees worked on projects for [defendant]" during a four-and-a-half year period, and the court had "no evidence" about "the degree of information sharing between the tainted attorneys and other Irell attorneys whose declarations are not given." 809 F. Supp. 1383, 1385, 1392 (N.D. Cal. 1992).

the hiring of any government lawyers seeking to transition from government to private practice—

the exact situation Rule 1.11 was designed to accommodate. *See* Mot. at 14.

## II.    <u>CONCLUSION</u>

At bottom, Defendants' Opposition rests on the meritless propositions that Mr. Tenreiro

and BLB&G deceived them and that the Firm is planning to violate its legal and professional

obligations. Defendants' arguments are belied entirely by BLB&G's extensive efforts to provide

full disclosure and obtain input from all relevant constituents, including Professor Green, the SEC,

Defendants, and the Court. BLB&G respectfully submits that its screening procedures should be

approved, and that it be permitted to move forward with hiring Mr. Tenreiro without facing the

peril of a disqualification motion by Defendants.

Dated: May 13, 2025

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano
Katherine M. Sinderson
Jeremy P. Robinson
Jonathan G. D'Errico
Emily A. Tu
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
katie@blbglaw.com
jeremy@blbglaw.com
jonathan.derrico@blbglaw.com
emily.tu@blbglaw.com

*Counsel for Lead Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*

17