# Exhibit D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, | No. 1:22-cv-03026-ALC-GWG |
| Plaintiff, | Honorable Gabriel W. Gorenstein |
| v. | |
| ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL, | |
| Defendants. | |

**REBUTTAL DECLARATION OF BRUCE A. GREEN IN SUPPORT OF**
**MOTION TO APPROVE CONFLICT SCREENING PROCEDURE**

I, Bruce A. Green, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I submit this Rebuttal Declaration in support of the motion of Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), to approve a conflict screening procedure for Mr. Jorge G. Tenreiro, a prospective partner.

2.      I previously submitted a Declaration dated April 22, 2025 in the above-captioned action.  It explained that Rule 1.11 of the New York Rules of Professional Conduct ("NY Rules"), which governs a lawyer's movement from government service to private practice, permits the lawyer's new firm to screen the moving lawyer from matters on which that lawyer worked personally and substantially as a government lawyer, and matters as to which the moving lawyer has material government confidential information.  My earlier Declaration further explained why, in my expert opinion, BLB&G's proposed screening procedures would comport with Rule 1.11 in the event that Mr. Tenreiro joins the law firm.  I hereby reaffirm, and incorporate by reference, the opinions expressed in my earlier Declaration.

1

3.      After I submitted my Declaration, the Defendants opposed BLB&G's motion.  *See* Defendants' Memorandum of Law in Opposition to Motion to Approve Conflict Screening Procedures ("Def. Mem.").  This Rebuttal Declaration is respectfully submitted in response to the Defendants' arguments in opposition to BLB&G's motion.

**ANALYSIS**

4.      The Defendants argue that BLB&G's proposed screening procedures cannot be trusted to prevent Mr. Tenreiro's disclosure of confidential information to other lawyers in the firm, Def. Mem. at 15-18, and that even if the proposed screening procedures could be trusted, an appearance of impropriety would remain.  *Id.* at 18-19.  They argue that any doubts should be resolved in favor of disqualification.  *Id.* at 11, 16.  For the following reasons, I disagree.

5.      To begin with, Rule 1.11 recognizes the interest in attracting qualified lawyers such as Mr. Tenreiro to public service by avoiding unnecessary restrictions on their later ability to secure private employment.  For decades, even before Rule 1.11 was adopted, courts in this Circuit have affirmed this compelling public interest.  *See, e.g.*, *Armstrong v. McAlpin*, 625 F.2d 433, 443-44 (2d Cir. 1980), *vacated on other grounds and remanded*, 449 U.S. 1106 (1981).  "If service with the government will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in practice of the very specialty for which the government sought his service – and if that sterilization will spread to the firm with which he becomes associated – the sacrifices of entering government service will be too great for most [individuals] to make." *Spinner v. City of New York*, 2002 U.S. Dist. LEXIS 26390, at *30 (E.D.N.Y. May 20, 2002) (citation omitted), *aff'd*, 2003 U.S. Dist. LEXIS 14854 (E.D.N.Y. Aug. 22, 2003); *accord Green v. City of New York*, 2011 WL 2419864, at *2 (S.D.N.Y. June 7, 2011).

6.      The need to allow government lawyers to move to the private sector without unnecessary restraint is also emphasized in the relevant Comment to Rule 1.11:

2

> This Rule represents a balancing of interests. On the one hand, where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government. Also, unfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service. *On the other hand, the rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government.* The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards. A former government lawyer is therefore disqualified only from particular matters in which the lawyer participated personally and substantially. *The provisions for screening and waiver in paragraph (b) are necessary to prevent the disqualification rule from imposing too severe a deterrent to entering public service.* The limitation on disqualification in paragraphs (a)(2) and (d) to matters involving a specific party or specific parties, rather than extending disqualification to all substantive issues on which the lawyer worked, serves a similar function.

NY Rule, Rule 1.11, cmt. [4] (emphasis added).

7.      As the above-quoted Comment recognizes, the screening provisions of Rule 1.11 are important to provide lawyers like Mr. Tenreiro an opportunity to find positions in the private sector that utilize the expertise they employed and developed in government service. *Cf. Armstrong*, 625 F.2d at 443 ("[A] decision rejecting the efficacy of screening procedures in this context may have significant adverse consequences. Thus, such disapproval may hamper the government's efforts to hire qualified attorneys; the latter may fear that government service will transform them into legal 'Typhoid Marys,' shunned by prospective private employers because hiring them may result in the disqualification of an entire firm in a possibly wide range of cases.").

8.      Consequently, even assuming that courts should resolve doubts in favor of disqualification when addressing other conflict-of-interest rules,[1] that is not the case with respect

---

[1] In fact, it is no longer courts' general practice to err on the side of disqualification, if it ever was. On the contrary, "[d]isqualification is disfavored in this Circuit and, as a result, the party seeking it must meet a high standard of proof before it is granted." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 827 F. Supp. 2d 341, 345 (S.D.N.Y. 2011); *see also Decker v. Nagel Rice LLC*, 716 F.

