UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

OKLAHOMA FIREFIGHTERS PENSION AND
RETIREMENT SYSTEM,                                     :

                          Plaintiff,                  :
                -v.-                                        OPINION AND ORDER
                                                      :    22 Civ. 3026 (ALC) (GWG)
ELON R. MUSK, ELON MUSK REVOCABLE
TRUST DATED JULY 22, 2003,                            :
EXCESSION, LLC, and JARED BIRCHALL,
                                                      :
                          Defendants.
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

The Oklahoma Firefighters Pension and Retirement System is the lead plaintiff in this

federal securities class action asserting that defendant Elon Musk violated securities laws when

he purchased shares of Twitter, Inc. in 2022.  See First Amended Complaint for Violations of the

Federal Securities Laws, dated April 30, 2024 (Dockets ## 73, 74, 99) ("FAC").  Counsel for

plaintiff, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), brings this motion because

it seeks to hire as a partner Jorge G. Tenreiro, who held a number of positions at the U.S.

Securities and Exchange Commission ("SEC"), including Chief Litigation Counsel.  Tenreiro

served in that role at the time the SEC filed suit against Musk in January 2025 relating to the

purchase of the shares.  Recognizing the conflict of interest that such a hiring would engender,

BLB&G has filed a motion requesting approval of BLB&G's proposed "conflict screening

procedures" to wall off Tenreiro from the rest of the firm in relation to this lawsuit.[1]  Tenreiro has

---

[1] Notice of Court-Appointed Lead Counsel's Motion to Approve Conflict Screening
Procedures, filed April 22, 2025 (Docket # 123); Court-Appointed Lead Counsel's Memorandum
of Law in Support of Motion to Approve Conflict Screening Procedures, filed April 22, 2025
(Docket # 124) ("Mem."); Declaration of Jorge G. Tenreiro in Support of Motion to Approve
Conflict Screening Procedures, dated April 22, 2025, annexed as Ex. B to Mem. (Docket # 124-

accepted an offer to join BLB&G contingent only on this Court's approval of the proposed

screening procedures.  Defendants have opposed the motion.  For the following reasons, the

Court approves BLB&G's proposed screening procedures.

I.      FACTUAL BACKGROUND

    A.  Procedural Background

This action was filed on April 12, 2022.  See Class Action Complaint for Violation of the

Federal Securities Laws, filed April 12, 2022 (Docket # 1).  On September 2, 2022, this Court

appointed the Oklahoma Firefighters Pension and Retirement System as lead plaintiff and

BLB&G as lead counsel.  See Rasella v. Musk, 342 F.R.D. 74 (S.D.N.Y. 2022).  An amended

complaint was filed May 1, 2025.  See FAC.

The complaint alleges that defendants committed securities fraud when Musk concealed

his ownership stake in Twitter, Inc.  Id. ¶ 1.  It is brought as a putative class action on behalf of

investors who sold Twitter, Inc. securities between March 25, 2022, and April 4, 2022, the period

during which defendant Musk purportedly concealed his ownership stake.  Id. at 1 & ¶¶ 5, 241.

On April 22, 2025, BLB&G asked the Court "to approve a routine ethical screen of Mr.

Jorge G. Tenreiro, an attorney formerly employed with the U.S. Securities and Exchange

Commission . . . that BLB&G would like to hire subject to this Court's review and approval of

the Firm's proposed screening procedures."  Mem. at 1.  BLB&G has since clarified that

---

2) ("Tenreiro Decl."); Declaration of Salvatore J. Graziano in Support of Motion to Approve
Conflict Screening Procedures, dated April 22, 2025, annexed as Ex. C to Mem. (Docket # 124-
3) ("Graziano Decl."); Defendants' Memorandum of Law in Opposition to Motion to Approve
Conflict Screening Procedures, filed May 6, 2025 (Docket # 126) ("Opp."); Declaration of Jesse
Bernstein, filed May 6, 2025 (Docket # 127) ("Bernstein Decl."); Lead Counsel's Reply
Memorandum of Law in Further Support of Motion to Approve Conflict Screening Procedures,
filed May 13, 2025 (Docket # 130) ("Reply"); Letter from Salvatore J. Graziano, filed May 30,
2025 (Docket # 134) ("May 30, 2025, Letter").

Tenreiro has accepted an offer of employment from BLB&G "contingent solely on this Court's grant of" the motion to approve the screening procedures.  See May 30, 2025, Letter at 1.

