# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,<br><br>                    Plaintiff,<br><br>          v.<br><br>ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL,<br><br>                    Defendants. | No. 1:22-cv-03026-ALC-GWG |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................ 1

II.  SUMMARY OF ALLEGATIONS COMMON TO THE CLASS ................................ 3

    A.  Defendants' Scheme To Defraud Investors ............................................. 3

    B.  The Truth Is Revealed ....................................................................... 6

    C.  Procedural History ........................................................................... 6

III.  ARGUMENT ............................................................................... 7

    A.  The Proposed Class Satisfies Rule 23(a) .............................................. 7

        1.  Numerosity Is Established .......................................................... 7

        2.  Commonality Is Established ........................................................ 8

        3.  Typicality Is Established ............................................................ 9

        4.  Adequacy Is Established ............................................................ 9

            a.  Oklahoma Firefighters Is Aligned With The Class And Not Subject To Unique Defenses ................................................ 10

            b.  Oklahoma Firefighters Has Vigorously Represented The Class And Will Continue To Do So ........................................... 10

            c.  Oklahoma Firefighters Has Selected Experienced and Qualified Class Counsel In Bernstein Litowitz ........................ 12

        5.  Ascertainability Is Established ..................................................... 13

    B.  The Proposed Class Satisfies Rule 23(b)(3) .......................................... 13

        1.  Common Questions of Law and Fact Predominate ............................. 13

            a.  The *Affiliated Ute* Presumption Applies .................................. 14

            b.  The Fraud-On-The-Market Presumption Applies ........................ 16

                i.  High Weekly Trading Volume (*Cammer* Factor 1) .......... 17

                ii.  Significant Analyst Coverage (*Cammer* Factor 2) ............ 17

iii.    Market Maker/Arbitrage Activity (*Cammer* Factor 3) .................................................................... 18

iv.    S-3 Registration Eligibility (*Cammer* Factor 4)................ 18

v.    Reaction Of Stock To New Company-Specific Information (*Cammer* Factor 5)........................................... 18

vi.    Market Capitalization (*Krogman* Factor 1)....................... 19

vii.    Small Bid-Ask Spread (*Krogman* Factor 2)..................... 20

viii.    Large Public Float (*Krogman* Factor 3)........................... 20

ix.    Additional Factors Confirming Market Efficiency........... 20

x.    Put-Call Parity for Twitter Options................................... 22

c.    Damages Will Be Calculated Using a Common Methodology That Is Consistent with the Class-Wide Theory of Liability ...................................................................... 23

2.    A Class Action Is Superior To Other Available Methods ........................ 24

C.    Lead Counsel Should Be Appointed Class Counsel ............................................. 24

IV.    CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ...............................................................................................13

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972)................................................................................2, 14, 15, 23

*In re Allergan PLC Sec. Litig.,*
    2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)................................................ *passim*

*In re Allergan, Inc. Proxy Violation Sec. Litig.,*
    No. 14-cv-02004 (C.D. Cal. Mar. 19, 2018), ECF No. 638......................................12

*In re Alstom SA Sec. Litig.,*
    253 F.R.D. 266 (S.D.N.Y. 2008) ...............................................................................8

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013)............................................................................... *passim*

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA") Litig.,*
    281 F.R.D. 134 (S.D.N.Y. 2012) ...............................................................................9

*In re Barrick Gold Sec. Litig.,*
    314 F.R.D. 91 (S.D.N.Y. 2016) ...............................................................3, 9, 13, 16

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................................2, 16

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) .....................................................17, 18, 19, 20

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) ..........................................................................21, 22

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,*
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..........................................................1

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,*
    2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)...........................................................7

*Comcast v. Behrend,*
    569 U.S. 27 (2013).................................................................................................23

iii

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................................22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).............................................................................................14, 16

*Erickson v. Jernigan Cap., Inc.*,
    692 F. Supp. 3d 114 (S.D.N.Y. 2023), *leave to appeal denied*, 2024 WL 748759 (2d
    Cir. 2024) ............................................................................................................2, 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).........................................................................................10

*In re Glob. Brokerage, Inc.*,
    2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) ..........................................................17

*Gruber v. Gilbertson*,
    2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019), *modified*, 2021 WL 3524089
    (S.D.N.Y. Aug. 10, 2021) ..................................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).............................................................................................16, 17

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
    338 F.R.D. 205 (S.D.N.Y. 2021) ..........................................................................14, 15

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................17, 19, 20

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ...............................................................................9, 11

*Martinek v. AmTrust Fin. Servs., Inc.*,
    2022 WL 326320 (S.D.N.Y. Feb. 3, 2022).......................................................13, 18, 19, 20

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).........................................................................20

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) ................................................................................18

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ..................................................................9

*In re Novo Nordisk Sec. Litig.*,
    No. 17-cv-00209 (D.N.J. Jan. 11, 2017), ECF No. 311-3 ......................................12

*Okla. Firefighters Pension & Ret. Sys. v. Musk*,
  2025 WL 951231 (S.D.N.Y. Mar. 28, 2025) ...........................................................14, 15

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  No. 20-cv-00201 (N.D. Tex. Jan. 28, 2025), ECF No. 156 .....................................12

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017).........................................................................................16

*Puddu v. NYGG (Asia) Ltd.*,
  2022 WL 2304248 (S.D.N.Y. June 27, 2022) ........................................8, 9, 14, 15

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015).........................................................................................23

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*,
  2019 WL 7020349 (S.D. Tex. Dec. 20, 2019)...........................................................20

*San Antonio Fire & Police Pension Fund v. Dole Food Co.*,
  No. 15-cv-1140 (D. Del. Nov. 15, 2021), ECF No. 110.........................................13

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ............................................... *passim*

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................................20

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ................................................................................25

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  546 F.3d 196 (2d Cir. 2008).........................................................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).........................................................................................................7

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  333 F.R.D. 39 (S.D.N.Y. 2019) ..................................................................................21

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).........................................................................................13

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)....................................................................................14, 19

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) ...................................................16

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ..............................17, 20

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
    2015 WL 1311073 (S.D.N.Y. Mar. 23, 2015) .....................................11

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .........................................................10

**STATUTES, RULES & OTHER AUTHORITIES**

Securities Exchange Act of 1934:

    § 10(b), 15 U.S.C. § 78j(b) ..............................................1, 3, 12, 22

    § 13, 15 U.S.C. § 78m ...............................................................4

    § 20(a), 15 U.S.C. § 78t(a) ......................................................1, 8

    15 U.S.C. § 78u-4 ......................................................................11

Federal Rule of Civil Procedure 23 ..................................................... *passim*

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995
    U.S.C.C.A.N. 730 ....................................................................12

Securities and Exchange Commission Rule,

    17 CFR § 240.10b-5 ...................................................................13

    17 CFR § 240.13d-1 ........................................................8, 9, 14, 15

    17 CFR 242.203(c)(6) ..................................................................21

## GLOSSARY OF CITATION CONVENTIONS

| Term | Definition |
|---|---|
| Amended Complaint or ¶__ | The First Amended Complaint filed at ECF No. 99, *Rasella v. Musk*, 1:22-cv-03026-ALC-GWG (S.D.N.Y.). Partially unsealed per the Court's May 20, 2024 Order. *See* ECF No. 95. |
| Advisor A | Managing Director at Morgan Stanley and "the lead on all things at MS [Morgan Stanley] related to Elon." ¶41. On May 20, 2024, the Court sealed the identity of Advisor A. ECF No. 95. For ease of reference in this public filing, Plaintiff refers to this individual as "Advisor A." |
| Bernstein Litowitz, BLB&G, or Lead Counsel | Bernstein Litowitz Berger & Grossmann LLP, Court-appointed Lead Counsel and proposed Class Counsel. |
| Birchall | Jared Birchall. Musk's "right hand man," including as Musk's wealth manager and managing director of Musk's family office, Excession. ¶¶36-39. Birchall has power of attorney over the Trust, which is also a named Defendant. ¶36. |
| Class Period | March 25, 2022 - April 4, 2022, inclusive. |
| Defendants | Defendants Elon Musk, Elon Musk Revocable Trust dated July 22, 2003, Jared Birchall, and Excession LLC. |
| Excession | Excession LLC. Excession is "Musk's family office" and "responsible for a range of wealth and investment management activities" on behalf of Musk. ¶35. |
| Exchange Act | Securities and Exchange Act of 1934, 15 U.S.C. §78a, *et seq.* |
| Ex. __ | Exhibits to the Declaration of Katherine M. Sinderson in Support of Lead Plaintiff's Motion for Class Certification. |
| Sinderson Decl. | Declaration of Katherine M. Sinderson in Support of Lead Plaintiff's Motion for Class Certification. |
| Plaintiff or Oklahoma Firefighters | Oklahoma Firefighters Pension & Retirement System. ¶31. |

| Term | Definition |
|---|---|
| Musk | Elon Musk, including the Elon Musk Revocable Trust dated July 22, 2003 and Excession LLC. ¶¶32-35. |
| Proposed Class | All persons or entities who sold Twitter common stock and/or call options and/or purchased put options between March 25, 2022 and April 4, 2022, inclusive (the "Class Period") and were damaged thereby (the "Class"). |
| | Excluded from the Class are Defendants; officers and directors of Defendant Excession LLC and Defendant Elon Musk Revocable Trust Dated July 22, 2003; Twitter, Inc. ("Twitter") and its subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which Defendants have a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity. |
| Rule 10b–5 | SEC Rule 10b–5, 17 C.F.R. §240.10b–5. |
| SEC | U.S. Securities and Exchange Commission. |
| SEC Investigation | The SEC's ongoing investigation into Musk's refusal to timely disclose his interests in Twitter. The SEC Investigation was launched on April 4, 2022—the same day that Musk filed his misleading Schedule 13G. ¶¶179-84, 192. |
| §10(b) or Section 10(b) | §10(b) of the Exchange Act, 15 U.S.C. §78j(b). |
| §20(a) or Section 20(a) | §20(a) of the Exchange Act, 15 U.S.C. §78t(a). |
| Trust | Elon Musk Revocable Trust dated July 22, 2003. Musk is the beneficial owner of the Trust, which is also a named defendant. ¶34. |
| Twitter | Relevant nonparty Twitter Inc., which Musk now owns. ¶40. |

Court-appointed Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff" or "Oklahoma Firefighters") respectfully submits this memorandum of law in support of its motion to (i) appoint Plaintiff as Class Representative, (ii) appoint Bernstein Litowitz as Class Counsel, and (iii) certify the following Class: "All persons or entities who sold Twitter common stock and/or call options and/or purchased put options between March 25, 2022 and April 4, 2022, inclusive (the "Class Period") and were damaged thereby."[1]

## I.    PRELIMINARY STATEMENT

This action, like most "securities fraud suit[s]," is "particularly well suited to class treatment." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *1 (S.D.N.Y. Sept. 8, 2021); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) ("Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification.").[2] "The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions." *Chicago Bridge,* 2020 WL 1329354, at *2. The Proposed Class should be certified here.

The Proposed Class satisfies Rule 23's numerosity and commonality requirements. It is composed of thousands of investors whose claims are all based on Defendants' class-wide scheme to deceive investors concerning Elon Musk's ownership and activist interests in Twitter. Rule 23's typicality requirement is also satisfied. Plaintiff, like all other Class members, suffered damages

---

[1] The Proposed Class excludes Defendants, officers and directors of Defendant Excession LLC and Defendant Elon Musk Revocable Trust Dated July 22, 2003, Twitter and its subsidiaries and affiliates, any person who is or was an officer or director of Twitter during the Class Period, any entity in which Defendants have a controlling interest, and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

[2] Unless noted, all emphasis is added, and internal citations and quotations are omitted. "Ex. __" references exhibits attached to the Declaration of Katherine M. Sinderson, filed herewith.

by being cheated out of the true value of its Twitter securities by trading at prices that were artificially deflated by Defendants' scheme and material misrepresentations, which became clear only after Musk's massive ownership stake and activist interest in Twitter were fully disclosed.

Plaintiff also satisfies Rule 23's adequacy requirement. Plaintiff: (i) understands its fiduciary duties to the Class, has actively prosecuted this case, and will continue to act in the best interests of all Class members (Ex. B at ¶4); (ii) has retained adequate counsel who have pursued this action zealously for three years—winning several important victories—and who possess the requisite experience and resources to prosecute this case as a class action through trial and any appeal (Ex. C); and (iii) has no conflicts with other Class members.

This action also satisfies Rule 23(b)(3)'s predominance requirement. Numerous common issues of fact and law are subject to common proof and predominate over any individual issues. Class-wide reliance is presumed under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims arise primarily from Defendants' scheme to hide Musk's massive ownership stake and activist interest in Twitter from investors. The Class is also entitled to the fraud-on-the-market presumption of reliance because Twitter securities traded in efficient markets. *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988); *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013). Here, as financial economics expert Dr. Joseph R. Mason demonstrates in his report, Twitter securities traded in efficient markets throughout the Class Period, and damages can be calculated based on a class-wide methodology that is consistent with Plaintiff's theory of liability. Ex. A at ¶¶1, 31, 107. Courts regularly endorse the same "out of pocket" damages methodology Dr. Mason offers here. *E.g., Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 130-31 (S.D.N.Y. 2023), *leave to appeal denied,* 2024 WL 748759 (2d Cir. 2024) (out-of-pocket damages considered "typical measure of damages" in sellers case); *see also*

*In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) ("Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages."); *Gruber v. Gilbertson*, 2019 WL 4439415, at *1, 8 (S.D.N.Y. Sept. 17, 2019), *modified*, 2021 WL 3524089 (S.D.N.Y. Aug. 10, 2021) (endorsing plaintiffs' damages model that measures "inflated price minus actual price" arising from a "multi-faceted scheme" where defendants "conceal[ed] that they had amassed large equity stakes in the [c]ompany" and rejecting argument that "[p]laintiffs' damages theory fails to measure damages attributable to their theory of liability").

Finally, the class action device is also the superior means of litigating Class members' claims. A class action is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and is least taxing on judicial resources. *See* Fed R. Civ. P. 23(b)(3). For the reasons herein, Plaintiff respectfully requests that the Court grant its Motion.

## II.    SUMMARY OF ALLEGATIONS COMMON TO THE CLASS

### A.    Defendants' Scheme To Defraud Investors

In January 2022, Defendants devised a scheme for Elon Musk to secretly acquire a massive activist interest in Twitter. ¶¶82-87, 111, 153, 170, 175, 200-02, tbl. 3. Together with Advisor A from Morgan Stanley, Defendants crafted an elaborate trading strategy designed to "***get in under the radar***" and "***not press the price***" of Twitter stock. ¶¶67, 87, 92-110, 216, 253. To help Musk buy as much stock as possible at the lowest prices, Defendants had Advisor A keep Musk's purchases secret to ensure that "***No one knows what is going on and why***." ¶¶87-89, 99-110. Musk later testified to the SEC that he "wanted to avoid as long as possible" making his Twitter interest public. ¶¶82, 99.

On January 31, 2022, Defendants began secretly acquiring Twitter stock. ¶¶91-98, 107, 174, tbls. 1 & 2. Ultimately, Musk spent over $2.6 billion in funds earmarked to covertly acquire million shares of Twitter at substantially discounted prices through the end of the Class Period on

April 4, 2022. ¶¶82, 91 tbl. 1. As part of this scheme, Advisor A kept Defendants apprised through daily (and often hourly) trading updates concerning Musk's purchases, including the "***Money Saved***" by hiding these trades from the market. ¶¶89-110, 112-25, 133, 142, 216, 253.

Musk and Birchall were both aware that, once Musk reached a 5% ownership interest in Twitter, he was required under Section 13 of the Exchange Act to disclose his interest on a Schedule 13D Form within 10 days. ¶¶58, 63-72, 78-79, 83-136. Musk did not want to do so, as he knew that filing this mandated disclosure "would definitely generate press" and "***there was a good chance that the price of Twitter might go up***." ¶¶67, 145-46, 211, 225. Birchall testified in the SEC Investigation that "five percent meant something . . . ***we knew that that would trigger something where at some point we would have to disclose something***." ¶¶74, 79, 129, 210; *see also* ¶¶75-77, 129, 211 (Musk's 2018 deposition testimony that "U.S. reporting requirements start at 5 percent").

As Musk approached the 5% ownership threshold, Advisor A warned Birchall about the critical milestone. ¶¶112-29, 213-14, 254. Advisor A wrote that "we should figure [out] ***how close we want to get to 5%*** but not exceed, unless.. you want to exceed." ¶¶113, 213. Advisor A also implored Birchall to retain counsel, stating: "[y]ou'll want to have your counsel confirm the reading of the rule" (¶¶119, 213), and "***[h]ave counsel confirm timing of [Section 13] filing*** around recent / future statements. Can discuss offline" (¶121). Advisor A even expressly inserted into his emails to Birchall bright red warnings that Morgan Stanley advisors "***do not provide tax or legal advice***," which Advisor A testified were "to make sure that it was very clear to [Birchall] . . . that this is a topic that ***required*** him to seek ***advice from counsel***." ¶¶115-17, 123-28.

To soothe these concerns, Birchall falsely assured Advisor A that Defendants' refusal to make Musk's required public disclosure ***had*** been blessed by counsel. ¶¶82-83, 111-29, 213-14,

254. But Musk's and Birchall's testimony in the SEC Investigation and discovery confirm that Defendants refused to retain counsel until they had built Musk's secret position in Twitter, spent the money allocated, and Defendants' scheme was completed. ¶¶111, 126-28, 153, 170, 182.

On or around March 7, 2022, Defendants ordered Advisor A to "continue moving forward with [] passing the five percent." ¶¶83, 90, 130-33. On March 14, 2022, Musk's Twitter holdings crossed the 5% threshold, which triggered his obligation to disclose his ownership and activist interests within 10 days by filing a Schedule 13D form. ¶¶112, 125, 137-40, 179, 214, 219.

The Class Period starts on March 25, 2022—the first day after Defendants violated their disclosure obligations regarding Musk's ownership and activist interests in Twitter. ¶141, tbl. 3. Over the next ten days, Musk continued to secretly amass over 13 million additional Twitter shares. ¶¶141-46, 174-75, tbl. 3. Defendants' refusal to disclose Musk's interests artificially deflated the prices of Twitter's stock, which allowed Musk to secretly maximize his ownership stake during the Class Period and saved him over $200 million. ¶¶83-96, 141-46, 157, 159, 174-75. Investors who sold during the Class Period were cheated out of the true value of those securities. ¶¶146-47.

While Defendants hid Musk's purchases of Twitter stock during the Class Period, Musk's inner circle grew concerned that the market was "gonna figure something out" and uncover Defendants' scheme. ¶¶148-54. Amidst those concerns, Musk issued misleading tweets, falsely stating that he was "giving serious thought" to "building a new social media platform"—while concealing that he had actually amassed a $2 billion position in Twitter. ¶¶83, 86, 148, 155-67.

But far from "giving serious thought" to creating a rival "social media platform," Musk held secret meetings with Twitter's leaders concerning his ownership and activist intentions for the Company. ¶¶166-73, 191, 216-22, 233, tbl. 3. At these meetings, Musk discussed "joining the Twitter Board," Musk's "significant stake of more than five percent" in the Company, and that

Musk was also "considering the possibility of taking Twitter private." ¶¶168-69, 220, 233, tbl. 3. On April 3, 2022, Twitter offered Musk a Board position, which Musk accepted the next day. ¶¶171, 176-78, tbl. 3.

## B.    The Truth Is Revealed

Recognizing that Defendants' undisclosed buying spree would soon come to light once Musk joined Twitter's Board, Advisor A and Birchall strategized on how to manufacture "plausible den[iability]" concerning Defendants' scheme. ¶177. Musk and Birchall authorized filing a Schedule 13G (the form reserved for passive investors) on April 4, 2022 that disclosed Musk's 9.2% ownership of Twitter. ¶¶179, 185, 232, 235, tbl. 3. But the Schedule 13G falsely represented to investors that Musk was merely a "passive" investor, disclosed nothing about Musk joining Twitter's Board, and misleadingly deleted a required certification that Musk had no intent to "influenc[e] the control" of Twitter, replacing it with "Not Applicable." ¶¶69-72, 179-86, 218, 232-33, tbl. 3. The SEC immediately commenced an investigation into Defendants' misleading filing. ¶¶184, 192. Before the markets opened on April 5, Twitter announced that Musk had agreed to join its Board. ¶¶187-90, tbl. 3. With the full truth out, Defendants' attorneys filed the requisite Schedule 13D form disclosing Musk's ownership stake and activist interest. ¶¶187-90, 262, tbl. 3.

In response, Twitter's stock price shot up by more than 27% to close at $49.97 per share on April 4, 2022. ¶¶185, 188, 235. Twitter's stock price again increased on April 5, 2022—spiking to $54.57 per share before closing at $50.98 per share—and continued to react positively on April 6, 2022. ¶188, 235. Investors who sold Twitter stock or traded its other securities during the Class Period were fraudulently deprived of enormous value for their securities. ¶¶146-47, 234-36.

## C.    Procedural History

The Amended Complaint (ECF No. 73) was filed on May 1, 2024 and incorporates discovery produced after the Court sustained Plaintiff's original Complaint on September 29, 2023

(ECF No. 49). On March 28, 2025, the Court largely sustained Plaintiff's Amended Complaint, including with respect to Plaintiff's scheme liability claims and misstatement claims. ECF No. 118 at 42. Discovery resumed thereafter.

## III.    ARGUMENT

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). "The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23," *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *2 (S.D.N.Y. Aug. 22, 2017), and courts in this district recognize that "securities fraud suit[s]" are "particularly well suited to class treatment," *Allergan*, 2021 WL 4077942, at *1.

To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3). *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *7 (S.D.N.Y. July 10, 2019). As the Supreme Court has explained, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage"; the question is whether the Rule 23 requirements are met, not whether Plaintiff will ultimately prevail. *Amgen*, 568 U.S. at 465-66. Each Rule 23 requirement is satisfied here.

### A.    The Proposed Class Satisfies Rule 23(a)

#### 1.    Numerosity Is Established

Rule 23(a)(1)'s numerosity requirement is presumed for classes larger than 40 members and, in securities class actions, numerosity is shown where a large number of shares is outstanding and traded during the relevant period. *See Allergan*, 2021 WL 4077942, at *6; *Signet*, 2019 WL 3001084, at *8. Twitter had more than 800 million shares of common stock outstanding in its

public float and an average weekly trading volume of approximately 337.6 million Twitter shares during the Class Period. *See* Ex. A at ¶37. The numerosity requirement is readily satisfied.

### 2.    Commonality Is Established

Commonality exists when "common issues of law or fact affect all class members." *Signet*, 2019 WL 3001084, at *8. In securities cases, commonality is satisfied where "plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *Allergan*, 2021 WL 4077942, at *6; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008) (same).

There are multiple common questions of law and fact, including: (i) whether Musk's statements were materially misleading when made; (ii) whether Defendants engaged in a scheme to deceive Twitter investors; (iii) whether Defendants acted with scienter; (iv) whether the prices of Twitter securities were artificially depressed during the Class Period due to Defendants' scheme and misstatements; (v) whether Defendants' scheme and Musk's misrepresentations caused Class members to suffer economic losses when the truth was revealed; and (vi) whether Musk and Birchall were "control persons" within the meaning of Section 20(a) of the Exchange Act.

Courts routinely certify classes involving these kinds of common questions. *See Signet*, 2019 WL 3001084, at *8 ("This case—as is typical of most securities fraud putative class actions—raises common questions of law and fact."); *Puddu v. NYGG (Asia) Ltd.,* 2022 WL 2304248, at *5 (S.D.N.Y. June 27, 2022) (claims arising from alleged Rule 13 violation "present a number of questions of law and fact common to all class members"); *Gruber*, 2019 WL 4439415, at *3 (plaintiffs satisfied "low hurdle" of commonality "because the class proceeding will generate common answers to several key questions," including "whether defendants engaged in deceptive conduct" and "whether there was scienter" underlying Rule 13 violation).

### 3. Typicality Is Established

The typicality requirement "is satisfied when each class member's claim arises from the same course of events" and "each class member makes similar legal arguments to prove the defendant's liability." *Barrick*, 314 F.R.D. at 98. This does not require the class members' claims to be identical; rather, the plaintiff must show that the claims are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence, and that the claims of the potential class members share a common question of law or of fact." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008).

Here, Plaintiff sold Twitter stock during the Class Period at artificially deflated prices due to Defendants' scheme and misrepresentations. ECF No. 10-1 at 4. Plaintiff's claims arise from the same course of conduct that gives rise to other Class members' claims, are based on the same legal theory, and will be proven by the same set of operative facts. *See In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *5 (D.N.J. Jan. 30, 2013) (stock purchasers "easily met" the typicality requirement for a class that included option buyers and sellers). Thus, the typicality requirement is satisfied. *See Puddu*, 2022 WL 2304248 at *3 ("The plaintiffs' claims are also typical of those of the class, as the class's claims all derive from the same alleged omissions of material fact."); *Gruber*, 2019 WL 4439415, at *3 (finding plaintiff's claims typical because "they all arise from the same fraudulent scheme"); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA") Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

### 4. Adequacy Is Established

To satisfy the adequacy requirement, the proposed class representative must "fairly and adequately protect the interests of the class." *Signet*, 2019 WL 3001084, at *9. The adequacy requirement "seeks to ensure that Plaintiff's interests are not antagonistic to those of the Class and that Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Id.* "The

focus is on uncovering conflicts of interest between named parties and the class they seek to represent. In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Plaintiff satisfies each facet of the adequacy inquiry, as discussed below.

### a. Oklahoma Firefighters Is Aligned With The Class And Not Subject To Unique Defenses

Plaintiff satisfies the adequacy requirement because it "suffer[ed] the same injury as the class members" because of Defendants' scheme and material misrepresentations, and thus "possess[es] the same interest" in obtaining the best possible recovery as other Class members. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003). Like all Class members, Plaintiff transacted in Twitter securities at artificially deflated prices during the Class Period and was injured by Defendants' fraudulent misconduct when the artificial deflation was removed after the truth was revealed. ¶¶31, 234-36. No disqualifying conflicts exist between Plaintiff and the Class. As demonstrated by the accompanying Declaration of Chase Rankin, Oklahoma Firefighters' Executive Director, Oklahoma Firefighters has provided excellent representation to the Class and is committed to obtaining the best possible recovery for the Class. *See* Ex. B at ¶4. As noted above, Oklahoma Firefighters' transactions in Twitter securities during the Class Period are also typical of other Class members, and do not give rise to any defenses unique to Oklahoma Firefighters.

### b. Oklahoma Firefighters Has Vigorously Represented The Class And Will Continue To Do So

Plaintiff has vigorously prosecuted this action on behalf of the Class and will continue doing so. Plaintiff fully understands its duties and responsibilities as Class Representative and has amply demonstrated its adequacy to lead this case. *See* Ex. B at ¶3.

Among other things, Oklahoma Firefighters has demonstrated its adequacy to represent the Class by retaining and overseeing experienced counsel, filing two detailed amended complaints advancing detailed allegations of violations of the federal securities laws, opposing Defendants' two rounds of motions to dismiss and achieving significant success in doing so each time, propounding and responding to discovery requests, engaging in extensive negotiations concerning discovery, litigating a letter-motion to compel relevant evidence, and filing this motion for class certification. *Id.* Plaintiff will continue to actively participate in and supervise the litigation through trial, including by receiving and reviewing periodic updates and other correspondence from counsel and participating in discussions with counsel regarding the litigation. *Id.* Thus, Plaintiff readily fulfills the adequacy requirement. *See Lapin*, 254 F.R.D. at 176 (rejecting adequacy challenge where "Plaintiff has demonstrated that he is familiar with the facts and legal theories underlying the case, is in regular contact with his lawyers, has met with them, has reviewed the complaint and other case documents, and understands that he is responsible for making decisions that impact the class and representing the class's best interests").

Moreover, as the Court recognized in appointing it as Lead Plaintiff, Oklahoma Firefighters is precisely the type of plaintiff favored by Congress to lead securities class actions under the PSLRA. ECF No. 23 at 9-11 ("Oklahoma Firefighters possess the resources and capabilities necessary to litigate the instant case"); *see also Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2015 WL 1311073, at *4 (S.D.N.Y. Mar. 23, 2015) ("[M]any courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs."); H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess., at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake."). Oklahoma Firefighters

is an experienced institutional investor and has achieved notable success for investors in other cases. *See In re Novo Nordisk Sec. Litig.*, No. 17-cv-00209 (D.N.J. Jan. 11, 2017), ECF No. 311-3 ($100 million recovery for investors); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, No. 20-cv-00201 (N.D. Tex. Jan. 28, 2025), ECF No. 156 ($40 million recovery for investors).

### c.    Oklahoma Firefighters Has Selected Experienced and Qualified Class Counsel In Bernstein Litowitz

Proposed Class Counsel Bernstein Litowitz (which has been serving as Lead Counsel to date) is "qualified, experienced, and able to conduct the litigation." *Erickson*, 692 F. Supp. 3d at 127. Bernstein Litowitz has extensive experience and success in prosecuting securities litigation and, indeed, is one of the preeminent law firms in the country representing investors in securities class actions. *See* Sinderson Decl. at ¶3; Ex. C. Lead Counsel has a proven track record of success in complex cases such as this one and has successfully prosecuted high-profile securities-fraud class actions across the country, including in this District, recovering billions of dollars on behalf of injured investors. *See id.*; Ex. C at 8-17.

Lead Counsel is also one of the few law firms with experience in successfully prosecuting claims under Section 10(b) of the Exchange Act on behalf of investors who were harmed by selling (rather than purchasing) a company's stock at prices that were artificially depressed (rather than inflated) by violations of the federal securities laws. *See, e.g., In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 14-cv-02004 (C.D. Cal. Mar. 19, 2018), ECF No. 638 (recovering $250 million on behalf of sellers of Allergan stock); *San Antonio Fire & Police Pension Fund v. Dole Food Co.*, No. 15-cv-1140 (D. Del. Nov. 15, 2021), ECF No. 110 (recovering $74 million on behalf of sellers of Dole stock). Consistent with its track record, Lead Counsel has vigorously prosecuted the Class's claims to date and will continue to do so. *See* Sinderson Decl. ¶4.

### 5.    Ascertainability Is Established

In addition to Rule 23(a)'s requirements, the Second Circuit "also recognizes an implicit 'ascertainability' requirement, which commands that the proposed class be 'defined using objective criteria that establish a membership with definite boundaries.'" *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022). This requirement is readily met in securities class actions, where class "membership is based on objective, definite criteria"—here, the dates of shareholders' transactions of Twitter common stock. *Barrick*, 314 F.R.D. at 104; *see also Signet*, 2019 WL 3001084, at *9 (class definition "clearly delineates the Class's boundaries"). Ascertainability is satisfied.

### B.    The Proposed Class Satisfies Rule 23(b)(3)

In addition to satisfying Rule 23(a), the Proposed Class also satisfies Rule 23(b)(3), which requires that (i) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Allergan*, 2021 WL 4077942, at *5. The Supreme Court has held that only the "essential element[s]" of a Rule 10b–5 claim need be subject to common proof. *Amgen,* 568 U.S. at 460, 468-69, 475. Thus, "[p]redominance is a test readily met" in securities-fraud cases. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 90 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (same).

### 1.    Common Questions of Law and Fact Predominate

Here, common questions of law and fact predominate over individual questions. "[T]he Supreme Court has noted that the predominance requirement is a test readily met in certain cases alleging . . . securities fraud." *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent.*

13

*Holdings, Inc.*, 338 F.R.D. 205, 214 (S.D.N.Y. 2021). Issues of "falsity," "materiality," and "loss causation" are all common questions of law and fact and, accordingly, support class certification. *Amgen*, 568 U.S. at 461-62, 474-75; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811-12 (2011) ("*Halliburton I*"); *Puddu*, 2022 WL 2304248, at *3 (in a Rule 13d-related case, "elements such as materiality, loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified").

Finally, the element of "reliance" also raises "common questions" in this case and supports class certification. Here, reliance is established under each of the two primary theories of reliance in securities cases, as detailed below.

### a.    The *Affiliated Ute* Presumption Applies

The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Defendants' scheme arises from their illegal concealment of Musk's interests in Twitter. *Gruber,* 2019 WL 4439415, at *6 ("*Affiliated Ute* presumption applies only where there is an omission of a material fact by one with a duty to disclose.").

Under *Affiliated Ute*, "positive proof of reliance is not a prerequisite to recovery." *Id.*; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017). As this Court held, "plaintiffs need not demonstrate affirmative proof of reliance in securities fraud cases 'involving primarily a failure to disclose' if the 'facts withheld [were] material in the sense that a reasonable investor might have considered them important in the making of this decision.'" *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 2025 WL 951231, at *14 (S.D.N.Y. Mar. 28, 2025) (quoting *Affiliated Ute*); *id.* at *12 ("Defendants point out Plaintiff relies primarily on Defendants' failure to disclose Musk's ownership stake in Twitter"); *see also Puddu*, 2022 WL 2304248, at *3 ("when a securities

14

fraud claim is premised on an omission rather than a false statement, reliance on the omission can be presumed from its materiality").[3]

Materiality—and, by extension, the *Affiliated Ute* presumption of reliance—is readily established here. Defendants knew that disclosure of Musk's interests in Twitter was material to investors, which is why they kept it secret. Defendants also knew that disclosure of Musk's interests would cause Twitter's stock price to rapidly increase, which is exactly what happened. The fact that Twitter's stock price spiked dramatically as Musk's ownership stake and activist interests were revealed confirms beyond question that the information that Defendants concealed was highly material. Plaintiff has therefore sufficiently established materiality. *Puddu*, 2022 WL 2304248, at *4 (applying *Affiliated Ute* presumption where defendants "fail[ed] to disclose [individual defendant's] relationship with [company]"—including concealing his secret ownership stake and "significant influence over the company's operations" in violation of Rule 13—because "[t]hese omissions are material").

Further and in any event, for purposes of class certification, the Supreme Court has definitively ruled that proof of materiality is not required because it is a common question. *Amgen*, 568 U.S. at 467-68 (ruling that materiality is a "common question for purposes of Rule 23(b)(3)" as a matter of law). "Consequently, proof of materiality is not required to establish that a proposed class is 'sufficiently cohesive to warrant adjudication by representation—the focus of the predominance inquiry under Rule 23(b)(3).'" *Id.*

---

[3] In any event, the *Affiliated Ute* presumption still applies when a complaint alleges both misstatements and omissions. *See Hawaii Structural Ironworkers*, 338 F.R.D. at 216 (collecting cases).

**b.      The Fraud-On-The-Market Presumption Applies**

Plaintiff and the Class are also entitled to the fraud-on-the-market presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). That presumption is based on the well-founded principle that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). When the "fraud-on-the-market" presumption applies, investors do not need to demonstrate individual reliance. *Halliburton I*, 563 U.S. at 811; *see also Barrick*, 314 F.R.D. at 101 (presumption "obviate[s] the need to prove reliance on an individual basis"). The Supreme Court acknowledged *Basic's* relevance for sellers cases: "it is hard to imagine that there ever is a buyer ***or seller*** who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 245.

As summarized below and in the report of Plaintiff's expert economist, Dr. Joseph Mason, the relevant factors demonstrate that the market for Twitter securities was efficient during the Class Period (March 25, 2022 through April 4, 2022, inclusive) as well as for a two year "Extended Period" that covers and includes the Class Period (March 23, 2020 through April 5, 2022, inclusive). Dr. Mason conservatively analyzed the Extended Period in addition to the Class Period because "small sample sizes may limit statistical power, meaning that only very large-impact events will be detectable." *In re Petrobras Sec.*, 862 F.3d 250, 278-79 (2d Cir. 2017); *see also Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 136-38 (M.D. Tenn. 2020) (granting class certification and rejecting argument that "a longer period (that encompasses the class period) would not be more accurate statistically than a shorter one"); *see also* Ex. A at ¶¶34, 59.

To evaluate market efficiency, courts first consider whether the security at issue trades on a major national exchange. Here, Twitter common stock actively traded on the NYSE, a

presumptively efficient market. Ex. A at ¶30; *see also Halliburton II*, 573 U.S. at 268 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *15 (S.D.N.Y. Aug. 13, 2018) (finding NYSE "presumptively efficient"). Next, courts consider the five "*Cammer* factors" (*Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989)), as well as the "*Krogman* factors" (*Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)). As discussed *infra*, these factors show that the market for Twitter securities was efficient during the Class Period.

### i.    High Weekly Trading Volume (*Cammer* Factor 1)

Courts hold that weekly turnover—measured by average weekly trading—of greater than 1% justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286. Here, during the Class Period, an average of 44% of Twitter's outstanding shares traded. Ex. A at ¶37. Thus, Twitter's weekly trading volume justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286; *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *12 (S.D.N.Y. Mar. 18, 2021) (holding that an "average weekly trading volume of 1% justifies a 'substantial presumption'" of efficiency).

### ii.    Significant Analyst Coverage (*Cammer* Factor 2)

Courts hold that analyst coverage supports market efficiency because when a company's financial disclosures are "closely reviewed by investment professionals" who "make buy/sell recommendations to client investors," the market price fluctuations reflect the financial disclosures "as interpreted by the securities analysts." *Cammer*, 711 F. Supp. at 1286. Here, at least 37 securities analysts—employed by firms including Bank of America, Morgan Stanley, JPMorgan, UBS, Wells Fargo, Deutsche Bank, BMO Capital Markets, and Macquarie—published over 400 analyst reports on Twitter securities during the Extended Period, including over 8 analyst reports

during the Class Period, further demonstrating efficiency. Ex. A at ¶¶39-40; *see also Cammer*, 711 F. Supp. at 1284 n.30; *Allergan*, 2021 WL 4077942, at *10.

### iii. Market Maker/Arbitrage Activity (*Cammer* Factor 3)

Courts find that the existence of market makers supports market efficiency. Numerous market makers ensure that investors "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87; *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (same). Twitter had at least 84 market makers providing similar activity over the Class Period, and at least 97 market makers over the Extended Period. Ex. A at ¶90, tbl. 1. This supports the conclusion that investors were able to, and did, "react swiftly" to public information by trading in Twitter stock, driving price changes. *Cammer*, 711 F. Supp. at 1286-87; *Martinek*, 2022 WL 326320, at *12. This factor also supports a finding of efficiency.

### iv. S-3 Registration Eligibility (*Cammer* Factor 4)

A corporation's eligibility to use SEC Form S-3 "is an important factor weighing in favor" of efficiency, as it reflects the SEC's belief that the market operates efficiently for eligible companies, *i.e.*, all public information "has already been disseminated and accounted for by the market place." *Cammer*, 711 F. Supp. at 1284-85. Twitter was eligible to file a Form S-3 during the Class Period and the Extended Period, demonstrating that the stock traded in an efficient market. Ex. A at ¶¶50-52.

### v. Reaction Of Stock To New Company-Specific Information (*Cammer* Factor 5)

"[O]ne of the most convincing ways to demonstrate [market] efficiency [is] to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. An event study that "correlates the disclosures of

unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008). Although courts have held that this factor is not always required, it nevertheless supports a finding of efficiency here. *Waggoner*, 875 F.3d at 96-97 ("We conclude that direct evidence of price impact under *Cammer* 5 is not always necessary to establish market efficiency.").

Dr. Mason establishes a clear cause-and-effect relationship between new, Twitter-specific information and the Company's stock price, which demonstrates market efficiency. Ex. A at ¶¶53-55. Specifically, the event study by Dr. Mason provides compelling evidence of this causal relationship by examining Twitter stock-price reactions following "Release Days"—dates with earnings or guidance announcements—as compared to all other dates in the Extended Period, which covers and includes the Class Period. Ex. A at ¶¶56-64; *Martinek*, 2022 WL 326320, at *17-18. Dr. Mason's analysis revealed "statistically significant differences between Release Days and non-Release Days," which reinforces that Twitter's stock price reacted in an efficient manner to new information about the Company. Ex. A at ¶90, tbl. 1. Thus, as Dr. Mason explains, this factor also supports a finding of market efficiency.

### vi.    Market Capitalization (*Krogman* Factor 1)

Higher market capitalization also indicates efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Twitter's market capitalization throughout the two-year Extended Period—which includes the Class Period—exceeded $18 billion, with no less than 763.6 million shares outstanding on any trading day within the Extended Period. During the Class Period, Twitter's market capitalization exceeded $29.5 billion, with no less than 763.6 million shares outstanding on any trading day. Ex.

A at ¶75. This supports a finding of market efficiency. *Krogman*, 202 F.R.D. at 478; *see also Martinek*, 2022 WL 326320, at *13 (average market capitalization of $2.71 billion).

### vii.     Small Bid-Ask Spread (*Krogman* Factor 2)

"A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *13 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 317 (S.D.N.Y. 2016) ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient."); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (finding bid-ask spread of .27% was indicative of an efficient market). The daily bid-ask spread for Twitter stock averaged only 0.03% over the Extended Period and averaged 0.02% over the narrower Class Period, which Dr. Mason explains supports a finding of market efficiency during the Class Period (and the Extended Period). Ex. A at ¶¶80, 90, tbl. 1; *see also Martinek*, 2022 WL 326320, at *14.

### viii.    Large Public Float (*Krogman* Factor 3)

Courts also consider the size of an issuer's float (*i.e.*, shares outstanding not held by insiders) in assessing efficiency. *See, e.g., Wilson*, 2018 WL 3913115, at *15 (finding a public float of 82.41% "exceeds amounts other courts have deemed sufficient to suggest a finding of market efficiency"). Over the Class Period, Twitter's public float as a percentage of total shares of stock outstanding remained above 86.8 percent. Ex. A at ¶76.

### ix.     Additional Factors Confirming Market Efficiency

In addition to the *Cammer* and *Krogman* factors, some courts have considered the following factors in examining market efficiency: (i) institutional ownership, (ii) autocorrelation, and (iii) short-selling. These factors further reinforce the market efficiency of Twitter stock.

20

**Institutional Ownership**: A high level of institutional ownership of a company's stock supports the conclusion that the stock trades in an efficient market. Here, institutional investors owned at least 74.3 percent of publicly available Twitter stock during the Extended Period and at least 80.7 percent of publicly available Twitter stock during the Class Period, with an average of 88.9 percent institutional ownership throughout the Extended Period. Ex. A at ¶49.

**Absence of Autocorrelation**: Courts consider whether a security's price exhibits autocorrelation, which is when a security's historical price changes can predict future price changes. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54-55 (S.D.N.Y. 2019). Statistically significant autocorrelation "can be an indicator of market inefficiency." *Id.* at 55. Dr. Mason determined that the price returns of Twitter stock were not predictable based on historical levels during the Extended Period, which covers the Class Period and supports a finding of efficiency during the Class Period. *See* Ex. A at ¶83.

**Short-Selling**: The lack of constraints on short-selling further supports a finding of market efficiency. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 n.77 (S.D.N.Y. 2015). Regulators are routinely concerned with short-selling constraints arising from a "failure to deliver," in which "the seller fails to deliver securities to the buyer when delivery is due." Ex. A at ¶86. A security with persistent delivery failures involving a large number of shares—per SEC Rule 203(c)(6), "at least 0.5% of the issue's total shares outstanding"—may imply that short selling is constrained. The fact that there were no days in which Twitter's "failure to deliver" level even reached 0.5% indicates the lack of notable constraints on short-selling of Twitter stock, supporting efficiency. *See* Ex. A at ¶88 Chart 2 (showing that rate of failure was, at most, approximately 0.2% briefly during the Extended Period).

21

### x.    Put-Call Parity for Twitter Options

Because the "value" of Twitter options "are derivative instruments whose values are derived" from Twitter stock, "the factors . . . that support the efficiency" of Twitter stock "also support the efficiency" of Twitter options. *See* Ex. A at ¶94. To start, the Twitter options traded in the Chicago Board Options Exchange—the largest U.S. options exchange—during the Class Period, which supports a finding that Twitter options traded in an efficient market during the Class Period. *See* Ex. A at ¶96.

Dr. Mason analyzed the efficiency of the markets for Twitter options by testing the extent to which Twitter options demonstrate a "put-call parity." Ex. A at ¶¶97-100. Put-call parity is a measure of the alignment between the prices of an issuer's stock and options; satisfaction of the condition indicates that, if the market for the issuer's stock is efficient, the market for its options is as well. *See id.*; *Carpenters Pension*, 310 F.R.D. at 81; *see also In re Enron Corp. Sec. Derivative & ERISA Litig.,* 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006) ("[E]vidence applying the *Cammer/Unger/Bell* factors to the stock[] is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options.").

Such deviation from put-call parity "may indicate an impact of short-sale constraints," which in turn supports a finding that the market is not efficient. Ex. A at ¶101. Here, Dr. Mason analyzed deviations from put-call parity for each series of Twitter options that traded during the Class Period by using the analyses applied in two studies. As to the first study, Dr. Mason determined that the average put-call parity deviations for Twitter options was negative 0.8 percent during the Class Period, which was lower than the average put-call parity deviation for approximately 4.5 million pairs of all options between 1998 and 1999 (0.36 percent). Ex. A at ¶102. As to the second study, Dr. Mason determined that the average put-call parity deviations for Twitter options was negative 0.11 percent during the Class Period, and lower than the average put-

call parity deviation for approximately 80,000 pairs of options between July 1999 and November 2001 (0.30 percent). *Id.* at ¶104. That the put-call parity deviations for Twitter options during the Class Period were lower than the average deviations presented in the two studies supports a finding of market efficiency for Twitter options. *See id.* at ¶102.

*           *           *

In sum, the factors that courts commonly employ in evaluating market efficiency support the conclusion that Twitter's common stock and options traded in efficient markets during the Class Period. Thus, the Class is entitled to invoke the fraud-on-the-market presumption of reliance**.**

### c.    Damages Will Be Calculated Using a Common Methodology That Is Consistent with the Class-Wide Theory of Liability

Courts in this Circuit routinely find that determining damages is subject to a common methodology in securities cases because damages can be calculated on a class-wide basis using an event study that measures investors' out-of-pocket damages. *See Allergan*, 2021 WL 4077942, at *15 ("there is no reason why an event study - the generally accepted method for measuring damages in a securities fraud class action - cannot work in this case"); *id.* (finding lead plaintiff's out-of-pocket damages model for calculating damages satisfied its burden under *Comcast v. Behrend*, 569 U.S. 27 (2013)); *Signet*, 2019 WL 3001084, at *20 (accepting damages model using event study); *Gruber*, 2019 WL 4439415, at *8 (finding damages model based on inflated price minus actual price sufficient for class certification and rejecting argument that "[p]laintiffs' damages theory fails to measure damages attributable to their theory of liability"). The Supreme Court has endorsed this measure of damages in securities cases for five decades. *See, e.g., Affiliated Ute,* 406 U.S. at 155. While Rule 23 does not require "a finding that damages are capable of measurement on a classwide basis," *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 402 (2d Cir. 2015), Plaintiff has done so here, as its proposed model calculates class-wide damages by using an event

study to measure the amount of artificial deflation in Twitter stock on each day of the Class Period. Ex. A at ¶¶106-09.

### 2.    A Class Action Is Superior To Other Available Methods

Rule 23(b)(3) asks whether class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Courts have long recognized that class actions are a desirable means for resolving claims based on securities laws," and find superiority is easily established. *Allergan*, 2021 WL 4077942, at *17. "Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Gruber*, 2019 WL 4439415, at *9.

All of the factors courts consider in assessing superiority are satisfied here. *Allergan*, 2021 WL 4077942, at *16-17. *First*, the number of Class members—in the thousands—is too large, and the typical claim is generally too small, for each individual Class member to have an interest in maintaining a separate action. *Second*, Plaintiff is aware of no other action that seeks recovery under the federal securities laws for damages caused by Defendants' alleged scheme. *Third*, the geographical dispersion of the Class members makes it desirable to litigate Plaintiff's claims in this forum. *Fourth*, there are no management difficulties that would preclude this Action from being maintained as a class action. *See id.* at *16.

### C.    Lead Counsel Should Be Appointed Class Counsel

Plaintiff also respectfully requests that the Court appoint Lead Counsel as Class Counsel. In appointing Class Counsel, Rule 23(g) provides that the Court consider: (i) the work counsel has done; (ii) counsel's experience in handling, among other things, class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Lead Counsel amply satisfies the Rule 23(g) criteria. Under Plaintiff's supervision and direction, Lead Counsel has vigorously prosecuted this case, including by, among other things: analyzing, researching and investigating the securities law claims here; drafting two detailed complaints; successfully opposing Defendants' motions to dismiss in large part; conducting ongoing fact discovery, including serving document subpoenas to various non-parties who possess relevant information; responding to document requests from Defendants, producing documents in response and responding to Defendants' interrogatories; successfully litigating a letter-motion to compel; retaining and consulting with experts in economics and damages analysis; and assembling a dedicated and highly skilled team to prosecute the Action. *See* Sinderson Decl. ¶4. Lead Counsel has significant experience prosecuting complex securities class actions, deep knowledge of the applicable securities laws, and an exemplary record of success. *See* Ex. C. Indeed, Bernstein Litowitz has helped recover billions of dollars for investors in this District and is well equipped to prosecute this case. *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 147 (S.D.N.Y. 2019) ("In light of Bernstein Litowitz's substantial resources and experience in litigating securities class actions, and the conduct of the litigation to date, the Court concludes that Bernstein Litowitz satisfies Rule 23(g).").

## IV.    **CONCLUSION**

Plaintiff requests entry of an Order certifying this Action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as the Class Representative, and appointing Bernstein Litowitz as Class Counsel.

Dated: June 23, 2025

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
Salvatore J. Graziano
Katherine M. Sinderson
Jeremy P. Robinson
Jonathan G. D'Errico
Emily A. Tu
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
katie@blbglaw.com
jeremy@blbglaw.com
jonathan.derrico@blbglaw.com
emily.tu@blbglaw.com

*Counsel for Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System*

## <u>ATTORNEY CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)</u>

I, Katherine M. Sinderson, an attorney licensed to practice law in the State of New York, certify that the foregoing Memorandum of Law complies with the word-count limitations set forth in Local Rule 7.1(c) of this Court. According to the word count tool of the word-processing system used to prepare this Memorandum of Law, this Memorandum of Law contains 7,882 words, excluding the caption, table of contents, table of authorities, glossary of citation conventions, signature block, and this Certification.

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson
