# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,**

    **Plaintiff,**

**v.**

**ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL,**

    **Defendants.**

**CASE NO.**

**1:22-cv-03026-ALC-GWG**

---

**EXPERT REPORT OF**
**JOSEPH R. MASON, PhD**

**June 23, 2025**

---



**TABLE OF CONTENTS**

**Page**

I.    Introduction ...................................................................................................................... 1

II.   Credentials and Compensation .......................................................................................... 1

III.  Information Considered ..................................................................................................... 2

IV.   Summary of Opinions ........................................................................................................ 3

V.    Background ........................................................................................................................ 3

    A.    Twitter ....................................................................................................................... 3

    B.    Lead Plaintiff ............................................................................................................ 4

    C.    Defendants ................................................................................................................. 4

    D.    Summary of Plaintiff's Claims ................................................................................. 5

        1)    Alleged Misrepresentations, Omissions, and Deceptive Scheme ........................ 5

        2)    Alleged Curative Events .................................................................................... 7

VI.   Assessment of Market Efficiency for TWTR Stock ........................................................... 7

    A.    *Cammer* Factors ........................................................................................................ 10

        1)    *Cammer* Factor 1: Average Weekly Trading Volume ....................................... 10

        2)    *Cammer* Factor 2: Analyst Coverage ................................................................ 11

        3)    *Cammer* Factor 3: Existence of Market Makers/Institutional Investors and
             Arbitrageurs .................................................................................................... 13

        4)    *Cammer* Factor 4: Eligibility to File an S-3 Registration Statement .................... 14

        5)    *Cammer* Factor 5: Empirical Evidence of Cause-and-Effect Relationship
             Between Events and Stock Price Movements ..................................................... 15

    B.    Additional Indicators of Market Efficiency .......................................................... 21

        1)    Market Capitalization and Public Float .............................................................. 21

        2)    Bid-Ask Spread ................................................................................................ 22

        3)    Statistical Properties of Stock Returns (Autocorrelation) ................................... 22

        4)    Lack of Constraints on Short Selling ................................................................. 23

    C.    Conclusion of Market Efficiency for TWTR Stock ............................................... 25

VII.  Assessment of Market Efficiency for TWTR Options ....................................................... 26

    A.    Put-Call Parity Relationship ................................................................................. 27

        1)    Evans, *et al.* Put-Call Parity Approach .............................................................. 28

        2)    Ofek, *et al.* Put-Call Parity Approach ............................................................... 29

    B.    Conclusion of Market Efficiency for TWTR Options ............................................ 29

VIII. Measuring Damages to Shareholders on a Class-wide Basis ........................................... 30

    A.    Measuring Share Price Deflation Based on Curative Events ............................... 30

    B.    Calculating Share Price Deflation for TWTR Stock During the Class Period ........... 31

    C.    Calculating Price Inflation and Deflation for TWTR Options During the Class Period ...... 32

    D.    Calculation of Class Member Damages ................................................................. 33

IX.   Further Work ................................................................................................................... 34





7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 1150
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

Oklahoma Firefighters Pension and Retirement System v. Elon R. Musk, Elon Musk Revocable Trust Dated July 22, 2003, Excession LLC, and Jared Birchall (collectively, "Defendants"), United States District Court, Southern District of New York, No. 1:22-cv-03026-ALC-GWG

## I.     Introduction

1.     I have been retained on behalf of Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff" or "Plaintiff") who brings the above-captioned matter on behalf of individuals and entities who sold Twitter, Inc. ("Twitter" or the "Company") common stock ("TWTR Stock") and/or Twitter call options ("TWTR Call Options") and/or purchased Twitter put options ("TWTR Put Options" together with TWTR Call Options, the "TWTR Options," and together with the TWTR Call Options and TWTR Stock, the "TWTR Securities") between March 25, 2022 and April 4, 2022, inclusive (the "Class Period"), and who were damaged as a result of Defendants' alleged wrongful conduct (the "Proposed Class").  In connection with my retention, I have been asked to provide my expert opinion on whether the markets for TWTR Stock and TWTR Options were efficient during the Class Period.[1]  I have also been asked to provide my expert opinion on whether damages in this action can be calculated using a common methodology that can be applied on a class-wide basis to Plaintiff and all other members of the Proposed Class, and in a manner consistent with Plaintiff's theory of liability.

## II.     Credentials and Compensation

2.     I am a retired Professor of Finance and former Hermann Moyse, Jr./Louisiana Bankers Association Chair at the Ourso School of Business, Louisiana State University, and Fellow at the Wharton School, the University of Pennsylvania.  I was previously an Associated Professor (with tenure) at Drexel University and, before, that, Senior Financial Economist at the Office of the Comptroller of the Currency, an independent bureau of the U.S. Department of the Treasury.  I have held long-term visiting appointments at the Federal Reserve Bank of Philadelphia and the Federal Deposit Insurance Corporation.  I am also a Senior Advisor at BVA Group LLC ("BVA Group").  I hold a Ph.D. and a Master of Science in Economics from the University of Illinois at Urbana-Champaign.

3.     I routinely apply financial, economic, and statistical analyses to the valuation of financial instruments, portfolios, and businesses in academic research, complex litigation, and corporate strategic

---

[1]     First Amended Class Action Complaint for Violations of the Federal Securities Laws, dated May 28, 2024, ("First Amended Complaint"), p. 1.



decision-making contexts. Given my specialized knowledge in these areas, I have provided expert consulting services and testimony in a broad range of economic and financial matters. The knowledge that I possess regarding these fields is beyond that of the average layperson and will help the trier-of-fact to understand the evidence that will be discussed in this case, and to determine facts at issue.

4. I have testified in depositions or trials over sixty-five times. A list of all cases in which I have testified at trial or deposition in the last four years appears in **Appendix A**. I have delivered written and oral testimony before Congressional Committees, the European Parliament, and the Federal Reserve Board on topics related to financial markets and valuation.

5. My academic research has been published in scholarly journals and books. A list of my publications in the past ten years appears in **Appendix A**. My research and economic commentary have been cited by media including The Wall Street Journal, The New York Times, The Washington Post, The Financial Times, The Economist, Barron's, BusinessWeek, die Zeit, Neue Zürcher Zeitung, Forbes, Fortune, Bloomberg Magazine, American Banker, and by press syndicates such as the Associated Press, Reuters, Bloomberg, KnightRidder, and MarketWatch-Dow Jones Newswire. I have been a frequent guest on CNBC, Bloomberg Television, and Fox Business News, and I have appeared on NBC News, CNN Headline News, CNBC Asia, National Public Radio, BBC Radio, Bloomberg Radio, and NBC Radio.

6. The BVA Group is compensated for my work in this matter at my standard rate of $1,125 per hour as well as for the work of other BVA Group professionals working under my direction and supervision at rates of $300 to $900 per hour. Neither my compensation nor BVA Group's compensation depends upon the results of my analyses in this report, my opinions, any related testimony, or the outcome of the above-referenced matter.

7. My opinions are based on my training, experience, and background, the analyses discussed herein, and the information I have had the opportunity to analyze. I may supplement my analysis as additional information is made available to me. Conclusions and analysis contained in this report may be supplemented, including through testimony or future reports.

### III.  Information Considered

8. I have prepared this report to state my expert opinions; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data I considered in reaching my opinions; and to make all other appropriate disclosures. I express no legal opinions in this report. The work that I conducted in this matter has been informed by my education, knowledge, and experience in economics and finance.

9. The information in this report is based upon discovery to date and other information that is currently available to me. I have considered and compiled materials as cited herein with the assistance of



BVA personnel working under my direction and supervision.  A listing of the materials I have considered in my work for this matter as of the date of this report is contained in **Appendix B**, as well as the citations in the footnotes to the text and tables presented in this report.  I will review, evaluate, and analyze additional data, facts, or information as they become available.  I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me.

### IV.  Summary of Opinions

10.    It is my opinion that TWTR Stock traded in an informationally efficient (semi-strong form) market during the Class Period.  It is also my opinion that TWTR Options traded in an informationally efficient (semi-strong form) market during the Class Period.

11.    In an informationally efficient (semi-strong form) market, one may apply an event study, possibly in conjunction with other generally accepted methods to estimate the price deflation (or inflation) of the TWTR Securities, if any, that was attributable to, or was maintained by, Defendants' alleged material misrepresentations, omissions, or deceptive scheme throughout the Class Period by observing the change in price when the previously undisclosed information is revealed. The resultant price impact, if any, for TWTR Securities may be used, along with other widely accepted financial and economic methods to examine the potential presence and possible impact of confounding information, to arrive at damages for every member of the Proposed Class using a common technique that is grounded in Plaintiff's theory of liability.

### V.  Background

#### A.    Twitter

12.    Twitter provides "a global platform for public self-expression and conversation in real time," claiming to "have democratized content creation and distribution so people can consume, create, distribute and discover content about the topics and events they care about most."[2]  Incorporated in April 2007, Twitter held an initial public offering and, therefore, traded on the New York Stock Exchange ("NYSE") beginning November 7, 2013, under the symbol "TWTR.".[3]

---

[2]    Twitter, Form 10-K for period ending December 31, 2021, p. 6.

[3]    Twitter, Prospectus, November 6, 2013, pp. 1, 9 and "Twitter Celebrates Initial Public Offering and First Day of Trading on the New York Stock Exchange," *Intercontinental Exchange*, November 7, 2013.



### B.    Lead Plaintiff

13.    The Oklahoma Firefighters Pension and Retirement System is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma, serving more than 26,000 people and managing approximately $3.4 billion in assets.[4]  During the Class Period, the Oklahoma Firefighters Pension and Retirement System sold more than 14,000 shares of TWTR Stock.[5]

### C.    Defendants

14.    Defendant Elon Musk is a famous businessman and one of the world's richest people. Beginning in 1995, Mr. Musk has founded and led a series of successful companies, including Zip2 (an online business directory that was sold to Compaq Computer Corporation for over $300 million), X.com (an online payments company that merged with Confinity to form PayPal), SpaceX (a private space exploration company), and Tesla (an electric car manufacturer).[6]  On April 25, 2022, Twitter announced that it entered into an agreement to be acquired by Mr. Musk (through an entity wholly owned by Mr. Musk) for approximately $44 billion.[7]  The contemplated transaction closed on October 27, 2022.[8]

15.    According to filings with the SEC, all shares of TWTR Stock beneficially owned by Mr. Musk were held by the "Elon Musk Revocable Trust Dated July 22, 2003" (the "Musk Trust")—another named Defendant in this case.[9]  Mr. Musk is reported to be the sole trustee of the Musk Trust.[10]

16.    Defendant Excession LLC ("Excession") is "[Mr.] Musk's family office" which is "'responsible for a range of wealth and investment activity on [Mr.] Musk's behalf, including his purchase of Twitter stock and ultimate acquisition of the Company."[11]

17.    Defendant Jared Birchall is a former investment banker, with previous experience at Goldman Sachs, Merrily Lynch & Co., and Morgan Stanley.[12]  I understand that Mr. Birchall has acted as Mr. Musk's wealth manager for at least the last decade, served as the managing director of Excession, and has power of attorney over the Musk Trust.[13]

---

[4]    *See* First Amended Complaint, ¶ 31 and Opinion and Order, dated March 28, 2025 ("MTD Opinion and Order"), p. 3.

[5]    *Id.*

[6]    Raisa Bruner, "A Complete Timeline of Elon Musk's Business Endeavors," *Time*, April 27, 2022.

[7]    "Elon Musk to Acquire Twitter," *PRNewswire*, April 25, 2022.

[8]    *See, e.g.,* Twitter, Schedule 13D for Qatar Investment Authority, October 27, 2022, p. 3 (noting that "[o]n October 27, 2022, pursuant to the terms of the Merger Agreement, Merger Sub merged with and into the Issuer (the 'Merger'), with the Issuer surviving the Merger and becoming a wholly owned subsidiary of Parent (the 'Surviving Corporation'). Parent is majority-owned and controlled by Elon R. Musk. Pursuant to the terms of the Merger Agreement, at the effective time of the Merger, each share of Common Stock held by QSMA1 LLC was converted into the right to receive $54.20 in cash, without interest.").

[9]    Twitter, Schedule 13G, dated April 4, 2022, Item 4, and Twitter, Schedule 13D, dated April 5, 2022, Item 5. *See also*, First Amended Complaint, ¶ 34 and MTD Opinion and Order, p. 4.

[10]   *Id.*

[11]   First Amended Complaint, ¶ 35. *See also* MTD Opinion and Order, p. 4.

[12]   First Amended Complaint, ¶ 37. *See also* MTD Opinion and Order, p. 4.

[13]   First Amended Complaint, ¶ 36. S*ee also* MTD Opinion and Order, p. 4.



### D.    Summary of Plaintiff's Claims

18.    I understand Plaintiff asserts the following causes of action:

    a.    Violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 against all Defendants;[14] and

    b.    Violation of Section 20(a) of the Exchange Act against Messrs. Musk and Birchall .[15]

#### 1)    Alleged Misrepresentations, Omissions, and Deceptive Scheme

19.    According to Plaintiff, Defendants "devised a scheme to secretly acquire a massive active ownership interest in Twitter," that would allow Mr. Musk "to get in under the radar" and "not press the price" of TWTR Stock.[16]    Plaintiff claims that Defendants engaged in trading strategies designed to conceal Mr. Musk's acquisition of TWTR Stock both prior to and during the Class Period and knowingly failed to disclose Mr. Musk's holdings in TWTR Stock despite obligations to do so by March 24, 2022.[17]    These actions were all allegedly undertaken to "keep the price of Twitter securities artificially low so [Mr.] Musk could buy shares as cheaply as possible."[18]

20.    Mr. Musk began acquiring shares of TWTR Stock in January 2022.[19]    Subsequent public filings show that Mr. Musk ultimately surpassed the 5 percent ownership threshold requiring disclosure under Rule 13 on March 14, 2022.[20]    By April 1, 2022, Mr. Musk had devoted over $2.6 billion to acquire 73,115,038 shares of TWTR Stock (approximately 9.1 percent of Twitter's outstanding common stock).[21]    Despite Defendants' acknowledgement of the reporting requirements under Rule 13,[22] Plaintiff claims that Defendants failed to make the required disclosures by March 24, 2022 (the final day of the 10-day reporting window).[23]

21.    Plaintiff also alleges that, in addition to failing to timely make the required disclosures under Rule 13, "[Mr.] Musk misled the market about Twitter [prior to and during the Class Period], including by falsely representing that he may be interested in building a rival platform to compete with Twitter, to divert

---

[14]    First Amended Complaint, ¶¶ 247-50. *See also* MTD Opinion and Order, p. 1.

[15]    First Amended Complaint, ¶¶ 261-62. *See also* MTD Opinion and Order, p. 1.

[16]    First Amended Complaint, ¶ 82. *See also* MTD Opinion and Order, p. 5.

[17]    *See, e.g.*, First Amended Complaint, ¶¶ 82-175. *See also* MTD Opinion and Order, pp. 5-9.

[18]    First Amended Complaint, ¶ 88. *See also*, MTD Opinion and Order, pp. 6 and 12.

[19]    Twitter, Schedule 13D, dated April 5, 2022.  *See also*, First Amended Complaint, Table 1, and MTD Opinion and Order, Table 1.

[20]    Twitter, Schedule 13G, dated April 4, 2022 (noting that the date of the event requiring the filing of the Schedule 13G occurred on March 14, 2022).

[21]    Twitter, Schedule 13D, dated April 5, 2022 (disclosing Mr. Musk's purchases of TWTR Stock). *See also*, First Amended Complaint, Table 1, and MTD Opinion and Order, Table 1.

[22]    Plaintiff cites to various statements by Mr. Musk (acknowledging that "U.S. reporting requirements start at 5 percent"), Mr. Birchall (noting that "[w]e knew that five percent meant something … we knew that that would trigger something where at some point we would have to disclose something."), and other parties as evidence that Defendants were aware of the reporting requirements. *See* MTD Opinion and Order, pp. 8-9, and First Amended Complaint, ¶¶ 9-11, 118-20.

[23]    First Amended Complaint, ¶¶ 15, 63-64, 120, 138-39. *See also* MTD Opinion and Order, pp. 8-9, 35.



attention from his undisclosed interests and keep Twitter's stock price low."[24]  For example, on March 26, 2022 in response to a tweet stating, "just buy twitter…and change the bird logo to a doge,"[25] Mr. Musk tweeted, "Haha that would be sickkk [*sic*]."[26]  Later that same day, Mr. Musk "tweeted that he was 'giving serious thought' to 'building a new social media platform' to rival Twitter."[27]

22.    Plaintiff claims that "[Mr.] Musk's tweets were false and misleading[,] as they gave the impression that he was contemplating building a new social media platform to serve as an alternative to Twitter—when in truth, [Mr.] Musk was secretly engaged in purchasing Twitter outright."[28]  Specifically, Plaintiff alleges that Mr. Musk held secret meetings with Twitter's leadership concerning his ownership and activist intentions for the Company, at which Mr. Musk discussed "joining the Twitter Board," Musk's "significant stake of more than five percent" in the Company, and that Musk was also "considering the possibility of taking Twitter private."[29]

23.    According to Plaintiff, "[Mr.] Musk's strategy of misdirection worked, and his tweets kept the market in the dark about [Mr.] Musk's activist intentions for Twitter."[30]  Due to Defendants' alleged scheme and the alleged series of misstatements, misrepresentations, and omissions, I understand that Mr. Musk was able "to save millions by keeping the price of Twitter's securities artificially depressed."[31]  The artificially depressed stock prices have, according to Plaintiff, damaged the members of the Proposed Class.

24.    On March 28, 2025, the Court in this Action issued an opinion sustaining Plaintiff's claims under the Exchange Act, including Plaintiff's:

      a.    "10(b)-5(a) and (c) claims … predicated on the following acts:  (1) the improper Schedule 13G filing; (2) Musk's misleading tweets about Twitter's future, and (3) the carrying out of a coordinated strategy to silently build up Musk's position in Twitter";

      b.    "10(b)-5(b) claim … predicated on the following statements: (1) Musk's March 26, 2022 "Haha that would [be] sickkk"; and (2) Musk's March 26, 2022 "Am giving serious thought to this" tweet."; and

      c.    "Section 20(a) claims."[32]

---

[24]    First Amended Complaint, ¶ 83. *See also* MTD Opinion and Order, pp. 13-14.
[25]    First Amended Complaint, ¶ 158. See *also* MTD Opinion and Order, pp. 13-14.
[26]    *Id.*
[27]    First Amended Complaint, ¶ 160. *See also* MTD Opinion and Order, pp. 13-14.
[28]    First Amended Complaint, ¶ 161. *See also* MTD Opinion and Order, pp. 13-14.
[29]    First Amended Complaint, ¶¶ 19, 166-73, 191, 216-22, 233, Table 3.
[30]    First Amended Complaint, ¶ 164.
[31]    First Amended Complaint, ¶ 161.
[32]    *See* MTD Opinion and Order, p. 42.



### 2)    Alleged Curative Events

25.    Prior to market open on April 4, 2022, Mr. Musk filed a Schedule 13G with the SEC which reported that Mr. Musk beneficially owned approximately 9.2 percent of the total outstanding common stock of Twitter.[33]  Mr. Musk's Schedule 13G allegedly omitted the certification regarding a lack of intent to change or influence the control of the issuer required when filing a Schedule 13G.[34]  Equity analysts from institutions such as Bank of America, Wells Fargo, Morningstar, Jeffries, CFRA Research, Truist Securities, and Wedbush Securities all issued reports on April 4, 2022 discussing the disclosure and potential impact Mr. Musk's ownership interest may have on Twitter going forward.[35]  Following Mr. Musk's disclosure of his stake in Twitter, the price of TWTR Stock increased 27.1 percent on April 4, 2022.[36]

26.    On the following day, April 5, 2022, Twitter filed a Form 8-K press release prior to trading hours announcing, among other things, that Mr. Musk had agreed to join Twitter's Board.[37]  Later that day, after trading concluded, Mr. Musk filed the requisite Schedule 13D disclosing Mr. Musk's beneficial ownership of approximately 9.1 percent of the total outstanding common stock of Twitter.[38]  TWTR Stock closed at $50.98 per share on April 5, 2022, up from $49.97 on April 4, 2022—a total increase of nearly 30% since Mr. Musk first publicly disclosed his ownership stake in Twitter on April 4, 2022.[39]

27.    Plaintiff asserts *inter alia* that because of Musk's "fraudulent scheme and disregard for his statutory obligations", security holders were "kept in the dark about Musk's ownership stake in Twitter," further alleging that Twitter's stock would have traded at a higher price during the Class Period had the market known about Musk's ownership in Twitter during the Class Period.[40]  As a result of Musk's materially false and misleading statements, members of the Class sold "Twitter shares at prices that were below the actual value of those securities, and thereby caused damage to the Class."[41]

## VI.    Assessment of Market Efficiency for TWTR Stock

28.    I understand courts have found that a plaintiff may not have to show actual or direct reliance on alleged material misstatements and omissions in order to prove the element of reliance for their securities fraud claims under Section 10(b) of the Exchange Act.  Instead, in accordance with precedent from the United States Supreme Court, courts permit a plaintiff asserting Section 10(b) claims to establish

---

[33]    Twitter, Schedule 13G, dated April 4, 2022.  The figures reported in Schedule 13G on April 4, 2022, do not reconcile with the figures filed in the Twitter, Schedule 13D, dated April 5, 2022.

[34]    First Amended Complaint, ¶ 183 and MTD Opinion and Order, pp. 5, 17. *See also*, Twitter, Schedule 13G, dated April 4, 2022, Item 10 and 17 CFR § 240.13d-102.

[35]    *See* **Appendix B**.

[36]    Based on stock price data retrieved from Bloomberg. *See also, e.g.,* Nivedita Balu, "Musk takes 9% stake in Twitter to become top shareholder, starts poll on edit button," *Reuters*, April 5, 2022.

[37]    Twitter, Form 8-K, dated April 4, 2022, p. 2. *See also*, First Amended Complaint, ¶ 187.

[38]    Twitter, Schedule 13D, dated April 5, 2022.

[39]    Based on stock price data retrieved from Bloomberg.

[40]    First Amended Complaint, ¶ 236.

[41]    *Id.*



reliance through the "fraud on the market" presumption.[42]  In order to invoke the "fraud on the market" presumption of reliance, I understand the Supreme Court has required (among other things) that the plaintiff establish that the security was traded on an efficient market during the relevant period.[43]  Because the value of TWTR Options derives directly from the value of TWTR Stock, establishing that TWTR Stock trades in an efficient market is also essential for establishing the efficiency of the market for TWTR Options.

29.     In finance and economics, the efficient market hypothesis ("EMH") refers to the extent to which information available to investors and market participants is incorporated into the price of a security.  As prominent academics have noted, "economists generally agree that material information—whether truthful or fraudulent—will generally affect the price of a stock and that the effect will be in a predictable direction."[44] This finding is consistent with the semi-strong form of market efficiency, under which all publicly available information is quickly and fully reflected in the price of a traded asset.[45]

30.     Throughout the Class Period, TWTR Stock traded on the NYSE under the ticker symbol "TWTR."[46]  It is widely accepted that prices of shares traded on major exchanges, such as the NYSE, respond to new, value-relevant information, with courts finding that shares of companies that traded on major exchanges generally trade in semi-strong form efficient markets.[47]  TWTR Stock trading on the NYSE throughout the Class Period is, therefore, strong evidence that the security traded in an efficient market.

---

[42]   *See Basic Inc. v. Levinson*, 485 U.S. 224, 245-46 (1988) ("*Basic*"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*").

[43]   *Halliburton II*, 573 U.S. at 277-78.

[44]   Brief of Financial Economists as Amici Curiae in Support of Resp'ts, *Halliburton Co. v. Erica P. John Fund, Inc.*, 2014 WL 526436, at *13-14 (2014) (No. 13-317) ("*Halliburton I*").

[45]   Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," 25(2) *The Journal of Finance*, (May, 1970), pp.383-417; *See also*, John Campbell, et al., *The Econometrics of Financial Markets* (2d ed. 1997), p. 22.

[46]   Twitter, Form 10-K for period ending Dec. 31, 2021, p. 1; Twitter, Form 10-Q for period ending Mar. 31, 2022, p. 1. Twitter, Form 10-Q for period ending June 30, 2022, p. 1.

[47]   I understand courts in the Southern District of New York as well as courts across the United States have recognized that trading on the NYSE is evidence of market efficiency. *See In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) ("[A] stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient"); *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 181-82 (S.D.N.Y. 2012) (NYSE "is a presumptively efficient market"); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) ("Defendants wisely do not dispute that Plaintiffs have established that FCA securities traded in an efficient market during the Class Period.  FCA securities were traded on the [NYSE], 'a paradigmatic efficient market.') (quoting *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 n.3 (S.D.N.Y. 2011)); and *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the New York Stock Exchange is not an efficient market."). *See also*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("Securities markets like the NYSE and the NASDAQ are 'open and developed', and are therefore 'well suited for application of the fraud on the market theory'. Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. 05–1151, 2013 WL 396117, at *11 (D.N.J. Jan. 30, 2013) (no further market efficiency analysis was necessary where the defendant's stock traded on the NYSE and was a component of the Dow Jones Industrial Average); *City of Sterling Heights Gen. Emps' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *10 (D.N.J. Aug. 31, 2015) ("Plaintiffs have proven that Prudential's stock traded in an efficient market. For one, Prudential's stock trades on the NYSE."); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 80 (D.N.J. 2019) ("Indeed, Third Circuit courts have consistently found that the NYSE is an efficient market for stock traded thereon."); *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *8 (D.N.J. Jan. 31, 2020) (noting that the NYSE is "one of the most efficient capital markets in the world"); *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *5 (D.N.J. Sept. 25, 2012) ("[S]ecurities traded on the NYSE are routinely recognized as trading in an efficient market"). *See also*, Brief of Financial Economists, *Halliburton I*, 2014 WL 526436, at *13-14 (2014) (in which prominent academics noted, "economists generally agree that material information - whether truthful or fraudulent—will generally affect the price of a stock and that the effect will be in a predictable direction.").



31. TWTR Stock was also included in the S&P 500 Index—a widely-used proxy for large-cap equity movements—during the Class Period.[48] Inclusion in indices such as the S&P 500 Index is based on a firm's shares meeting certain criteria with regard to market capitalization, public float, liquidity, and "reasonable" prices, similar to the criteria typically used to evaluate whether a stock trades in semi-strong form efficient markets.[49] Thus, the fact that TWTR Stock met these criteria during the Class Period further supports the proposition that it traded in an efficient market.

32. While the aforementioned characteristics of TWTR Stock provide strong evidence that TWTR Stock traded in an efficient market during the class period, I analyze various other aspects of TWTR Stock to further support the proposition. Specifically, I understand that federal courts nationwide regularly consider the five factors set forth in *Cammer v. Bloom*.[50] These five factors (the "Cammer Factors") are:

      a. average weekly trading volume relative to outstanding shares;

      b. number of analysts following the stock;

      c. market maker and arbitrage activity;

      d. ability to issue new securities through an S-3 registration statement; and

      e. empirical facts showing a cause-and-effect relation between unexpected corporate events or financial releases and stock price movement.

33. In addition to the factors outlined in *Cammer*, I understand that some federal courts (including this Court) have considered additional factors in assessing the efficiency of a market, including,

      a. market capitalization and float;[51]

      b. bid-ask spread;[52]

      c. autocorrelation (serial correlation) in stock price returns;[53] and

      d. constraints on short selling.[54]

---

[48] Based on data retrieved from Bloomberg.

[49] *See, e.g.,* S&P 500® Overview, https://www.spglobal.com/spdji/en/indices/equity/sp-500/#overview; Nasdaq 100 Factsheet, https://indexes.nasdaqomx.com/docs/FS_XNDX.pdf.

[50] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*"). *See also*, *e.g., Binder v. Gillespie*, 184 F.3d 1059, 1064-65 (9th Cir. 1999) (affirming application of *Cammer* Factors); *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) (applying factors); *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 649 (C.D. Cal. 2018) (applying factors); *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) ("*Waggoner*") (endorsing *Cammer* Factors, while noting the Second Circuit has "repeatedly … declined to adopt a particular test for market efficiency").

[51] *See, e.g., Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) ("*Krogman*"). *See also*, *Waggoner*, 875 F.3d at 94-95 (recognizing courts "often consider" the *Krogman* factors); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) ("*McIntire*") (applying each *Krogman* factor).

[52] *Id.*

[53] *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160-62 (S.D.N.Y. 2012) ("*Billhofer*") (applying *Krogman* and analyzing autocorrelation).

[54] *See, e.g., Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 n.77 (S.D.N.Y. 2015) ("*Carpenters*").



34.   Certain of the above factors require a sufficient number of observations for valid statistical estimation.  The length of the Class Period—seven trading days—restricts the number of observations available for certain of the statistical exercises involved in the above analyses.  Twitter was a large, stable, well-established public company during the entire period relevant to this action, including the Class Period.  Accordingly, I extend my observation period prior to (and inclusive of) the Class Period.  This allows me to consider sufficient data for a period that covers and includes the Class Period for purposes of establishing the market efficiency for TWTR Stock during the Class Period.  I, therefore, analyze TWTR Stock over both the Class Period (when reasonable and appropriate) and the approximately two-year period prior to and including the Class Period (*i.e.*, March 23, 2020, through April 5, 2022, inclusive, the "<u>Extended Period</u>").  I report the results of my analyses relating to each of the previously discussed factors below.

## A.   *Cammer* Factors

### 1)   *Cammer* Factor 1: Average Weekly Trading Volume

35.   A stock must have a reasonable level of trading activity for new information to be rapidly incorporated into its share price.  In *Cammer*, the court observed that an actively traded security is indicative of market efficiency "because it implies significant investor interest in the company," which "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[55]  The court identified weekly turnover (*i.e.*, the average weekly trading volume as a percentage of the total shares outstanding) as an appropriate indicator of active trading, concluding that "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[56]

---

[55]   *Cammer*, 711 F. Supp. at 1286.

[56]   *Id.* at 1293 (citing Alan R. Bromberg and Lewis D. Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("*Bromberg*").



36.     **Chart 1** shows weekly turnover in TWTR Stock throughout the Extended Period:

**Chart 1.  Twitter Weekly Stock Turnover** [57]



37.     During the Extended Period, average weekly volume was approximately 94.5 million shares and weekly turnover (relative to shares outstanding) exceeded the 2.0 percent threshold at all points, averaging 11.9 percent over the Extended Period.[58]  For the Class Period specifically, the trading activity was notably higher, with average weekly trading volume of approximately 337.6 million shares and weekly turnover ranging from 9.4 percent of shares outstanding to 111.3 percent of shares outstanding (an average of 44.0 percent).[59]  These results provide a strong presumption of efficiency in every week during both the Extended Period and the Class Period and support a finding of an efficient market for TWTR Stock during both the Extended Period, in general, and the Class Period specifically.

### 2)     *Cammer* Factor 2: Analyst Coverage

38.     Widespread dissemination of information about companies and discussion among market participants helps incorporate information into stock prices.  *Cammer* held that a "significant number of securities analysts" following a stock "would imply, for example, relevant financial reports were closely

---

[57]  Weekly trading volume and total shares outstanding as reported by Bloomberg based on full trading weeks. Data presented graphically through April 1, 2022.

[58]  As this analysis focuses on weekly trading volume, the figures for the Extended Period reflect trading volume through April 8, 2022 (the final full week of the Extended Period).

[59]  As this analysis focuses on weekly trading volume, the figures for the Class Period reflect trading volume from March 21, 2022 through April 8, 2022 (the three full weeks surrounding and including the Class Period).  Limiting this analysis to the Class Period (*i.e.*, utilizing incomplete weeks of trading data) results in average weekly trading volume of approximately 121.1 million shares and weekly turnover ranging from 2.6 percent of shares outstanding (which represents a single day of trading—March 25, 2022) to 35.3 percent of shares outstanding (an average of 15.8 percent).



reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[60]

39.    Securities analysts from major financial institutions who follow Twitter make buy and sell recommendations about Twitter to its security holders on a regular basis.  Bloomberg reports the number of analyst recommendations for publicly traded equities.  This data indicates that at least 37 securities analysts covered Twitter during the Extended Period and the Class Period.[61]

40.    A search of analyst reports yields over 800 individual analyst reports covering Twitter during the Extended Period and 8 analyst reports discussing Twitter during the Class Period.[62]  These reports include detailed analyses of Twitter's business and operations from securities analysts at major financial institutions such as Bank of America, Morgan Stanley, JPMorgan, UBS, Wells Fargo, Deutsche Bank, BMO Capital Markets, and Macquarie.[63]  In addition to supporting analysts' buy/sell recommendations and price targets for Twitter, these analyst reports reflected analysts' responses, from both a quantitative and qualitative perspective, to new, value-relevant information.  For example, as discussed previously, several reports were issued on the final day of the Class Period—April 4th, 2022—covering Mr. Musk's ownership disclosure by analysts from major financial institutions including Bank of America, Wells Fargo, Morningstar, Jeffries, CFRA Research, Truist Securities, and Wedbush Securities.[64]

41.    I also identified over 8,000 reports from financial media, wire services, and general media discussing Twitter during the Extended Period in publications including *The New York Times*, *Associated Press*, and *The Wall Street Journal*.[65]  Of these 8,000 reports, 71 occurred during the Class Period.[66]  This media coverage also facilitated the dissemination of Twitter-related information to the market.

42.    The breadth and depth of analyst and media coverage of Twitter during the Extended Period and the Class Period demonstrates that newly available, value-relevant financial information was actively monitored and scrutinized by a network of investment professionals and financial journalists who quickly digested new information and disseminated that to Twitter security holders.  Such extensive coverage supports a finding that TWTR Stock traded in an efficient market throughout both the Extended Period and the Class Period.

---

[60]    *Cammer*, 711 F. Supp. at 1286.

[61]    Based on data retrieved from Bloomberg.

[62]    Based on analyst reports available through Refinitiv Eikon.

[63]    *Id.*

[64]    *See* **Appendix B**.

[65]    Based on news and media articles available through Factiva.

[66]    *Id.*



### 3)    *Cammer* Factor 3: Existence of Market Makers/Institutional Investors and Arbitrageurs

43.    Counterparties that are available to buy and sell securities facilitate active trading and help investors trade on available information.  The court in *Cammer* found that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[67]

44.    The SEC defines a market maker as "a firm that stands ready to buy or sell a stock at publicly quoted prices."[68]  By standing ready to buy and sell a stock at a publicly quoted price, market makers assure that buyers and sellers of a stock have a ready counterparty available for the "completion of the market mechanism" when new, value-relevant information becomes available.[69]  Stated differently, market makers hold shares of securities to fill buy or sell orders on demand, thereby offering liquidity to securities traders.

45.    TWTR Stock was listed on the NYSE throughout the Extended Period and the Class Period.[70] The NYSE assigns a Designated Market Maker ("DMM") to each security that trades on it, facilitating fair and orderly trading.[71]  The structure of the NYSE, including its DMM system, in combination with the requirements for being listed on the NYSE, contributes to a general presumption by economists and courts that a stock traded on the NYSE trades in an efficient market.[72]

46.    I identified at least 114 financial institutions that disclose they made a market in TWTR Stock (*i.e.*, were market makers) during the Extended Period and 84 that make such disclosures during the Class Period, set forth in **Exhibit 1**.[73]  The presence of multiple market makers ensures that buyers and sellers are able to routinely exchange shares at market-clearing prices, which ensures prices are reflective of information known by market participants.

---

[67]    *Cammer*, 711 F. Supp. at 1286-87.

[68]    "*Glossary: Market Makers*," SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[69]    *Cammer*, 711 F. Supp. at 1286-87.

[70]    Twitter, Form 10-K for period ending December 31, 2019, p. 1; Twitter, Form 10-Q for period ending June 30, 2022, p.1.

[71]    According to the NYSE:

> The cornerstone of the NYSE market model is the Designated Market Maker (DMM).  DMMs have obligations to maintain fair and orderly markets for their assigned securities.  They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability.  This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value.  DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions.  A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery.

> *How the NYSE Market Model Works: Designated Market Maker*, NYSE, https://www.nyse.com/market-model.

[72]    *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (trading facilitated by DMM on the NYSE, among other things, justified "a strong presumption of efficiency"); *Banc of Cal..*, 326 F.R.D. at 649("The oversight of a DMM favors market efficiency.").

[73]    Based on Bloomberg's Broker Activity Summary.  I excluded market makers with brokerage activity but whose identity was not provided on Bloomberg.



47.     In addition to market makers, *Cammer* points to the presence of arbitrageurs, who "react swiftly to company news and reported financial results," as another indication of market efficiency.[74]  Arbitrageurs maintain market efficiency by identifying mispricing opportunities and buying/selling assets that are under/over-priced.  This ensures prevailing prices reflect available value-relevant information.

48.     One way to gauge how much of a security is owned by the type of sophisticated, well-informed investors that typically act as arbitrageurs is to examine the percentage of shares owned by institutional investors such as mutual funds or money managers.   Institutional investors are presumed to be well-informed about the securities they hold and able to interpret and act upon new information.[75]  Such investors have the capital, information, and resources required to take advantage of even relatively small arbitrage opportunities, ensuring that share prices reflect value-relevant information to the fullest extent possible.

49.     Institutional investors owned at least 74.3 percent (an average of 88.9 percent) of the publicly-available TWTR Stock during the Extended Period and at least 80.7 percent during the Class Period (an average of 80.7 percent).[76]  This is consistent with the level of institutional ownership of stocks included in major indices such as the S&P 500.[77]  TWTR Stock was, therefore, predominantly held by informed investors who were in a position to consider and react to new, value-relevant information.[78] The high level of institutional ownership of TWTR Stock, coupled with the participation of numerous market makers trading significant volumes, supports a finding that TWTR Stock traded in an efficient market during both the Extended Period and the Class Period.

### 4)    *Cammer* Factor 4: Eligibility to File an S-3 Registration Statement

50.     The SEC allows "more seasoned" companies to file a Form S-3.[79]  Specifically, a Form S-3 is a filing with the SEC which provides an expedited registration process for public securities to be issued by a public company that already has registered a class of securities under the Securities Act and which has been in compliance with the reporting requirements under the Securities Act without defaulting on debts

---

[74]   *Cammer*, 711 F. Supp. at 1286-87.

[75]   Brad M. Barber, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law*, Winter 1994, p. 292.

[76]   Calculated as the number of shares owned by institutional investors expressed as a percentage of shares outstanding as reported by Bloomberg.

[77]   Charles McGrath, "80% of equity market cap held by institutions," *Pensions & Investments,* April 25, 2017.

[78]   Based on data retrieved from Bloomberg, I identified over 1,197 institutional investors that owned TWTR Stock during the Extended Period and the Class Period.  Based on data collected by Bloomberg, institutional holders include stock held by 13F filers (generally registered investment companies and advisers with at least $100 million of assets under management), mutual funds (domestic and international), domestic insurance companies, and institutional stake holders that appear on the aggregate level.

[79]   *Cammer*, 711 F. Supp. at 1284.



during the previous year.[80]  A company is eligible to register an equity offering with an expedited Form S-3 when its common equity held by non-affiliates (its "public float") is worth at least $75 million.[81]

51.    The court in *Cammer* found "the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient" as "it is the largest and most well-known companies which register equity securities on Form S-3."[82]  According to *Cammer*, "[t]he 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed [prospectus] … It is this aspect of the Form S-3 requirements that calls into play the efficient market hypothesis."[83]

52.    Throughout both the Extended Period and the Class Period, TWTR Stock traded on the NYSE and met the principal requirements to file a Form S-3: it had sufficient public float, had not defaulted on debt, and was in compliance with Securities Act disclosure obligations.[84]  Accordingly, at all times during the Extended Period and the Class Period, I understand that Twitter had the ability to file a Form S-3. Twitter's eligibility to file a Form S-3 supports a finding that its shares traded in an efficient market during both the Extended Period and the Class Period.[85]

### 5)    *Cammer* Factor 5: Empirical Evidence of Cause-and-Effect Relationship Between Events and Stock Price Movements

53.    The fifth *Cammer* factor relates to a cause-and-effect relationship between events and stock price movements.  The *Cammer* court wrote:

> [I]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.  This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.[86]

54.    The fifth *Cammer* factor implies that on days when new information that is relevant to the value of a company whose stock trades in an efficient market becomes available, the abnormal price movements

---

80    Form S-3 Registration Statement Under the Securities Act of 1933, pp. 2-3.

81    Alternatively, companies that do not have a public float of at least $75 million can file an S-3 if they meet all other S-3 requirements, are not a shell company, have their stock listed and registered on a national securities exchange, and limit their offerings to no more than 1/3 of the market value of stock held by non-affiliates. *See* Form S-3 Registration Statement Under the Securities Act of 1933, pp. 3 and 5.

82    *Cammer*, 711 F. Supp. at 1285, 1271 n.5.

83    *Id.* at 1285 & n.33.

84    Twitter filed a Form S-3 during the Extended Period on May 27, 2020. Twitter also indicated in each of its annual filings during the Extended Period that it was a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. I understand that a domestic well-known seasoned issuer as defined in Rule 405 of the Securities Act meets all the registrant requirements of General Instruction I.A. of Form S-3. *See* 17 CFR § 230.405*; see also*, Twitter, Form 10-K for period ending December 31, 2020, p. 1; Twitter, Form 10-K for period ending December 31, 2021, p. 1. Twitter's public float exceeded $17 billion on all days during the Extended Period and $28 billion on all days during the Class Period based on data retrieved from Bloomberg. I found no indication that Twitter had defaulted on debt or failed to comply with its Securities Act disclosure obligations during either the Extended Period or the Class Period.

85    *See Krogman*, 202 F.R.D. at 476 (finding that the SEC permits the filing of a Form S-3 "only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary").

86    *Cammer*, 711 F. Supp. at 1287.



in that company's shares (both positive and negative) tend to be larger than those on days without such information.[87]

55.    This reflects common sense.  Since information has the potential to change expectations about a company and, therefore, the value of its shares, on average one would expect days on which new, value-relevant information was released to be associated with a relatively higher frequency of significant share price reactions in an efficient market.  Generally, such comparison utilizes statistical techniques that require more daily observations than those included in the Class Period.  Even when there are sufficient observations during the Class Period, I routinely show empirical facts relating to Cammer 5 over a longer extended time period.  While I show empirical results for the Class Period without relying upon formal statistics due to the small number of observations, the empirical facts for the Extended Period (which is, again, inclusive of the Class Period) are the basis for statistical tests in this section.

### a)    Release Days

56.    In order to analyze the fifth *Cammer* factor with regard to TWTR Stock, I identify a subset of days on which Twitter released value-relevant information to the market ("<u>Release Days</u>").  I compare the frequency of share price reactions, or abnormal returns, on Release Days (the treatment group) to those of other days in the Extended Period (the control group) to test whether Release Days tended to be accompanied by significant changes in the share price of TWTR Stock.

57.    In this analysis, the abnormal return on any Release Day is indicative of the reaction of TWTR Stock to new company-specific information, after controlling for returns that may be predicted from broader market or industry movements.[88]  Comparing the frequency of statistically significant abnormal returns on the Release Days to the frequency of statistically significant abnormal returns on all other trading days during the Extended Period can allow one to evaluate the relationship between releases of new information about Twitter and changes in its stock price.[89]

58.    After reviewing Twitter's activities during the Extended Period, I consider Release Days to be days on which Twitter issued quarterly or annual financial results via earnings announcements.[90]  Many

---

[87]    Abnormal share price movements, or abnormal returns, refer to the portion of daily share price returns that are not attributable to market or industry factors. *See infra* ¶ 75.

[88]    As I explain below, I predict Twitter's share price returns on each day by applying a widely used technique known as an event study. *See, e.g.,* Campbell, *supra* note 45. *See also, e.g.*, *Halliburton II*, 573 U.S. at 280-81; *Carpenters*, 310 F.R.D. at 87 (holding an event study is "a generally accepted methodology for establishing market efficiency"); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) (finding *Basic* presumption applied based on event study).

[89]    Statistical significance is the likelihood that a result or observed relationship between two variables is unlikely under a specific hypothesis. Hypothesis testing is traditionally employed to determine the level at which a result is statistically significant or not. This provides a "p-value," which represents the probability of observing data as extreme as that which was measured if the null hypothesis is indeed true. A statistically significant result at the 1 percent significance level is one in which there is a less than 1 percent probability of observing this result if the null hypothesis were true. Such p-values are also often described in terms of confidence levels by subtracting the p-value from 100 percent, as done above. *See, e.g.*, Jeffrey M. Wooldridge, *Introductory Econometrics* (6th ed. 2016), p. 119.

[90]    Additional details about my event study methodology can be found in my reliance materials. I examined whether my conclusions are robust by performing the same analysis—that is, testing the same hypothesis—using the following Release Days: days on



academic articles and treatises explain theoretically and demonstrate empirically that information disclosed in conjunction with earnings announcements can cause investors to significantly reevaluate the worth of a particular security.[91]

59.    Limiting Release Days to earnings announcements does not imply that there are no other days within the Extended Period on which new, value-relevant information was released.  If there exist other days upon which value-relevant information is released, the selection of a limited number of Release Days potentially biases my results against finding a cause-and-effect relationship because such circumstances would decrease the likelihood of observing a difference in the frequency of statistically significant abnormal returns on Release Days as compared to other days—so my approach here is conservative.  Conversely, the presence of an earnings announcement does not, by itself, indicate that value-relevant information was revealed; *e.g.*, a firm could announce earnings results that were expected.  By only considering earnings release dates, therefore, I ensure that the manner in which I identified Release Days is consistent with the principles of sound economic hypothesis testing and is objective and replicable.[92]

60.    The Extended Period in this case encompasses 515 trading days (including the Class Period), during which I identified 8 Release Days as listed in **Exhibit 2**.  The information included in each Release Day originated from Twitter and was released to the public market via press release.

### b)    Event Study

61.    In order to examine the extent to which the price of TWTR Stock responded to information disclosed on Release Days, I apply a widely accepted statistical methodology known as an event study.[93]  An event study explores the hypothesis that share price returns correspond to an event—in this case, earnings releases.  The technique controls for other factors affecting share price returns by associating share price movements with those of control variables such as market and industry indices.  An event study may also be used to isolate the impact of an announcement corresponding to a particular event from other factors that would have affected the share price at that time, such as macroeconomic news affecting broad market indices.

---

which Twitter issued quarterly and annual financial results via earnings announcements as well as days on which Twitter issued a Form 8K. The selection of Release Days does not materially affect my *Cammer* factor 5 analysis.

[91]    *See, e.g.*, William H. Beaver, "The Information Content of Annual Earnings Announcements," 6 *Journal of Accounting Research* (1968), pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," 9 *Journal of Accounting Research* (1971), pp. 119-63; Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," 35(1) *The Journal of Finance* (1980), pp. 1-12.

[92]    Such a parsimonious strategy also enhances the objectivity of my analysis as it avoids subjective debates about whether releases on other days may or may not contain value-relevant information.

[93]    Campbell, *supra* note 45 at Ch. 4. *See also*, *Halliburton II*, 573 U.S., 280-81.



62. A widely used application of the event study technique is known as the market model.[94] The market model is based on regression analysis, which provides a statistical framework for examining the nature and form of the relationship between two or more variables. The market model isolates abnormal returns by predicting the per share return of TWTR Stock (the dependent variable) as a function of changes in broad market and industry indices (the independent variables) on each day in the Extended Period, separating abnormal returns of TWTR Stock from typical variations in the industry or market.[95]

63. The market model I apply uses the following indices:[96]

    a. For my market-specific performance control, I use the S&P 500 Index (the "Market Index").[97] Currently, the index represents approximately 80 percent of the total available U.S. equity market by market capitalization.[98] The broad reach of the index ensures that the impact of market-wide factors is captured in the index movements and, thus, makes it a suitable proxy for general market movements.[99]

    b. For my industry-specific performance control, I use an index comprising 38-42 companies included in a bespoke market-weighted version of the Dow Jones Internet Composite Index as of the beginning and end of the Extended Period (the "Industry Index").[100] During the Extended Period, Twitter compared the performance of TWTR Stock against and the Dow Jones Internet Composite Index—an index that "is designed to measure the performance of the 40 largest and most actively traded stocks of U.S. companies in the internet industry."[101]

---

[94] Campbell, *supra* note 45 at Ch. 4. *See also,* A. Craig MacKinlay, "Event Studies in Economics and Finance," 35(1) *Journal of Economic Literature* (March 1997)*.*

[95] Share price returns are computed as the percentage movements in the security price. For the purposes of estimating the market model, share price returns are typically expressed as logarithmic returns, or log returns. Specifically, a log return is the natural logarithm of the ratio of two daily closing security prices: $\ln(P_t/P_{t-1})$, where '$\ln$' is the natural logarithm, '$P_t$' refers to the security price on day $t$ and '$P_{t-1}$' refers to the security price one trading day prior to day $t$.

[96] Additional details about my event study methodology can be found in my reliance materials. I examined whether my conclusions are robust by performing the same analysis—that is, testing the same hypothesis—using the following market indices: the S&P 500 Total Return Index and the Nasdaq 100 Total Return Index; and the following industry indices: the S&P Internet Select Industry Index, the S&P North American Tech Sector Index, and a version of the bespoke market-weighted version of the Dow Jones Internet Composite Index without capping the market-weighting. The selection of the market and industry indices does not materially affect my *Cammer* factor 5 analysis.

[97] Jodie Gunzberg & Tim Edwards, "Why is the S&P 500® Relevant Globally?" *S&P Global,* June 20, 2018, https://www.spglobal.com/ en/research-insights/articles/Why-is-the-SP-500-Relevant-Globally.

[98] *Id. See also* "S&P 500 Index," *Bloomberg,* https://www.bloomberg.com/quote/SPX:IND.

[99] During the Extended Period, Twitter compared its stock performance to the S&P 500 Index. *See, e.g.,* Twitter, Form 10-K for period ending December 31, 2021, p. 39.

[100] S&P Global, "Dow Jones Internet Composite Index," *S&P Global,* https://www.spglobal.com/spdji/en/indices/equity/dow-jones-internet-composite-index/#overview.

[101] *See* Twitter, Form 10-K for period ending December 31, 2021, p. 39, and "Dow Jones Internet Composite Index," *S&P Global,* https://www.spglobal.com/spdji/en/indices/equity/dow-jones-internet-composite-index/#overview.



64.    In addition to the market and industry indices, I include indicator variables for each Release Day included in the estimation window as well as April 4, 2022 and April 5, 2022—the dates of alleged curative disclosures—which controls for returns of TWTR Stock on those days.[102]

### c)    Model Estimation

65.    Having specified the market model, the next step is to use it to predict the share price return of TWTR Stock on each day in the Extended Period.[103]  Such estimation is carried out in "event time," rather than calendar time.  Using event time, I predict each trading day's return using a set number of prior day returns.  The time period used to estimate the model is called the estimation window.[104]  For each trading day, I use an estimation window consisting of the preceding three months (63 trading days) of daily returns.[105]

### d)    Analysis of Abnormal Returns

66.    After generating the predicted return of TWTR Stock for each day during the Extended Period, I subtract the predicted return from the actual return of TWTR Stock on that day to arrive at the abnormal return (*i.e.*, the return that is not attributable to market or industry factors).

67.    The statistical significance of abnormal returns is based upon the null hypothesis that the market model (and not new, value-relevant information) fully explains the returns of TWTR Stock—that is, each day's return does not differ from the prediction.  For instance, if an abnormal return on a Release Day is statistically significantly different from zero at the 95 percent confidence level, that means we are 95 percent confident that we can reject the null hypothesis that the abnormal return on the Release Day is indistinguishable from what is predicted by the market model.  Conversely, there is a less than 5 percent chance one would observe an abnormal return of such a magnitude under the null hypothesis that the market model fully explains the returns of TWTR Stock.

68.    If TWTR Stock trades in an efficient market, I expect a higher frequency of statistically significant abnormal returns on days in which potentially new value-relevant information is released to the

---

[102]    Indicator variables have a value of one on the relevant Release Day and zero on all other days. I also include indicator variables on days on which alleged misrepresentations or curative events occurred.

[103]    Given the length of the Class Period, there are no earnings announcements during the Class Period (and, even if there were Release Days during the Class Period, there would not be a large enough number of comparison days).

[104]    Campbell, *supra* note 45 at 152.

[105]    It is my opinion that a 63-trading day estimation window is appropriate, given policy changes in response to COVID during the period at issue.  As set forth in my reliance materials, the results of my *Cammer* factor 5 analysis are not sensitive to the estimation window.



market relative to other trading days.[106]  I do not, however, expect statistically significant returns to occur on all Release Days, since not all information released to the market is material or differs from expectations (*i.e.*, market prices may already reflect the information in the event it was previously expected).[107]

69.    My analysis of the Extended Period found a significantly higher frequency of statistically significant abnormal returns on Release Days compared to other days.  Within the Extended Period, 6 of the 8 Release Days identified (75 percent), are significant at the 95 percent confidence level.[108]  In contrast, for the remaining 507 days in the Extended Period, only 7.1 percent of abnormal returns are significant at the 95 percent confidence level.[109]

70.    The difference between the 75 percent of the time the stock moved in a statistically significant fashion on Release Days (at the 95 percent confidence level) and the 7.1 percent of the time the stock moved in a statistically significant fashion on non-Release Days (at the 95 percent confidence level) is the subject of my hypothesis test—whether the null hypothesis that Release Days are not statistically different from non-Release Days can be rejected.  Chi-squared and Fisher's exact tests confirm the statistical significance of the difference in the frequency of occurrences.[110]

71.    Further, while I have not been asked to quantify the price impact of the alleged misrepresentations, omissions, and scheme at this time, my event study indicates that the information revealed on the alleged curative events elicited statistically significant and positive abnormal returns at a 95 percent confidence level on both of the alleged curative event dates (April 4 and April 5, 2022), which is consistent with and corroborative of a finding of market efficiency during the Class Period.

### e)    Conclusion

72.    My analysis of abnormal price returns of TWTR Stock during the Extended Period, which covers and includes the Class Period, is a standard approach to evaluating *Cammer* factor 5 and suggests that prices of TWTR Stock responded promptly to new information about the Company, which directly supports a conclusion that TWTR Stock traded in an efficient market during the Extended Period and, thus, during the Class Period, in a manner that can be considered as having arisen from a cause-and-effect

---

[106]  Although p-values of 0.05 are often applied as a threshold for statistical significance, the American Statistical Association ("ASA") has cautioned against relying on bright-line thresholds without considering the broader context of the analysis, explaining that "[p]ractices that reduce data analysis or scientific inference to mechanical 'bright-line' rules (such as 'p < 0.05') for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. A conclusion does not immediately become 'true' on one side of the divide and 'false' on the other." Ronald L. Wasserstein & Nicole A. Lazar, "The ASA Statement on p-Values: Context, Process, and Purpose," 70(2) *The American Statisticia* (2016), pp. 129-33.

[107]  The absence of a statistically significant abnormal return at any particular level does not necessarily imply that a company's stock did not react to a particular set of information since, for instance, significant positive and negative news released at the same time can have offsetting effects, resulting in an abnormal return that is not statistically significant at that level.

[108]  *See* **Exhibit 2**.

[109]  *See id.* While I apply a 95 percent confidence level, my conclusions generalize to any reasonable confidence level.

[110]  These are standard statistical tests used to compare the frequency of outcomes across different categories of observations (in this case, Release Days and Non-Release Days). Under both tests, the null hypothesis is that Release Days are not more likely than non-Release Days to have abnormally large price returns; the null hypothesis is rejected at the 1 percent level under both tests.

 **bva**group®

relationship.  I have seen no evidence to suggest that this cause-and-effect relationship ceased to exist specifically during the Class Period.  Indeed, the statistically significant abnormal returns present on the alleged curative event dates indicate that the prices of TWTR Stock continued to respond promptly to new information about the Company, supporting the conclusion that the cause-and-effect relationship persisted throughout the Class Period.

## B.    Additional Indicators of Market Efficiency

73.    I understand courts evaluating whether individual securities trade in efficient markets have considered other factors in addition to those identified in *Cammer*.  I address those factors below.

### 1)    Market Capitalization and Public Float

74.    The size of a stock's market capitalization and public float have been found to be indicators of market efficiency, as larger companies are more likely to be actively traded and a larger public float may represent greater trading opportunities for sophisticated investors.[111]

75.    Throughout the Extended Period, Twitter's market capitalization exceeded $18.0 billion with no less than 763.6 million shares outstanding on any trading day.[112]  The inclusion of TWTR Stock in the S&P 500 is evidence that Twitter's market capitalization was among the largest publicly traded companies in the U.S. at the time.[113]  Indeed, during the Class Period, Twitter's market capitalization exceeded $29.5 billion with no less than 763.6 million shares outstanding on any trading day.

76.    Twitter's public float as a percent of total shares of common stock outstanding remained above 86.8 percent throughout the Extended Period and the Class Period.[114]  As discussed above regarding *Cammer* factor 4, Twitter had sufficient public float to file a Form S-3 throughout the Extended Period and the Class Period.

77.    Twitter's large market capitalization and public float throughout the Extended Period and the Class Period support a finding that Twitter common stock traded in an efficient market during both the Extended Period and the Class Period.

---

[111]    *Krogman*, 202 F.R.D. at 477-78; *Billhofer*, 281 F.R.D. at 160 ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float … strongly indicate that [a corporation's shares] traded in an efficient market such that the *Basic* presumption is appropriate."); *McIntire*, 38 F. Supp. 3d at 433 (same); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 317 (S.D.N.Y. 2016) ("The markets for companies with higher market capitalizations … are more likely to be efficient."), *aff'd sub nom.* *Waggoner*, 875 F.3d 79 (2017).

[112]    Twitter historical market capitalization and shares outstanding as reported by Bloomberg. Market capitalization represents the market value of a company's issued and outstanding stock. CFA Institute, *CFA Program Curriculum Level I Volume 5: Equity and Fixed Income* (2019), p. 44.

[113]    *See, e.g.,* S&P 500 Factsheet, https://www.spglobal.com/spdji/en/indices/equity/sp-500/#overview; and Nasdaq 100 Factsheet, https://indexes.nasdaqomx.com/docs/FS_XNDX.pdf.

[114]    Free float percentage as reported in Bloomberg. Free float percentage is defined as the number of shares of public float (*i.e.*, shares that are readily and freely tradable) expressed as a percentage of shares outstanding. CFA Institute, *CFA Program Curriculum Level I Volume 5: Equity and Fixed Income* (2019), p. 165.



### 2)    Bid-Ask Spread

78.    The bid-ask spread for a security is the difference between the highest price that a buyer is willing to pay and the lowest price that a seller is willing to accept.[115]  Stocks trading at high volumes with multiple market makers tend to have many ready buyers and sellers and narrower bid-ask spreads, whereas stocks that are more thinly traded tend to have fewer ready buyers and sellers and wider bid-ask spreads.

79.    Certain courts have recognized threshold values for bid-ask spreads that are deemed to weigh in favor of market efficiency.  For instance, the court in *Cheney* found that a bid-ask spread of 2.44 percent weighed in favor of market efficiency.[116]

80.    Bloomberg reports that the average bid-ask spread for TWTR Stock for each trading day during the Extended Period never exceeded 0.18 percent (*e.g.*, bid-ask spread of $0.18 on a trading price of $100) and averaged 0.03 percent.[117]  During the Class Period, the average bid-ask spread for TWTR Stock never exceeded 0.03 percent and averaged 0.02 percent.[118]   The narrow bid-ask spread observed for TWTR Stock supports a finding that the shares traded in an efficient market during both the Extended Period and the Class Period.

### 3)    Statistical Properties of Stock Returns (Autocorrelation)

81.    Econometric techniques used to assess market efficiency involve examining whether lagged (previous day's) price returns are predictors of future (today's) price returns (*i.e.*, whether price returns are autocorrelated over time).  If yesterday's (or the previous day's) returns predict today's returns, security holders can profitably trade on past market data, implying the market is not efficient.[119]  As noted previously, the seven trading days in the Class Period do not provide enough daily observations for high-powered statistical tests, so that I, again, rely upon the Extended Period, which covers and includes the Class Period.

82.    I examine the relationship between yesterday's stock price returns and today's stock price returns using a regression analysis.  When regressing the return of TWTR Stock on its own "lagged" returns (*i.e.*, the prior day's return) throughout the Extended Period, I find no statistically significant relationship.[120]  Put simply, the price return of previous days cannot be used to predict the price return today, which is characteristic of an efficient market.

---

[115]    *Id.* at 44.

[116]    *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003); *see also*, *Billhofer*, 281 F.R.D. at 154 (the average bid-ask spread was 0.198%).

[117]    Twitter bid-ask spread percent as reported by Bloomberg.

[118]    *Id.*

[119]    *See*, *e.g.*, Campbell, *supra* note 45 at 22.

[120]    *See*, *e.g.*, *id.* at 44. In regression analysis, the null hypothesis being tested is that the coefficient on the independent variables is zero.  In this case, the coefficient on the independent variable is insignificant, indicating the data are consistent with the null hypothesis (that the coefficient is zero and that the prior day's return has no impact on the current day's return). Robert S. Pindyck & Daniel L. Rubinfeld, *Econometric Models and Economic Forecasts* (4th ed. 1998), p. 43.



83.     When future returns are not predictable based on historical returns, the price series may follow a "random walk" such that one would expect the presence of what is known as a "unit root" to be reflected in the price series.[121]  The Augmented Dickey-Fuller test, which evaluates the presence of a unit root in a time-series, suggests that the price returns of TWTR Stock were not predictable based on historical performance during the Extended Period, which further supports a finding the TWTR Stock traded in an efficient market throughout both the Extended Period and the Class Period.[122]

84.     These standard statistical results further support a finding that TWTR Stock traded in a semi-strong form efficient market during the Extended Period and, therefore, the Class Period.

### 4)    Lack of Constraints on Short Selling

85.     I understand that the presence of short sellers is considered to be evidence of market efficiency.[123]  Short sellers, who seek to profit from their judgment that a stock is overvalued, may strengthen the ability of a market to correctly adjust for new information by providing an indication of when prices are too high.

86.     While I am aware of no definitive test for constraints on short selling, regulatory agencies rely on certain factors to assess short-selling constraints.  Regulators are routinely concerned with short-selling constraints arising from a "failure to deliver," in which "the seller fails to deliver securities to the buyer when delivery is due."[124]  The SEC, therefore, requires self-regulatory organizations like the NYSE and Nasdaq to maintain threshold lists of securities that illustrate risks of short sale constraints.[125]  A threshold security is one that meets the following three criteria:

   a.    There is an aggregate fail to deliver position at a registered clearing agency for five consecutive settlement days;[126]

   b.    There are aggregate fails to deliver at a registered clearing agency of 10,000 shares or more per security;[127] and

---

[121]   *See, for instance*, Campbell, *supra* note 45 at 30. "Augmented Dickey-Fuller unit root test," in *Stata Time Series Reference Manual Release 15* (2017), p. 156-57.

[122]   The Augmented Dickey Fuller test is consistent with the expectation that, in an efficient market, Twitter stock prices are non-stationary. These results are presented in my reliance materials.

[123]   *See, e.g., Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *Carpenters*, 310 F.R.D. at 81 n.77.

[124]   "Investor Bulletin: An Introduction to Short Sales," *Investor.gov*, October 29, 2015, https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-51.

[125]   *See, e.g.,* "NYSE Regulation Threshold Securities," *NYSE*, https://www.nyse.com/regulation/threshold-securities; "Nasdaq Threshold List," *Nasdaq Trader*, https://www.nasdaqtrader.com/trader.aspx?id=RegSHOThreshold.

[126]   In the context of short selling, fails-to-deliver shares "represent the aggregate net balance of shares that failed to be delivered as of a particular settlement date." "Fails-to-Deliver Data," *SEC*, https://www.sec.gov/data/foiadocsfailsdatahtm; "Threshold Securities," *SEC*, https://www.sec.gov/answers/threshold.htm.

[127]   "Threshold Securities," *SEC*, https://www.sec.gov/answers/threshold.htm.



c. The level of fails is equal to at least one-half of one percent of the issuer's total shares outstanding.[128]

87. The SEC then tracks the total failed-to-deliver shares for each security. As shown in the chart below, the rate of failures-to-deliver for TWTR Stock was below the one-half of one percent threshold established by the SEC on all of the trading days during the Extended Period and the Class Period.

88. Fees associated with selling a given security short may also effectively impose a constraint on short-selling, as large fees would deter some security holders who might otherwise engage in such activity. The SEC noted that securities designated as "threshold securities" tend to have large fees.[129] Since Twitter was not included on the threshold list during either the Extended Period or the Class Period, it follows that fees on short sales of its stock would most likely not have been at the level of a stock with such a "threshold" designation during either the Extended Period or the Class Period.

**Chart 2.  Twitter Failed-to-Deliver Shares[130]**



89. With few delivery failures and the lack of a threshold security designation, there is no evidence of short sale constraints for TWTR Stock during the Extended Period or the Class Period. This is further evidence that TWTR Stock traded in a semi-strong form efficient market during both the Extended Period and the Class Period.

---

[128] 17 CFR § 242.203.

[129] *In the Matter of Gary S. Bell*, SEC Release No. 34-65941, 2011 WL 6184476, at *1 (Dec. 13, 2011) (noting that "threshold securities are hard-to-borrow and therefore command large fees in the stock loan market").

[130] "Fails-to-Deliver Data," *SEC*, https://www.sec.gov/data/foiadocsfailsdatahtm; shares outstanding as reported by Bloomberg.



**C.      Conclusion of Market Efficiency for TWTR Stock**

90.     I understand courts—like academics—have not established a single bright-line test of whether a market for a security is or is not efficient;[131] rather, a finding of market efficiency is based on a comprehensive consideration of multiple factors, as discussed herein.  **Table 1** summarizes my findings for each of these factors for TWTR Stock:

**Table 1.  Summary of Market Efficiency Findings**

| Factor Name | Results | | Supports EMH |
| --- | --- | --- | --- |
| | Extended Period | Class Period | |
| *Cammer* Factors | | | |
| Stock trading volume | 11.9 percent average weekly turnover | 9.4 percent average weekly turnover | Yes |
| Number of analysts following stock | At least 37 covering analysts | At least 37 covering analysts | Yes |
| Market makers and institutional investors | At least 114 market makers and 1,197 institutional holders | At least 84 market makers and 1,197 institutional holders | Yes |
| Eligibility to file an S-3 registration statement | Eligible. | Eligible. | Yes |
| Cause-and-effect relationship between events and stock price movements | Statistically significant differences between Release Days and non-Release Days | Analyzed as part of the Extended Period and based on the alleged curative events | Yes |
| **Other Factors** | | | |
| Market capitalization | > $18.0 billion | > $29.5 billion | Yes |
| Bid-ask spread | Average spread of 0.03 percent | Average spread of 0.02 percent | Yes |
| Stock's float | > 86.8 percent of shares publicly floated | > 86.8 percent of shares publicly floated | Yes |
| Statistical properties | No indication of autocorrelation in returns; unit root illustrates no persistence of historical information in returns | Not separately analyzed | Yes |
| Constraints on short selling | No evidence of persistent constraints | No evidence of persistent constraints | Yes |

91.     Shares that trade in an efficient market do not necessarily have to meet each of the above criteria.   TWTR Stock, however, met each of these criteria throughout the Extended Period and the

---

[131]    *Cammer*, 711 F. Supp. at 1287.



Class Period. In my opinion, TWTR Stock traded in a semi-strong form efficient market during both the Extended Period and the Class Period, which is clearly supported by my analysis of the *Cammer* factors and other factors.

### VII.  Assessment of Market Efficiency for TWTR Options

92.    A stock option is a derivative security that fundamentally derives its value from the underlying stock. There are two types of options contracts: *call options* and *put options*. A *call option* gives the holder the right (but not the obligation) to purchase the underlying asset (in this case, TWTR Stock) at the contractually specified price (or strike price) by the contractually specified date (or expiration date). Conversely, a *put option* gives the holder the right to sell the underlying asset (in this case, TWTR Stock) at the strike price by the expiration date. The party who purchases or owns the option has a *long position*, while the counterparty who sold the option has a *short position*. The price paid for the option is also referred to as the *option premium*. *American options* can be exercised at any time up to the expiration date while *European options* can only be exercised on the expiration date.[132]

93.    The value of an option is comprised of (1) the *intrinsic value* of the option (or the difference between the current underlying asset price and the strike price),[133] and (2) the *time value* of the option (which reflects the probability that the underlying asset may appreciate or depreciate by the end of the expiration date in a manner that is advantageous to the option holder). *Moneyness* describes the intrinsic value of the option's premium. An option is *in-the-money* when there is intrinsic value and exercising the option would provide an economic benefit to the holder. Conversely, an option is *out-of-the money* when there is no intrinsic value and exercising the option would not provide any economic benefit to the holder.[134]

94.    Because the TWTR Options are derivative instruments whose values are derived from TWTR Stock, to assess whether the market for TWTR Options traded in an efficient market, one would first assess whether the market for the underlying asset (in this case, TWTR Stock) also traded in an efficient market. Therefore, the factors discussed above that support the efficiency of TWTR Stock also support the efficiency of TWTR Options.[135] I have already established that shares of TWTR Stock traded in an efficient market during both the Extended Period and the Class Period.

---

[132]    *See* John C. Hull, Options, Futures, and Other Derivatives (9th ed. 2014), p. 9. The TWTR Options traded during the Class Period and Extended Period are American options and can be exercised at any time up to the expiration date. Because of this flexibility, an American Option is worth at least as much as a European Option.

[133]    A long option cannot have an intrinsic value less than zero because the option holder has the right (and not the obligation) to exercise the option, so that the option holder would not exercise the option unless it is advantageous to do so.

[134]    An option whose underlying stock price is equal to the strike price has no intrinsic value and is referred to as being *at-the-money*.

[135]    For example, securities analysts who follow Twitter would disseminate information about Twitter that helps market participants incorporate information into the prices of all Twitter securities, including TWTR Stock and TWTR Options.



95.     Practitioners and courts have found that when stocks of companies that trade on major exchanges generally trade in semi-strong form efficient markets, derivative securities based on such stock can also be considered to trade in efficient markets.[136]  As the Court stated in *Cammer* (citing Bromberg):[137]

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the Nasdaq National Market System.

96.     Throughout the Class Period, TWTR Options traded on the Chicago Board Options Exchange ("CBOE").  The CBOE was founded in 1973 and was the first marketplace for trading U.S. listed options.[138] Today, the CBOE is the largest U.S. options exchange with an average of 11.8 million contracts traded each day.[139]  The fact that TWTR Options traded in the largest U.S. options exchange supports the conclusion that TWTR Options traded in an efficient market during the Class Period.

### A.     Put-Call Parity Relationship

97.     Empirical evidence regarding whether options demonstrate a no-arbitrage relationship known as put-call parity ("Put-Call Parity") during the Class Period also support an inference of market efficiency in those options.  Options demonstrating qualities of put-call parity are thought to trade in an efficient market.

98.     Put-Call Parity is a principle that defines the relationship between the prices of a European call and put option with the same underlying asset, strike price, and expiration.[140]  While the TWTR Options are American options, Put-Call Parity should nevertheless generally hold to a close approximation because American options can, in this application, be thought of as a series of European options.  For Put-Call Parity to hold, the value of a European call option ("$C$") plus the present value of the option's strike price ("$PV(K)$") should be equal to the value of a European put option ("$P$") plus the value of the underlying asset ("$S_0$") less the present value of dividends expected to be paid during the remaining duration of the option ("$PV(D)$"):

$$C + PV(K) = P + S_0 - PV(D)$$

99.     Rearranging the equation above, the implied value of the underlying stock ("$S_0$") can be expressed as follows:

$$S_0 = C - P + PV(K) + PV(D)$$

---

[136]   *See*, *e.g.*, *JPMorgan Chase & Co.*, 2015 WL 10433433, at *7 ("[A] stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient"); *Livonia Emps.'*, 284 F.R.D. at 181-82 (NYSE "is a presumptively efficient market"); *Lapin*, 254 F.R.D. at 183 ("[N]o argument could be made that the New York Stock Exchange is not an efficient market."); *see also* Brief of Testifying Economists as Amici Curiae in Support of Resp'ts, *Halliburton I*, 2014 WL 507164, at *7-8.

[137]   *Cammer*, 711 F. Supp. at 1292 (citing *Bromberg*).

[138]   "About Us," *CBOE*, https://www.cboe.com/about/#our-story.

[139]   "Overview," *CBOE*, https://res.cboe.com/us/options/overview; "Market Statistics," *CBOE*, https://www.cboe.com/data/market_statistics.

[140]   *See* Hull, *supra* note 132 at 251.



100.    Deviations from Put-Call Parity are normally seen in financial markets and do not, in and of themselves, impugn options market efficiency.  The rate of such deviations relative to market norms, however, can help inform views of options market functioning and potentially, thereby, efficiency.  I matched each call option with the corresponding put option during the Class Period based on their strike prices and expiration dates as reported by the CBOE.  I use the average of the daily best bid and best ask quotes provided by CBOE to estimate the prices of the TWTR Options, and the underlying TWTR Stock prices provided by CBOE.[141]   Since options do not include dividends prior to their exercise, it is commonly necessary to estimate the present value of such dividends.  In this case, however, TWTR did not pay any dividends during the Class Period and, thus, the present value of dividends is set to $0.[142]  Dividends and strike prices are normally discounted using risk-free rates obtained from Bloomberg.[143]

### 1)    Evans, *et al.* Put-Call Parity Approach

101.    While persistent deviations of Put-Call Parity may indicate an impact of short-sale constraints,[144] I did not find evidence of short-sale constraints for TWTR Stock during the Extended Period or the Class Period, as discussed in Section VI.B(4).  Absent constraints on short sales, Put-Call Parity deviations suggest that arbitragers should be able to earn riskless profits (after accounting for any transaction costs) by purchasing the cheaper assets and selling the expensive ones and that short-term arbitrage opportunities should dissipate quickly in an efficient market.  The lack of persistent Put-Call Parity deviations would, therefore, indicate that the market for TWTR Options traded in an efficient market during the Class Period.

102.    Evans, *et al.* (2009) found that the average Put-Call Parity deviation for approximately 4.5 million pairs of options between 1998 and 1999 was 0.36 percent.[145]   Based on the same analyses presented in the article, the Put-Call Parity deviations for TWTR Options was negative 0.08 percent during

---

[141]   CBOE provides the best bid, best ask, and underlying share price as of 3:45 pm eastern. *See* "Option End-of-Day Summary File Specification," *CBOE*, https://datashop.cboe.com/documents/Option_EOD_Summary_Layout.pdf.

[142]   *See, e.g.*, Twitter, Form 10-K for period ending December 31, 2021, p. 38 (noting that "[Twitter has] never declared or paid any cash dividends on [its] capital stock. [Twitter] intend[s] to retain any future earnings and do[es] not expect to pay any dividends in the foreseeable future."). Although the Board of Directors for Twitter approved a dividend distribution of one right for each outstanding share of the Company's common stock to stockholders of record as of the close of business on April 25, 2022 as set forth in a Preferred Stock Rights Agreement dated as of April 15, 2022, the transaction with Mr. Musk was deemed not to trigger the dividend distribution right. Twitter, Form 10-Q for period ending June 30, 2022, p. 26.

[143]   Risk-free rates are linearly interpolated.

[144]   *See, e.g.*, Richard B, Evans et al., "Failure is an Option: Impediments to Short Selling and Option Prices," 22(5) *Review of Financial Studies* (2009) ("Evans (2009)"); Eli Ofek, et al., "Limited Arbitrage and Short Sale Restrictions: Evidence from the Options Markets," 74 *Journal of Financial Economics* (2004) ("Ofek (2004)").

[145]   Evans (2009).



the Class Period (as presented in **Exhibit 3A**),[146] lower than the average presented in the article. The results of this test support the efficiency of the market of TWTR Options during the Class Period.[147]

### 2)    Ofek, *et al*. Put-Call Parity Approach

103.    The presence of Put-Call Parity deviations may also be due to the non-synchronous trading of the underlying stock and quoted option prices (so that apparent deviations are merely be the result of measurement error rather than an actual deviation of Put-Call Parity).[148]

104.    Ofek, *et al*. (2004) found that the average Put-Call Parity deviation for a sample of approximately 80 thousand pairs of options between July 1999 and November 2001 was 0.30.[149] Based on the same analyses presented in the article, the Put-Call Parity deviations for TWTR Options was negative 0.11 during the Class Period (as presented in **Exhibit 3B**),[150] lower than the average presented in the article. The results of this test also support the efficiency of the market of TWTR Options during the Class Period.[151]

### B.    Conclusion of Market Efficiency for TWTR Options

105.    My analyses of TWTR Options during the Class Period indicate that the prices of TWTR Stock and TWTR Options reflected their respective intrinsic values as evident by the absence of any persistent Put-Call Parity deviations during the Class Period. I also found that TWTR Stock, the underlying asset from which the TWTR Options derive their value, traded in an efficient market during the Extended Period and the Class Period. Based on this evidence, it is my opinion that TWTR Options traded in an efficient market during the Class Period.

---

[146]    The authors calculated Put-Call Parity deviation as follows: Put-Call Parity deviation = $(S_0 - S_i)/S_0$ , where $S_0$ equals the actual underlying TWTR Stock price, and $S_i = C - P + PV(K) + PV(D)$, the implied stock price based on the Put-Call Parity relationship. I applied the same filters that the authors apply in the Failure is an Option article: excluding options with fewer than six calendar days and greater than 180 calendar days to expiration; options with prices less than $0.375; and options whose option value is less than its intrinsic value.

[147]    *See* **Exhibit 3A**. As a robustness check, I also assess options that are near-the-money and found the results to be consistent with my findings.

[148]    *See, e.g.*, Ofek, supra note 144.

[149]    *Id.* at Table 2.

[150]    The authors calculated Put-Call Parity deviation as follows: Put-Call Parity deviation ("R") = $100 \times ln(S_0/S_i)$ , where $S_0$ equals the actual underlying TWTR Stock price, and $S_i = C - P + PV(K) + PV(D)$, the implied stock price based on the Put-Call Parity relationship. I applied the same filters that the authors apply in the Limited Arbitrage and Short Sale Restrictions article: excluding options with zero open interest, options with underlying stock prices below $5.00, options with fewer than 30 calendar days and greater than 365 calendar days to expiration, options that are out-of-the money (where $|ln(S_0/K)| > 0.3$, options with bid-ask spreads > 50%, and options whose call price is less than its intrinsic value.

[151]    *See* **Exhibit 3B**. As a robustness check, I also assess options that are near-the-money and found the results to be consistent with my findings.



### VIII. Measuring Damages to Shareholders on a Class-wide Basis

106.   Under Plaintiff's liability theory, Defendants' misrepresentations and omissions of material facts regarding Mr. Musk's acquisition of TWTR Stock caused TWTR Stock to trade at artificially deflated prices between March 25, 2022 and April 4, 2022. According to Plaintiff, security holders were harmed to the extent they sold TWTR Stock and/or TWTR Call Options and/or purchased TWTR Put Options at prices that were impacted by Defendants' alleged misstatements and deceptive scheme.

107.   At any time during the Class Period, the amount of artificial deflation in the price of TWTR Stock, like the share price itself, was identical for all shares of TWTR Stock traded on the NYSE. The daily artificial price deflation amounts are sometimes referred to as the deflation ribbon, which is the difference between the actual security prices and the security prices that should have prevailed but-for the alleged fraud.  This deflation ribbon can be used to compute damages for any and all members of the Proposed Class using a uniform, class-wide methodology.  Specifically, damages for any and all members of the Proposed Class that sold TWTR Stock can be calculated as the price deflation at the time securities were sold less any price deflation present at the time securities were purchased (or acquired).  This method is widely accepted and applies to any and all members of the Proposed Class.

108.   Any share price deflation on TWTR Stock also affects the value of TWTR Options, as the value of the options are derived from the underlying stock.  There would, therefore, be inflation and/or deflation for each TWTR Call Option and each TWTR Put Option (which vary by strike price and expiration date across call options and put options) throughout the Class Period.  The inflation and/or deflation for each TWTR Options contract can then be used to compute damages for any and all members of the Proposed Class.  For TWTR Call Options, damages can be calculated as the deflation present at the time securities were sold (or written) less any deflation present at the time securities were purchased (or acquired).  For TWTR Put Options, damages can be calculated as the inflation present at the time securities were purchased (or acquired) less any inflation present at the time securities were sold (or exercised).  This approach is similarly widely accepted and identical across all members of the Proposed Class.

109.   In this manner, damages can be calculated in the same way for all class members, based on the timing and volume of each class member's transactions of TWTR Stock and TWTR Options, using generally accepted methodologies.

### A.   Measuring Share Price Deflation Based on Curative Events

110.   Estimating share price deflation often begins by analyzing the impact of curative events.  When previously withheld information is disclosed to the market, artificial price deflation is removed from a security's price (*i.e.*, causing the stock price to increase in response to the disclosed information).  Curative events may, therefore, indicate the extent to which the share price had been impacted by the alleged



material misrepresentations, omissions, or deceptive scheme and, as a result, may be used to estimate share price deflation in the context of semi-strong form efficient markets.

111.   Based on my conclusion that shares of TWTR Stock traded in a semi-strong form efficient market, the share price reacted to new, value-relevant information promptly reflected the effects of such events on the share price.[152]   I can, therefore, measure the impact of a curative event on the price of TWTR Stock using the abnormal returns, if any, that followed such disclosure, as determined through an event study approach.

112.   When an abnormal return follows a curative event, it may be reasonable to conclude that the return was caused by the event in question, provided news of the event became available to the market at the time of (or prior to) the abnormal movement.  If no other information was released at or about the same time as the event, then the abnormal return may be used as an estimate of the event's effect on the value of the Company's shares.  If information unrelated to the alleged fraud (*i.e.*, "confounding information") was also released at or about the same time as the curative events, then I would evaluate whether such confounding information is responsible for all or some of the abnormal stock price return.  If I determine that confounding information caused some of the abnormal stock price decline following a curative event, then I can isolate the portion of such price decline caused by the confounding information so as to "disaggregate" the price impact of such confounding information from the price impact of the fraud-related information.  There are a variety of means by which I could analyze potentially confounding information (in accordance with Plaintiff's theory of liability) and disaggregate the price impact of such confounding information, if necessary, including standard financial analysis and valuation tools.  For instance, practitioners routinely measure the value of expected earnings using income and market approaches, which may be used to quantify the impact of changes in expectations and perceived risks associated with a business or earnings stream.[153]

## B.    Calculating Share Price Deflation for TWTR Stock During the Class Period

113.   I understand Plaintiff claims that Twitter security holders were harmed to the extent they sold TWTR Stock and/or TWTR Call Options and/or purchased TWTR Put Options at prices that were impacted by Defendants' alleged misstatements and deceptive scheme.  Thus, once the impact of the curative event, if any, on the price of TWTR Stock has been estimated, one may estimate the share price deflation that existed for each day in the Class Period based on how earlier counterfactual disclosures of the relevant information would have affected the price of shares of TWTR Stock at the time they would have been made.

---

[152]   *See, e.g.,* A. Craig MacKinlay, "Event Studies in Economics and Finance," 35 (1) *Journal of Economic Literature* (March 1997).

[153]   *See, for instance,* Shannon P. Pratt, "*Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), Chapters 3, 9, 11. Under the income approach, value today equals future cash flows discounted at the opportunity cost of capital, which reflects the risk associated with those cash flows. The market approach generally applies a multiple to a measure of future income, such as earnings.



114.   To the extent I am called upon to evaluate damages and loss causation at a later stage of this case, I will consider the facts and circumstances of the case, including documents produced and testimony elicited during the discovery phase of this litigation as appropriate, in order to measure the extent to which, if at all, Twitter's common stock price was artificially deflated throughout the Class Period, during which Defendants allegedly misrepresented and failed to disclose material, adverse, non-public information regarding Defendants' artificial suppression of the price of TWTR Stock.  I will also consider how artificial share price deflation in Twitter common stock was affected by the allegedly concealed information during the Class Period and the impact that the alleged curative event had on artificial deflation.  This analysis will allow me to measure artificial share price deflation on every day of the Class Period for all members of the Class, which I will use to compute damages to each member of the Proposed Class using the same methodology.

### C.   Calculating Price Inflation and Deflation for TWTR Options During the Class Period

115.   Once price deflation of TWTR Stock has been determined for each day during the Class Period, one can assess the impact of the share price deflation on the value of TWTR Options for each day during the Class Period using the Black-Scholes-Merton model ("BSM").[154]  The BSM is regularly used to estimate the value of stock options.[155]  In determining the value of a stock option, the BSM relies on six factors that affect the price of a stock option:[156]

> a.   the current stock price ($S_t$) at time $t$;
>
> b.   the strike price ($K$);
>
> c.   the time to expiration ($T$);
>
> d.   the volatility of the stock price ($\sigma$);
>
> e.   the risk-free interest rate ($r$); and
>
> f.   the expected dividends during the life of the options contract ($D$).

116.   The amount of inflation and/or deflation on TWTR Options can be estimated for each day during the Class Period by calculating the difference between (a) the value implied by the BSM using the actual price of TWTR Stock and (b) the value implied by the BSM using the price of TWTR Stock but for the

---

[154]   Myron S. Scholes and Robert C. Merton both won the noble prize in economics largely for their work on options valuation and the BSM pricing model. Fischer Black died in 1995 and was ineligible for the prize. *See* "Myron Scholes Facts," *The Nobel Prize*, https://www.nobelprize.org/prizes/economic-sciences/1997/scholes/facts and "Robert C. Merton Facts," *The Nobel Prize*, https://www.nobelprize.org/prizes/economic-sciences/1997/merton/facts.

[155]   *See* Hull, *supra* note 132 at 321-47. Alternatively, a binomial options model can be implemented to take into account the optionality of an American option. *See, e.g.*, John C. Hull, *Options, Futures, and Other Derivatives* (7th ed. 2008), pp. 237-56.

[156]   Hull, *supra* note 132 at 234.



alleged misrepresentations and omissions.[157]    One can estimate inflation or deflation for each TWTR Options contract that traded during the Class Period.

117.   The  amount of inflation and/or deflation on TWTR Options is estimated based on the difference between two model prices (with the change based on the difference in stock price).  Therefore, to the extent there may be modeling error based on the choice of assumptions or the choice of option model, one could reasonably assume that the modeling errors may cancel each other out.  There is also no reason to expect the choice of option model would bias the inflation calculations in either direction.

### D.    Calculation of Class Member Damages

118.   I understand that Section 10(b) addresses the liability for Class Members who sustained losses in connection with the purchase or sale of securities as a result of the Defendants' alleged fraudulent scheme and misrepresentations and/or omissions.[158]   In cases with allegations of securities fraud, I understand courts regularly accept damages claims calculated using the well-established and widely accepted approach based on "out-of-pocket" losses.[159]  This approach measures the difference between the price an investor paid, and the price that investor would have paid but for the fraud (*i.e.*, the amount of artificial deflation in the stock price).

119.   Once the deflation ribbon for TWTR Stock has been estimated for each day during the Class Period and the associated inflation and/or deflation for each TWTR Options contract has been computed for each day during the Class Period, including by performing any analyses required to disaggregate the price impact of any confounding information, one may compute damages arising from Defendants' alleged fraudulent scheme and misrepresentations and/or omissions.

120.   For any and all members of the Proposed Class who sold TWTR Stock during the Class Period, damages can be calculated as the price deflation at the time securities were sold less any price deflation present at the time securities were purchased (or acquired).  For any and all members of the Proposed Class who sold TWTR Call Options, damages can be calculated as the deflation present at the

---

[157]   This calculation can be performed reliably using the same input parameters ($K, T, \sigma, r,$ and $D$) to estimate the impact of a higher but-for share price on the option value. This calculation assumes that the alleged misrepresentations and omissions did not materially affect the expected dividends to be paid during the life of the option ($D$) or the stock volatility ($\sigma$).

[158]   *See* 17 CFR § 240.10b-5 ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").

[159]   Courts in the Southern District of New York as well as across the nation widely recognize that the "out of pocket" measure of damages based on an event study is "the generally accepted method for measuring damages in a securities fraud class action." *In re Allergan PLC Sec. Litig.,* 2021 WL 4077942, at *15 (S.D.N.Y. Sept. 8, 2021) ("As this Court has previously noted, there is 'no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case.'"). *See also Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 131 (S.D.N.Y. 2023) ("Here, Plaintiff proposes that the damages are the difference in the price received for the shares (*i.e.*, $17.30) and the value the shareholders should have received absent the materially misleading Proxy. This is a typical measure of damages.") (collecting cases); *Barrick Gold*, 314 F.R.D. at 103 ("Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages."); *City of Miami Gen. Emps. Ret. Trust v. RH, Inc.,* 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (noting that an event study "is the standard measurement of damages in Section 10(b) securities cases.") (gathering cases).



time securities were sold (or written) less any deflation present at the time securities were purchased (or acquired).  For any and all members of the Proposed Class who purchased TWTR Put Options, damages can be calculated as the inflation present at the time securities were purchased (or acquired) less any inflation present at the time securities were sold (or exercised).  The total amount of damages can then be calculated by the total number of shares (or options) multiplied by the per-share (or per-option) loss.

121.   One also must consider statutory limitations in relation to class members' damages, to the extent they are deemed relevant.  In particular, I understand the Private Securities Litigation Reform Act of 1995 ("PSLRA") states that "damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[160]  This limitation can be applied mechanically to each transaction that results in damages for each member of the Proposed Class still holding the security at such date.

122.   The methods and techniques I describe are widely accepted and may be applied to any and all members of the Proposed Class.

### IX.   Further Work

123.   My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available to me.

_____

Joseph R. Mason, PhD

---

[160]   15 U.S.C. § 78u-4(e)(1).  Additionally, "if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period," then "damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security." 15 U.S.C. § 78u-4(e)(2).



**Appendix A**



## JOSEPH R. MASON PhD
*Senior Advisor*

Dr. Joseph R. Mason is a PhD economist with more than 25 years of experience applying structured economic reasoning to litigation, regulatory, and public policy testimony.

In litigation, Dr. Mason is frequently retained as an economic expert in disputes and investigations involving complex pricing, valuation, and macroeconomic dynamics in both unregulated and regulated markets, including financial, energy, health, insurance, and telecommunications. He has testified on loss causation and damages in class action, antitrust, and private litigation (*i.e.*, transfer pricing, contractual suitability, standard of care, financial guaranties, and representations and warranties) as well as market efficiency and damages in Rule 10(b)-5, Section 11, and other securities litigation. Dr. Mason has offered expert testimony at trials, depositions, or arbitrations more than 65 times, having been retained on behalf of entities including banks, hedge funds, insurance companies, and the U.S. government. He has testified in high-profile federal court cases such as Assured Guaranty Municipal Corp. v. Flagstar Bank, In re Blue Cross Blue Shield Antitrust Litigation, In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations, and TMI Trust Company of New York v. WMC Mortgage LLC at trials and hearings in U.S. District Courts in the Southern District of New York, the District of Connecticut, the District of Columbia, and others.

In regulatory matters, Dr. Mason has been engaged by both the SEC and respondents in a variety of investigations and lawsuits relating to matters including insider trading (both civil and criminal litigation), algorithmic trading, mark-to-market procedures, and investment portfolio allocations. Dr. Mason has been engaged by banks in connection with regulatory risk management system reviews, proper implementation and classification of structured finance arrangements, and regulatory economic capital assessments. He has also been engaged as a principal in multiple internal risk management and modeling reviews by institutions such as Fannie Mae, Credit Agricole CIB/Calyon, and ExxonMobil.

Regarding public policy, Dr. Mason has testified before numerous U.S. House and Senate Committees, European Parliament, and the Federal Reserve Board. He has also advised Congress' Joint Economic Committee, the Government Accountability Office, the Congressional Research Service, the Federal Reserve Bank of Richmond, the Public Company Accounting Oversight Board, and the Financial Crisis Inquiry Commission. He has appeared on numerous television and radio networks and been cited extensively in print media.

Dr. Mason is currently a Fellow at the University of Pennsylvania's Wharton School of Business. Over the course of a lengthy academic career, he was a tenured Professor of Finance and the Hermann Moyse, Jr. / Louisiana Bankers Association Chair at Louisiana State University, an Assistant and tenured Associate Professor at Drexel University, and adjunct faculty at Georgetown University. Before that, Dr. Mason was a Senior Financial Economist at the Office of the Comptroller of the Currency, where, among other things, he analyzed economic risks in support of bank examinations and regulatory policy. He performed similar work for the Federal Reserve Bank of Philadelphia, the Federal Deposit Insurance Corporation, and the World Bank. His economic training and experience are reflected in his many published academic articles on financial crises, valuation, and risk management in the presence of imperfect information, the economics of loss causation, and the economic dynamics of liquidations and recoveries.

Dr. Mason holds a Doctor of Philosophy and Master of Science in economics from the University of Illinois at Urbana-Champaign and a Bachelor of Science in economics from Arizona State University.

**Direct** *+1.212.364.1926*
**Mobile** *+1.610.805.9083*
**Email** *jmason@bvagroup.com*



**JOSEPH R. MASON,** PhD

*Senior Advisor*

---

## TESTIMONY AND PUBLICATIONS

**DEPOSITION TESTIMONY:**

*MLRN LLC, v. U.S. Bank National Association*
No. 65712/2018
Supreme Court of the State of New York, County of New York

*Florida Health Sciences Center, Inc., et al., v. Richard Sackler, et al.*
No. 19-018882
In the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida

*In re: Interest Rate Swaps Antitrust Litigation*
MDL No. 2704 Master, Docket No. 16 MD 2704 (JPO)
United States District Court, Southern District of New York

*SEB Investment Management AB, et al., Individually and On Behalf of All Others Similarly Situated v. Wells Fargo & Company, et al.*
No. 3:22-cv-03811
United States District Court, Northern District of California

*Commerzbank AG, v. Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas*
No. 1:15-cv-10031-JGK
United States District Court, Southern District of New York

*Sjunde AP-Fonden, individually and on Behalf of All Others Similarly Situated v. The Goldman Sachs Group, Inc., et al.*
No. 1:18-cv-12084-VSB
United States District Court, Southern District of New York

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*Industriens Pensionsforsikring A/S, Individually and On Behalf of All Others Similarly Situated v. Becton, Dickinson and Company, Vincent A. Forlenza, Thomas E. Polen, and Christopher R. Reidy*
No. 2:20-cv-02155-SRC-CLW
United States District Court, District of New Jersey

*Deutsche Bank National Trust Company, solely in its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 v. Morgan Stanley ABS Capital I Inc.*
No. 650291/2013
Supreme Court of the State of New York, County of New York

*Deutsche Bank National Trust Company, solely in its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.*
No. 651959/2013
Supreme Court of the State of New York, County of New York

*Commerzbank AG v. U.S. Bank National Association*
No. 16-cv-04569-DLC-SDA
United States District Court, Southern District of New York

---

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**



**JOSEPH R. MASON,** PhD

*Senior Advisor*

---

*Phoenix Light SF Limited, et al. v. HSBC Bank USA, National Association*
No. 14-cv-10101-LGS-SN
United States District Court, Southern District of New York

**TRIAL AND HEARING TESTIMONY:**

*Sjunde AP-Fonden, individually and on Behalf of All Others Similarly Situated v. The Goldman Sachs Group, Inc., et al.*
No. 1:18-cv-12084-VSB
United States District Court, Southern District of New York

*United States of America v. Sun Kook (Bill) Hwang and Patrick Halligan*
No. 1:22-cr-00240
United States District Court, Southern District of New York (Foley Square)

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*In re Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406)*
No. 13-cv-20000-RDP
United States District Court, Northern District of Alabama, Southern Division

**LEGISLATIVE AND REGULATORY TESTIMONY, BRIEFS, AND PRESENTATIONS:**

Brief of Joseph R. Mason, et al., as Amici Curiae Supporting Respondents, *On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit, In The Supreme Court of the United States*, Facebook Inc., et al., Petitioners, v. Amalgamated Bank, et al., Respondents, October 1, 2024.

Brief of Joseph R. Mason as Amicus Curiae in Support of Respondent, on *Writ of Certiorari to the United States Court of Appeals For The Second Circuit, in the Supreme Court of the United States*, Alex Cantero, et al., Individually and on Behalf of All Others Similarly Situated, Petitioners, v. Bank of America, N.A., Respondent, January 25, 2024.

Brief of Prof. Joseph R. Mason in Support of Petitioner, on *Petition for a Writ of Certiorari to the United States Court of Appeals for the Second Circuit, in the Supreme Court of the United States*, Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Lender Claim Trust, Petitioner, v. JP Morgan Chase Bank, N.A., et al., Respondents, January 22, 2024.

*Presentation to U.S. Securities & Exchange Commission Staff*
Confidential matter relating to whether and how a global asset management company applied algorithmic trading tools, models, and methods to emerging market debt portfolio management, Washington, D.C.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Financial Economists in support of Respondents, on *Writ of Certiorari to the United States Court of Appeals for the Second Circuit, In The Supreme Court of the United States*, Goldman Sachs Group, Inc., et al., Petitioners, v. Arkansas Teacher Retirement System, et al., Respondents, March 3, 2021.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Economics and Finance Professors, in support of *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Defendant's Cross Motion-Motion for Summary Judgment*, People of the State of California, et al., Plaintiffs, v. The Office of the Comptroller of the Currency, et al., Defendants, United States District Court, Northern District of California (Oakland), January 21, 2021.

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**

**bvagroup**® | Valuation. Disputes. Advisory.

**JOSEPH R. MASON,** PhD

*Senior Advisor*

---

*Testimony before the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Energy and Mineral Resources,* "Climate Change: Preparing for the Energy Transition," February 12, 2019.

Co-Author (with Jeffrey D. Balcombe and W. Scott Dalrymple), *"Financial Supervision and Regulation in the US: Dodd-Frank Reform," European Parliament*, December 2018.

*Testimony before the U.S. Senate Committee on Energy and Natural Resources,* "Hearing on the Bureau of Ocean Energy Management's 2017-2022 OCS Oil and Gas Leasing Program," May 19, 2016.

*Testimony before the U.S. House of Representatives Committee on Natural Resources,* "The Impacts of Federal Policies on Energy Production and Economic Growth in the Gulf," September 15, 2015.

"Overview and Structure of Financial Supervision and Regulation in the U.S.," Prepared for the European Parliament's Committee on Economic and Monetary Affairs, Directorate General for Internal Policies, Policy Department A: Economic and Scientific Policy, IP/A/ECON/2012-16, PE 492.470, September 2015.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee, Minority Field Hearing,* "The EPA's Threat to Louisiana's Ozone Attainment," August 5, 2014.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee,* "Climate Change: The Need to Act Now," June 18, 2014.


**ACADEMIC PUBLICATIONS:**

"Income and Health Care Consumption: Evidence from Mortgage Payment Shocks," (with Hong Lee and Deokrye Baek), forthcoming *Health Economics.*

"The Recent History and Development of Syndicated Loan Markets," (with Todd E. Goldwasser), *Securities Regulation Law Journal*, Vol. 52, No. 4, Winter 2024.

"Did Doubling Reserve Requirements Cause the 1937-38 Recession? New Evidence on the Impact of Reserve Requirements on Bank Reserve Demand and Lending," (with Charles Calomiris and David Wheelock), *Journal of Financial Intermediation*, Vol. 56, October, 2023.

"Odd Lot Illusion: The Lack of Discounts for Non-Agency Residential Mortgage Backed Securities after the Crisis," (with Jody W. Bland and W. Scott Dalrymple), *Securities Regulation Law Journal*, Spring 2023.

"ETF ownership and firm-specific information in corporate bond returns," (with Meredith E. Rhodes), *Journal of Financial Markets*, Vol. 63, March 2023.

"Asset Sales, Recourse, and Investor Reactions to Initial Securitizations: Evidence Why Off-Balance Sheet Accounting Treatment Does Not Remove On-Balance Sheet Financial Risk," (with Eric J. Higgins and Adi Mordel), *Journal of Risk Finance*, Vol. 20, Issue 3, August 12, 2019.

"Self-reporting under SEC Reg AB and transparency in securitization: evidence from loan-level disclosure of risk factors in RMBS deals," (with Michael Imerman and Hong Lee), *Journal of Risk Finance*, Vol. 15, Issue 4, August 18, 2014.


**BOOK CHAPTERS:**

"Financial Regulation and Fraud in CO2 Markets," *Research Handbook of Investing in the Triple Bottom Line*, Sabri Boubaker, Douglas Cummings and Doc Nguyen, eds., Cheltenham: Edward Elgar, 2018, pp. 9-28.

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**

bvagroup® | Valuation. Disputes. Advisory.

**JOSEPH R. MASON,** PhD

*Senior Advisor*

---

"Contagion and Bank Failures during the Great Depression: The Chicago Banking Panic of June 1932," (with Charles Calomiris), American Economic Review, December 1997 (87:5), pp. 863-884. Reprinted in The International Library of Critical Writings in Economics –*Regulation and Governance of Financial Institutions*, edited by James R. Barth and Ross Levine, Cheltenham: Edward Elgar Publishers, 2016.


**COMMENTS, OPINIONS, EDITORIALS:**

"One Way to Keep Medicare Working in Pennsylvania," *Pittsburgh Post-Gazette*, April 22, 2025

"Outlawing Software Won't Bring Down Philly Rents," *NJBIZ*, February 10, 2025

"The CFPB's recent lawsuits cement the case for its dissolution," *American Banker*, January 30, 2025

"How innovative approaches to the future of work will benefit U.S. economy," *The Center Square*, January 17, 2025

"The FDIC Should Look Inward Before Taking On More Regulation," *RealClearMarkets.com*, October 10, 2024.

"SVB's Sudden Collapse Wasn't a Social Media Triggered 'Twitter Run.' It's What People Always Do When their Money is Threatened," (with Kris James Mitchener), *MarketWatch*, March 25, 2023

"Here's Why the Key Metric Used to Test the Health of U.S. Banks is Flawed," *CNBC Squawk Box Interview*, March 17, 2023.

"Stress Testing Wouldn't Have Saved Silicon Valley Bank," (with Kris James Mitchener), *Wall Street Journal*, March 15, 2023.

"COVID-19 Recovery and Commercial Real Estate Dynamics," (with Jody Bland), *BVA Group*, April 17, 2020.

"Evaluating Economic Losses in the Age of Coronavirus," (with Jody Bland), *BVA Group*, April 16, 2020.

"PPP Loan Policy and Lenders' Litigation Risk," (with Jody Bland), *BVA Group*, April 6, 2020.

"COVID-19 as a Natural Disaster and the Role of CARES," (with Jody Bland), *BVA Group*, April 2, 2020.

"Consumer Debt Defaults and the COVID-19 Pandemic," (with Jody Bland), *BVA Group*, March 27, 2020.

"Investing in a Consumer Debt Holiday," (with Jody Bland), *BVA Group*, March 25, 2020.

"COVID-19 Economic Policy to Fight the New War," (with Jody Bland), *BVA Group*, March 24, 2020.

"Mortgage Payment Holidays, Servicing Advances, and Fed Policy," (with Jody Bland) *BVA Group*, March 23, 2020.

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**

**bva**group® | Valuation. Disputes. Advisory.

**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Appendix B - Information Considered**

**Court Documents:**
(1) Opinion and Order, March 28, 2025
(2) First Amended Class Action Complaint for Violations of the Federal Securities Laws, May 28, 2024

**Analyst Reports:**
(1) Rosenblatt Securities, "Trump Ban All But Secures Dismal '21E Outlook," January 12, 2021
(2) Rosenblatt Securities, "Disruption or Evolution; Twitter Bluesky Backup + NBCU Wants in on Ecomm Gold Rush," January 15, 2021
(3) Rosenblatt Securities, "Soft '21 Revenue Guide Highlights iOS Uncertainty," February 10, 2021
(4) Rosenblatt Securities, "Analyst Day Reaches for the Stars, and May Have One in Back Pocket," February 26, 2021
(5) Rosenblatt Securities, "MAP Can't Roll Back the Clock; US ARPU to Slip Further in '21," April 30, 2021
(6) Rosenblatt Securities, "Houston, We Still Have a DAU Problem," July 23, 2021
(7) Rosenblatt Securities, "iOS and Twitter Share Brief Kinship, But Don't See BFF Future," October 27, 2021
(8) Invest Heroes, "3Q 2021 Report," November 30, 2021
(9) Zacks, "Twitter Inc," December 28, 2021
(10) Stock Traders Daily, "TWTR," January 1, 2022
(11) Truist Securities, "Lowering Ests on Sale of MoPub; Higher Opex Under New CEO," January 10, 2022
(12) Cowen, "TWTR; US Ad Buyer Survey Highlights; 4Q21 Preview," January 13, 2022
(13) Zacks, "Twitter Inc," January 14, 2022
(14) Stock Traders Daily, "TWTR," January 15, 2022
(15) Zacks, "Twitter Inc," January 16, 2022
(16) JPMorgan, "Updating Estimates for Higher '22 Expenses," January 25, 2022
(17) Stock Traders Daily, "TWTR," January 25, 2022
(18) UBS, "4Q21 Preview; FB, GOOGL, SNAP, TWTR, PINS," January 25, 2022
(19) Zacks, "Twitter Inc," January 27, 2022
(20) MKM Partners, "Lowering PT & Ests; We Like the New CEO's Quick Moves; Now, Just Reset '23E Guide Before Flying," January 28, 2022
(21) Valens Credit, "Credit Markets and Rating Agencies Continue to Overstate Credit Risk," January 28, 2022
(22) Morgan Stanley, "How Are FB, SNAP, PINS, TWTR and TikTok Engagement Changing and What it Means for '22," January 30, 2022
(23) Stock Traders Daily, "TWTR," February 1, 2022
(24) Valens Credit, "Weekly Insights," February 2, 2022
(25) Zacks, "Twitter Inc," February 2, 2022
(26) Marktfeld, "Intraday vs Overnight Returns 2017 to 2022," February 4, 2022
(27) JPMorgan, "Latest Thoughts Into Week of Feb. 7 Internet Earnings," February 6, 2022
(28) BofA Global Research, "4Q Soft; See Attractive Valuation and Improving Product Focus," February 10, 2022
(29) Canaccord Genuity, "Product Improvements and Investments Persist," February 10, 2022
(30) Evercore ISI, "Proof in This Pudding Is Still Pending," February 10, 2022
(31) Guggenheim, "Daily MIC; TWTR 4Q21; Repurchase Plan Overtakes In Line Results, Lower 1Q FY Guide," February 10, 2022
(32) Guggenheim, "TWTR; NEUTRAL; Need for Acceleration Intensifies as Guidance Window Tightens; 4Q21 Review," February 10, 2022
(33) Jefferies, "Q4; Encouraging Rev Growth Outlook, But Discouraged by 1M User Miss," February 10, 2022
(34) JPMorgan, "4Q21 Quick Look; In Line Results a Sigh of Relief," February 10, 2022
(35) Morningstar, "Twitter's Strong User Growth and Monetization Keeps Firm on Track," February 10, 2022



## Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.
## Appendix B - Information Considered

(36) Oppenheimer, "Plodding Along, But Potential to Gain Share at Low Valuation," February 10, 2022

(37) Piper Sandler, "4Q21 Wrap; Solid Debut for New CEO, LT Targets Unchanged," February 10, 2022

(38) UBS, "Twitter 4Q21 EPS First Read," February 10, 2022

(39) Argus Research, "Analyst's Notes," February 11, 2022

(40) Barclays, "Steady Pass of the Baton," February 11, 2022

(41) BMO Capital Markets, "Investments Continue, While Buybacks Accelerate," February 11, 2022

(42) Cowen, "TWTR 4Q21 Review; Rev In Line, mDAUS Light," February 11, 2022

(43) JPMorgan, "In Line Qtr & Rev Outlook With Upside to '22 Profits, but mDAU's Remain Key Focus," February 11, 2022

(44) JPMorgan, "Q4 Results In Line and Mid Term Guide Reiterated," February 11, 2022

(45) MKM Partners, "Soft 4Q Results; Steady But Slow Transition to DR Advt. in Progress," February 11, 2022

(46) Morgan Stanley, "Reviewing 4Q," February 11, 2022

(47) Susquehanna Financial Group, "Twitter Inc.; 2022 Outlook Solid," February 11, 2022

(48) Wedbush, "Mixed Qtr But Accelerated Product Velocity Expected to Contribute to Targets," February 11, 2022

(49) Wolfe Research, "Steady Execution Key to Hit FY23 Targets," February 11, 2022

(50) Marktfeld, "Capital Deployment Dashboard," February 14, 2022

(51) Oppenheimer, "Model Update," February 14, 2022

(52) Truist Securities, "New CEO Has Line of Sight to 2023 Revenue and mDAUs Targets," February 14, 2022

(53) Truist Securities, "New CEO Has "Line of Sight" to 2023 Revenue and mDAUs Targets," February 14, 2022

(54) Wells Fargo, "4Q21; Revenue Product Progress, Still Looking for mDAU Acceleration," February 14, 2022

(55) Stock Traders Daily, "TWTR," February 15, 2022

(56) Invest Heroes, "4Q 2021 Report," February 18, 2022

(57) UnivDatos Market Insights, "Company Profile Twitter Inc," February 22, 2022

(58) Marktfeld, "Ownership Timelines & Shareholder Analytics," February 24, 2022

(59) Zacks, "Twitter Inc," February 24, 2022

(60) Stock Traders Daily, "TWTR," February 25, 2022

(61) Valens Research, "Embedded Expectations Analysis," February 25, 2022

(62) Benchmark Company, "Structural Platform Challenges Limit Scale," March 1, 2022

(63) Stock Traders Daily, "TWTR," March 1, 2022

(64) MKM Partners, "Quick Notes from #TwitterAdTalk; Web Traffic & Performance Advt. Products Looking Better," March 3, 2022

(65) Wolfe Research, "Twitter, Inc," March 3, 2022

(66) Zacks, "Twitter Inc," March 3, 2022

(67) Cowen, "Trimming Est's for Digital Advertising Platforms Amid Russia, Ukraine Conflict," March 9, 2022

(68) Deutsche Bank, "Not a Hot Topic Yet," March 10, 2022

(69) Morgan Stanley, "What Did We Learn and What Matters Next; FB, TWTR," March 14, 2022

(70) Stock Traders Daily, "TWTR," March 15, 2022

(71) UBS, "4Q21 Model Update," March 15, 2022

(72) Guggenheim, "Daily MIC; AAPL App Store Control to Face EU Challenge; Super Bowl Olympics Provide TV Boost," March 18, 2022

(73) Guggenheim, "TWTR; NEUTRAL; Trimming 2022 Ad Estimates on European Risks, Remain Below 2023 Guide," March 18, 2022

(74) MKM Partners, "QSG Survey Sneak Peek; PNDORA, TWTR," March 25, 2022

(75) Stock Traders Daily, "TWTR," March 25, 2022

(76) Marktfeld, "Investor Targeting March 2022," March 27, 2022



## Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.
## Appendix B - Information Considered

(77) Marktfeld, "Peer Group Analytics Q4 FY2021," March 29, 2022

(78) Zacks, "Twitter Inc," March 29, 2022

(79) Stock Traders Daily, "TWTR," April 1, 2022

(80) BofA Global Research, "Elon Musk Reveals 9% Stake in Twitter," April 4, 2022

(81) Jefferies, "DBAM; Don't Bet Against Musk, But See Better Ways to Play Digital Advertising," April 4, 2022

(82) Morningstar, "Elon Musk Acquired a Sizable Stake in Twitter; Shares Remain Attractive (2)," April 4, 2022

(83) Morningstar, "Elon Musk Acquired a Sizable Stake in Twitter; Shares Remain Attractive," April 4, 2022

(84) Truist Securities, "Musk Becomes TWTR's #1 Shareholder; Likely to Press Mgt on Content Moderation, Execution," April 4, 2022

(85) Wedbush, "Musk Takes 9.2% Stake in Twitter; Initial View This is Just the Start," April 4, 2022

(86) Wells Fargo, "Musings on Musk and Monetization as Elon Puts His Money Where His Mouth Is," April 4, 2022

(87) JMP Securities, "Elon Musk Joins Twitter's Board," April 5, 2022

(88) MKM Partners, "Downgrade to Neutral; NT Risk, Reward Balanced at Current Levels," April 5, 2022

(89) Morgan Stanley, "Elon and Twitter; What Could This Mean for the Muskonomy," April 5, 2022

(90) Susquehanna Financial Group, "VIX Remains Sticky; TWTR Overwrites," April 5, 2022

(91) Wedbush, "Musk Gets Onto Twitter Board in a Friendly Move; Now Get Out the Popcorn," April 5, 2022

(92) Zacks, "Twitter Inc," April 5, 2022

(93) Marktfeld, "Investor Targeting (Fund Edition) April 2022," April 6, 2022

(94) Argus Research, "Analyst's Notes," April 11, 2022

(95) Morningstar, "Elon Musk Declines Twitters Offer to Join Board," April 11, 2022

(96) Wedbush, "Musk Makes U Turn on Twitter Board; Expect "Game of Thrones" Battle Ahead Now," April 11, 2022

(97) Morningstar, "Elon Musk Declines Twitter's Offer to Join Board," April 12, 2022

(98) Applied Logic, "Twitter, $45, April 14, 2022 Communication Services," April 14, 2022

(99) BofA Global Research, "Elon Musk Offers to Acquire Twitter for $54.20 Share," April 14, 2022

(100) Cowen, "Elon Musk Launches Takeout Offer," April 14, 2022

(101) Cowen, "TWTR 1Q22 Preview; Expect User Growth to Accelerate; 1H22 Rev Faces Tough Comps," April 14, 2022

(102) Deutsche Bank, "Elon Goes All In," April 14, 2022

(103) Jefferies, "Expect No on Musk's $54.20 Offer, But Will There Be Another Bid," April 14, 2022

(104) Jefferies, "Our Takeaways From Unpacking Musk's Tweets," April 14, 2022

(105) JMP Securities, "Elon Musk Offers to Acquire Twitter for $54.20 Per Share," April 14, 2022

(106) JPMorgan, "Thoughts on Elon Musk's Offer," April 14, 2022

(107) MKM Partners, "Musk Makes an Offer to Buy Twitter; Is it High Enough," April 14, 2022

(108) Morningstar, "Elon Musk Bids to Take Twitter Private for $54.20 per Share," April 14, 2022

(109) Oppenheimer, "Downgrading Twitter on Musk Takeover Bid," April 14, 2022

(110) Piper Sandler, "Elon Musk Just Setting Up His TWTTR Offer," April 14, 2022

(111) Truist Securities, "Musk Offers to Acquire 100% of Twitter at $54.20 share," April 14, 2022

(112) Wedbush, "Musk Makes $54 Bid for Twitter; Deal Likely Happens in Soap Opera Ending," April 14, 2022

(113) Wedbush, "Musk Makes Formal Bid to Takeover Twitter; Not So Sure Deal Gets Done Here," April 14, 2022

(114) Stock Traders Daily, "TWTR," April 15, 2022

(115) Wedbush, "Poison Pill Enacted; Thoughts on Next Steps in This MMA Battle for Twitter," April 17, 2022

(116) Wolfe Research, "Metaverse Weekly; Datapoints from Early 1Q Earnings, TWTR Drama; PTON Pricing Tweaks," April 17, 2022

(117) Argus Research, "Analyst's Notes," April 18, 2022

(118) Benchmark Company, "Deja Yahoo; Poison Pill or Not, Hard to See Better Bid Than Musk's," April 18, 2022



## Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.
## Appendix B - Information Considered

(119) Morningstar, "Twitter Adopts Poison Pill, but Musk Has Other Options (2)," April 18, 2022

(120) Morningstar, "Twitter Adopts Poison Pill, but Musk Has Other Options," April 18, 2022

(121) Valens Credit, "Despite Robust Recovery Rates, Strong Cash Flows, and a Sizable Cash Building, Credit Markets...," April 18, 2022

(122) Wells Fargo, "Caught Between and Rock and a Hard Case," April 18, 2022

(123) Rosenblatt Securities, "Musk Probably Loses, Launch at Neutral," April 19, 2022

(124) JPMorgan, "Suspending Rating, Price Target, and Estimates," April 20, 2022

(125) JPMorgan, "Suspending Rating," April 20, 2022

(126) Valens Credit, "Weekly Insights," April 20, 2022

(127) Truist Securities, "Downgrading TWTR to Hold; 1Q22 Results Likely Inline with Expectations," April 21, 2022

(128) Cowen, "TWTR Agrees to Elon Musk's $54.20 Share Takeout Offer," April 25, 2022

(129) Deutsche Bank, "The Bird Found Its Nest... At Last," April 25, 2022

(130) Evercore ISI, "#TWTROut," April 25, 2022

(131) Marktfeld, "Intraday vs Overnight Returns 2017 to 2022," April 25, 2022

(132) Morningstar, "Twitter Grants Elon Musk His Wish to Take the Firm Private for $54.20 per Share," April 25, 2022

(133) Oppenheimer, "Twitter Accepts Elon Musk's Takeover Bid at 9% Discount to SNAP," April 25, 2022

(134) Piper Sandler, "We Have Liftoff; Musk Made It Happen," April 25, 2022

(135) Stock Traders Daily, "TWTR," April 25, 2022

(136) Truist Securities, "Musk Gets What He Wants; TWTR's Board Concedes," April 25, 2022

(137) UBS, "Bye Bye Birdie," April 25, 2022

(138) Wedbush, "Musk Takes Over Twitter at $44B, to Take It Private in Effort to Rebuild," April 25, 2022

(139) Wells Fargo, "Bird in Hand; Raise Price Target to $54.20 on Musk Deal," April 25, 2022

(140) Wolfe Research, "Funding Secured," April 25, 2022

(141) JMP Securities, "Twitter Enters Definitive Agreement to be Purchased by Elon Musk for $54.20 Per Share," April 26, 2022

(142) MKM Partners, "Musk to Acquire TWTR; Social Media vs. Free Speech, Spam Bots, Section 230, & Web 3.0," April 26, 2022

(143) Rosenblatt Securities, "Deal Sealed, Updating PT, Meaning Mulled," April 26, 2022

(144) Evercore ISI, "Quick Tweet Re TWTR's EPS Results," April 27, 2022

(145) Wedbush, "With the Twitter Win...Now Comes the Tesla Stock and Distraction Worries," April 27, 2022

(146) Applied Logic, "Twitter, $48.5, April 28, 2022 Communication Services," April 28, 2022

(147) BMO Capital Markets, "Raising Target to Deal Price and Hoping Elon Joins Next Wednesday's Newfront," April 28, 2022

(148) Canaccord Genuity, "Mixed Q1 Results; Twitter Going Private Following Acceptance of Musk's Acquisition Offer," April 28, 2022

(149) Deutsche Bank, "The Bird Staying Too Far From Its Nest," April 28, 2022

(150) Guggenheim, "TWTR; NEUTRAL; 1Q22 mDAUs Ahead, Revenue Behind; Management Removes Guidance," April 28, 2022

(151) JPMorgan, "Updating Model Following 1Q Earnings," April 28, 2022

(152) Morningstar, "Solid Twitter User Growth in Q1; Market Awaits Closing of Musk Deal, but Spread Remains Wide," April 28, 2022

(153) Piper Sandler, "1Q22 Model Update; Housekeeping at Twilight," April 28, 2022

(154) S3 Partners, "Shorts Return to Twitter," April 28, 2022

(155) Truist Securities, "1Q22 Results Virtually In Line; No Surprises Here for Musk; Guidance Pulled on Deal," April 28, 2022

(156) Benchmark Company, "Post 1Q Estimate Revisions, Next Chapter Is Musk's," April 29, 2022



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Appendix B - Information Considered**

(157) Cowen, "TWTR 1Qww Review; Rev below Consensus, No Forward Outlook Amid Acquisition," April 29, 2022

(158) JMP Securities, "1Q22 Results; Model Update," April 29, 2022

(159) Marktfeld, "Peer Group Analytics Q1 FY2022," April 29, 2022

(160) Wedbush, "Reports a Solid Quarter With Upside to User Growth Ahead of Pending Acquisition," April 29, 2022

(161) New Street Research, "NSR Policy; Musk Twitter Regulator Process; Open Market Institute and Other Threats...," May 1, 2022

(162) Stock Traders Daily, "TWTR," May 1, 2022

(163) Evercore ISI, "Can Elon Musk Save Twitter," May 2, 2022

(164) MKM Partners, "1Q Recap + Acquisition Developments (Breakup Fee, TSLA Sale, Musk Tweets," May 2, 2022

(165) Wolfe Research, "Updating Estimates Post 1Q Results," May 2, 2022

(166) Zacks, "Twitter Inc," May 4, 2022

(167) Argus Research, "Analyst's Notes," May 5, 2022

(168) Barclays, "Rating Suspended," May 5, 2022

(169) Wedbush, "Sequel to the Soap Opera Ellison, Others Now Helping Musk on Twitter Bid," May 5, 2022

(170) Marktfeld, "Capital Deployment Dashboard," May 12, 2022

(171) Jefferies, "Unpacking Musk's Ambitious Targets," May 13, 2022

(172) Morningstar, "Musk Tweets Doubts About Twitter Deal but Says He Remains Committed," May 13, 2022

(173) Truist Securities, "Musk Puts the Twitter Deal on Pause; Will He Try to Renegotiate or Walk Away," May 13, 2022

(174) Wedbush, "In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence," May 13, 2022

(175) Stock Traders Daily, "TWTR," May 15, 2022

(176) Jefferies, "Looking for a Scapegoat; Lower Bid to Come," May 16, 2022

(177) Wedbush, "Musk Giving More Indication Getting "Cold Feet" on Twitter Deal Due to Bots," May 16, 2022

(178) Wedbush, "Twitter and Musk Thoughts; Bot Issue Likely Excuse for Lower Price or Walk Away," May 16, 2022

(179) Probes Reporter, "Twitter's Long History of Not Disclosing its SEC Investigations May Hurt It Today," May 18, 2022

(180) Susquehanna Financial Group, "More on the VIX; Bear Market Bounce Hedges, WDC and TWTR Trading Callouts," May 18, 2022

(181) Marktfeld, "Ownership Timelines & Shareholder Analytics," May 19, 2022

(182) Marktfeld, "Investor Targeting May 2022," May 22, 2022

(183) Wedbush, "Expect More Fireworks Heading Into Twitter Shareholder Meeting Later This Week," May 23, 2022

(184) Zacks, "Twitter Inc," May 23, 2022

(185) Morningstar, "Snap Warns of Disappointing Q2," May 25, 2022

(186) Stock Traders Daily, "TWTR," May 25, 2022

(187) Baptista Research, "Twitter, Inc," May 30, 2022

(188) Zacks, "Twitter Inc," May 30, 2022

(189) Stock Traders Daily, "TWTR," June 1, 2022

(190) Wedbush, "Musk Set to Hold "All Hands Meeting" With Twitter Employees Tomorrow," June 15, 2022

(191) Zacks, "Twitter Inc," June 15, 2022

(192) Marktfeld, "Information Content of Earnings Release 2017 to 2022," June 16, 2022

(193) Rosenblatt Securities, "We Now Assume the Musk Deal Price is Cut to $33," June 21, 2022

(194) Stock Traders Daily, "TWTR," June 25, 2022

(195) Zacks, "Twitter Inc," June 27, 2022

(196) Wedbush, "Disruptive Technology; Assuming Coverage of TWTR, UBER, LYFT," June 29, 2022



## Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.
## Appendix B - Information Considered

(197) Zacks, "Twitter Inc," June 29, 2022

(198) Marktfeld, "Investor Targeting June 2022 (Fund Edition)," June 30, 2022

(199) Susquehanna Financial Group, "Trading Callout; Positioning for a TWTR Recut; BAC Short Term Options," June 30, 2022

(200) Probes Reporter, "88 Public Companies With Undisclosed SEC Probes," July 1, 2022

(201) Wedbush, "Reflecting Uncertainty of Musk Deal and Price Negotiation," July 7, 2022

(202) Wedbush, "Musk Formally Terminates Twitter Deal with 13D Filing," July 8, 2022

(203) Wedbush, "Code Red Situation at Twitter; Lowering Price Target to $30 on Deal Collapsing," July 9, 2022

(204) Jefferies, "Painful Breakup, Stock Trapped in Short Term," July 10, 2022

(205) Truist Securities, "TWTR's Nightmare Scenario Playing out with Musk Looking to Terminate the Deal," July 10, 2022

(206) Benchmark Company, "Compromise at $37 or Southbound to $27," July 11, 2022

(207) JMP Securities, "We're Headed to Court; Mr. Musk Seeks to Terminate the Twitter Acquisition," July 11, 2022

(208) MKM Partners, "Musk Cancels Twitter Deal; Legal Battle Coming Up," July 11, 2022

(209) Morningstar, "Musk Parting From Twitter Purchase, but Twitter Remains Attractive (2)," July 11, 2022

(210) Morningstar, "Musk Parting From Twitter Purchase, but Twitter Remains Attractive," July 11, 2022

(211) Rosenblatt Securities, "It's Getting ugly With Musk," July 11, 2022

(212) Wedbush, "Advisor Call Diving Deeper Into Legal Next Steps for Twitter and Musk in Court," July 11, 2022

(213) Wedbush, "Now Whats Next for Twitter and Musk Saga; Major Legal Battle Ahead," July 11, 2022

(214) Piper Sandler, "Failure to Launch; Recasting Thesis Following Termination Notice," July 12, 2022

(215) Wedbush, "Ann Lipton Advisor Call Today Discussing Twitter and Musk Legal Dynamics," July 12, 2022

(216) Wedbush, "Twitter Launches Suit Against Musk Around $44 Billion Deal; Now It Begins," July 12, 2022

(217) Wedbush, "Twitter Stock Up as Street Views Suit as "Very Strong" Heading Into Delaware," July 13, 2022

(218) Rosenblatt Securities, "It's Happy Hour, and Musk is Buying," July 14, 2022

(219) Wedbush, "Walking Through 4 Scenarios in Twitter, Musk Legal Battle; TWTR Upper Hand," July 15, 2022

(220) Rosenblatt Securities, "Musk Responds, as Twitter and Snap Kick Off Earnings Season," July 18, 2022

(221) Wells Fargo, "All Sales Final; Increased Conviction on Deal Close Post Chancery Court Expert Call," July 18, 2022

(222) Truist Securities, "Previewing Results for Digital Advertising Platforms GOOGL, META, TWTR," July 19, 2022

(223) Jefferies, "Invite; Expert Call to Discuss the Twitter vs Elon Musk Lawsuit," July 20, 2022

(224) Rosenblatt Securities, "Musk Trial Timing Ruling Was Encouraging," July 20, 2022

(225) Evercore ISI, "Quick Tweet on Q2 Results and Read Thru," July 21, 2022

(226) BMO Capital Markets, "Coverage Discontinued," July 22, 2022

(227) Canaccord Genuity, "Q2 Advertising Revenue Growth Slows; Twitter vs. Musk Headed to Delaware Court in Oct," July 22, 2022

(228) Cowen, "TWTR 2Q22 Review; Results Were Light, Hurt by FX; Trial Set for October," July 22, 2022

(229) Guggenheim, "TWTR; NEUTRAL; 2Q Revenue Declines YY; Ad Revenue Further Decelerates," July 22, 2022

(230) JMP Securities, "2Q22 Results; Model Update," July 22, 2022

(231) MKM Partners, "Negative Fundamental First Pass on 2Q Earnings + Latest Thoughts on Musk vs. Twitter," July 22, 2022

(232) Morningstar, "Twitter Attracted Users in Q2 but Macro and Musk Issues Slowed Down Ad Spending (2)," July 22, 2022

(233) Morningstar, "Twitter Attracted Users in Q2 but Macro and Musk Issues Slowed Down Ad Spending," July 22, 2022



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Appendix B - Information Considered**

(234) Piper Sandler, "2Q22 Model Update; Results Miss Expectations, Negative Read for Digital Ads," July 22, 2022

(235) Rosenblatt Securities, "2Q22 Was Impacted by Sector Headwinds, It Shouldn't Matter," July 22, 2022

(236) Susquehanna Financial Group, "Earnings Volatility and (Another) TWTR Trading Callout," July 22, 2022

(237) Truist Securities, "First Look; TWTR 2Q22 Results Disappoint on Macro Weakness, Acquisition Debacle," July 22, 2022

(238) Jefferies, "Q2 Earnings & Legal Expert Recaps; Expect Significant Challenges Ahead," July 24, 2022

(239) Marktfeld, "Capital Deployment Dashboard," July 24, 2022

(240) Wolfe Research, "Updating Estimates Post 2Q Results," July 24, 2022

(241) Argus Research, "Analyst's Notes," July 25, 2022

(242) Stock Traders Daily, "TWTR," July 25, 2022

(243) Zacks, "Twitter Inc," July 26, 2022

(244) Evercore ISI, "Quick Tweet on Estimates Update," July 28, 2022

(245) Marktfeld, "Peer Group Analytics Q2 FY2022," July 29, 2022

(246) Wells Fargo, "Model Update Post 2Q Earnings," July 29, 2022

(247) Stock Traders Daily, "TWTR," August 1, 2022

(248) Marktfeld, "Intraday vs Overnight Returns 2017 to 2022," August 2, 2022

(249) Guggenheim, "Model Update; Updating SPOT and TWTR Models Following 2Q Earnings, Quarterly Filings," August 3, 2022

(250) MacroRisk Analytics, "The Economy Matters for TWTR," August 4, 2022

(251) Susquehanna Financial Group, "Twitter Inc.; Downgrading to Neutral," August 5, 2022

(252) PriceTarget Research, "Twitter Inc," August 6, 2022

(253) Smart Insider, "Twitter Inc," August 6, 2022

(254) Zacks, "Twitter Inc," August 8, 2022

(255) Baptista Research, "Twitter, Inc," August 9, 2022

(256) Wedbush, "Musk Selling More Stock Writing on Wall Deal Could Be in the Cards," August 10, 2022

(257) Marktfeld, "Information Content of Earnings Releases 2017 to 2022," August 11, 2022

(258) Oppenheimer, "Model Update," August 15, 2022

(259) Stock Traders Daily, "TWTR," August 15, 2022

(260) Truist Securities, "Internet; Tough Week for the IDM Grp Amid Renewed Macro Concerns; More Bad News for TWTR," August 16, 2022

(261) Marktfeld, "Investor Targeting August 2022," August 18, 2022

(262) Marktfeld, "Ownership Timelines & Shareholder Analytics," August 21, 2022

(263) Probes Reporter, "88 Public Companies With Undisclosed SEC Probes," August 22, 2022

(264) MKM Partners, "Event Driven A.M. Note," August 23, 2022

(265) Rosenblatt Securities, "Whistleblower Heightens Risks, Downgrade to Neutral," August 24, 2022

(266) Stock Traders Daily, "TWTR," August 25, 2022

(267) MKM Partners, "2Q Model Update + Highlights from Conf. Call on Legal Considerations on Musk Versus TWTR," August 26, 2022

(268) Wedbush, "Zatko Whistleblower Situation Adds Complexity to Twitter Case; Eyes on Delaware," August 30, 2022

(269) Stock Traders Daily, "TWTR," September 1, 2022

(270) Probes Reporter, "84 Public Companies With Undisclosed SEC Probes," September 2, 2022

(271) Wedbush, "Big Day Ahead for Twitter; Shareholder Vote on Musk Deal; Zatko Heads to Senate," September 12, 2022

(272) Jefferies, "Hedge Fund Holdings; Refreshing Uber Crowded Battleground; High & Low Turnover," October 2, 2022

(273) JMP Securities, "Press Reports Suggest Mr. Musk & Twitter Agreed to Close the Acquisition at $54.20," October 4, 2022



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Appendix B - Information Considered**

(274) Morgan Stanley, "Selected Trading Multiples," October 4, 2022
(275) Truist Securities, "In Surprising Pivot Musk Agrees to Acquire TWTR on Original Terms; End of Saga," October 4, 2022
(276) Wedbush, "Musk to Proceed with Twitter Deal; Writing Was on the Wall Heading Into Court," October 4, 2022
(277) Wedbush, "Raising Price Target to Deal Price; $44 Billion Deal Set to Close," October 4, 2022
(278) Guggenheim, "Morning Summary," October 5, 2022
(279) Jefferies, "Waiting for PayPay Related Updates," October 5, 2022
(280) MKM Partners, "Morning Summary," October 5, 2022
(281) MKM Partners, "Musk 3 Twitter as End of an Era Nears," October 5, 2022
(282) Rosenblatt Securities, "PT Upped for a Done Deal," October 5, 2022
(283) Truist Securities, "Morning Meeting Highlights," October 5, 2022
(284) Wedbush, "Best Ideas List (BIL); Upgrades; Downgrades; Initiations," October 5, 2022
(285) Wedbush, "Twitter Board Playing a Game of High Stakes Poker; Waiting to Accept Musk Terms," October 5, 2022
(286) Wells Fargo, "Bots or Not, Musk Agrees to Close Transaction," October 5, 2022
(287) Wells Fargo, "Recently Published Research EQ," October 5, 2022
(288) Guggenheim, "Morning Summary," October 6, 2022
(289) Piper Sandler, "Internet Earnings Preview; Wave 1," October 6, 2022
(290) Piper Sandler, "Temperature Checks; Our Discussions With an Ad Buyer into 3Q Earnings," October 6, 2022
(291) Wedbush, "Focus Research," October 6, 2022
(292) Zacks, "Twitter Inc," October 6, 2022
(293) Deutsche Bank, "Reminder; Digital Ad Trends Discussion with Wpromote CEO," October 7, 2022
(294) Guggenheim, "Morning Summary," October 7, 2022
(295) Oppenheimer, "Industry Update," October 7, 2022
(296) Oppenheimer, "Morning Research Summary," October 7, 2022
(297) Smart Insider, "Twitter Inc," October 7, 2022
(298) Susquehanna Financial Group, "The Newsfeed," October 7, 2022
(299) Truist Securities, "Internet; IDM Grp Gets Some Reprieve This Week After Breaking Thru its Mid July Lows Last Wee," October 7, 2022
(300) Truist Securities, "Morning Meeting Highlights," October 7, 2022
(301) Wedbush, "Trial on Hold...Musk, Twitter Given October 28 Deadline to Get Deal Done," October 7, 2022

**Media:**
(1) Twitter Celebrates Initial Public Offering and First Day of Trading on the New York Stock Exchange," *Intercontinental Exchange* , November 7, 2013
(2) Jodie Gunzberg and Tim Edwards, "Why is the S&P 500® Relevant Globally?" *S&P Global,* June 20, 2018, https://www.spglobal.com/ en/research-insights/articles/Why-is-the-SP-500-Relevant-Globally
(3) Nivedita Balu, "Musk takes 9% stake in Twitter to become top shareholder, starts poll on edit button," *Reuters* , April 5, 2022
(4) "Elon Musk to Acquire Twitter," *PRNewswire* , April 25, 2022
(5) Raisa Bruner, "A Complete Timeline of Elon Musk's Business Endeavors," *Time* , April 27, 2022

**Public Filings and SEC Filings:**
(1) Twitter, Prospectus, November 6, 2013
(2) Twitter, Form 8-K, dated April 4, 2022
(3) Twitter, Form 10-K for period ending December 31, 2019
(4) Twitter, Form 10-K for period ending December 31, 2020



## Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.
## Appendix B - Information Considered

(5) Twitter, Form 10-K for period ending December 31, 2021
(6) Twitter, Form 10-Q for period ending March 31, 2022
(7) Twitter, Form 10-Q for period ending June 30, 2022
(8) Twitter, Form S-3, May 27, 2020
(9) Twitter, Schedule 13D, dated April 5, 2022
(10) Twitter, Schedule 13D for Qatar Investment Authority, October 27, 2022
(11) Twitter, Schedule 13G, dated April 4, 2022

**Academic Papers**
(1) William H. Beaver, "The Information Content of Annual Earnings Announcements," 6 *Journal of Accounting Research* (1968)
(2) Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," 25(2) *The Journal of Finance* (May, 1970),
(3) Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," 9 *Journal of Accounting Research* (1971)
(4) Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," 35(1) *The Journal of Finance* (March 1980)
(5) Brad M. Barber, et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law*, Winter 1994
(6) Craig MacKinlay, "Event Studies in Economics and Finance," 35(1) Journal of Economic Literature, Vol. (March 1997)
(7) Eli Ofek, et al., "Limited Arbitrage and Short Sale Restrictions: Evidence from the Options Markets," 74 *Journal of Financial Economics* (2004)
(8) Richard B, Evans et al., "Failure is an Option: Impediments to Short Selling and Option Prices," 22(5) *Review of Financial Studies* (2009)
(9) Ronald L. Wasserstein and Nicole A. Lazar, "The ASA Statement on p-Values: Context, Process, and Purpose," 70(2) *The American Statistician* (2016)
(10) Charles McGrath, "80% of equity market cap held by institutions," *Pensions & Investments,* April 25, 2017

**Books:**
(1) John Campbell, et al., *The Econometrics of Financial Markets* (1997)
(2) Robert S. Pindyck and Daniel L. Rubinfeld, *Econometric Models and Economic Forecasts* (4th ed. 1998)
(3) John C. Hull, Options, Futures, and Other Derivatives (7th ed. 2008)
(4) Shannon, P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008)
(5) John C. Hull, Options, Futures, and Other Derivatives (9th ed. 2014)
(6) Jeffrey M. Wooldridge, *Introductory Econometrics* (6th ed. 2016)
(7) Augmented Dickey-Fuller unit root test," *Stata Time Series Reference Manual Release 15* (2017)
(8) "CFA Program Curriculum Level I Volume 5: Equity and Fixed Income, *CFA Institute* (2019)

**Data Sources:**
(1) Bloomberg L.P.
(2) S&P Capital IQ
(3) Factiva
(4) LSEG

**Case Law and Related Documents:**
(1) *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Appendix B - Information Considered**

(2) *Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989)

(3) *Binder v. Gillespie,* 184 F.3d 1059 (9th Cir. 1999)

(4) *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001)

(5) *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484 (S.D. Fla. 2003)

(6) *Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168 (S.D.N.Y. 2008)

(7) *Schleicher v. Wendt,* 618 F.3d 679 (7th Cir. 2010)

(8) *In re DVI, Inc. Sec. Litig.,* 639 F.3d 623 (3d Cir. 2011)

(9) *In re Schering-Plough Corp./ENHANCE Sec. Litig.,* 2012 WL 4482032 (D.N.J. Sept. 25, 2012)

(10) *Billhofer v. Flamel Techs., S.A.,* 281 F.R.D. 150 (S.D.N.Y. 2012)

(11) *City of Livonia Emps.' Ret. Sys. v. Wyeth,* 284 F.R.D. 173 (S.D.N.Y. 2012)

(12) *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,* No. 05–1151, 2013 WL 396117 (D.N.J. Jan. 30, 2013)

(13) *In re Diamond Foods, Inc. Sec. Litig.,* 295 F.R.D. 240, 247 (N.D. Cal. 2013)

(14) *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. (2014)

(15) Brief of Testifying Economists as Amici Curiae in Support of Resp'ts, Halliburton Co. v. Erica P. John Fund, Inc., 2014 WL 507164

(16) Brief of Financial Economists as Amici Curiae in Support of Resp'ts, Halliburton Co. v. Erica P. John Fund, Inc., 2014 WL 526436

(17) *McIntire v. China MediaExpress Holdings, Inc.,* 38 F. Supp. 3d 415 (S.D.N.Y. 2014)

(18) *City of Sterling Heights Gen. Emps' Ret. Sys. v. Prudential Fin., Inc.,* 2015 WL 5097883 (D.N.J. Aug. 31, 2015)

(19) *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69 (S.D.N.Y. 2015)

(20) *In re JPMorgan Chase & Co. Sec. Litig.,* 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)

(21) *In re Barrick Gold Sec. Litig.,* 314 F.R.D. 91 (S.D.N.Y. 2016)

(22) *Strougo v. Barclays PLC,* 312 F.R.D. 307 (S.D.N.Y. 2016)

(23) *Waggoner v. Barclays PLC,* 875 F.3d 79, 94 (2d Cir. 2017)

(24) *City of Miami Gen. Empls. Ret. Trust v. RH, Inc.,* 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)

(25) *In re Banc of Cal. Sec. Litig.,* 326 F.R.D. 640 (C.D. Cal. 2018)

(26) *Pirnik v. Fiat Chrysler Autos., N.V.,* 327 F.R.D. 38 (S.D.N.Y. 2018)

(27) *Roofer's Pension Fund v. Papa,* 333 F.R.D. 66, 80 (D.N.J. 2019)

(28) *In re Novo Nordisk Sec. Litig.,* 2020 WL 502176 (D.N.J. Jan. 31, 2020)

(29) *In re Allergan PLC Sec. Litig.,* 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)

(30) *Erickson v. Jernigan Capital, Inc.,* 2023 WL 5966785 (S.D.N.Y. Sept. 14, 2023)

**Other:**

(1) 17 CFR § 240.13d-102

(2) S&P 500® Overview, https://www.spglobal.com/spdji/en/indices/equity/sp-500/#overview

(3) Nasdaq 100 Factsheet, https://indexes.nasdaqomx.com/docs/FS_XNDX.pdf

(4) "*Glossary: Market Makers,*" *SEC*, https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers

(5) How the NYSE Market Model Works: Designated Market Maker, NYSE, https://www.nyse.com/market-model

(6) Form S-3 Registration Statement Under the Securities Act of 1933

(7) 17 CFR § 230.405

(8) 17 CFR § 240.10b-5(b)

(9) 17 CFR § 242.203

(10) "S&P 500 Index," *Bloomberg*, https://www.bloomberg.com/quote/SPX:IND

(11) "Dow Jones Internet Composite Index", *S&P Global*, https://www.spglobal.com/spdji/en/indices/equity/dow-jones-internet-composite-index/#overview



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Appendix B - Information Considered**

(12) "Investor Bulletin: An Introduction to Short Sales," *Investor.gov*, October 29, 2015, https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-51

(13) "NYSE Regulation Threshold Securities," *NYSE*, https://www.nyse.com/regulation/threshold-securities

(14) "Nasdaq Threshold List," *Nasdaq Trader*, https://www.nasdaqtrader.com/trader.aspx?id=RegSHOThreshold

(15) Fails-to-Deliver Data," *SEC*, https://www.sec.gov/data/foiadocsfailsdatahtm

(16) "Threshold Securities," *SEC*, https://www.sec.gov/answers/threshold.htm

(17) *In the Matter of Gary S. Bell,* SEC Release No. 34-65941, 2011 WL 6184476 (Dec. 13, 2011)

(18) "About Us," *CBOE*, https://www.cboe.com/about/#our-story

(19) "Overview," *CBOE*, https://res.cboe.com/us/options/overview

(20) "Market Statistics," *CBOE*, https://www.cboe.com/data/market_statistics

(21) "Option End-of-Day Summary File Specification,," *CBOE*, https://datashop.cboe.com/documents/Option_EOD_Summary_Layout.pdf

(22) 15 U.S.C. § 78u-4(e)(1)

(23) 15 U.S.C. § 78u-4(e)(2)

(24) "Myron Scholes Facts," *The Nobel Prize*, https://www.nobelprize.org/prizes/economic-sciences/1997/scholes/facts

(25) "Robert C. Merton Facts," *The Nobel Prize*, https://www.nobelprize.org/prizes/economic-sciences/1997/merton/facts

**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Exhibit 1**
**List of Disclosed Market Makers**

| Market Maker | | |
| --- | --- | --- |
| ACS Execution Services, LLC | Fox River Execution Technology, LLC | Quantlab Brokerage, LLC |
| Aegis Capital Corp. | Global Execution Brokers, LP | Regal Discount Securities, Inc. |
| Allen & Company Incorporated | GMP Securities, LLC | Rice Financial Products Company |
| American Capital Partners, LLC | Goldman Sachs | Robert W. Baird & Co., Inc |
| Andrew Garrett, Inc. | GTS Securities LLC | Robinhood Financial, LLC |
| B. Riley And Co. Inc. | Guggenheim Securities, LLC | Sagetrader, LLC |
| Banyan Securities, LLC | HAP Trading, LLC | Sanford C. Bernstein and Co. |
| Barclays Capital Inc. | Hardcastle Trading USA LLC | Sentinel Brokers Company, Inc. |
| BATS Trading, Inc. | HSBC | SpeedRoute LLC |
| Baypoint Trading LLC | Instinet | Stephens Inc. |
| BMO Capital Markets | Interactive Brokers LLC | Stifel Nicolaus |
| BNY Capital Markets, Inc. | ITG Inc. | Stock USA Investments |
| Bofa Securities, Inc. | J.H. Darbie & Co., Inc. | Stockcross Financial Services |
| BRUT, LLC | Jane Street Capital, LLC | SunTrust Capital Markets, Inc. |
| BTIG, LLC | Jeffries | TD Securities (USA) Inc. |
| Canaccord Genuity Inc. | Johnson Rice and Co. | The Benchmark Company, LLC |
| Cantor Fitzgerald & Co. | Jones and Associates Inc. | The Vertical Group, Inc. |
| Central States Capital Markets, LLC | Joseph Gunnar and Co. | Tradebot Systems, Inc. |
| Charles Schwab and Co., Inc. | Jump Trading, LLC | TRC Markets LLC |
| Citadel Derivatives Group LLC | Ladenburg, Thalmann & Co., Inc. | Two Sigma Securities |
| Citadel Securities LLC | Lampost Capital LLC | UBS Securities LLC. |
| Citigroup Global Markets Inc. | LEK Securities Corporation | Vandham Securities Corp. |
| Clearpool Execution Services, LLC | Lime Brokerage LLC | Velocity Clearing, LLC |
| CLSA Americas, LLC | Maxim Group, LLC | ViewTrade Securities, Inc. |
| CODA Markets, Inc. | Mizuho Securities USA Inc. | Virtu Americas LLC |
| Comhar Capital Markets, LLC | MKM Partners | Wall Street Access |
| Cutler Group, LP | Moors and Cabot Inc. | Webull Financial LLC |
| Cuttone & Co., Inc. | Morgan Stanley | Wedbush Morgan Securities |
| D.A. Davison and Co. | National Financial Services LLC | Wedbush Securities, Inc. |
| Dart Executions, LLC | National Securities Corp. | Wells Fargo Securities, LLC |
| Dawson James Securities, Inc | Needham and Co. | White Bay Pt LLC |
| Deutsche Bank | O'Connor & Company LLC | WhoTrades, Inc. |
| Dougherty & Company LLC | Old Mission Capital, LLC | William Blair & Company LLC |
| DRW Securities, LLC | Oppenheimer & Co. Inc. | William O'Neil & Company |
| E*Trade Clearing LLC | Paulson Investment Co. Inc. | Wolverine Execution Services, Inc. |
| Electronic Brokerage Systems. LLC | Pictet Overseas Inc. | XR Securities LLC |
| Electronic Transaction Clearing, Inc. | Prebon Financial Products Inc. | |
| Elevation, LLC | Pundion LLC | |
| Flow Traders US LLC | Quantex Clearing, LLC | |

<u>Source</u>:
Bloomberg L.P.



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Exhibit 2**
**Summary of Release Days (1)**

| Date | Time (2) | Effective Trading Day | TWTR Return Actual | TWTR Return Abnormal | p-value | Sig (3) |
|------|----------|----------------------|--------|----------|---------|---------|
| 4/30/20 | 7:02 AM | 4/30/20 | -7.8% | -8.4% | 0.004 | *** |
| 7/23/20 | 7:02 AM | 7/23/20 | 4.1% | 6.9% | 0.005 | *** |
| 10/29/20 | 4:12 PM | 10/30/20 | -21.1% | -19.8% | 0.000 | *** |
| 2/9/21 | 4:05 PM | 2/10/21 | 13.2% | 12.8% | 0.000 | *** |
| 4/29/21 | 4:06 PM | 4/30/21 | -15.2% | -14.3% | 0.000 | *** |
| 7/22/21 | 4:05 PM | 7/23/21 | 3.0% | -0.2% | 0.867 | |
| 10/26/21 | 4:05 PM | 10/27/21 | -10.8% | -9.9% | 0.000 | *** |
| 2/10/22 | 7:00 AM | 2/10/22 | -2.0% | -1.8% | 0.245 | |

<u>**Sources and Notes**</u>:

(1) Abnormal returns are estimated based on a market model with the S&P 500 Index and a bespoke market-weighted industry index of Dow Jones Internet Composite Index members. The estimation window consists of the 63 trading days preceding the day for which abnormal returns are estimated.

(2) Timing of release based on Bloomberg L.P. and S&P Capital IQ.

(3) Asterisks represent significance levels based on a two-tailed test: * $p \leq 0.10$, ** $p \leq 0.05$, *** $p \leq 0.01$.



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Exhibit 3A**
**Test for Put-Call Parity Deviations**
**Based on Evans et. al Approach (1)**

| | Average Put-Call Parity Deviations | |
|---|---|---|
| Date | All (2) | Near-The-Money ("NTM") (3) |
| March 25, 2022 | -0.08% | -0.08% |
| March 28, 2022 | -0.03% | -0.03% |
| March 29, 2022 | -0.05% | -0.05% |
| March 30, 2022 | -0.09% | -0.09% |
| March 31, 2022 | -0.09% | -0.07% |
| April 01, 2022 | -0.09% | -0.09% |
| April 04, 2022 | -0.15% | -0.16% |
| Class Period (4) | -0.08% | -0.08% |

**Notes:**

(1) The implied stock price ($S_i$) is equal to PV(K) + PV(D) + C - P, where, PV(K) = Present Value of Strike Price, PV(D) = Present Value of Expected Dividends, C = Call Option Price, and P = Put Option Price.  The average of the best bid (NBB) and best ask (NBO) at 3:45pm Eastern is used for the option price.  For this analysis, the expected dividend payment amounts (if any) to expiration are based on the historical dividend payment amounts.

(2) Put-Call Parity Deviation = $(S_0 - S_i) / S_0$, where $S_0$ = Underlying Stock Price.  Based on method employed in the article, Richard B, Evans et al., "Failure is an Option: Impediments to Short Selling and Option Prices," 22(5) *Review of Financial Studies* (2009).  Calls and options are matched based on strike price and expiration date, and excludes the following observations (consistent with the methodology employed by the authors):
- Options with less than 6 calendar days and greater than 180 calendar days to maturity,
- Options with prices less than $0.375,
- Options where C > $S_0$ or C < $S_0$ - PV(K) - PV(D),
- Options where P > K or P < K - $S_0$.

(3) Near-the-money options restricted to options where ln $|(S_0 / K)| < 0.1$.

(4) Class Period from March 25, 2022 through April 4, 2022, inclusive.

**Sources:**

H.15 Data retrieved from Federal Reserve Bank of St. Louis.  Options data retrieved from CBOE Datashop.



**Oklahoma Firefighters Pension and Retirement System v. Elon Musk, et al.**
**Exhibit 3B**
**Test for Put-Call Parity Deviations**
**Based on Ofek et al. Approach  (1)**

| | Average Put-Call Parity Deviations | |
| Date | All (2) | Near-The-Money ("NTM") (3) |
| --- | --- | --- |
| March 25, 2022 | -0.10 | -0.12 |
| March 28, 2022 | -0.05 | -0.07 |
| March 29, 2022 | -0.07 | -0.08 |
| March 30, 2022 | -0.12 | -0.13 |
| March 31, 2022 | -0.11 | -0.11 |
| April 01, 2022 | -0.12 | -0.13 |
| April 04, 2022 | -0.20 | -0.21 |
| Class Period (4) | -0.11 | -0.12 |

**Notes:**

(1) The implied stock price ($S_i$) is equal to PV(K) + PV(D) + C - P, where,
PV(K) = Present Value of Strike Price, PV(D) = Present Value of Expected Dividends, C = Call Option Price, and P = Put Option Price.  The average of the best bid (NBB) and best ask (NBO) at 3:45pm Eastern is used for the option price.  For this analysis, the expected dividend payment amounts (if any) to expiration are based on the historical dividend payment amounts.

(2) Put-Call Parity Deviation = ($S_0$ - $S_i$) / $S_0$, where $S_0$ = Underlying Stock Price.  Based on method employed in the article, Eli Ofek, et al., "Limited Arbitrage and Short Sale Restrictions: Evidence from the Options Markets," 74 *Journal of Financial Economics* (2004).  Calls and options are matched based on strike price and expiration date, and excludes the following observations (consistent with the methodology employed by the authors):
- Options with zero open interest,
- Options with underlying stock prices less than $5,
- Options with less than 30 calendar days and greater than 365 calendar days to maturity,
- Options that are out-of-the money, where $|ln (S_0 / K)| > 0.3$,
- Options with bid-ask spreads greater than 50%,
- Options where C < $S_0$ - PV(K) - PV(D),

(3) Near-the-money options restricted to options where $ln |(S_0 / K)| < 0.1$.

(4) Class Period from March 25, 2022 through April 4, 2022, inclusive.

**Sources:**

H.15 Data retrieved from Federal Reserve Bank of St. Louis.  Options data retrieved from CBOE Datashop.

