**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OKLAHOMA FIREFIGHTERS PENSION AND
RETIREMENT SYSTEM,

                  Plaintiff,

                  v.

ELON R. MUSK, ELON MUSK REVOCABLE
TRUST DATED JULY 22, 2003, EXCESSION,
LLC, and JARED BIRCHALL,

                  Defendants.

Case No. 1:22-cv-03026-ALC-GWG

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...........................................................................................................3

I.      RELEVANT FACTUAL BACKGROUND.................................................................3

      A.     OKF Alleges That Defendants Damaged Investors By Keeping The Price Of Twitter Stock Artificially Low During The Class Period...................................3

      B.     OKF Makes A Single Sale Of Twitter During The Class Period ...........................4

II.     PROCEDURAL BACKGROUND.........................................................................6

      A.     OKF Files An Initial Complaint Pleading Pure Omissions, And An Amended Complaint Based In Substantial Part On Alleged Misstatements ..........6

      B.     The Court Grants In Part And Denies In Part Defendants' Motion To Dismiss..........................................................................................................7

      C.     OKF Seeks To Certify A Class Of Shareholders ...................................................8

ARGUMENT ................................................................................................................8

I.      CLASS CERTIFICATION IS IMPROPER BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE AND RENDER OKF ATYPICAL............................9

      A.     OKF Cannot Rely On Any Presumption Of Reliance Because OKF Would Have Sold Twitter Stock At The Exact Same Price Even If It Had Been Aware Of The Alleged Fraud ...........................................................................10

      B.     OKF Fails To Meet The Typicality Requirement Under Rule 23(a) Because ███████ Algorithmic Trading Subjects OKF To Unique Defenses.........14

II.     *AFFILIATED UTE* IS INAPPLICABLE FOR THE INDEPENDENT REASON THAT OKF'S CLAIMS ARE NOT PRIMARILY BASED ON OMISSIONS ..............17

III.    *BASIC* IS INAPPLICABLE FOR THE INDEPENDENT REASON THAT THE ALLEGED FRAUD HAD NO IMPACT ON THE PRICE OF TWITTER STOCK ......................................................................................................19

      A.     The *Basic* Presumption Does Not Apply To The Two Musk Tweets ..................20

      B.     The *Basic* Presumption Does Not Apply To The Alleged Scheme ......................21

IV.    OKF HAS NOT PROPOSED A COMMON DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASS-WIDE DAMAGES ...........................22

CONCLUSION.............................................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)....................................................................1, 2 8, 11, 13, 17, 18, 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)....................................................................................................10

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ..........................................................................................21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)..........................................................................................15

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................1, 2, 3, 8, 11, 13, 19, 20, 21, 22

*Cohen v. Laiti*,
  98 F.R.D. 581 (E.D.N.Y. 1983) ..................................................................................15

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..........................................................................................9, 22, 25

*Desai v. Deutsche Bank Secs. Ltd.*,
  573 F.3d 931 (9th Cir. 2009) .......................................................................................22

*In re DiDi Glob. Inc. Sec. Litig.*,
  2025 WL 1909295 (S.D.N.Y. July 7, 2025) .........................................................17, 19

*duPont v. Brady*,
  828 F.2d 75 (2d Cir. 1987)..........................................................................................13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011).....................................................................................................10

*In re FirstEnergy Corp. Sec. Litig.*,
  --- F.4th ----, 2025 WL 2331754 (6th Cir. Aug. 13, 2025) ..............................19, 22

*Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................................22

*GAMCO Invs., Inc. v. Vivendi, S.A.*,
  927 F. Supp. 2d 88 (S.D.N.Y. 2013)...........................................................................13

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990)........................................................................16

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ...................................................................16

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)........................................................................3, 20, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)..........................................2, 9, 10, 13, 14, 20

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
    296 F.R.D. 549 (N.D. Ohio 2013) .......................................................22

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) .....................................12

*In re IMAX Sec. Litig.*,
    272 F.R.D. 138 (S.D.N.Y. 2010) ................................................10, 16

*Jaroslawicz v. M&T Bank Corp.*,
    2024 WL 2975766 (D. Del. June 13, 2024)........................................24

*Kamerman v. Ockap Corp.*,
    112 F.R.D. 195 (S.D.N.Y. 1986) .........................................................16

*Kline v. Wolf*,
    88 F.R.D. 696 (S.D.N.Y. 1981) ...............................................15, 16, 17

*Kline v. Wolf*,
    702 F.2d 400 (2d Cir. 1983).................................................................16

*Kottaras v. Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012)...............................................................24

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .........................................................15

*Loritz v. Exide Tech.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015)......................................25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024).......................................................................7, 18

*McGuinness v. Parnes*,
    1988 WL 66214 (D.D.C. June 17, 1988).............................................13

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   704 F. Supp. 2d 378 (S.D.N.Y. 2010) .....................................................................18

*In re Nat'l Century Fin. Enters., Inc.*,
   846 F. Supp. 2d 828 (S.D. Ohio 2012) ...................................................................13

*In re Overstock Sec. Litig.*,
   119 F.4th 787 (10th Cir. 2024) ...............................................................................13

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)......................................................................................9

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) .............................................................................16

*Schwab v. E*Trade Fin. Corp.*,
   285 F. Supp. 3d 745 (S.D.N.Y. 2018)......................................................................18

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) .........................................................................11, 13

*Steginsky v. Xcelera, Inc.*,
   2015 WL 1036985 (D. Conn. Mar. 10, 2015) .........................................................15

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   552 U.S. 148 (2008)................................................................................................22

*In re U.S. Foodservice, Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013)......................................................................................9

*Villella v. Chemical and Mining Company of Chile Inc.*,
   333 F.R.D. 39 (S.D.N.Y. Sept. 24, 2019) ..........................................................13, 15

*In re Vivendi Universal, S.A. Sec. Litig.*,
   183 F. Supp. 3d 458 (S.D.N.Y. 2016).....................................................................13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   2 F.4th 1199 (9th Cir. 2021) ..................................................................................19

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).......................................................................11, 17, 19, 20

*Weintraub v. Texasgulf Inc.*,
   564 F. Supp. 1466 (S.D.N.Y. 1983)........................................................................15

*WM High Yield Fund v. O'Hanlon*,
   964 F. Supp. 2d 368 (E.D. Pa. 2013) ......................................................................22

*In re WorldCom Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) .........................................................................19

*Youngers v. Virtus Inv. Partners Inc.*,
2017 WL 2062986 (S.D.N.Y. May 15, 2017) .................................................10, 17

## **Statutes / Rules**

SEC Rule 10b-5(a)..................................................................................7, 8, 18, 21

Federal Rule of Civil Procedure 23 ...........................................................1, 9, 10, 11

Federal Rule of Civil Procedure 23(a) ..............................................................9, 15, 16

Federal Rule of Civil Procedure 23(b)........................................2, 8, 9, 10, 15, 22, 25

Securities Exchange Act of 1934 Section 20(a) ...............................................................7

Securities Exchange Act of 1934 Section 10(b) ...........................................2, 7, 10, 11

Securities Exchange Act of 1934 Section 13(d) ...................................................7, 22

Defendants Elon R. Musk ("Musk"), the Elon Musk Revocable Trust dated July 22, 2003, Excession, LLC, and Jared Birchall ("Defendants") respectfully submit this memorandum of law in opposition to Plaintiff Oklahoma Firefighters Pension And Retirement System's ("Plaintiff" or "OKF") Motion for Class Certification (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

OKF alleges that through affirmative misstatements and a supposed "scheme," Defendants sought to conceal Musk's increasing ownership of Twitter stock during the Class Period.  OKF claims further that when the truth about Musk's ownership was disclosed on April 4, 2022, Twitter's stock price increased sharply, thereby damaging investors who sold Twitter stock during the Class Period at a lower price.  OKF's Motion thus seeks to certify a class of investors who traded in Twitter securities between March 25 and April 4, 2022.  The Motion should be denied.

OKF's inability to establish reliance on the alleged fraud—as it must to sustain a securities fraud claim—defeats both the predominance and typicality requirements of Rule 23 and precludes class certification.  OKF seeks to invoke two rebuttable presumptions of reliance in an attempt to show that common issues predominate over individual ones as to the reliance inquiry:  the "fraud on the market" presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) for misstatements, and the presumption of class-wide reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) for omissions.  OKF is entitled to neither presumption because the factual record definitively shows that OKF did not rely on the alleged misstatements or omissions.

Specifically, OKF, through its investment manager, ████, made a single sale of Twitter stock during the Class Period. ██████████████████████████████████████████ ██████████████████████████████████████████████████ OKF's Class Period sale of Twitter stock occurred because ████████████████████████ ██████████████████████████████████████████████████



The *Basic* and *Affiliated Ute* presumptions are rebutted where—like here—a plaintiff would have made the same transaction "***even had [it] been aware that the stock's price was tainted by fraud***." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 269 (2014). Without either presumption, individual issues of reliance will predominate, rendering class certification under Rule 23(b)(3) inappropriate.

Class certification should also be denied for the simple reason that OKF cannot individually sustain a Section 10(b) claim due to its lack of reliance, yet it remarkably seeks to represent a class of plaintiffs for that very claim. This is fatal—a putative class representative must be able to individually state a claim against defendants, even when acting on behalf of a class. For these reasons, OKF cannot satisfy the typicality requirement under Rule 23(a)(3).

OKF's Motion should be denied for additional reasons. *First*, the *Affiliated Ute* presumption applies only in the narrow circumstance not present here where a plaintiff's allegations rest primarily on omissions ***that are independent*** of misstatements and where proving reliance is practically impossible. *Second*, the *Basic* presumption is inapplicable because OKF the evidence shows that alleged fraud did not have any impact on the price of Twitter stock. Because of the lack of price impact, "*Basic*'s fundamental premise completely collapses, rendering class

certification inappropriate." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.* ("*Goldman I*"), 594 U.S. 113, 119 (2021). *Finally*, OKF's Motion also fails because OKF will be unable to advance a methodology appropriate for calculating class-wide damages under the unique facts in this case.

## **BACKGROUND**

### I.    RELEVANT FACTUAL BACKGROUND

#### A.    OKF Alleges That Defendants Damaged Investors By Keeping The Price Of Twitter Stock Artificially Low During The Class Period

OKF alleges that, during the Class Period, Defendants misrepresented their intentions relating to Musk's acquisition of Twitter stock, even while Musk was accumulating millions of shares. In particular, Plaintiff alleges that, on January 31, 2022, Defendants began purchasing secondary market shares of Twitter. ¶¶ 91, 174.[1] Between that date and April 1, 2022, Defendants allegedly executed an "elaborate trading strategy," Mot. at 3, utilizing an "algorithm that picks up 5% of the [daily] volume that passes through the market" to purchase shares, ¶ 93. OKF further alleges that on March 14, 2022, Musk's interest in Twitter exceeded 5%, "trigger[ing] the start of the 10-day window to satisfy [the] Rule 13 disclosure obligations." ¶¶ 137-38.

The Class Period begins on March 25, 2022—the first day after the expiration of the "10-day window," ¶ 139—and ends on April 4, 2022, when Musk filed a Schedule 13G disclosing that his interest in Twitter had reached 9.2%, ¶¶ 22, 179, 232; *see also* Ex. 1 (Expert Report of Allen Ferrell, Ph.D.) ("Ferrell Rep.") ¶ 9.[2]

Equity analysts interpreted Musk's Schedule 13G filing to mean he was taking an activist interest in Twitter. Ferrell Rep. ¶ 57. For example, Bank of America Securities wrote that "[w]e

---

[1] Unless otherwise indicated, this brief omits internal quotation marks and citations, adopts alterations, and adds emphasis. References to "¶ __" are to the Amended Complaint, ECF No. 99.
[2] Exhibits ("Ex. __") are to the Declaration of Jesse Bernstein in Opposition to Plaintiff's Motion for Class Certification dated August 22, 2025.

see the news as positive for the stock as it opens up potential for Mr. Musk taking up a board seat and influencing vision and execution." *Id.* ¶ 54(d).  And 61% of respondents to a Morgan Stanley poll answered that Musk's Schedule 13G meant he was "seeking greater influence to preserve his platform," while a mere 5% responded that Musk's stake was a "passive investment." *Id.* ¶ 54(c).

The next day, April 5, 2022, "Twitter filed a Form 8-K press release that announced the Company would appoint Musk to its Board of Directors."  ¶ 187.  Upon market close that day, "Musk's lawyers . . . amended Musk's Schedule 13G and filed a Schedule 13D that disclosed both Musk's ownership stake in Twitter and the fact that he was joining the Board."  ¶ 189.

### B.    OKF Makes A Single Sale Of Twitter During The Class Period

During the Class Period, ███████████████████████████████████
██████████████████ Ex. 2 (OKF Initial Disclosures).  ██████ is a quantitative fund that



During the Class Period, ████████ transacted just once in Twitter stock on OKF's behalf: a March 28, 2022 sale of 14,367 shares at $39.09 per share.  Ex. 5 (OKF's Relevant Trading

---

[3] █████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████

Activity); *see also* ECF No. 10-1 at 4.[4]  This trade, like all of ████ trades for OKF, ████████

████████████████████████████████████████████ algorithm

triggered the March 28, 2022 sale of Twitter shares ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

     Given its quantitative, systematic algorithmic process, ████ did not consider, and would

not have considered, ***any*** of the information comprising the fraud alleged by OKF. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Specifically, ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████

*Id.* at 137:3-10.[5]  Similarly, ████████████████████████████████

████████████████████████████ :

████████████████████████████████████

[4] ████████████████████████████████████████ Ex. 6 (Intech's April 2022 Report on OKF's
Portfolio).

[5] *See also id.* at 130:17-24 ████████████████████████████████
████████████████████████████████████████████
████████████████████

████████████████████

███████

*Id.* at 131:17-22.[6]  And ████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████

██████

*Id.* at 131:2-7.[7] ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

The evidence therefore shows conclusively that OKF, through ██████, would have made the exact same sale of Twitter shares even if it had been aware of the allegedly misrepresented and/or withheld information—i.e., regardless of whether it was aware of the alleged fraud.

## II.    PROCEDURAL BACKGROUND

### A.    OKF Files An Initial Complaint Pleading Pure Omissions, And An Amended Complaint Based In Substantial Part On Alleged Misstatements

OKF filed its initial complaint on November 21, 2022.  ECF No. 33 (the "Initial Complaint").  The Initial Complaint asserted causes of action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), claiming (i) pursuant to Section 13(d) of

---



[6] *See also id.* at 137:12-17 ████████████████████████████████

███████████████████████

[7] *See also id.* at 137:19-138:1 ████████████████████████████████

████████████████████████████████████████████████

the Exchange Act, Defendants were obligated to, but did not, timely disclose that as of March 14, 2022, Musk's holdings in Twitter stock exceeded 5%, and (ii) Defendants filed a misleading Schedule 13G on April 4, 2022, the day before the Class Period ended. *Id.* Apart from the Schedule 13G filed on the final day of the Class Period, the Initial Complaint asserted ***only omissions***. *See, e.g.*, *id.* ¶¶ 126-29 (alleging as "Materially False And Misleading Statements And Omissions" only the failure to disclose under Section 13(d) and the Schedule 13G). The Court granted in part and denied in part Defendants' motion to dismiss. ECF No. 49.

On April 12, 2024, the United States Supreme Court handed down *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), which held that "[p]ure omissions are not actionable under Rule 10b–5(b)." *Id.* at 260. In light of *Macquarie*, the parties agreed that OKF could file an amended complaint. ECF No. 69.

On April 30, 2024, OKF filed its Amended Complaint. ECF No. 99 (the "Amended Complaint"). To avoid dismissal under *Macquarie*, OKF recharacterized its non-disclosure claim, alleging that "[a]s part of an elaborate scheme to control Twitter . . . Musk and [newly-added Defendant Jared] Birchall concealed Musk's steadily increasing ownership in Twitter ***and misled investors through misdirection and half-truths***." ¶ 227. The corresponding section of the Amended Complaint, titled "Musk's Misleading Affirmative Statements In Furtherance Of His Scheme," alleges that Musk issued misleading public Tweets in support of his alleged scheme, as well as the Schedule 13G alleged in the prior complaint. ¶¶ 228-33.

**B.    The Court Grants In Part And Denies In Part Defendants' Motion To Dismiss**

On March 28, 2025, this Court granted in part, and denied in part, Defendants' Motion to Dismiss the Amended Complaint. ECF Nos. 108-109, 118. The Court held OKF adequately pleaded a cause of action under Rule 10b-5(a) and (c) because "the facts surrounding the trading strategy evince a deceptive act in furtherance of a scheme to defraud." ECF No. 118 ("Op.") at

30. The Court ruled that the alleged failure to disclose "signals falsely to investors that there is no such ownership to disclose." *Id.* at 29. But the Court limited the alleged misstatements to just two Musk Tweets dated March 26, 2022: in one, Musk states he is "giving serious thought" to creating a platform to rival Twitter, and in the other he responds "[h]a ha that would be sickkk" to a Twitter user's suggestion Musk "buy Twitter" and "change the bird logo to a doge." *Id.* at 39-40. The Court held the Tweets could be misleading because they suggest Musk had no plans to acquire Twitter, even while Musk was accumulating shares. *Id.*

### C.    OKF Seeks To Certify A Class Of Shareholders

On June 23, 2025, Plaintiff moved to certify a class of those who sold Twitter securities between March 25, 2022 and April 4, 2022 (the "Class Period") and incurred damages. Mot. at 1. To satisfy the Rule 23(b)(3) requirement that "common questions of law and fact predominate over individual questions" as to the element of reliance, the Motion invokes both *Affiliated Ute* and *Basic*, "the two primary theories of reliance in securities cases." *Id.* at 14. The Motion also summarily asserts that class-wide damages will be determined by a "common methodology," specifically an "event study to measure the amount of artificial deflation in Twitter stock on each day of the Class Period." *Id.* at 23-24.

This Opposition appends the Expert Report of Allen Ferrell, Ph.D., which concludes, *inter alia*, that (i) the two alleged misstatements remaining in the case—Musk's March 26, 2022 Tweets—were not "new value-relevant information" and did not affect Twitter's stock price, and (ii) Plaintiff's expert "fails to establish that his proposed damages methodology can reliably measure the alleged artificial deflation in Twitter's common stock." Ferrell Rep. ¶ 27.

### <u>ARGUMENT</u>

A "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Thus,

"a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Id.* A plaintiff "must actually ***prove***—not simply plead—that [its] proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275; *see also Comcast*, 569 U.S. at 33. As OKF acknowledges, it bears the burden of proving that it satisfies each of the four elements of Rule 23(a)—(i) numerosity, (ii) typicality, (iii) commonality, and (iv) adequacy—as well as the predominance and superiority requirements of Rule 23(b)(3). Mot. at 2-3.

The trial court "must make a definitive assessment of [these] requirements, notwithstanding their overlap with merits issues, . . . must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence." *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). Contrary to Plaintiff's portrayal of class certification as a foregone conclusion, the Supreme Court has made clear that class certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met. *Comcast*, 569 U.S. at 33; *accord In re Petrobras Sec.*, 862 F.3d 250, 260 n.11 (2d Cir. 2017) (calling for "rigorous analysis" of Rule 23 requirements). Plaintiff has not met its burden.

## I.     CLASS CERTIFICATION IS IMPROPER BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE AND RENDER OKF ATYPICAL

OKF did not rely on the alleged fraud. OKF would have made the exact same investment decision at the exact same price even had it known about the alleged misstatements and omissions. The uncontroverted record evidence dooms OKF's ability to obtain class certification for two independent reasons. *First*, OKF's non-reliance means it is not entitled to any "presumption of reliance," without which "individual reliance issues would overwhelm questions common to the class" and destroy the "predominance" element of Rule 23. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462-63 (2013). *Second*, OKF's non-reliance subjects it to unique defenses,

which threaten to become the focus of this litigation. Indeed, a particular focus will be whether OKF even has a claim itself. And it "is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class." *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010).

### A.   OKF Cannot Rely On Any Presumption Of Reliance Because OKF Would Have Sold Twitter Stock At The Exact Same Price Even If It Had Been Aware Of The Alleged Fraud

To certify its proposed class, OKF must meet Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen*, 568 U.S. at 460. To evaluate predominance, a court examines the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 809 (2011). It is undisputed that reliance is an element of a Section 10(b) claim. *E.g.*, *Amgen*, 568 U.S. at 462-63. Thus, to establish predominance here, OKF must establish that it can prove the elements of its claims—including reliance—through class-wide evidence.

Proving reliance directly—i.e., proving what an individual investor actually relied on in making an investment decision—necessarily involves individual questions. *Halliburton II*, 573 U.S. at 268 ("If every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would ... overwhelm[] the common ones, making certification under Rule 23(b)(3) inappropriate."). Like OKF, a class representative in a Section 10(b) class action must therefore invoke a "presumption of reliance" in order to obtain class certification. *Id.* (absent a presumption, "individual reliance issues would overwhelm questions common to the class" and destroy the "predominance" element of Rule 23); *see also Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 2062986, at *3 (S.D.N.Y. May 15, 2017) ("[W]ithout a class-wide presumption of reliance, each plaintiff will have to prove reliance individually.").

Here, OKF invokes two presumptions of reliance. Mot. at 13-14. *First*, OKF invokes the

fraud-on-the-market presumption in *Basic*, under which a seller of stock in an efficient market can rely on the stock's market price because "most publicly available information is reflected" in the price, including "any public material misrepresentations." 485 U.S. at 247. *Second*, OKF invokes the *Affiliated Ute* presumption, which presumes reliance where a plaintiff's action arises "primarily" from a "failure to disclose" and as a result, reliance would be impossible to prove as a practical matter. 406 U.S. at 153; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (underscoring the limited nature of *Affiliated Ute*). Critically, **both** presumptions may be rebutted with proof that the plaintiff would have bought the defendant's stock at the same price "***even had [the plaintiff] been aware that the stock's price was tainted by fraud***." *Basic*, 485 U.S. at 269; *see In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48-49 (S.D.N.Y. 2013) ("To rebut the class-wide presumption of reliance on material omissions, a defendant must prov[e] by a preponderance of the evidence that disclosure of that information would ***not have altered the plaintiff's investment decision***."). Defendants have such proof.

The testimony of OKF's representative demonstrates conclusively that ▮▮▮—on OKF's behalf—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Supra* at 4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Supra* at 5-6.

Indeed, contrary to OKF's allegation that for traders using "systematic trading algorithms, a Schedule 13D filing would likely trigger an automatic stop to any campaign of selling a company's securities," ¶ 67, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████ Making trades in response to the latest market

news or disclosures was ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████[8]

These uncontroverted facts defeat any presumption of reliance because the alleged misrepresentations and omissions "would ***not have altered*** [OKF's] investment decision." *duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987). And given that ██████ had plenary authority over OKF's Twitter investments, it is ██████ reliance that is the relevant inquiry. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466-67 (S.D.N.Y. 2016) (presumption of reliance rebutted where plaintiffs' third-party investment advisor "was indifferent to the fraud"); *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 888 (S.D. Ohio 2012) (rejecting plaintiffs' "argument that it is unfair they cannot assert claims under the blue sky laws of their states of domicile" where plaintiffs "chose to have [out of state] investment advisors act on their behalf"

---

[8] Courts have denied certification where plaintiffs' trading patterns merely ***suggest*** they may not have relied, let alone an admission under oath that OKF would have purchased at the same price even was the alleged fraud known. *See IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *22 (S.D.N.Y. Oct. 29, 2013) ("Here, the in-and-out-trading patterns of the named plaintiffs raise individualized questions regarding why they made their investments (was it in fact reliance on the market?) and whether they have negative loss causation.").

and the defendants "dealt only with [the investment advisors], not with the individual plaintiffs").

███████ algorithm "would have … sold the [Twitter] stock even had [it] been aware that the stock's price was tainted by fraud," which "severs" the "link between the alleged misrepresentation and either the price received … by the plaintiff, or his decision to trade at a fair market price," and thus rebuts the *Basic* presumption of reliance. *Halliburton II*, 573 U.S. at 269; *see also GAMCO Invs., Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 101-02 (S.D.N.Y. 2013) (*Basic* presumption rebutted where "it cannot be said that but for [Defendant's] misstatements and omissions about its liquidity condition, Plaintiffs would not have transacted in [Defendant's] ADS's"), *aff'd sub nom.* 838 F.3d 214 (2d Cir. 2016); *In re Overstock Sec. Litig.*, 119 F.4th 787, 800 (10th Cir. 2024) (*Basic* presumption rebutted where plaintiff claimed to have purchased shares "to avoid breaching its lending contracts," which meant "it cannot also have bought its shares because of Defendant's alleged misstatements."); *McGuinness v. Parnes*, 1988 WL 66214, at *3 (D.D.C. June 17, 1988) (presumption rebutted where defendant "proffered a showing that although McGuinness did not know about the alleged misinformation, he would have traded despite knowing that information about the company's future was false").

For the same reason—that ██████ would have made the same investment decision at the same price even with full knowledge of the allegedly undisclosed information about Musk's Twitter holdings—the evidence rebuts any *Affiliated Ute* presumption. *See Halliburton II*, 573 U.S. at 269; *Smith Barney*, 290 F.R.D. at 48-49.[9]

---

[9] OKF may claim that Defendants' argument would effectively preclude any algorithmic trader— or at least OKF—from recovering legitimate damages through a securities action. This is wrong. Defendants' argument would impact only algorithmic traders who admit they still would have traded even had they known the allegedly omitted material information. To the extent all algorithmic traders suffer from that flaw—which is contrary to OKF's own allegations, ¶ 67, algorithmic traders would indeed not make suitable lead plaintiffs. According to ███████████

The atypical facts here are precisely what courts find missing in rejecting similar attempts to defeat reliance at the class certification stage. For instance, in *Villella v. Chemical and Mining Company of Chile Inc.*, 333 F.R.D. 39 (S.D.N.Y. Sept. 24, 2019), the defendant argued that the plaintiff, as a "value investor . . . by definition did not rely on the market price," which the court rejected because the investor "believed [the shares] were undervalued and would reach their true value" once the price incorporated certain market developments. *Id.* at 56. The court found that had the plaintiff known of the fraud, "discovery indicates that it ***would not have purchased*** the ADS at the price it did." *Id.* at 57. Here, by contrast, ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ Class certification should be denied.

### B.    OKF Fails To Meet The Typicality Requirement Under Rule 23(a) Because ██████ Algorithmic Trading Subjects OKF To Unique Defenses

OKF must also demonstrate typicality under Rule 23(a)(3)—that is, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). But "class certification is inappropriate" where, as here, "a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *see also Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) (class certification inappropriate where lead plaintiff

---

████████████████████████████████████████████████████

████ It should, of course, be incumbent on a lead plaintiff movant to investigate whether their investment manager's trading strategy suffers from the defects that Intech's strategy suffers from for purposes of proving reliance ***before*** they seek to be appointed lead plaintiff. Here, OKF either did not conduct such investigation or pursued this case despite knowledge that their investment manager would have made the exact same sale regardless of whether they had known the allegedly omitted information. Either way, OKF cannot represent a class of sellers seeking damages for the alleged failure to disclose information that would not have changed OKF's trading at all.

is subject to a unique defense that may "divert attention from the substance of the basic claim."),
*aff'd in part, vacated on other grounds*, 702 F.2d 400 (2d Cir. 1983). To that end, "certification
is routinely refused when the court is confronted with a sufficiently clear showing of the defense's
applicability to the representative plaintiff." *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *4
(D. Conn. Mar. 10, 2015), *aff'd*, 658 F. App'x 5 (2d Cir. 2016). Defendants need show only that
the defense is "meritorious enough to require the plaintiff to devote considerable time to rebut
[it]." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008).

Contrary to its conclusory assertion in its Motion, Mot. at 10, OKF is atypical of the
putative class because it is vulnerable to the unique defense that it did not rely on Musk's alleged
misstatements or omissions in making its single Class Period sale. *Supra* at 5-6, 9-14. *See Cohen
v. Laiti*, 98 F.R.D. 581, 584 (E.D.N.Y. 1983) ("[I]t is clear that [plaintiff's] investment strategy
invites rebuttal and that the time likely to be consumed thereby is sufficient to justify our finding
that this strategy gives rise to a unique defense requiring a denial of class representative status to
[plaintiff]."); *Weintraub v. Texasgulf Inc.*, 564 F. Supp. 1466, 1471 (S.D.N.Y. 1983) (denying
class certification where "plaintiff was a sophisticated speculative trader whose unusual trading
activities will give rise to unique defenses").

OKF's susceptibility to this unique reliance defense is sufficient to defeat Rule 23(a)'s
typicality requirement. *See Kline*, 88 F.R.D. at 699 (plaintiff atypical where it was "subject to
unique defenses on the issue of reliance inapplicable to other purported class members"); *Gary
Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d
Cir. 1990) (affirming denial of certification on typicality grounds where plaintiff was subject to
defense of non-reliance); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007)
("[A] named plaintiff who is subject to an arguable defense of non-reliance on the market has been

held subject to a unique defense, and therefore, atypical of the class"); *Kamerman v. Ockap Corp.*, 112 F.R.D. 195, 198 (S.D.N.Y. 1986) (same); *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) (plaintiffs' "incredibility might support a rebuttal unavailable against many other class members, i.e., that plaintiffs did not significantly rely on the integrity of the market or that, even if they had known of the alleged misrepresentation, they would still have purchased the stock.").

Denial of class certification is particularly warranted here because the evidence does not merely raise questions as to whether OKF relied on the alleged fraud.  It is uncontroverted that OKF **did not rely**.  Under these circumstances, OKF is entitled to no recovery at all, whether as a class representative or even as an absent class member.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 430-31 (7th Cir. 2015) (entitling defendants to judgment for all class members who would have "purchased the stock at the inflated price" even had the member known at the time of purchase "that defendants' false and misleading statements had the effect of inflating" the stock price.  This conclusive lack of reliance mandates denial of class certification because it "is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class." *IMAX*, 272 F.R.D. at 147.

What's more, Plaintiff alleges that "Defendants crafted an elaborate trading strategy designed to get in under the radar and not press the price of Twitter stock," Mot. at 3 (citing ¶¶ 67, 87, 92-110, 216, 253) (emphasis omitted), emphasizing Defendants' use of algorithmic trading, and in particular the feature of Defendants' algorithm that sought to purchase Twitter shares more cheaply by staying below the "volume average weighted price," referred to as "VWAP."  *See, e.g.*, ¶ 87 (noting a "secret algorithmic trading strategy to acquire Twitter securities"); ¶ 93 (alleging that algorithm sought to purchase shares below the VWAP so as to "not be detected by the market"). ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████    To the extent OKF claims that algorithmic trading is inherently nefarious, OKF is

liable to the very same attack.  *See Kline*, 88 F.R.D. at 699.

\* \* \*

This is the unusual case in which undisputed evidence demonstrates that OKF cannot

satisfy predominance or typicality due to lack of reliance.  Class certification should be denied.

## II.    *AFFILIATED UTE* IS INAPPLICABLE FOR THE INDEPENDENT REASON THAT OKF'S CLAIMS ARE NOT PRIMARILY BASED ON OMISSIONS

Setting aside Defendants' rebuttal of *Affiliated Ute* in Section I.A, OKF cannot rely on

*Affiliated Ute* to establish class-wide reliance for the independent reason that *Affiliated Ute* "does

not apply to . . . half-truths, nor does it apply to misstatements whose only omission is the truth

that the statement misrepresents."  *Waggoner*, 875 F.3d at 96; *accord In re DiDi Glob. Inc. Sec.

Litig.*, 2025 WL 1909295, at \*12 (S.D.N.Y. July 7, 2025).  This presumption "should be applied

sparingly," *Youngers*, 2017 WL 5991800, at \*8, and is only intended to reach "situations where

reliance as a practical matter is impossible to prove," *Waggoner*, 875 F.3d at 95.  Thus, "the failure

to disclose the alleged falsity of a representation does not transform a misrepresentation case into

an omission case and allow a plaintiff to seek refuge in the *Affiliated Ute* presumption."  *Schwab

v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 753 (S.D.N.Y. 2018); *see also In re Merrill Lynch

Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 398 (S.D.N.Y. 2010) ("the mere fact of []

concealment" cannot "transform [] alleged malfeasance into an omission rather than an affirmative

act").  Applying *Affiliated Ute* here "would swallow the reliance requirement almost completely."

*Merrill Lynch*, 704 F. Supp. 2d at 398.

To start, OKF's allegations and pleading history defeat its attempt to invoke *Affiliated Ute*.

OKF revised its original complaint to make clear it was ***not*** relying mainly on omissions so that it

could avoid dismissal under the Supreme Court's *Macquarie* opinion. *Supra* at 7. Those revisions emphasize that the alleged scheme "concealed Musk's steadily increasing ownership in Twitter and misled investors ***through misdirection and half-truths***," ¶ 227, and the Amended Complaint devotes most of the section that itemizes the purported misrepresentations and omissions to "Musk's Misleading Affirmative Statements In Furtherance Of His Scheme," ¶¶ 228-33.[10] OKF cannot have it both ways: in reframing its claims as relying on ***misrepresentations***, OKF no longer alleges "primarily a failure to disclose," *Affiliated Ute*, 406 U.S. at 153, and thus cannot invoke *Affiliated Ute* in support of its causes of action under Rule 10b-5(a), (b), or (c). *See also* ¶ 237 (claims "are predicated ***in part*** upon Defendants' scheme to conceal and mislead investors regarding facts that Musk had a legal duty to disclose.").

The result of OKF's strategic pleading is that OKF's "omissions" claim is indistinguishable from its misstatements claim. *See Waggoner*, 875 F.3d at 96 ("half-truths" and "misstatements whose only omission is the truth that the statement misrepresents" do not support *Affiliated Ute* presumption); *In re FirstEnergy Corp. Sec. Litig.*, --- F.4th ----, 2025 WL 2331754, at *13 (6th Cir. Aug. 13, 2025) (a claim "is primarily based on misrepresentations if . . . the omissions are only the inverse of the misrepresentations, or the only omissions are the truth that is misrepresented"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1205 (9th Cir. 2021) ("[A]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself," but that is not sufficient to transform affirmative conduct

---

[10] *See also* ¶ 17 ("[I]n service of Defendants' scheme, Musk ***misleadingly represented to the public*** that he was 'giving serious thought' to 'building a new social medial platform,' which helped further conceal that he was pursuing an active role at Twitter and also aided his scheme by keeping the price of Twitter securities artificially low."); ¶ 83 ("Musk misled the market about Twitter, including ***by falsely representing*** that he may be interested in building a rival platform to compete with Twitter, to divert attention from his undisclosed interest and keep Twitter's stock price low.").

into omissions).  OKF's claims are thus readily distinguished from "scheme" cases in which courts have invoked *Affiliated Ute* to certify a class; in those cases, "the deceptive conduct is distinct from the false or misleading statements themselves."  *DiDi Glob.*, 2025 WL 1909295, at *16 ("[A]llegations concerning a deceptive act by the Officer Defendants . . . are distinct from the misleading statements in the offering documents."); *see also In re WorldCom Sec. Litig.*, 219 F.R.D. 267, 297-98 (S.D.N.Y. 2003) (deceptive conduct was allegedly concealment of a relationship, which concealment was separate from misstatements alleged in the analyst reports).  Here, the alleged concealed facts are precisely what OKF claims rendered the Tweets false.

Further, reliance here is not "impossible to prove," *Waggoner*, 875 F.3d at 95, as it must be to invoke *Affiliated Ute*.  Indeed, in its opinion on Defendants' motion to dismiss, the Court ruled that Musk's alleged failure to disclose the Schedule 13 form "signals falsely to investors that there is no such ownership to disclose."  Op. at 29.  To prove reliance, an investor need only allege that they reviewed the Schedule 13 filings and determined that the absence of any Schedule 13 form from Musk signaled that Musk (or any other person) had no such ownership to disclose.

For this independent reason, OKF may not rely on the *Affiliated Ute* presumption.

## III.    *BASIC* IS INAPPLICABLE FOR THE INDEPENDENT REASON THAT THE ALLEGED FRAUD HAD NO IMPACT ON THE PRICE OF TWITTER STOCK

Defendants can also "sever the link" between the alleged misstatements or alleged scheme, and the "decision to trade at a fair market price," *Halliburton II*, 573 U.S. at 269, by proving, by a preponderance of the evidence, that the misstatements or scheme had no effect on the market price of the security at issue, *Basic*, 485 U.S. at 248.  "The district court's task is simply to . . . determine whether it is more likely than not that the alleged misrepresentations had a price impact," even where the "evidence overlaps with materiality or any other merits issue."  *Goldman I*, 594 U.S. at 124, 126-27.  Defendants make such a showing here.

### A.      The *Basic* Presumption Does Not Apply To The Two Musk Tweets

OKF cannot avail itself of the *Basic* presumption to prove reliance on the two March 26, 2022 Tweets because the record is devoid of evidence that they had any effect on the price of Twitter stock.  *See* ¶¶ 155-58.[11]  Rather, as Defendants' expert, Dr. Allen Ferrell, explains, the movement of Twitter's stock price in the wake of the two Musk Tweets was not "statistically significant," and there is "no reliable economic basis to conclude that the alleged misrepresentation related to Mr. Musk's March 26, 2022 tweets was value-relevant information."  Ferrell Rep. ¶¶ 47-49.  In short, the market saw Musk's March 26, 2022 Tweets and yawned.  Because these alleged misrepresentations "had no price impact . . . *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate."  *Goldman I*, 594 U.S. at 119.

OKF has not established that Musk's Tweets had any impact on the price of Twitter's stock for the additional reason that there is a "mismatch" between the Tweets and the alleged disclosure that supposedly corrected the misinformation that the Tweets contained.  *See id.* at 123.  As the Supreme Court explained in *Goldman I*, the "inference" that "the back-end price drop equals front-end inflation [] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  *Id.*

Plaintiff's theory that the Tweets were misleading rests on the assumption that investors interpreted them to signal Musk's ***disinterest*** in acquiring Twitter.  *See, e.g.*, ¶¶ 228-34.  But there is no evidence that anyone (apart from Plaintiff's counsel) interpreted Musk's Tweets that way. Ferrell Rep. ¶¶ 41-44.  To the contrary, at least two sources viewed the Tweets as expressing

---

[11]  Plaintiff identifies one Tweet in which Musk claims he is "giving serious thought" to establishing a platform to rival Twitter, ¶ 155, and another where he appears to treat purchasing Twitter as a "hypothetical" despite having already purchased many millions of shares, ¶ 158.

interest in *acquiring* Twitter.[12]  But if the market did not view Musk's Tweets as stating his *disinterest* in Twitter, then the April 4, 2022 "disclosure" of Musk's *interest* in Twitter could not have "corrected" those Tweets.  *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74, 102 (2d Cir. 2023) ("mismatch" between misstatement and disclosure occurs when the latter does not "bear[] on the same subject" as the former).  Unsurprisingly, there is no evidence that the market linked the April 4 disclosure to the Tweets.  Ferrell Rep. ¶ 51.  It is thus much more likely than not that Musk's Tweets had no impact on the price of Twitter stock.

## B.    The *Basic* Presumption Does Not Apply To The Alleged Scheme

Similarly, OKF cannot avail itself of the *Basic* presumption to prove reliance on the remaining aspects of the scheme under Rule 10b-5(a) and (c) because they were undisclosed.   The alleged scheme supposedly comprises (i) the two Tweets; (ii) the trading algorithm Musk allegedly employed to purchase Twitter shares, and (iii) the filing of the Schedule 13G on April 4, 2022.  Mot. at 5-6.  As explained above, neither of Musk's two allegedly misleading Tweets had any price impact.  Further, the alleged trading algorithm by which Musk acquired Twitter shares prior to the Class Period was not disclosed to the public, which necessary defeats the element of reliance necessary to plead scheme liability.  *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 166-67 (2008) ("[T]he investors cannot be said to have relied upon any of the respondents' deceptive acts," which took place outside public view, "and as the requisite reliance cannot be shown, respondents have no liability to petitioner"); *see* Op. at 30 (presumption of reliance not established because "Plaintiff has not demonstrated that 'the investing public had knowledge,

---

[12] Ferrell Rep. ¶ 44 ("One news article commented that when other Twitter users suggested that Mr. Musk should just outright buy Twitter, Mr. Musk didn't outright reject that idea, joking about how cool it would be if he bought the social media giant and changed Twitter's logo to that of cryptocurrency Doge. The second article stated: Elon Musk has hinted at the possibility of starting up his own social media company — or possibly buying Twitter.").

either actual or presumed," of the alleged deceptive acts).[13]

And even were the fraud-on-the-market presumption appropriate here (it is not), as Dr. Ferrell explains, there is no reliable economic basis to conclude that the algorithm had any impact on Twitter's stock price. Ferrell Rep. ¶¶ 65-69. Breaking up orders using algorithmic trading is a widely-accepted and utilized trading strategy for executing large trades, *id.* ¶ 66, and to that end, there was no market commentary following the April 4 disclosure that commented on the speed with which Musk accumulated his stake in Twitter or otherwise suggests that the market viewed Musk as having participated in an undisclosed scheme, *id.* ¶¶ 68-69.

For these independent reasons, OKF thus may not avail itself of the *Basic* presumption.

## IV. OKF HAS NOT PROPOSED A COMMON DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASS-WIDE DAMAGES

The proposed class should be rejected for the additional, independent reason that OKF fails to "establish[] that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Although damages "[c]alculations need not be exact" at the certification stage, "courts must conduct a rigorous analysis to determine whether" a plaintiff's damages case is consistent with its liability case. *Id.* at 35; *accord FirstEnergy*, 2025 WL 2331754, at *22. And OKF must offer more than an expert's unelaborated "say-so" that a viable model of class-wide damages exists. *Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014).

OKF's damages theory is based broadly on the notion that investors unwittingly sold shares

---

[13] *See also Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009) (refusing to recognize presumption of reliance upon undisclosed manipulative conduct); *Haw. Ironworkers Annuity Tr. Fund v. Cole*, 296 F.R.D. 549, 555 (N.D. Ohio 2013) ("The decision in *Stoneridge* thus stands for the proposition that, to invoke the fraud-on-the-market in a scheme liability case, a plaintiff must establish that deceptive conduct was publicly disclosed."); *WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 389 (E.D. Pa. 2013) ("To impose this scheme liability, it must be shown that the [p]laintiff [] knew about or relied on deceptive conduct by [the defendant] that was publicly disclosed at the time they purchased or sold DVI's securities.").

of Twitter at deflated prices during the Class Period because, had Musk disclosed his equity stake as required under Section 13(d), Twitter's share price would have been higher. Dr. Mason devotes four paragraphs to concepts of a plan for a damages methodology, which he intends to base broadly on "the impact of curative events" on Twitter's common stock. Mason Rep. ¶ 110. But this proposal fails to acknowledge, much less address, that any such model must predict how Twitter's stock would have reacted in a purely hypothetical world in which Musk disclosed *different* stakes in Twitter on several *different* dates during the Class Period.

*First*, Dr. Mason's apparent proposal to measure damages by the difference between the price of Twitter during the Class Period and after the April 4, 2022 disclosure is not a realistic or reasonable measure of class-wide damages. It ignores that the purported deflation on any given day of the Class Period was necessarily different, because Musk's stake in Twitter, and the information concerning any supposed activist intentions as to Twitter, varied from day to day. Ferrell Rep. ¶¶ 52-55. For instance, although Musk disclosed a 9.2% stake in Twitter on April 4, 2022, he would have disclosed a lower stake between March 25, 2022 and April 1, 2022 (the last Class Period day on which Musk acquired Twitter shares), which would have caused Twitter's stock price to move differently from how it rose on April 4. *See id*. ¶ 52 (academic literature indicates stock prices react differently depending on the percentage ownership disclosed). Dr. Mason does not acknowledge this issue, much less hint at how he would model each day's deflation in this hypothetical world. *See* Ex. 7 (Depo. Tr. of Dr. Mason dated August 19, 2025) at 123:12-20 ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

As another example, the record indicates that Twitter did not offer Musk a seat on its board

until April 3, 2022, did not execute a formal letter appointing him until April 4, and did not announce his appointment until April 5.  ¶¶ 21, 24, 178.  Musk therefore could not have filed a Schedule 13D referencing appointment to the board before April 3.  Thus, there is no economic basis on which to conclude that the reaction of Twitter's stock price on April 4—which the market viewed as indicating Musk's potential activist interest in Twitter, Ferrell Rep. ¶ 55—reflects the alleged deflation during any Class Period days between March 25, 2022 and, at the earliest, April 2, 2022.  Dr. Mason does not address how he will account for the differences in deflation relating to Musk's intentions concerning Twitter.  *See* Ferrell Rep. ¶ 53.

*Second*, Dr. Mason states that he will address any confounding information with "widely accepted financial and economic methods to examine the potential presence and possible impact of confounding information," Mason Rep. ¶ 11—essentially that he will cross that bridge when he comes to it.  Dr. Mason does not identify any confounding information present at the time of the April 4, 2022 corrective disclosure, yet is confident he has a methodology that will be able to address it.  *See, e.g.*, *Jaroslawicz v. M&T Bank Corp.*, 2024 WL 2975766, at *8 (D. Del. June 13, 2024) (expert's methodology insufficient where "Plaintiffs have not proposed any mechanism for incorporating intervening or confounding factors into their proposed damages calculations"); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25-26 (D.D.C. 2012) (expert's proposed methodology was too vague because it failed to account for "[confounding] factors that may have affected price").  Dr. Mason offers no reason for the Court to share his confidence.

*Third*, Dr. Mason's proposed damages methodology does not account for the fact that market participants did not link the "curative" events disclosed between April 4 and April 5, 2022 to the alleged misrepresentations on March 26, 2022.  Nor do any of the analyst reports concerning Twitter link the April 5, 2022 Schedule 13D filing, and accompanying disclosure about Musk's

appointment to the Board, as curative of the March 26, 2022 tweets about a potential rival platform or the allegedly secret algorithmic trading strategy.  Ferrell Rep. ¶¶ 52, 58-60.

*Fourth*, Dr. Mason's proposed damages methodology relies on curative disclosures over multiple days.  This means Dr. Mason does not provide a methodology that would reliably estimate how a series of different disclosures "cured" alleged misstatements on March 26, 2022 or the alleged omission of the filing of a Schedule 13D.  *See, e.g.*, *Loritz v. Exide Tech.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (denying class certification where expert merely "discuss[ed] general techniques for computing damages in securities fraud cases" but failed to connect those techniques "to the facts of th[e] case").  As an example, OKF claims Musk's Schedule 13D filing after market close on April 5, 2022 "disclosed both Musk's ownership stake and his activist intentions."  ¶ 24.  But market commentary on April 4, 2022 demonstrates that investors interpreted Musk's Schedule 13G filing—which also disclosed Musk's ownership stake—as Musk having an activist interest in Twitter.  Ferrell Rep. ¶¶ 57-58.  Dr. Mason has thus not established how his proposed damages methodology would demonstrate that the allegedly curative Schedule 13D filing on April 5, 2022 would have changed the total mix of information.

For these reasons, Dr. Mason's proffered methodology for calculating damages for the proposed class is insufficient to support a finding of predominance.  *Comcast*, 569 U.S. at 34-35 (plaintiffs failed to satisfy predominance requirement for class certification where damages model did not "establish that damages [were] susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" and, absent such a showing, "[q]uestions of individual damage calculations [would] inevitably overwhelm questions common to the class").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff OKF's Motion for Class Certification.

DATED:  New York, New York
             August 22, 2025

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Jesse Bernstein*
Alex Spiro
Sarah Heaton Concannon
Jesse Bernstein
Jacob J. Waldman
Brenna Nelinson
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com
sarahconcannon@quinnemanuel.com
jessebernstein@quinnemanuel.com
jacobwaldman@quinnemanuel.com
brennanelinson@quinnemanuel.com

Nathan Goralnik
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (212) 849-7049
nathangoralnik@quinnemanuel.com

Rachel G. Frank (*pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
rachelfrank@quinnemanuel.com

*Attorneys for Defendants Elon R. Musk, the Elon Musk Revocable Trust Dated July 22, 2003, Excession, LLC, and Jared Birchall*

**<u>ATTORNEY CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)</u>**

I, Jesse Bernstein, an attorney duly admitted to practice before this Court, hereby certify that, pursuant to Local Rule 7.1(c), the annexed Memorandum of Law was prepared using Microsoft Word and the document contains 25 pages in 12-point font or larger, with 1" margins on all sides pursuant to the Court's Individual Practices.

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on this 22nd day of August, 2025 in New York, New York.

*/s/ Jesse Bernstein*
Jesse Bernstein