3

to Rule 1.11, and certainly not with respect to its screening provisions, because an unnecessarily restrictive approach would discourage lawyers such as Mr. Tenreiro from seeking government employment in the first place. *See Spinner*, 2002 U.S. Dist. LEXIS 26390, at \*29 ("When . . . the [alleged conflict of interest] stems from counsel's prior public or government service, courts must be wary not to take action which will discourage other attorneys from entering government employment.") (citation omitted).

9.      In any event, there should be no legitimate doubts about the efficacy of screening in this case. BLB&G's proposed screening procedures fully comply with the requirements of Rule 1.11, and BLB&G is open to instituting additional measures if the Court deems them necessary. The Defendants do not suggest any further procedural steps to prevent the improper use of material confidential information that Mr. Tenreiro may have learned while employed at the SEC. The Defendants argue that no measures will confidently prevent Mr. Tenreiro from sharing confidential information with the BLB&G lawyers involved in this action.

10.     The Defendants' argument is contrary to the basic premise of the conflict-of-interest rules' screening provisions, which is that if lawyers institute timely screening measures, they can be trusted as officers of the court to comply with them.

11.     One can be particularly confident in the efficacy of screening in this action because Mr. Tenreiro, the personally disqualified lawyer, is unlikely to possess any significant confidential information in the first place. The Defendants offer no reason to conclude that while Mr. Tenreiro was briefly in a supervisory role vis-à-vis the SEC lawyers investigating Mr. Musk, Mr. Tenreiro learned information that would be useful to the Plaintiff in this action and not publicly available

---

Supp. 2d 228, 231 (S.D.N.Y. 2010) ("Disqualification is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint'") (citation omitted).

or accessible in the course of routine discovery.  The SEC, which has been notified of Mr. Tenreiro's proposed move to BLB&G, and which is the party that Rule 1.11(a)(2) is meant to protect, has expressed no concern that he acquired significant confidential information that would be put at risk.

12.     Nor is there any good reason to question Mr. Tenreiro's representation under oath that he does not recall any useful confidential information he may have learned.  Even where, unlike here, law firms have failed to institute screening in a timely fashion, courts have accepted lawyers' sworn representations that no confidential information was disclosed.  *See*, *e.g.*, *Am. Int'l Grp.,* 827 F. Supp. 2d at 346 (crediting affidavits from Quinn Emanuel personnel that no confidences were orally shared and also crediting the personally disqualified lawyer's representation that he remembered his previous work at only a high level of generality and did not remember any relevant confidential information); *Arista Records LLC v. Lime Grp. LLC*, 2011 U.S. Dist. LEXIS 17434, *21-22 (S.D.N.Y. Feb. 22, 2011) (crediting lawyers' representation that no confidences were shared).

13.     The Defendants nevertheless challenge the adequacy of screening, principally on the ground that Mr. Tenreiro would be working in a "relatively small New York office, with approximately twenty partners," and "will necessarily have frequent interactions with plaintiff's counsel and their colleagues."  Def. Mem. at 15-16.  BLB&G's website lists slightly over 100 lawyers and other professionals.  The Defendants cite no authority suggesting that a law firm of this size is too small to screen a former government lawyer as specifically authorized by Rule 1.11. Although courts have sometimes declined to allow small law firms to screen lawyers who learned confidential information in a prior law firm, those decisions involved law firms significantly smaller than BLB&G, almost none applied Rule 1.11, which expressly permits screening, and none

5

relied on the size of the firm as the sole ground to foreclose screening.  As the state court explained in *Essex Equity Holdings USA, LLC v. Lehman Bros.*, 29 Misc. 3d 371 (N.Y. Sup. Ct., N.Y. Cnty, June 10, 2010), which the Defendants cite four times (*see* Def. Mem. at 10, 12, 16 & 18):

> [N]one of the [prior] cases . . . stands for a per se rule against screening [by small law firms]. In each of the cases, size was a contributing factor in the decision to disqualify, but there were aggravating factors which . . . raised "grave concerns about both the possibility of unintentional breaches of client confidences and about the appearance of impropriety" . . ..  In fact, the Second Circuit, referring to the ruling in *Cheng* [*v. GAF Corp.*, 631 F.2d 1052 (2d Cir. 1980], where a 20-person firm was disqualified, explicitly stated that a per se rule was not intended by that ruling, "We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from de facto separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint." (*Hempstead Video, Inc. v Incorporated Vil. of Val. Stream*, 409 F3d 127, 138 [2d Cir. 2005].)

> A per se rule against screening for small firms has not been the law heretofore in New York and would be impractical to adopt. Where would the line be drawn? Would it be inflexible? The better course, and the one the court chooses to follow, is the one outlined in Comment 7 to rule 1.11 which permits screening but cautions: "A small firm may need to exercise special care and vigilance to maintain effective screening but, if appropriate precautions are taken, small firms can satisfy the requirements of [rule 1.11]." (New York State Bar Association, Rules of Professional Conduct rule 1.11, Comment 7.)

14.    In any event, BLB&G is by no means small.  In most other parts of the country, BLB&G would be regarded as a large firm, not a small one.  Given its size, there is no reason to doubt BLB&G's ability to restrict Mr. Tenreiro's access to files in this action, and, if he brings relevant SEC files with him (which he will not), to restrict other BLB&G lawyers' access to those files.  Although Mr. Tenreiro may be likely to interact with other BLB&G lawyers, including those representing the Plaintiff, Mr. Tenreiro and the Plaintiff's lawyers should be as capable of avoiding conversation about this case as lawyers in a larger firm.  An effective screen relies principally on lawyers' professionalism and commitment to their ethical obligations, not on a prohibition against professional interactions between the personally disqualified lawyers and those responsible for the relevant matter.

6

15.    The Defendants also take unwarranted potshots at BLB&G's integrity.    They suggest that BLB&G's lawyers are untrustworthy because, when the law firm initially sought the Defendants' consent to the proposed screening procedures, BLB&G did not give the Defendants all the information that BLB&G later shared with the Defendants and submitted to the Court.    *See* Def. Mem. at 17-18.    The suggestion is unfair, unwarranted and unworthy.    Throughout, BLB&G has acted with care to comply with Rule 1.11, first seeking the Defendants' consent (albeit unsuccessfully), and then seeking the Court's permission to screen Mr. Tenreiro.    BLB&G's paramount obligation has been to avoid learning confidential information that Mr. Tenreiro may have acquired at the SEC.    The need to proceed carefully limited BLB&G's ability to obtain specifics from Mr. Tenreiro about his prior work relating to the SEC's investigation of Mr. Musk. It would be unsurprising, and certainly would not reflect lack of candor, if BLB&G's factual understandings became progressively clearer, more detailed and more accurate during the short period during which it sought the Defendant's consent, engaged in a meet-and-confer, and filed its motion.

16.    Finally, the Defendants assert that there will be an "appearance of impropriety" even if BLB&G fully implements the screening procedures contemplated by Rule 1.11.  Def. Mem. at 18-19.  The Defendants do not identify the impropriety.  They imply, however, that Mr. Tenreiro will appear to have misused his SEC position to secure a partnership at BLB&G – presumably by making discretionary decisions favorable to the Plaintiff.  But all of the evidence is to the contrary: Mr. Tenreiro had no opportunity to make significant decisions regarding the SEC's case against Mr. Musk during the brief time that he was in a supervisory position with respect to the SEC investigation, and BLB&G's interest in him has nothing to do with his indirect involvement in the SEC investigation.

17.      Rule 1.11(a)(2) is meant, in part, to remove the incentive for government lawyers to abuse their authority with an eye toward future employment.  But here, there is no fair basis to suspect that Mr. Tenreiro misused his SEC position to secure a position at BLB&G, and in any event, mere suspicions alone should not be enough to foreclose the firm from hiring and screening Mr. Tenreiro.  *See Essex Equity*, 29 Misc. 3d at 382-85 ("Although there is some foundation to petitioners' suspicions, without more, the court is unwilling to make the finding, on the claims here, that an appearance of impropriety standing alone prevents the remaining lawyers in the firm, if properly screened, from continuing to represent respondents.").

*          *          *

18.      The question for the Court is whether BLB&G would be disqualified if it were to make Mr. Tenreiro a partner of the firm while screening him from this action in accordance with the procedures contemplated by Rule 1.11 and any others required by the Court.[2]  The proposed measures are sufficient to ensure that Mr. Tenreiro has no involvement in this action, does not discuss it with BLB&G lawyers representing the Plaintiff, and is not otherwise in a position to convey whatever material confidential information he may have acquired at the SEC.  If the Court disapproves, BLB&G would continue to represent the Plaintiff while Mr. Tenreiro seeks employment elsewhere.  That result would be contrary to Rule 1.11, which is intended to facilitate government lawyers' movement to private practice by limiting restrictions to those that are truly necessary.  Here, there is no good reason, much less a necessity, to reject the screening procedures specifically authorized by the Rule.

---

[2] BLB&G's motion presenting this question is not meaningfully distinguishable from the motions made in prior cases seeking prospective rulings on disqualification.  *See* Def. Mem at 10 n.11 (citing five prior cases).

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2025

_____
Bruce A. Green