B.  Tenreiro and the SEC Action Against Musk

Tenreiro was employed by the SEC from December 2013 to April 4, 2025.  Tenreiro Decl. ¶ 3.  "From approximately late August 2021 through approximately September 12, 2022, [Tenreiro] was detailed to the Office of the Chair of the SEC, serving as the Enforcement Counsel advising the Chair on matters relating to [the SEC's Division of] Enforcement's work." Id. ¶ 4.  From October 2022 to November 2024, Tenreiro was "Deputy Chief of the SEC's Crypto Assets and Cyber Unit."  Opp. at 3.  "From December 1, 2024, through February 3, 2025, [Tenreiro] worked as the SEC's Chief Litigation Counsel, overseeing the SEC's national litigation program."  Tenreiro Decl. ¶ 5.  According to Tenreiro, as Chief Litigation Counsel, he "was one of as many as several dozen reviewers who typically review Enforcement staff recommendations to the Commission recommending the potential filing of an Enforcement civil action or administrative proceeding."  Id.

On January 14, 2025, during Tenreiro's tenure as Chief Litigation Counsel, "the SEC filed the lawsuit SEC v. Musk, No. 25-cv-00105 (D.D.C.)" ("SEC v. Musk") "alleging a violation of Section 13(d) of the Securities Exchange Act of 1934 and Rule 13d-1 thereunder . . . with respect to Mr. Musk's purchases of Twitter shares in 2022."  Id. ¶ 6.

As to his involvement with SEC v. Musk, Tenreiro has declared under oath that he

was not and [has] never been, at any time, part of any SEC staff (Enforcement or otherwise) assigned to conduct the day-to-day work, or the supervision of any work, that ultimately led to the filing of SEC v. Musk, including but not limited to investigation SEC File No. SF-4519 ("SEC Investigation"), the miscellaneous district court action SEC v. Musk, No. 3:23-mc-80253 (N.D. Cal. filed October 5, 2023) . . . , or any other investigation or matter.

Id. ¶ 7.  .

As to the SEC Investigation, Tenreiro declares that his "substantive participation" was

limited to the following:

a.  In the normal course of my duties as Enforcement Counsel to the Chair, I
    would have likely participated in discussions with the Chair that may have
    occurred discussing the SEC Investigation.  I have no recollection of any
    content regarding any discussion of the SEC Investigation that may have
    occurred during my detail as Enforcement Counsel to the Chair.
b.  In the normal course of my duties as Chief Litigation Counsel, from
    approximately December 1, 2024, through the filing of <u>SEC v. Musk</u>, I was
    responsible for participating in certain discussions concerning the SEC
    Investigation and the then-potential SEC civil enforcement action and for
    reviewing and commenting on documents relating to the decision of whether
    to file the then-potential civil enforcement action.

<u>Id.</u> ¶ 9.  Tenreiro also states that after January 14, 2025, he "did not substantively participate in

the SEC Investigation or in <u>SEC v. Musk</u>, or in any other matter relating to those matters."  <u>Id.</u>

¶ 11.

On January 31, 2025, Tenreiro was informed that he would begin a detail in the SEC's

Office of Information Technology on February 3, 2025.  <u>Id.</u> ¶ 13.  As of January 31, 2025,

Tenreiro had no further involvement with the Division of Enforcement's work.  <u>Id.</u>

Tenreiro declares that he has

no recollection of any confidential government information underlying the
allegations in <u>SEC v. Musk</u> or relating to the SEC Investigation, or of any
allegations in this case, or, to the best of my knowledge, of any other information
that could be used to the material disadvantage of Mr. Musk in any matter.

<u>Id.</u> ¶ 10.  Additionally, Tenreiro states that "[t]o the best of my knowledge, I am not in possession

or aware of any non-public information acquired while I was an SEC employee that could be

used to the material disadvantage of any defendant in this case," and "did not take or retain any

information, confidential or otherwise, about the SEC Investigation or the defendants in <u>SEC v.

Musk</u>" when he left the SEC.  <u>Id.</u> ¶¶ 22, 25.

Tenreiro separated from the SEC on April 4, 2025, under a "Voluntary Incentive Separation Program" that was offered to SEC employees  Id. ¶¶ 23, 24.

      C.  Tenreiro and BLB&G

"On January 21, 2025, [Tenreiro] began contacting potential outside employers to explore the possibility of post-SEC employment."  Id. ¶ 12.  On February 6, 2025, a former classmate of Tenreiro's connected him with two BLB&G partners, Katherine M. Sinderson and James A. Harrod.  Id. ¶ 15; Graziano Decl. ¶ 2.

From early February to March 2025, Tenreiro spoke to several BLB&G partners, including Sinderson, Harrod, Salvatore Graziano, Hannah Ross, Jeroen van Kwawegen, Jerry Silk, and John Rizio-Hamilton, to discuss his potential employment with BLB&G.  Tenreiro Decl. ¶¶ 16-18; Graziano Decl. ¶¶ 2-5.[2]  Tenreiro states that during these conversations, neither Tenreiro, nor anyone else, discussed SEC v. Musk, the SEC Investigation, or the instant action. Tenreiro Decl. ¶ 30; see Graziano Decl. ¶ 6.

Tenreiro first became aware that BLB&G was counsel in the instant action sometime between March 15 and March 17, 2025, and "promptly informed [BLB&G] of the limited circumstances of [his] involvement in SEC discussions leading up to the filing of SEC v. Musk." Tenreiro Decl. ¶ 21.

Tenreiro also declares that he has

> not disclosed and will never disclose to anyone at BLBG any non-public information acquired while I was an SEC employee, including but not limited to any non-public information acquired while I was an SEC employee that could be used to the material disadvantage of any defendant in any case in which BLBG serves as counsel.

---

[2]  Defendants highlight that Sinderson "is one of the primary counsel in this case," Opp. at 7; Notice of Appearance, filed September 20, 2022 (Docket # 24), and that van Kwawegen "is co-leading a stockholder's challenge to Mr. Musk's compensation package from Tesla, Inc.," Opp. at 5.

Id. ¶ 27.  His only discussions "with anyone at BLBG about this matter and about SEC v. Musk

have been as part of the conflicts checks process and this proposed conflict screening procedure

. . . and did not involve any discussion of any non-public information."  Id. ¶ 30; see Graziano

Decl. ¶ 8.

     More generally, Tenreiro declares that he has "never discussed with anyone who was not

at the time an SEC employee, including specifically anyone at BLBG, any non-public

information about the SEC Investigation, SEC v. Musk or about this matter."  Tenreiro Decl.

¶ 29.

     D.  BLB&G's Ethical Screen

     On March 14, 2025, Tenreiro was informed by Rizio-Hamilton and Graziano that any

offer to join BLB&G

> would be contingent on (1) Mr. Tenreiro's agreement not to participate in any way
> in the representation of any BLB&G client adverse to any defendant in any case
> in which BLB&G worked as counsel and in which non-public information
> acquired while Mr. Tenreiro was an SEC employee could be used to the material
> disadvantage of any defendant; and (2) either the defendant(s)' or the relevant
> court's approval of a conflict screening procedure that would preclude Mr.
> Tenreiro's participation in any case in which BLB&G worked as counsel and in
> which non-public information acquired while Mr. Tenreiro was an SEC employee
> could be used to the material disadvantage of any defendant.

Graziano Decl. ¶ 7; Tenreiro Decl. ¶ 20.  Tenreiro "agreed to comply with these instructions."

Tenreiro Decl. ¶ 20.

     "To facilitate Mr. Tenreiro's consideration of this request, Mr. Rizio-Hamilton sent Mr.

Tenreiro a list of all active BLB&G cases."  Graziano Decl. ¶ 7.  In response, Tenreiro identified

cases brought by BLB&G, including this one, that included defendants who were potentially

connected to SEC actions in which Tenreiro was involved.  Id. ¶ 8.

     On March 19, 2025, Graziano, a partner at BLB&G, "informed Jesse Bernstein, counsel

for Defendants in this Action and a partner at Quinn Emanuel Urquhart & Sullivan, that BLB&G was interested in potentially hiring Mr. Tenreiro subject to the considerations outlined above." Id. ¶ 11. Defendants did not consent. Id. ¶ 12.

Also on March 19, 2025, Graziano and Rizio-Hamilton reached out to Professor Bruce Green, "a professional legal ethics expert." Id. ¶ 10. Green and BLB&G subsequently "developed a set of screening procedures that [BLB&G] w[ould] implement with respect to Mr. Tenreiro if he is ultimately employed at BLB&G." Id. ¶ 16. Those procedures essentially consist of walling Tenreiro off from any information or personnel working on this case and ensuring that he does not receive a share of any fee earned from the instant action. Id. ¶¶ 16-17.

E.  Tenreiro's Online Activities

Defendants have noted that Tenreiro "liked" three social media posts that they contend were critical of Musk, see Opp. at 5-6; Social Media Posts, filed May 6, 2025, annexed as Exs. E-G to Bernstein Decl. (Dockets ## 127-5, 127-6, 127-7), and one post in which an SEC litigator announced his resignation from the SEC, see Opp. at 6; Social Media Post, filed May 6, 2026, annexed as Ex. H to Bernstein Decl. (Docket # 127-8).

II.  LEGAL BACKGROUND

As to the power of the Court to approve screening procedures in advance of Tenreiro's hiring, case law is replete with instances in which district courts have opined on whether a firm's conflict screening procedures are satisfactory where a conflicted attorney has already joined the firm after the conflict-engendering suit was filed. See, e.g., Energy Intel. Grp., Inc. v. Cowen & Co., LLC, 2016 WL 3920355 (S.D.N.Y. July 15, 2016); Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ., 722 F. Supp. 2d 295 (E.D.N.Y. 2010). Far less common are applications to approve conflict screening procedures filed before the attorney joins the firm bringing suit.

Nonetheless, we are aware of at least two courts that have given such approvals.  See Eberle

Design, Inc. v. Reno A & E, 354 F. Supp. 2d 1093, 1097-98 (D. Ariz. 2005) (ordering that a firm

contemplating hiring a conflicted attorney will "not be disqualified" provided the firm complies

with applicable rules of professional conduct); Bank Brussels Lambert v. Chase Manhattan Bank,

N.A., 1996 WL 66130, at *1 (S.D.N.Y. Feb. 15, 1996) (approving a proposed "screening

procedure" prior to the conflicted attorney joining the firm).  Additionally, advance rulings as to

conflicts are routinely given in criminal cases where a proposed counsel has a conflict of interest.

See generally United States v. Curcio, 680 F.2d 881 (2d Cir. 1982).

While we doubt that the constitutional or prudential "ripeness" doctrine applies to an

application that is entirely collateral to the merits of a lawsuit, we note that Tenreiro's potential

hiring has progressed well beyond the "conjectural or hypothetical" stage, that there is no "future

event" (other than this Court's decision) that stands in the way of Tenreiro's hiring, and that the

Court's failure to rule would create "a direct and immediate dilemma for the parties."  Nat'l Org.

for Marriage, Inc. v. Walsh,714 F.3d 682, 688, 691 (2d Cir. 2013).

As to the law that governs this application, we begin with the proposition that the

"authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve

the integrity of the adversary process.'"  Hempstead Video, Inc. v. Inc. Vill. of Valley Stream,

409 F.3d 127, 132 (2d Cir. 2005) (quoting Bd. of Educ. of City of N.Y. v. Nyquist, 590 F.2d

1241, 1246 (2d Cir. 1979)).  As the Second Circuit has explained:

> [D]isqualification has been ordered only in essentially two kinds of cases: (1)
> where an attorney's conflict of interests . . . undermines the court's confidence in
> the vigor of the attorney's representation of his client, . . . or more commonly (2)
> where the attorney is at least potentially in a position to use privileged
> information concerning the other side through prior representation.

Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 764-65 (2d Cir. 1990) (quoting Nyquist,

590 F.2d at 1246) (alteration in original).  In reviewing disqualification motions, courts "often benefit from guidance offered by the American Bar Association (ABA) and state disciplinary rules."  Hempstead Video, Inc., 409 F.3d at 132.  However, because "the Court's primary concern is with the integrity of the adversary process, not the enforcement of the ethical rules," Am. Int'l Grp., Inc. v. Bank of Am. Corp., 827 F. Supp. 2d 341, 345 (S.D.N.Y. 2011), "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification," Hempstead Video, Inc., 409 F.3d at 132.

Nevertheless, when faced with an issue related to a conflict of interest, "[a] starting point is of necessity the Code of Professional Responsibility."  Goodwine v. City of N.Y., 2016 WL 379761, at *2 (S.D.N.Y. Jan. 29, 2016) (quoting Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 753 (2d Cir. 1975)).  Rule 1.11 of the New York Rules of Professional Conduct, which largely mirror the American Bar Association's ethical rules, see Model Rules of Pro. Conduct r. 1.11 (Am. Bar Ass'n 1983), contains a provision that specifically governs attorneys who were formerly in government service.  22 N.Y.C.R.R. § 1200.0, Rule 1.11(a).  Thus, courts have "looked primarily to Rule 1.11 rather than to caselaw governing successive representation" to assess potential conflicts of interests stemming from prior government service.  Goodwine, 2016 WL 379761, at *2.

Rule 1.11(a) provides in pertinent part that "a lawyer who has formerly served as a public officer or employee of the government"

> (2) shall not represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

§ 1200.0, Rule 1.11(a).

Rule 1.11(b) provides that "[w]hen a lawyer is disqualified from representation under paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter" unless certain procedures are followed. Id. Rule 1.11(b). Specifically, the firm must act "promptly and reasonably" to:

> (i) notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client;
> (ii) implement effective screening procedures to prevent the flow of information about the matter between the personally disqualified lawyer and the others in the firm;
> (iii) ensure that the disqualified lawyer is apportioned no part of the fee therefrom; and
> (iv) give written notice to the appropriate government agency to enable it to ascertain compliance with the provisions of this Rule.

Id. Rule 1.11(b)(1). Rule 1.11(b)(2) additionally mandates that the hiring may only take place if "there are no other circumstances in the particular representation that create an appearance of impropriety." Id. Rule 1.11(b)(2).

Finally, the Code provides that

> a lawyer having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. . . . A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely and effectively screened from any participation in the matter in accordance with the provisions of paragraph (b).

Id. Rule 1.11(c).

Thus, a law firm that employs a former government lawyer may still undertake representation in a matter in which the former government lawyer participated personally and substantially, even if that lawyer has pertinent confidential government information, if the law firm abides by certain conditions, including "effective screening procedures." In other words,

while "[a]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences," this presumption may be rebutted by the construction of a screen "that effectively protects against any sharing of confidential information." Hempstead Video, Inc., 409 F.3d at 133, 138.

Still the New York Rules of Professional Conduct do not permit hiring if there are "circumstances in the particular representation that create an appearance of impropriety." § 1200.0, Rule 1.11(c). The comments to Rule 1.11 explain that "there may be circumstances where, despite screening, representation by the personally disqualified lawyer's firm could still undermine the public's confidence in the integrity of the legal system." N.Y. Rules of Pro. Conduct, Rule 1.11 cmt. 6 (N.Y. State Bar Ass'n 2025). "Such a circumstance may arise . . . where the personally disqualified lawyer occupied a highly visible government position prior to entering private practice, or where other facts and circumstances of the representation itself create an appearance of impropriety." Id. The comments advise that

> [i]n deciding whether the screening procedures permitted by this Rule will be effective to avoid imputed disqualification, a firm should consider a number of factors, including how the size, practices and organization of the firm will affect the likelihood that any confidential information acquired about the matter by the personally disqualified lawyer can be protected.

Id. cmt. 7.

III.    DISCUSSION

BLB&G makes no argument that Tenreiro's prior work at the SEC did not create a conflict of interest. Instead, it argues that its planned screening procedures comply with the Code's provision for such procedures and that there is no appearance of impropriety. We thus address only these two issues.

A.  Efficacy of BLB&G's Proposed Screening Procedures

"An attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." Hempstead Video, Inc., 409 F.3d at 133.  As noted, this presumption may be rebutted through screening procedures. See id. at 133-34; § 1200.0, Rule 1.11(b), (c).  "When evaluating whether this presumption of shared confidences has been rebutted, '[c]ourts should inquire on the facts of the case before them whether the practices and structures in place are sufficient to avoid disqualifying taint.'" Victorinox AG v. The B & F Sys., Inc., 200 F. Supp. 3d 423, 426 (S.D.N.Y. 2016) (alteration in original) (citing Hempstead Video, Inc., 409 F.3d at 137), aff'd, 709 F. App'x 44 (2d Cir. 2017).

BLB&G seeks to "rebut the presumption that attorneys within a law firm share confidential information" by implementing an ethical screen.  Mem. at 10. BLB&G describes those screening procedures as follows:

1. Bar Mr. Tenreiro from working on any engagements, assignments, matters, or service performed by BLB&G in connection with the present action;
2. Prohibit Mr. Tenreiro from having any discussions concerning the present action with any BLB&G personnel;
3. Deny Mr. Tenreiro access to all documents and computer-stored information concerning the present action;
4. Bar all BLB&G personnel from providing Mr. Tenreiro with information relating to the present action;
5. Bar all BLB&G personnel from asking, directly or indirectly, for any confidential or privileged information from Mr. Tenreiro, and prohibit all BLB&G personnel from discussing the present action in Mr. Tenreiro's presence, including from casual discussion or routine status updates;
6. Before Mr. Tenreiro joins BLB&G, BLB&G will notify all BLB&G personnel that no one is permitted to discuss or exchange emails with Mr. Tenreiro regarding the present action;
7. BLB&G has informed Mr. Tenreiro that if he joins the firm, he must not provide any confidential or privileged information pertaining to the present action or any of the defendants to any BLB&G personnel; and
8. BLB&G has provided written notice to the SEC of its desire to hire Mr. Tenreiro and the ethical screening procedures it would implement if permitted to do so.

See id. at 10-11.  Additionally, Tenreiro "will not be apportioned any part of any fee that may be received by BLB&G in connection with this Action."  Graziano Decl. ¶ 17.

BLB&G contends that these screening procedures are "timely and effective[]" under the New York Rules of Professional Conduct.  22 N.Y.C.R.R. § 1200.0, Rule 1.11(c).  See Mem. at 11.  BLB&G argues that they are "timely because they will be implemented before Mr. Tenreiro joins the Firm or does any work at BLB&G" and effective "because they will include all elements listed in Rule 1.11(b)."  Id.  BLB&G also highlights that it "has adopted additional protective measures, including giving advance notice to this Court so that the Court may impose any additional screening measures, as well as advance notice to Defendants (through their counsel) so that they are in a position to suggest additional measures."  Id. at 12.

These procedures comply in every respect with the requirements of Rule 1.11(b).  If implemented correctly, the procedures eliminate the possibility that any information relating to the suit would flow between Tenreiro and anyone else at the firm.  They also ensure that Tenreiro will not gain financially from any potential recovery arising from this action.  Additionally, BLB&G has acted "promptly" by preparing to take these steps prior to Tenreiro's hiring. § 1200.0, Rule 1.11(b); see Graziano Decl. ¶ 7; Tenreiro Decl. ¶ 20.  BLB&G's procedures "effectively protect[] against any sharing of confidential information," thereby protecting against any possible "taint."  Hempstead Video, Inc., 409 F.3d at 138.

In their opposition, defendants characterize BLB&G's New York office as "relatively small" because it has "approximately twenty partners."  Opp. at 16.  They argue that "[g]iven Mr. Tenreiro's background in securities fraud litigation, he will necessarily have frequent interactions with plaintiff's counsel and their colleagues."  Id.  Although firm size may weigh against the effectiveness of a screening procedure, see Yaretsky v. Blum, 525 F. Supp. 24, 30 (S.D.N.Y.

1981), here, the record does not suggests that BLB&G's size would turn an otherwise effective screen into an ineffective one, see Brown v. City of Syracuse, 2013 WL 2445050, at *3 (N.D.N.Y. June 4, 2013) (finding that the presumption of shared confidences was rebutted as a result of an effective screening procedure, even though the law firm in question only employed four attorneys). Indeed, while a 20-partner firm may be small by the standards of New York City, it would hardly be considered small in most other parts of the country. Additionally, defendants' argument ignores that the firm consists of more than 75 attorneys in total. see Reply at 6, and that, according to the firm's website, the vast majority are in the New York Office.

Additionally, the two cases defendants rely on fail to support their argument on this point. In Yaretsky, 525 F. Supp. 24, the court concluded that the screening procedure would be ineffective in part because the conflicted attorney "prepared an affidavit about a conversation he had with defendants' counsel while he was employed at [his prior law firm]" at the direction of his present employer. Id. at 30. The court also highlighted that it was possible that the conflicted attorney "could be called as a witness should this matter result in further litigation." Id. Finding that "[e]ach of these situations has, or would, force contact between [the conflicted attorney] and [his current firm's] lawyers in the context of discussing this case," the court concluded that no screening procedures "could survive such an assault." Id. The present situation does not raise similar concerns.

Defendants also rely on Matter of Essex Equity Holdings USA, LLC (Lehman Bros. Inc.), 29 Misc. 3d 371 (N.Y. Sup. Ct. 2010). In that case, however, the court noted that "if appropriate precautions are taken, small firms can satisfy the requirements of" Rule 1.11. 29 Misc. 3d at 387 (citing N.Y. Rules of Pro. Conduct, Rule 1.11 cmt. 7). Here, nothing in the record suggests that BLB&G's procedures would be ineffective as a screen.

Defendants also cite to case law for the proposition that "daily contacts generate a danger of inadvertent disclosure and appearance of impropriety." Opp. at 16 & n.15. However, the cases cited on this point are largely inapposite: in both Crudele v. N.Y. City Police Dep't, 2001 WL 1033539 (S.D.N.Y. Sept. 7, 2001), and Baird v. Hilton Hotel Corp., 771 F. Supp. 24 (E.D.N.Y. 1991), the conflicted attorney and the attorney who handled the matter in question worked for a law firm that was much smaller than BLB&G and where there were daily interactions. See Crudele, 2001 WL 1033539 at *4; Baird, 771 F. Supp. at 27.

Defendants also allege that BLB&G was not "promptly forthcoming" about Tenreiro's conflict or his contacts with BLB&G. Opp. at 17. However, these discussions reflect only minor errors or omissions, if any, and thus do not "undermin[e] the credibility" of BLB&G's assurances as to the efficacy of the ethical screen. Id.

B.  Whether There Is an Appearance of Impropriety

Defendants argue that there would be an appearance of impropriety if Tenreiro were hired because he "held highly visible positions, including as the SEC's Chief Litigation Counsel and Enforcement Counsel to the Chair." Id. at 18. Certainly, comment 6 to Rule 1.11 considers that holding a "highly visible government position" prior to entering private practice may, "despite screening, . . . still undermine the public's confidence in the integrity of the legal system," N.Y. Rules of Pro. Conduct, Rule 1.11 cmt. 6. But while the positions Tenreiro held rank high in the hierarchy of the SEC, there is no evidence that these positions are commonly known among the public. Thus, we cannot characterize these positions as "highly visible." As a result, there is little danger that the "public's" confidence in the legal system would be eroded through the hiring. Furthermore, the Court is unaware of a case that has relied solely on concerns regarding

15

an attorney's prior "highly visible government position" as a basis for rejecting otherwise

adequate screening procedures.

Tenreiro's actual experience in his SEC positions vis-à-vis the investigation into Musk

further undermines the strength of defendants' argument on this point: Tenreiro has represented

that he has never been a part

> of any SEC staff (Enforcement or otherwise) assigned to conduct the day-to-day
> work, or the supervision of any work, that ultimately led to the filing of SEC v.
> Musk, including but not limited to investigation SEC File No. SF-4519 ("SEC
> Investigation"), the miscellaneous district court action SEC v. Musk, No. 3:23-
> mc-80253 (N.D. Cal. filed October 5, 2023) . . . , or any other investigation or
> matter.

Tenreiro Decl. ¶ 7.  Notwithstanding defendants' arguments to the contrary, we have no reason to

doubt these representations.

Defendants also argue that "the extremely short time" that elapsed "between the filing of

the SEC Action and Mr. Tenreiro's outreach" to BLB&G "create[s] an appearance of

impropriety" that is "enhanced" because Tenreiro presumably "participated in the approval of the

SEC Action just days before leaving the agency."  Opp. at 19.  But the timing of Tenreiro's

departure appears to have been precipitated by his being assigned to detail in an office with a

focus unrelated to his prior work and the agency's offering of a voluntary separation package.

See Tenreiro Decl. ¶¶ 13, 23, 24.  More to the point, given that Tenreiro did not know that

BLB&G was counsel in this case until sometime between March 15 and March 17, 2025, see id.

¶ 21, the length of the period between Tenreiro's alleged involvement with SEC actions against

Musk and outreach to BLB&G is immaterial.  For similar reasons, we find that Tenreiro's "likes"

of social media posts do not create an appearance of impropriety, particularly since the posts

have nothing to do with the SEC enforcement action against Musk or the instant litigation.

*      *      *

Accordingly, we conclude that BLB&G's screening procedures cure Tenreiro's conflict of interest.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, BLB&G's motion to approve conflict screening procedures (Docket # 123) is granted.

SO ORDERED.

Dated: June 5, 2025

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge