# EXHIBIT 1

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,<br><br>  Plaintiff,<br><br>  v.<br><br>ELON R. MUSK, ELON MUSK EVOCABLE TRUST DATED JULY 22, 2003, EXCESSION LLC, AND JARED BIRCHALL,<br><br>  Defendants. | No. 1:22-cv-03026-ALC-GWG |

**REBUTTAL EXPERT REPORT OF ALLEN FERRELL, Ph.D.**

**August 22, 2025**

**CONFIDENTIAL**

**Table of Contents**

I.      Qualifications ................................................................................................................ 1

II.     Background .................................................................................................................... 2

III.    Plaintiff's Allegations and the Mason Report .......................................................... 5

    A.  Plaintiff's Allegations ............................................................................................ 5
    B.  Expert Report of Joseph R. Mason ........................................................................ 8

IV.     Assignment ................................................................................................................... 9

V.      Summary of Conclusions ............................................................................................ 9

VI.     The March 26, 2022 Tweets Did Not Result in a Negative and Statistically Significant
        Change in Twitter's  Stock Price ............................................................................. 10

    A.  Event Study Methodology .................................................................................... 11
    B.  Event Study Results .............................................................................................. 14

VII.    Dr. Mason Fails to Establish That His Proposed Damages Methodology Can Reliably
        Measure Artificial Deflation in Twitter's Common Stock .............................................. 16

VIII.   Dr. Mason Does Not Propose a Damages Methodology for Plaintiff's Section 20(a)
        Claims ......................................................................................................................... 21

IX.     Algorithmic Trading Is a Routine Trading Strategy ......................................................... 22

**CONFIDENTIAL**

## I.    QUALIFICATIONS

1.    I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.    I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, a research associate at the National Bureau of Economic Research, and a visiting professor at Stanford. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), a member of the American Bar Association Task Force on Corporate Governance and of the American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.    I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the U.S. Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of corporate and securities matters, including matters involving mergers & acquisitions and damages. My expert testimony in the last four years, publications in the last ten years, and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.    I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated at an hourly rate of $1,600, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions, testimony, or conclusions, nor upon the outcome of this matter.

**CONFIDENTIAL**

5.      The materials I have relied upon in reaching the opinions and conclusions set out in this report are listed in **Appendix B**.

6.      This report is subject to change or modification should additional relevant information become available which bears on my analysis, opinions, or conclusions contained herein. I may also seek to respond to opinions or analyses proffered by other experts. I further reserve the right to amend or supplement this report on instruction of counsel or as a result of any motion or court order that may impact the nature or scope of claims and issues in this litigation. I may also prepare illustrative exhibits based on the contents of this report if I am called upon to testify at trial.

## II.     BACKGROUND

7.      Oklahoma Firefighters Pension and Retirement System ("Plaintiff") filed this lawsuit "on behalf of investors who sold the securities of Twitter … between March 25, 2022 and April 4, 2022, inclusive (the 'Class Period'), and who were damaged as a result of Defendants' scheme to defraud and related misrepresentations."[1] Plaintiff brings claims against all Defendants for violating Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(a), (b), and (c).[2] Plaintiff also brings claims against Defendants Mr. Musk and Mr. Birchall for violating Section 20(a) of the Exchange Act.[3]

8.      As of December 31, 2021, Elon Musk ("Mr. Musk" or "Musk") was Chief Executive Officer ("CEO") of Tesla, Inc. and Space Exploration Technologies, Corp.[4] Jared Birchall ("Mr. Birchall"), a former banker at Morgan Stanley, was Mr. Musk's wealth manager and managing director of Mr. Musk's family office, Excession LLC, since 2016.[5]

---

[1] First Amended Complaint For Violations of the Federal Securities Laws, *Oklahoma Firefighters Pension and Retirement System v. Elon R. Musk, et al.*, United States District Court, Southern District of New York, No. 1:22-cv-03026-ALC-GWG, filed May 28, 2024 ("Complaint"), at 1. Defendants in this case are Elon Musk, Elon Musk Revocable Trust Dated July 22, 2003, Excession LLC, and Jared Birchall.

[2] Complaint, ¶ 5.

[3] Complaint, ¶ 262.

[4] Tesla, Inc., Form 10-K, for the fiscal year ended December 31, 2021, at 20.

[5] "What to know about Jared Birchall, Elon Musk's right-hand man," *Fast Company*, April 18, 2025, available at https://www.fastcompany.com/91319028/what-to-know-about-jared-birchall-elon-musks-right-hand-man.

2

**CONFIDENTIAL**

9.      As of December 31, 2021, Twitter, Inc. ("Twitter" or the "Company")[6] was "a global platform for public self-expression and conversation in real time."[7] For fiscal year end 2021, Twitter's total revenue was $5.08 billion and its loss from operations was $492.7 million.[8]

10.      On March 26, 2022 at 1:57 PM ET, a Twitter user @WSBChairman tweeted: "just buy twitter" and "change the bird logo to a doge."[9] Mr. Musk responded, at 2:16 PM ET: "Haha that would be sickkk."[10] Later that day, at 10:27 PM ET, Mr. Musk further tweeted: "Am giving serious thought to this," responding to tweets about a rival platform.[11] (together, the "March 26, 2022 Tweets").

11.      On March 25, 2022, the first day of the Class Period, Mr. Musk owned 59,972,951 shares of Twitter, or 7.5% of Twitter's outstanding common stock as of December 31, 2021.[12] This ownership percentage grew throughout the Class Period.[13]

12.      On April 3, 2022, Twitter formally invited Mr. Musk to join its Board of Directors.[14]

13.      On April 4, 2022, the last day of the Class Period, at 6:04 AM ET, Mr. Musk filed a Schedule 13G disclosing ownership of 73,486,938 shares of Twitter, or 9.2% of Twitter's outstanding common stock as of December 31, 2021.[15]

---

[6] Twitter was renamed X in July 2023. *See* "Twitter is now X. Here's what that means," *CBS News*, July 24, 2023.

[7] Twitter, Inc., Form 10-K, for the fiscal year ended December 31, 2021, at 6.

[8] Twitter, Inc., Form 10-K, for the fiscal year ended December 31, 2021, at 40.

[9] Chairman Twitter feed, March 26, 2022, at 1:57 PM ET and at 2:01 PM ET, available at https://x.com/WSBChairman/status/1507778664708165646 and https://x.com/WSBChairman/status/1507779689049477134.

[10] Elon Musk Twitter feed, March 26, 2022, at 2:16 PM ET, available at https://x.com/elonmusk/status/1507783547964121088.

[11] Elon Musk Twitter feed, March 26, 2022, at 10:27 PM ET, available at https://x.com/elonmusk/status/1507907130124222471.

[12] *See* **Appendix C**.

[13] *See* **Appendix C**.

[14] Complaint, ¶ 176.

[15] Twitter, Inc. Schedule 13G, filed April 4, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000110465922041911/tm2211482d1_sc13g.htm (accepted at 6:04 AM ET on April 4, 2022). *See also* **Appendix C**.

**CONFIDENTIAL**

14.    Also on April 4, 2022, "Musk and Twitter entered into a letter agreement stating that Musk would be appointed to Twitter's Board."[16] The letter stated that subject to customary onboarding procedures, Mr. Musk would be appointed to the Board as a Class II director with a term expiring at "the Company's 2024 annual meeting of stockholders."[17] The letter also stated that "Mr. Musk agrees that, for so long as Mr. Musk is serving on the Board and for 90 days thereafter, Mr. Musk will not, either alone or as a member of a group, become the beneficial owner of more than 14.9% of Company's common stock outstanding at such time, including for these purposes economic exposure through derivative securities, swaps or hedging transactions."[18]

15.    On April 5, 2022, at 8:25 AM ET, Twitter disclosed the Board invitation letter, when Twitter filed SEC Form 8-K announcing the appointment of Mr. Musk as a director.[19]

16.    On April 5, 2022, after market close, at 5:18 PM ET, Mr. Musk filed a Schedule 13D, amending the Schedule 13G filing on April 4, 2022 and reporting a 9.1% ownership stake in Twitter.[20] The Schedule 13G included statements regarding Mr. Musk's appointment as a Class II director to Twitter's Board and reported that Mr. Musk held Twitter common stock for investment

---

[16] Complaint, ¶ 21. *See also* Exhibit 10.1 to Twitter, Inc. Form 8-K, filed April 5, 2022 available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000119312522095651/d342257d8k.htm (accepted at 8:25 AM ET on April 5, 2022).

[17] Exhibit 10.1 (letter agreement between Mr. Musk and Twitter regarding appointment of Mr. Musk as a director to Twitter's Board is dated April 4, 2022), available at https://www.sec.gov/Archives/edgar/data/1418091/000119312522095651/d342257dex101.htm.

[18] Exhibit 10.1 (letter agreement between Mr. Musk and Twitter regarding appointment of Mr. Musk as a director to Twitter's Board is dated April 4, 2022), available at https://www.sec.gov/Archives/edgar/data/1418091/000119312522095651/d342257dex101.htm.

[19] Twitter, Inc. Form 8-K, filed April 5, 2022 available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000119312522095651/d342257d8k.htm (accepted at 8:25 AM ET on April 5, 2022).

[20] Twitter, Inc. Schedule 13D, filed April 5, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000110465922042863/tm2211757d1_sc13d.htm (accepted at 5:18 PM ET on April 5, 2022). *See also* **Appendix C**.

**CONFIDENTIAL**

purposes.[21] The form also listed all transactions completed by Mr. Musk in Twitter's common stock since January 31, 2022.[22]

## III.   PLAINTIFF'S ALLEGATIONS AND THE MASON REPORT

### A.  Plaintiff's Allegations

17.   Plaintiff claims that, as part of a scheme to defraud investors, Defendants engaged in a "secret, algorithmic trading strategy for Musk to acquire billions of dollars of Twitter securities without tipping off the market."[23] Plaintiff alleges that the algorithmic trading strategy was "running on an algorithm that picks up 5% of the volume that passes through the market [and was designed for the prices to stay] under the [volume-weighted average price] VWAP."[24] Plaintiff alleges that "[b]y trading 'below VWAP' Neuhaus [a managing director at Morgan Stanley] demonstrated that Musk's stock prices were not pushing up the average price of the stock and were thus escaping market detection."[25]

18.   Plaintiff further alleges that Defendants utilized the allegedly "secret, algorithmic trading strategy … to acquire billions of dollars of Twitter"[26] in order to scheme and "violate Musk's disclosure obligations so they could secretly build a massive position in Twitter at artificially low prices while deceiving investors."[27]

19.   Plaintiff alleges that Mr. Musk crossed the 5% threshold in his Twitter holdings on March 14, 2022, which Plaintiff alleges triggered his obligation to disclose his interests by filing a Schedule 13D within 10 days.[28] Plaintiff alleges that, on March 24, 2022, Defendants continued

---

[21]   Twitter, Inc. Schedule 13D, filed April 5, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000110465922042863/tm2211757d1_sc13d.htm (accepted at 5:18 PM ET on April 5, 2022).

[22]   Twitter, Inc. Schedule 13D, filed April 5, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000110465922042863/tm2211757d1_sc13d.htm (accepted at 5:18 PM ET on April 5, 2022).

[23] Complaint, ¶ 1.

[24] Complaint, ¶ 93.

[25] Complaint, at 32, fn. 3 & ¶ 1.

[26] Complaint, ¶ 1.

[27] Complaint, ¶ 1.

[28] Complaint, ¶ 15.

**CONFIDENTIAL**

with their alleged scheme and concealed Mr. Musk's interests in Twitter from investors.[29] Plaintiff alleges Mr. Musk had a 7.5% ownership stake in Twitter as of March 24, 2022.[30]

20.    Plaintiff further alleges that "in service of Defendants' [alleged] scheme, Musk … represented to the public that he was 'giving serious thought' to 'building a new social media platform,' which further helped [to allegedly] conceal that he was pursuing an active role at Twitter and also aided his [alleged] scheme by keeping the price of Twitter securities artificially low. In reality, Musk had already secretly purchased over $2 billion dollars of Twitter securities … and … he had no intention of (and had taken no steps towards) building a new social media platform."[31] Plaintiff further claims that, through the alleged scheme, Defendants "kept the prices of Twitter's securities artificially low … [and Mr. Musk] saved over an estimated $200 million."[32]

21.    Plaintiff claims that Defendants made the following misrepresentations during the Class Period:

a. "On March 26, 2022, Musk tweeted 'Given that Twitter serves as the de facto public town square, failing to adhere to free speech principles fundamentally undermines democracy,' and then asked 'Is a new platform needed?' as an alternative to Twitter."[33]

b. On the same day, "Twitter user @WSBChairman sent Defendant Musk a tweet… stating, 'just buy twitter . . . and change the bird logo to a doge,' [a crypto currency logo] to which Musk responded, 'Haha that would be sickkk.'"[34]

c. Later that day, "as a follow up to his Twitter criticism which initiated a firestorm of discussion online about Twitter's shortcomings, Musk tweeted that he was 'giving serious thought' to 'building a new social media platform' to rival Twitter."[35]

22.    I understand that in its Motion to Dismiss Order, the Court ruled that for 10(b)-5(a) and (c) claims only statements predicated on the following remain in the case: (i) Mr. Musk allegedly filing an improper Schedule 13G, (ii) Mr. Musk's misleading tweets about Twitter's future, and (iii) Mr. Musk carrying out a coordinated trading strategy to silently build up Mr.

---

[29] Complaint, ¶ 15.

[30] Complaint, at 30-31 (Table 1).

[31] Complaint, ¶ 17.

[32] Complaint, ¶ 20.

[33] Complaint, ¶ 156 (emphasis removed).

[34] Complaint, ¶ 230.

[35] Complaint, ¶ 160.

**CONFIDENTIAL**

Musk's position in Twitter.[36] For the 10(b)-5(b) claims, the Court rules that only statements predicated on the following remain in the case: (i) Mr. Musk's March 26, 2022 tweet stating: "Haha that would [be] sickkk" and (ii) Mr. Musk's March 26, 2022 tweet stating: "Am giving serious thought to this."[37]

23.    Plaintiff claims that the alleged truth emerged when:

a. On April 4, 2022 at 6:04 AM ET, Mr. Musk filed a Schedule 13G that disclosed his 9.2% ownership stake in Twitter.[38] Plaintiff alleges that the Schedule 13G did disclose Mr. Musk's ownership interest in Twitter but this alleged disclosure "only partially fulfilled Musk's reporting obligations…."[39] It claims that, by filing a Schedule 13G instead of a Schedule 13D, Mr. Musk "falsely signaled to investors that [he] was a 'passive' investor" and the filing "said nothing about Musk joining Twitter's board."[40]

b. On April 5, 2022 at 8:25 AM ET, Twitter filed a Form 8-K announcing the appointment of Mr. Musk as a director.[41] Plaintiff claims that "[i]nvestors reacted strongly to learning Musk's true involvement in Twitter and his activist intentions."[42]

c. On April 6, 2022, Twitter stock continued to react positively to the news of Mr. Musk's "true involvement in Twitter and his activist intentions."[43] After market close, at 5:18 PM ET on April 5, 2022, Mr. Musk filed a Schedule 13D reporting a 9.1% ownership stake in Twitter.[44] The Schedule 13D noted that Mr. Musk and Twitter entered into an agreement on April 4, 2022 according to which, among other things, Mr. Musk will

---

[36] Opinion and Order, *Oklahoma Firefighters Pension and Retirement System v. Elon R. Musk, Elon Musk Revocable Trust Dated July 22, 2003, Excession LLC, and Jared Birchall*, United States District Court, Southern District of New York, No. 22-cv-03026 (ALC), filed March 28, 2025 ("MTD Order"), at 42.

[37] MTD Order, at 42.

[38] Complaint, § V.A. *See also* Twitter Schedule 13G, filed on April 4, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000110465922041911/tm2211482d1_sc13g.htm (accepted at 6:04 AM ET on April 4, 2022).

[39] Complaint, ¶ 22.

[40] Complaint, ¶ 22.

[41] Twitter, Inc. Form 8-K, filed April 5, 2022 available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000119312522095651/d342257d8k.htm (accepted at 8:25 AM ET on April 5, 2022).

[42] Complaint, ¶ 188.

[43] Complaint, ¶ 188.

[44] Twitter, Inc. Schedule 13D, filed April 5, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000110465922042863/tm2211757d1_sc13d.htm (accepted at 5:18 PM on April 5, 2022).

**CONFIDENTIAL**

serve as a director of the Company.[45] Plaintiff claims that the filing of the Schedule 13D "disclosed both [Musk's] ownership stake and his activist intentions."[46]

### B. Expert Report of Joseph R. Mason

24.    On June 23, 2025, Plaintiff submitted the Expert Report of Joseph R. Mason, PhD (the "Mason Report"). In that report, Dr. Mason concluded that Twitter's stock and options "traded in an informationally efficient (semi-strong form) market during the Class Period."[47]

25.    Dr. Mason also concluded:

> In an informationally efficient (semi-strong form) market, one may apply an event study, possibly in conjunction with other generally accepted methods to estimate the price deflation (or inflation) of the TWTR [Twitter] Securities, if any, that was attributable to, or was maintained by, Defendants' alleged material misrepresentations, omissions, or deceptive scheme throughout the Class Period by observing the change in price when the previously undisclosed information is revealed. The resultant price impact, if any, for TWTR Securities may be used, along with other widely accepted financial and economic methods to examine the potential presence and possible impact of confounding information, to arrive at damages for every member of the Proposed Class using a common technique that is grounded in Plaintiff's theory of liability.[48]

26.    To estimate deflation in Twitter securities during the Class Period, Dr. Mason claims that he will analyze "the impact of curative events."[49] He states that when "previously withheld information is disclosed to the market, artificial price deflation is removed from a security's price (*i.e.*, causing the stock price to increase in response to the disclosed information). Curative events may, therefore, indicate the extent to which the share price had been impacted by the alleged material misrepresentations, omissions, or deceptive scheme and, as a result, may be used to estimate share price deflation in the context of semi-strong form efficient markets."[50]

---

[45]    Twitter,    Inc    Schedule    13D,    filed    April    5,    2022,    available    at https://www.sec.gov/Archives/edgar/data/1418091/000110465922042863/tm2211757d1_sc13d.htm (accepted at 5:18 PM on April 5, 2022).

[46] Complaint, ¶ 24.

[47] Mason Report, ¶ 10.

[48] Mason Report, ¶ 11.

[49] Mason Report, ¶ 110.

[50] Mason Report, ¶ 110. *See also* Deposition of Joseph R. Mason, August 19, 2025 ("Mason Deposition"), 83:22-86:19.

CONFIDENTIAL

27.    Dr. Mason claims that, for each Twitter option contract, he will use the artificial deflation in Twitter's common stock to estimate a but-for option price using the Black-Scholes-Merton option pricing model.[51] He then states that the difference between the actual option price and the but-for option price is the deflation or inflation in the Twitter call or put option, respectively.[52]

## IV.    ASSIGNMENT

28.    I was asked by counsel for Defendants to opine on:

a.    Whether the alleged misrepresentations that were made on March 26, 2022 constituted value-relevant information to the market.

b.    Whether Dr. Mason has demonstrated that alleged class-wide damages could be calculated subject to a common and reliable methodology consistent with Plaintiff's claims.

c.    Insofar as algorithmic trading is alleged to have been part of the alleged scheme to conceal Mr. Musk's ownership in Twitter, whether algorithmic trading is unusual or unexpected by market participants.

## V.    SUMMARY OF CONCLUSIONS

29.    Based on my review, analysis, experience, and training, I have reached the following principal conclusions:

a.    The economic evidence is inconsistent with Plaintiff's claim that the alleged misrepresentations that were made on March 26, 2022 constituted value-relevant information, as the disclosure of this information did not result in a negative and statistically significant change in Twitter's stock price (*See* Section VI).

b.    Dr. Mason fails to establish that his proposed damages methodology can reliably measure the alleged artificial deflation in Twitter's common stock (*See* Section VII).

　　i.    Dr. Mason's damages methodology ignores that market participants did not link the "curative" events disclosed on April 4 and April 5, 2022 to the alleged misrepresentations on March 26, 2022. As such, there is no reliable basis for Dr. Mason to rely on the "curative" disclosures for his proposed damages methodology.

　　ii.    Dr. Mason does not address how his proposed damages methodology would account for the discrepancy between the information that *was disclosed* on April

---

[51] Mason Report, ¶ 115.

[52] Mason Report, ¶¶ 116-117.

**CONFIDENTIAL**

4 and April 5, 2022 and the information that *could have been disclosed* on March 25, 2022, at the start of the Class Period.

    iii.    Dr. Mason's proposed damages methodology, which relies on curative events over multiple days, would overstate the alleged deflation (if any) at the start of the Class Period.

    iv.    Dr. Mason's proposed options methodology relies on his common stock damages methodology and, accordingly, he also fails to establish that his proposed damages methodology can reliably measure artificial deflation in Twitter options.

c.    Dr. Mason does not propose a damages methodology for Plaintiff's Section 20(a) claims in his report. At his deposition Dr. Mason testified that ████████████ ████████████████████████████████████████████████████ ████████████████████████████.[53] Thus, the same criticisms of his proposed Section 10(b) damages methodology are applicable to his Section 20(a) damages methodology. Therefore, Dr. Mason has not demonstrated that Section 20(a) damages in this matter can be reliably calculated on a class-wide basis subject to a common methodology.

d.    Market participants routinely engage in algorithmic trading. Because algorithmic trading is a routine market practice the fact that algorithmic trading was used in the context of large trades would not be "new" information that was only revealed by an alleged corrective disclosure. (*See* Section IX).

30.    I elaborate on the bases for these conclusions in the remainder of the report.

## VI. THE MARCH 26, 2022 TWEETS DID NOT RESULT IN A NEGATIVE AND STATISTICALLY SIGNIFICANT CHANGE IN TWITTER'S STOCK PRICE

31.    The Court's MTD Order stated that Mr. Musk's response that he is "giving serious thought" to a suggestion by a Twitter user that a rival platform is needed can be "reasonably read as an affirmative representation that Musk had no interest in Twitter, but was rather building out a rival platform."[54] Plaintiff's claims regarding this tweet assume that the alleged misrepresentation about a rival platform is an unfavorable news event for Twitter, *i.e.*, that Mr. Musk was not planning to acquire Twitter and instead might create a competitive platform. If this alleged misrepresentation constituted value-relevant information and this information, in fact, caused the

---

[53] Mason Deposition, 149:23-150:4.

[54] MTD Order, at 40. The MTD Order also includes Mr. Musk's response "Haha that would [be] sickkk" to a tweet "just buy twitter" "leaving out the critical information that he *already owned* nearly ten percent of the company" as another "material misleading representation." *See* MTD Order, at 39-40.

10

**CONFIDENTIAL**

market to view the company more unfavorably than before, then one would expect to observe a negative and statistically significant residual return in Twitter's stock on this alleged misrepresentation date. As I demonstrate below, this is not the case. My analysis shows that the information disclosed on March 26, 2022 did not result in a negative and statistically significant change in Twitter's stock price.

### A. Event Study Methodology

32.    In an efficient market, finance theory dictates that stock prices reflect the expected future cash flows of a company.[55] These expectations are influenced by market, industry, and company-specific factors. In an efficient market, stock prices reflect the total mix of publicly available information regarding these expected future cash flows.[56] Publicly available information containing such value-relevant information can encompass everything from a company's public SEC filings to newspaper articles.

33.    A central tenet of the efficient market hypothesis is that as new information becomes public, stock prices "quickly and fully" reflect that information.[57] Therefore, only disclosures of information that significantly alter the total mix of publicly available information impact the price of a stock. Only new public information will necessitate a revision of the company's expected future cash flows and the risk thereof and, hence, result in a changed stock price. In other words, only new information is "news" in an efficient market, as previously known or expected information would have already been incorporated into the stock price of a security in an efficient market.[58] Moreover, in an efficient market, new value-relevant information would be expected to impact any company to which such information is value-relevant, regardless of who released the information.[59]

---

[55] Brealey, R. and S. Myers, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 2003, at 60-61.

[56] Brealey, R., S. Myers, and A. Marcus *Fundamentals of Corporate Finance*, McGraw-Hill/Irwin, 2004, at 165.

[57] Jones, C., *Investments: Analysis and Management*, John Wiley & Sons, Inc., 2013, at 320.

[58] *See, e.g.*, Elton, E., M. Gruber, S. Brown, and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis,* John Wiley & Sons, Inc., 2003, at 403.

[59] *See, e.g.*, Schwert, G.W., "Using Financial Data to Measure Effects of Regulation," *Journal of Law and Economics*, Vol. 24, 1981, 121-158, at 129-135.

**CONFIDENTIAL**

34.     The academic literature has explored how "quickly" new information is "fully" reflected in the stock price in an efficient market. Numerous academic studies indicate that an efficient market's reaction to new events is immediate and unbiased.[60]

35.     The Mason Report concludes that Twitter common stock traded in an informationally efficient (semi-strong form) market during the Class Period.[61] For purposes of my analysis, I have assumed that Twitter common stock traded in an efficient market during the Class Period.

36.     To analyze the information disclosed in the March 26, 2022 Tweets by Mr. Musk, I implemented a widely used and generally accepted statistical framework known as an event study for testing whether there was statistically significant stock price movement associated with the disclosure of new value-relevant public information.[62] An event study controls for market and industry effects (estimated with the use of market and industry indices) on the stock price, thereby isolating the portion of the stock price movement that is company-specific (the "abnormal return" or "residual return").[63] My event study methodology is detailed in **Appendix D**.

37.     The event study examines whether the observed abnormal, or company-specific, return of a stock over a given time interval (*i.e.*, "event window") is outside the range of typical random stock price fluctuations observed for that stock.[64] An event window that compares the

---

[60] *See, e.g.*, Kothari, S.P., "Capital Markets Research in Accounting," *Journal of Accounting and Economics*, Vol. 31, 2001, 105-231; Ederington, L. and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* Vol. 30, 1995, 117-134; Busse, J. and T.C. Green, "Market Efficiency in Real Time," *Journal of Financial Economics,* Vol. 65, 2002, 415-437; Visaltanachoti, N. and T. Yang, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finance,* Vol. 34, 2010, 594-605.

[61] Mason Report, ¶ 10.

[62] *See, e.g.*, Ferrell, A. and A. Saha, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* Vol. 63, 2007, 163-186.

[63] *See, e.g.*, Weil, R. et al., *Litigation Services Handbook: The Role of the Financial Expert,* John Wiley & Sons, Inc., 2007, Appendix A, at 18.

[64] To control for market and industry effects, a regression analysis is employed in order to predict the company's stock return based on the observed market and industry returns. The residual return is then the difference between the company's actual stock return and the return predicted by the regression model. *See, e.g.*, Weil, R. et al., *Litigation Services Handbook: The Role of the Financial Expert,* John Wiley & Sons, Inc., 2007, Appendix A, at 19.

**CONFIDENTIAL**

closing price on the prior day to the closing price on the day on which the new information was disclosed is typical.[65]

38.    If the abnormal return falls outside the range that accounts for the typical random stock price fluctuations (*i.e.*, a "confidence interval"), it is considered statistically significant. If the stock price movement is indistinguishable from random price fluctuations (*i.e.*, falls within the confidence interval), the movement is fully explainable by movements in the market and industry and cannot be attributed to the new company-specific information announced on the event date.[66] An abnormal return is typically considered "statistically significant" in an event study if it lies outside the 95% confidence interval (*i.e.*, lies outside the range that accounts for 95% of random price fluctuations).[67] An abnormal return that falls outside of the 95% confidence interval is considered to be significant at the 5% level.

39.    To test whether an observed abnormal return is significant at the 5% level, a "t-statistic" is calculated by dividing the abnormal return by the standard error of the regression.[68] The probability of observing a given t-statistic by random market fluctuations is then measured. This probability is known as a "p-value." The lower the p-value, the less likely it is that the price movement is a result of random market fluctuations. Thus, it is when the p-value is 5% (*i.e.*, 0.05) or less that the abnormal return is considered statistically significant. In conducting his event studies on the dates he studied, Dr. Mason likewise used 5% as the applicable standard.[69]

---

[65] A different event window than the typical close-to-close window may be appropriate depending on the facts and circumstances, such as an event window that runs from market-close to market-open. *See, e.g.*, Ederington, L. and J.H. Lee, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* Vol. 30, 1995, 117-134.

[66] *See, e.g.*, Corrado, C., "Event Studies: A methodology review," *Accounting and Finance*, Vol. 51, 2011, 207-234, at 209-211.

[67] Using a 95% confidence interval for determining statistical significance is a standard metric for event studies. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence,* National Academies Press, 2011, at 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.").

[68] *See, e.g.*, Wooldridge, J., *Introductory Econometrics: A Modern Approach,* Cengage Learning, 2013, at 130.

[69] Mason Report, ¶ 67.

**CONFIDENTIAL**

## B. Event Study Results

40.    The March 26, 2022 Tweets occurred on a Saturday and include Mr. Musk's tweets stating: "Haha that would [be] sickkk" and "Am giving serious thought to this."[70] The first Tweet was made at 2:16 PM ET[71] in response to a tweet by a Twitter user @WSBChairman who tweeted: "just buy twitter" and "change the bird logo to a doge."[72] The second tweet was later the same day, at 10:27 PM ET, when Mr. Musk further tweeted: "Am giving serious thought to this," responding to tweets about a rival platform.[73]

41.    To the extent Mr. Musk's March 26, 2022 Tweets were meant to communicate to the market that Mr. Musk had no interest in buying Twitter, as Plaintiff claims, there is no indication that market participants interpreted the March 26, 2022 Tweets in that way.

42.    To reach this conclusion, I reviewed Twitter analyst reports that were available to me between March 26 and March 29, 2022. Based on my review, none of those analyst reports mention Mr. Musk and/or his intentions with regards to Twitter.[74]

43.    I also reviewed news articles from March 26 to March 29, 2022.[75] I found that those articles re-iterated Mr. Musk's tweet about a rival platform and stated that he has signaled to the market that a new platform was needed. For example, an article by *Business Insider* stated: "Musk asked 'is a new platform needed?' which, to some, signaled a possibility that the Tesla CEO would create a new social media platform."[76] The *Business Daily* reported that "[i]f Musk decides to go

---

[70] MTD Order, at 42.

[71] Elon Musk Twitter feed, March 26, 2022, at 2:16 PM ET, available at https://x.com/elonmusk/status/1507783547964121088.

[72] Chairman Twitter feed, March 26, 2022, at 1:57 PM ET and at 2:01 PM ET, available at https://x.com/WSBChairman/status/1507778664708165646 and https://x.com/WSBChairman/status/1507779689049477134.

[73] Elon Musk Twitter feed, March 26, 2022, at 10:27 PM ET, available at https://x.com/elonmusk/status/1507907130124222471.

[74] I reviewed all Twitter analyst reports available through third-party data providers: LSEG, Capital IQ, and FactSet. Because there were only 2 reports available between March 26 and March 29, 2022, I reviewed the additional 3 reports between March 29, 2022 and April 3, 2022 (*i.e.*, the day before the first alleged corrective disclosure on April 4, 2022), which also did not mention Mr. Musk and/or his intentions with regards to Twitter.

[75] I reviewed Factiva Allnews articles that mentioned "Musk" and "Twitter" in the headline or lead paragraph between March 26, 2022 and March 29, 2022.

[76] "Despite calling himself a 'free speech absolutist,' Elon Musk has a history of retaliation against employees and critics," *Business Insider*, March 27, 2022.

ahead with creating a new platform, he would be joining a growing portfolio of technology companies" but that "[n]one of the companies … have come close matching the reach and popularity of the mainstream platforms so far."[77]

44.     The news articles did not state that Mr. Musk had no interest in buying Twitter. In fact, certain news articles suggested the opposite of Plaintiff's interpretation. Specifically, one news article commented that when other Twitter users suggested that Mr. Musk "should just outright buy Twitter," Mr. Musk "didn't outright reject that idea, joking about how cool it would be if he bought the social media giant and changed Twitter's logo to that of cryptocurrency Doge."[78] The second article stated: "Elon Musk has hinted at the possibility of starting up his own social media company — or possibly buying Twitter."[79]

45.     On March 25, 2022 (the Friday preceding the March 26, 2022 Tweets), Twitter's closing stock price was $38.60. On March 28, 2022 (the next trading day, Monday, following the March 26, 2022 Tweets), Twitter's closing price was $39.12.  My event study finds that Twitter's residual return on March 28, 2022 was -0.72% with a t-statistic of -0.38, which is not statistically significant at the 5% level.[80] *See* **Appendix D**.

46.     Dr. Mason's event study also does not find a statistically significant price movement on March 28, 2022. Dr. Mason's event study finds that Twitter's residual return on March 28, 2022 was -0.68% with a t-statistic of -0.50, which is not statistically significant at the 5% level.[81]

47.     Thus, there is no reliable economic basis to conclude that the alleged misrepresentation contained in the March 26, 2022 Tweets ("Haha that would [be] sickkk" and "Am giving serious thought to this") was value-relevant information.

---

[77] "Elon Musk giving 'serious thought' to build a new social media platform," *Business Daily*, March 28, 2022.

[78] "Elon Musk says he's thinking about building his own Twitter," *Mashable.com*, March 28, 2022.

[79] "'Seize the memes of production,' Musk unleashes," *news.com.au*, March 27, 2022.

[80] Mr. Musk's March 26, 2022 (Saturday) response was at 10:27 PM ET, which was not a trading date.

[81] *See* Dr. Mason's backup (MUSK_MASON_0005248), at tab "_SPXT_CB_DJINET_AllE_63", cell R510, reporting a t-statistic of -0.50. My event study specifications differ from Dr. Mason's. However, when I run various sensitivity checks that include Dr. Mason's specifications, none of the variations show that Twitter's residual return on March 28, 2022 was negative and statistically significant. *See* **Appendix D**. *See also* Mason Deposition, 173:9-24.

**CONFIDENTIAL**

48.      Given the above, there is no reliable economic basis to conclude that the March 26, 2022 Tweets elicited a price impact by virtue of causing a statistically significant price decrease.

49.      At his deposition, Dr. Mason stated that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████[82] However, Dr. Mason has not provided (and I am not aware of) any basis for his assertion that the market was aware of Mr. Musk's "status quo" and that the information contained in the March 26, 2022 Tweets was disclosed earlier.[83] In contrast to Dr. Mason's claim, I understand that Plaintiff alleges that Mr. Musk made affirmative misrepresentations that "artificially depressed the price of Twitter's securities below the price at which Twitter securities would have traded **absent** those material misrepresentations."[84] Thus, Dr. Mason's explanation as to why the March 26, 2022 Tweets were not new value-relevant information and merely confirmed the alleged status quo that Mr. Musk was not interested in buying a significant portion of Twitter is not economically supported.

## VII.    DR. MASON FAILS TO ESTABLISH THAT HIS PROPOSED DAMAGES METHODOLOGY CAN RELIABLY MEASURE ARTIFICIAL DEFLATION IN TWITTER'S COMMON STOCK

50.      Dr. Mason states that he will perform the requisite analysis if called upon to do so at a later stage of this case,[85] but he nonetheless proposes in the Mason Report a damages methodology that he asserts can be used to measure alleged artificial deflation in Twitter's common stock. He starts by stating that, under Plaintiff's liability theory, Defendants' alleged misrepresentations "caused TWTR Stock to trade at artificially deflated prices between March 25, 2022 and April 4, 2022."[86] He claims that he will measure the alleged share price deflation by analyzing the impact of allegedly "curative" events on Twitter's stock price using an event study and disaggregating any yet to be identified confounding information through "a variety of means,"

---

[82] Mason Deposition, 190:18-24.

[83] *See* Mr. Musk's Twitter page, available at https://x.com/elonmusk.

[84] Complaint, ¶ 234 (emphasis added).

[85] Mason Report, ¶ 114.

[86] Mason Report, ¶ 106.

CONFIDENTIAL

including through the use of "standard financial analysis and valuation tools."[87] Then, he explains that, "once the impact of the curative event, if any, on the price of TWTR Stock has been estimated, one may estimate the share price deflation that existed for each day in the Class Period based on how earlier counterfactual disclosures of the relevant information would have affected the price of shares of TWTR Stock at the time they would have been made."[88] He then calculates per-share damages for the members of the proposed Class using the "out-of-pocket" method, which measures the difference in deflation at the time of sale minus the deflation at the time of purchase.[89] As explained below, Dr. Mason fails to establish that his proposed damages methodology can reliably measure alleged artificial deflation in Twitter common stock.

51.    As an initial matter, Dr. Mason's methodology does not account for the fact that market participants did not link the "curative" events disclosed between April 4 and April 5, 2022 to the alleged misrepresentations contained in the March 26, 2022 Tweets.[90] Specifically, none of the analyst reports I reviewed made a connection linking Mr. Musk's disclosure of his ownership stake and his activist intentions as curative of the March 26, 2022 Tweets (*i.e.*, none of the analyst reports I reviewed stated that Mr. Musk, in his March 26, 2022 Tweets, misled investors that he had no interest in acquiring Twitter or becoming a Board director).[91]

52.    Dr. Mason's proposed damages methodology is based on the analysis of "the impact of curative events" on Twitter's common stock, which Dr. Mason's analysis implies affected Twitter's stock price on April 4 and 5, 2022.[92] This indicates that Dr. Mason's proposed damages methodology assumes that the alleged curative events are Mr. Musk's filing of Schedule 13G on April 4, 2022 and Twitter's announcement that Mr. Musk was appointed to its Board on April 5, 2022. His approach relies upon a connection between the information that was disclosed

---

[87] Mason Report, ¶¶ 110-112.

[88] Mason Report, ¶ 113.

[89] Mason Report, ¶ 118.

[90] ███████████████████████████████████ *See* Mason Deposition, 181:11-19.

[91] I reviewed all available Twitter analyst reports from March 25, 2022 to April 5, 2022 from FactSet, Capital IQ, and LSEG.

[92] Mason Report, ¶ 64 (stating that he included indicator variables for April 4 and 5, 2022, which he defines as "the dates of alleged curative disclosures"); *id.* ¶ 110. *See also* Mason Deposition, 88:18-89:14.

**CONFIDENTIAL**

during the allegedly curative events and what could have been disclosed at the start of the proposed Class Period (*i.e.*, March 25, 2022 in this case). As Dr. Mason testified, "in this case the alleged misstatements that remain standing seem to be disavowals of an ownership interest that has in fact already been substantially accumulated. So I would say that the misrepresentations and the ultimate curative disclosure match."[93] However, Dr. Mason fails to demonstrate how his proposed methodology would account for the discrepancy between the information that *was disclosed* on April 4 and April 5, 2022 and the information that *could have been disclosed* on March 25, 2022.

53.    As described in Section II, several considerable changes occurred between March 25, 2022 and April 4-5, 2022 related to Mr. Musk's beneficial ownership of Twitter stock and his level of involvement.

54.    First, Mr. Musk did not hold a 9.1% stake in Twitter at the start of the Class Period. As **Appendix C** shows and as Plaintiff claims, Mr. Musk had 7.5% of Twitter's stock at the start of the Class Period.[94] The academic literature finds that different disclosed percentage ownerships have a different residual price impact.[95] Thus, there is no reliable economic basis to conclude that the price reaction on the alleged corrective disclosure date reflects the alleged artificial deflation at the start of the Class Period or throughout the Class Period.

55.    Second, Twitter did not announce that Mr. Musk was appointed to its Board until April 5, 2022. Even if Mr. Musk could somehow disclose his appointment to Twitter's board earlier than Twitter's announcement, even Plaintiff acknowledges that Mr. Musk was not offered a board seat until April 3, 2022 and Twitter and Mr. Musk did not sign a letter agreement appointing Mr. Musk to Twitter's Board until April 4, 2022.[96] In fact, Dr. Mason agreed ███████

███████████████████████████████████████████████████████████████████

---

[93] Mason Deposition, 137:23-138:6. *See also id.*, 96:21-97:11 ██████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████

[94] Complaint, at 30-31 (Table 1). *See also* **Appendix C**.

[95] Scherr, F., A. Abbott, and U. Dillon, "Returns to Target Shareholders From Initial Purchases of Common Shares: A Multivariate Analysis," *Quarterly Journal of Business Economics*, Vol. 32, No. 4, 1993, 66-78, at 73.

[96] Complaint, ¶ 176; Exhibit 10.1 to Twitter, Inc. Form 8-K, filed April 5, 2022 available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000119312522095651/d342257d8k.htm (accepted at 8:25 AM ET on April 5, 2022).

**CONFIDENTIAL**

████████████████████████[97] Thus, Mr. Musk could not have filed a Schedule 13D that would have included the information about his Board seat at the start of the Class Period. The academic literature finds that the price reaction (if any) to a Schedule 13D disclosure depends on the stated motives and the percentage of holdings. Some stated investment motives (*i.e.*, the purpose of investment or the type of activist role) may not elicit a price reaction while others may.[98] Even for those that elicit a price reaction, the price reaction could vary. Thus, there is no reliable economic basis to conclude that the price reaction on the alleged corrective disclosure date reflects the alleged artificial deflation at the start of the Class Period.

56.    Plaintiff claims that there were two pieces of information that were disclosed on April 5, 2022: Mr. Musk's ownership stake and his activist intentions, *i.e.*, joining Twitter's Board.[99]  In his deposition, Dr. Mason stated that ████████████████████████ ████████████████████████[100] when there are multiple pieces of information reported on corrective disclosure dates. If the trier of fact finds one of the above two pieces of information disclosed on April 5, 2022 not actionable, Dr. Mason's proposed damages methodology does not explain what "standard financial analysis and valuation tools" he would use to "decompose" the information about the Board seat from Mr. Musk's ownership stake.

57.    Dr. Mason ignored that Plaintiff alleges a third disclosure that, after market close on April 5, 2022, Mr. Musk filed a Schedule 13D that purportedly revealed "both [Musk's] ownership stake and his activist intentions."[101] Dr. Mason testified that ████████████████ ████████████████████████[102] Regardless, my review of analyst commentary on April 4, 2022 demonstrates that this information

---

[97] Mason Deposition, 140:14-141:4 ████████████████████████

████████████████████████

[98] Scherr, F., A. Abbott, and U. Dillon, "Returns to Target Shareholders From Initial Purchases of Common Shares: A Multivariate Analysis," *Quarterly Journal of Business Economics*, Vol. 32, No. 4, 1993, 66-78, at 73. *See also,* Klein, A. and E. Zur, "Entrepreneurial Shareholder Activism: Hedge Funds and Other Private Investors," *The Journal of Finance*, Vol. 64, No. 1, 2009, 187-229, at 210, Table V.

[99] Complaint, ¶ 24.

[100] Mason Deposition, 148:4-18.

[101] Complaint, ¶ 24.

[102] Mason Deposition, 90:6-11.

was stale, *i.e.*, previously disclosed. Investors already interpreted Mr. Musk's Schedule 13G filing on April 4, 2022, which also disclosed Mr. Musk's ownership stake, as Mr. Musk likely having an activist interest in Twitter. For example, following Mr. Musk's Schedule 13G filing on April 4, 2022, analysts commented:

    a.  "While Mr. Musk's intentions behind this move were not spelled out, it is clear that he sees both a financial and a strategic incentive in owning such an asset in our view…. More importantly, we believe a primary driver of this investment is Mr. Musk's desire to reshape the platform and make it more open-source with fewer intermediary controls. Being able to reshape this important platform would also give him a powerful tool of influence … we would not be surprised to see him increase his stake even further, and potentially assume a more active role in the decision-making at the company."[103]

    b.  "We would expect this passive stake as just the start of broader conversations with the Twitter board/management that could ultimately lead to an active stake and a potential more aggressive ownership role of Twitter."[104]

    c.  61% of respondents to a Morgan Stanley poll responded that the Schedule 13G filing meant that Mr. Musk was "seeking greater influence on Twitter to preserve his platform" and only 5% responded that this was just a "passive investment."[105]

    d.  "We see the news as positive for the stock as it opens up potential for Mr. Musk taking up a board seat and influencing vision and execution."[106]

    e.  "Elon Musk has a large fan base and his public opinion on the company's product offerings and operational matters could amount to pressure on the management team, which may influence the decision making process at TWTR inexplicitly."[107]

58.    This market commentary indicates that investors understood both Mr. Musk's ownership stake and his alleged activist intentions on April 4, 2022. Moreover, the Schedule 13D repeated the previously disclosed news of Mr. Musk's appointment to Twitter's Board, announced by Twitter before market open on April 5, 2022. Thus, if the market for Twitter stock is efficient—as Dr. Mason contends—then one would not expect a price reaction to previously disclosed (*i.e.*, stale) information.

---

[103] "Twitter: Musk Becomes TWTR's #1 Shareholder; Likely to Press Mgt on Content Moderation/Execution," Truist, April 4, 2022, at 1.

[104] "Tesla: Musk Takes 9.2% Stake in Twitter; Initial View This is Just the Start," Wedbush, April 4, 2022, at 1. (emphasis removed).

[105] "Tesla: Elon and Twitter: What Could This Mean for the Muskonomy?" Morgan Stanley, April 5, 2022, at 1.

[106] "Twitter: Elon Musk reveals 9% stake in Twitter," Bank of America Securities, April 4, 2022, at 1.

[107] "Twitter: Deciphering Musk's Motivations," Deutsche Bank, April 4, 2022, at 1.

**CONFIDENTIAL**

59.     Therefore, there is no reliable economic basis to conclude that the alleged corrective disclosure about filing Schedule 13D on April 5, 2022 (after market close) caused an additional price reaction. Thus, to the extent that Dr. Mason's proposed damages methodology would incorporate the price increase on April 6, 2022 related to this disclosure, Dr. Mason's proposed methodology would overstate the alleged deflation (if any) at the start of the Class Period.

60.     Furthermore, Dr. Mason's damages methodology does not address how he would estimate deflation associated with the allegedly fraudulent algorithmic trading. Dr. Mason testified in his deposition that █████████████████████████████████████████████ ████████████████████████████████████████████[108]

61.     Finally, Dr. Mason's proposed options methodology relies on his common stock damages methodology. He states that "[a]ny share price deflation on [*sic*] TWTR stock also affects the value of TWTR Options as the value of the options are derived from the underlying stock."[109] Accordingly, because Dr. Mason failed to establish that his proposed damages methodology can reliably measure alleged artificial deflation in Twitter's common stock, it also fails to establish that his proposed damages methodology can reliably measure artificial deflation in Twitter options.

## VIII.     DR. MASON DOES NOT PROPOSE A DAMAGES METHODOLOGY FOR PLAINTIFF'S SECTION 20(A) CLAIMS

62.     Dr. Mason does not propose a damages methodology for Plaintiff's Section 20(a) claim in his report. He merely mentions that these claims exist in his Summary of Plaintiff's Claims.[110]

63.     At his deposition Dr. Mason stated that █████████████████████ ████████████████████████████████████████████ ██████[111] Thus, the same criticisms of his proposed Section 10(b) damages methodology are applicable to his Section 20(a) damages methodology.

64.     Therefore, Dr. Mason has not demonstrated that Section 20(a) damages in this matter can be reliably calculated on a class-wide basis subject to a common methodology.

---

[108] Mason Deposition, 32:20-24.

[109] Mason Report, ¶ 108.

[110] Mason Report, ¶ 18.

[111] Mason Deposition, 149:23-150:4.

**CONFIDENTIAL**

## IX.    ALGORITHMIC TRADING IS A ROUTINE TRADING STRATEGY

65.    Plaintiff claims that, as part of the scheme, Defendants engaged in a "secret, algorithmic trading strategy for Musk to acquire billions of dollars of Twitter securities without tipping off the market."[112] It further claims that, "[w]hen a buyer purchases at the massive level Musk intended to pursue, the increased demand typically causes the stock price to increase."[113] Plaintiff concludes that because Mr. Musk and Mr. Birchall were aware of this possibility they "intently focused on concealing their trades from the market in order to keep the stock price artificially low and hide their scheme."[114] Plaintiff's claims incorrectly imply that there is something unusual or surprising regarding such algorithmic trading strategies for executing large trades.  This is not supported by the academic literature.

66.    The academic literature demonstrates that breaking up orders using algorithmic trading is a widely-accepted and utilized trading strategy for executing large trades.[115] For example, Hendershott, et al. (2011) state:

> "Now virtually every large broker-dealer offers a suite of algorithms to its institutional customers to help them execute orders in a single stock, in pairs of stocks, or in baskets of stocks. Algorithms typically determine the timing, price, quantity, and routing of orders, dynamically monitoring market conditions across different securities and trading venues, reducing market impact by optimally and sometimes randomly breaking large orders into smaller pieces, and closely tracking benchmarks such as the volume-weighted average price (VWAP) over the execution interval. As they pursue a desired position, these algorithms often use a mix of active and passive strategies, employing both limit orders

---

[112] Complaint, ¶ 1.

[113] Complaint, ¶ 92.

[114] Complaint, ¶ 92.

[115]

**CONFIDENTIAL**

and marketable orders. Thus, at times they function as liquidity demanders, and at times they supply liquidity. … AT [(Algorithmic Trading)] may also be used by traders who are trying to passively accumulate or liquidate a large position. There are optimal dynamic execution strategies for such traders. For example, Bertsimas and Lo (1998) find that, in the presence of temporary price impacts and a trade completion deadline, orders are optimally broken into pieces so as to minimize cost. Many brokers incorporate such considerations into the AT products that they sell to their clients. In addition, algorithms monitor the state of the limit order book to dynamically adjust their trading strategies, for example, when to take and offer liquidity..."[116]

67.     Statements by market participants are also consistent with the use of algorithmic trading strategies. For example, Ken Griffin, the founder of Citadel Securities (one of the largest trading institutions),[117] testifying in front of the House Committee on Financial Services, stated: "today, virtually all trades executed by institutional investors are in the form of program trades such as volume-weighted average price (VWAP) and other algorithmic trades. … These VWAP trades are not large trades … [i]t is a trade that is sliced into small pieces, 100 or 200 shares, and executed over the course of a day, a week, or a month."[118]

68.     As relevant to Plaintiff's claims, market commentary by equity analysts that I reviewed does not mention that Mr. Musk engaged in a fraudulent scheme by utilizing an algorithmic trading strategy to acquire Twitter shares.[119] I am not aware of any analyst commentary following the alleged April 4 disclosures that expressed surprise at or otherwise commented on the speed with which Mr. Musk accumulated his stake in Twitter. This is not surprising as algorithmic trading strategies are routine strategies that the market expects investors to utilize, and thus would not be new information to the market.

69.     Therefore, there is no reliable economic basis to support the claim that the "secret, algorithmic trading" scheme that Defendants were engaged in was unusual or surprising or that it would be new information (revealed, say, by an alleged corrective disclosure) to the market that

---

[116] *See, e.g.*, Hendershott, T., C.M. Jones, and A.J. Menkveld, "Does Algorithmic Trading Improve Liquidity?" *Journal of Finance*, Vol. 66, No. 1, 2011, 1-33 at 2 and 5.

[117] "Citadel Securities' $9.7 Billion Trading Revenue Passes Barclays," *Bloomberg,* March 6, 2025; Citadel, Who We Are, available at https://www.citadel.com/who-we-are/leadership/kenneth-c-griffin/.

[118] Virtual Hearing Before the Committee on Financial Services, U.S. House of Representatives, February 18, 2021, available at https://www.govinfo.gov/content/pkg/CHRG-117hhrg43966/html/CHRG-117hhrg43966.htm.

[119] I reviewed all available Twitter analyst reports from March 25, 2022 to April 5, 2022 from FactSet, Capital IQ, and LSEG.

**CONFIDENTIAL**

algorithmic trading was used in the context of large trades. Rather, algorithmic trading to acquire Twitter stock would reflect routine market practice.

_____

Allen Ferrell

August 22, 2025

24

**CONFIDENTIAL**

**Appendix A**
**Allen Ferrell CV**

August, 2025

# Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

1

**CONFIDENTIAL**

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term


**COURSES TAUGHT**

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

**REFEREE FOR FOLLOWING JOURNALS**

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

**CONSULTING AREAS**

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions, Digital Assets

**Papers**

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, forthcoming *Journal of Accounting Research* (2025)

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

**CONFIDENTIAL**

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

3

**CONFIDENTIAL**

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

 "Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

4

**CONFIDENTIAL**

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

### TESTIMONY LAST FOUR YEARS

*Bitgo Holdings v. Galaxy Digital Holdings*, Case No. 2022-0808-KSJM, Expert report and deposition on August 14, 2025

*People of State of New York v. Gemini Trust Company*, Index No. 452784/2023, Expert report and deposition on August 5, 2025

*Yoshikawa v. Exxon*, C.A. No. 3:21-cv-00194-N, Expert report and deposition on July 18, 2025

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023 and court hearing on May 12, 2025

*In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL, Expert report and deposition on April 29, 2025

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019, trial testimony June 7, 2022 and deposition on January 27, 2025

*Homyk v. ChemoCentryx*, Case No. 4:21-CV-03343-JST, Expert reports and depositions on January 6, 2024 and December 4, 2024

*Alesco Preferred Funding et al v. ACP re LTD et al,* Index Case No. 655881/2017, Expert reports and deposition on August 9, 2024

*BLST Northstar v. Santander*, Case No. 22-cv-2210, Expert reports and deposition on August 2, 2024

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert reports and depositions on August 26, 2021 and May 29, 2024

*Gelt Trading v. Co-Diagnostics*, Case No. 2:20-CV-00368-CMR, Expert report and deposition on March 1, 2024

*In re Ripple Labs Litigation*, Case No. 4:18-CV-06753-PJH, Expert report and deposition on October 16, 2023

**CONFIDENTIAL**

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074-JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

6

**CONFIDENTIAL**

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert report and deposition on August 26, 2021

**CONFIDENTIAL**

## Appendix B
## Materials Considered

### I.    Legal Documents

1. First Amended Complaint For Violations of the Federal Securities Laws, *Oklahoma Firefighters Pension and Retirement System v. Elon R. Musk, et al.,* United States District Court, Southern District of New York, No. 1:22-cv-03026-ALC-GWG, filed May 28, 2024

2. Opinion and Order, *Oklahoma Firefighters Pension and Retirement System v. Elon R. Musk, Elon Musk Revocable Trust Dated July 22, 2003, Excession LLC, and Jared Birchall*, United States District Court, Southern District of New York, No. 22-cv-03026 (ALC), filed March 28, 2025

### II.    Expert Reports & Depositions

1. Expert Report of Joseph R. Mason, PhD, June 23, 2025 and backup

2. Deposition of Richard Yasenchak, July 17, 2025

3. Deposition of Joseph R. Mason, August 19, 2025

### III.    Bates Stamped Documents

1. Oklahoma Firefighters Pension and Retirement System production OklahomaFF_0000001 – OklahomaFF_0004209

2. Intech production INTECH0001 – INTECH0197

3. Mason report backup production MUSK_MASON_0000001 – MUSK_MASON_005371

### IV.    SEC Filings

1. Tesla, Inc., Form 10-K, for the fiscal year ended December 31, 2021

2. Twitter, Inc., Form 10-K, for the fiscal year ended December 31, 2021

3. Twitter, Inc., Schedule 13G, filed April 4, 2022

4. Twitter, Inc., Form 8-K, filed April 5, 2022 and exhibits

5. Twitter, Inc., Schedule 13D, filed April 5, 2022

### V.    Academic Literature

1. Brealey, R. and S. Myers, *Principles of Corporate Finance,* McGraw-Hill/Irwin, 2003

2. Brealey, R., S. Myers, and A. Marcus, *Fundamentals of Corporate Finance*, McGraw-Hill/Irwin, 2003

**CONFIDENTIAL**

3.  Busse, J. and T.C. Green, "Market Efficiency in Real Time," *Journal of Financial Economics,* Vol. 65, 2002, 415-437

4.  Corrado, C., "Event Studies: A methodology review," *Accounting and Finance*, Vol. 51, 2011, 209-211

5.  Ederington, L. and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* Vol. 30, 1995, 117-134

6.  Elton, E., M. Gruber, S. Brown, and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis,* John Wiley & Sons, Inc., 2003

7.  Ferrell, A. and A. Saha, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* Vol. 63, 2007, 163-186

8.  Hendershott, T., C.M. Jones, and A.J. Menkveld, "Does Algorithmic Trading Improve Liquidity?" *Journal of Finance*, Vol. 66, No. 1, 2011, 1-33

9.  Jones, C., *Investments: Analysis and Management*, John Wiley & Sons, Inc., 2013

10. Klein, A. and E. Zur, "Entrepreneurial Shareholder Activism: Hedge Funds and Other Private Investors," *The Journal of Finance*, Vol. 64, No. 1, 2009, 187-229

11. Kothari, S.P., "Capital Markets Research in Accounting," *Journal of Accounting and Economics*, Vol. 31, 2001, 105-231

12. Scherr, F., A. Abbott, and U. Dillon, "Returns to Target Shareholders From Initial Purchases of Common Shares: A Multivariate Analysis," *Quarterly Journal of Business Economics*, Vol. 32, No. 4, 1993, 66-78

13. Schwert, G.W., "Using Financial Data to Measure Effects of Regulation," *Journal of Law and Economics*, Vol. 24, 1981, 129-135

14. Visaltanachoti, N. and T. Yang, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finance,* Vol. 34, 2010, 594-605

15. Weil, R. et al., *Litigation Services Handbook: The Role of the Financial Expert,* John Wiley & Sons, Inc., 2007

16. Wooldridge, J., *Introductory Econometrics: A Modern Approach,* Cengage Learning, 2013

## VI.    Analyst Reports

1.  "Our Evaluation of TWTR," Jefferson Research, March 25, 2022

2.  "Twitter: Expectations Low in Front of DR Ramp and Easy User Comps," Loop Capital, March 25, 2022

3.  "Quantitative Survey Group | QSG Survey Sneak Peek – PNDORA, TWTR," MKM Partners, March 25, 2022

4.  "Twitter, Inc. Stock Report," CFRA, March 26, 2022

**CONFIDENTIAL**

5. "Twitter Inc. (TWTR) Summary," Zacks, March 29, 2022

6. "Twitter Inc. Company Profile," Wright Investors' Service, March 31, 2022

7. "Our Evaluation of TWTR," Jefferson Research, April 1, 2022

8. "Twitter, Inc. Stock Report," CFRA, April 2, 2022

9. "Twitter: Elon Musk reveals 9% stake in Twitter," Bank of America Securities, April 4, 2022

10. "CFRA Maintains Buy Opinion on Shares of Twitter," CFRA, April 4, 2022

11. "Twitter, Inc. Stock Report," CFRA, April 4, 2022

12. "Twitter: Deciphering Musk's Motivations," Deutsche Bank, April 4, 2022

13. "DBAM – Don't Bet Against Musk, But See Better Ways to Play Digital Advertising," Jefferies, April 4, 2022

14. "TWTR, SPOT, ROKU – Alert: 'Oh Hi' – Quick Takes on Musk's Twitter Stake, Spotify's Union Negotiations, and Roku's Amazon Streaming Deal," KeyBanc Capital Markets, April 4, 2022

15. "Twitter Inc.," Morningstar Equity Analyst Report, April 4, 2022

16. "Twitter Inc. Morningstar Analysis," Morningstar Equity Research, April 4, 2022

17. "Twitter: Musk Becomes TWTR's #1 Shareholder; Likely to Press Mgt on Content Moderation/Execution," Truist, April 4, 2022

18. "Tesla: Musk Takes 9.2% Stake in Twitter; Initial View This is Just the Start," Wedbush, April 4, 2022

19. "TWTR: Musings on Musk and Monetization as Elon Puts his Money Where His Mouth Is," Wells Fargo, April 4, 2022

20. "CFRA Maintains Buy Opinion on Shares of Twitter," CFRA, April 5, 2022

21. "Twitter, Inc. Stock Report," CFRA, April 5, 2022

22. "Twitter, Inc. (TWTR): Elon Musk Joins Twitter's Board," JPM, April 5, 2022

23. "Twitter, Inc. Downgrade to Neutral: N-T Risk/Reward Balanced at Current Levels," MKM Partners, April 5, 2022

24. "Tesla: Elon and Twitter: What Could This Mean for the Muskonomy?" Morgan Stanley, April 5, 2022

25. "VIX Remains Sticky; TWTR Overwrites," SIG Susquehanna, April 5, 2022

26. "Tesla (TSLA): Musk Gets Onto Twitter Board in a Friendly Move; Now Get Out the Popcorn," Wedbush, April 5, 2022

27. "Twitter Inc. (TWTR) Summary," Zacks, April 5, 2022

3

**CONFIDENTIAL**

### VII.   <u>News Articles</u>

1.  Factiva Allnews search with "Musk" and "Twitter" in headline or lead paragraph between March 26, 2022 and March 29, 2022

2.  "Despite calling himself a 'free speech absolutist,' Elon Musk has a history of retaliation against employees and critics," *Business Insider*, March 27, 2022

3.  "'Seize the memes of production,' Musk unleashes," *news.com.au*, March 27, 2022

4.  "Elon Musk giving 'serious thought' to build a new social media platform," *Business Daily*, March 28, 2022

5.  "Elon Musk says he's thinking about building his own Twitter," *Mashable.com*, March 28, 2022

6.  "Twitter is now X. Here's what that means," *CBS News*, July 24, 2023

7.  "Citadel Securities' $9.7 Billion Trading Revenue Passes Barclays," *Bloomberg*, March 6, 2025

8.  "What to know about Jared Birchall, Elon Musk's right-hand man," *Fast Company*, April 18, 2025


### VIII.   <u>Other Documents</u>

1.  Federal Judicial Center, *Reference Manual on Scientific Evidence,* National Academies Press, 2011

2.  "Trading Series," Intech Investment Management

3.  Virtual Hearing Before the Committee on Financial Services, U.S. House of Representatives, February 18, 2021


### IX.   <u>Websites</u>

1.  Chairman Twitter feed, March 26, 2022, at 1:57 PM ET, available at https://x.com/WSBChairman/status/1507778664708165646

2.  Chairman Twitter feed, March 26, 2022, at 2:01 PM ET, available at https://x.com/WSBChairman/status/1507779689049477134

3.  Citadel, Who We Are, available at https://www.citadel.com/who-we-are/leadership/kenneth-c-griffin/

4.  Elon Musk Twitter feed, available at https://x.com/elonmusk

5.  Elon Musk Twitter feed, March 25, 2022, at 3:34 AM ET, available at https://x.com/elonmusk/status/1507259709224632344

6.  Elon Musk Twitter feed, March 25, 2022, at 4:26 AM ET, available https://x.com/elonmusk/status/1507272763597373461

7.  Elon Musk Twitter feed, March 26, 2022, at 1:51 PM ET, available at https://x.com/elonmusk/status/1507777261654605828

4

8. Elon Musk Twitter feed, March 26, 2022, at 1:54 PM ET, available at https://x.com/elonmusk/status/1507777913042571267

9. Elon Musk Twitter feed, March 26, 2022, at 2:16 PM ET, available at https://x.com/elonmusk/status/1507783547964121088

10. Elon Musk Twitter feed, March 26, 2022, at 10:27 PM ET, available at https://x.com/elonmusk/status/1507907130124222471

## X.      Data Sources

1. Bloomberg LP

2. Capital IQ

3. Center for Research in Security Prices (CRSP)

4. FactSet

5. LSEG

All documents and data cited in the report and appendices.

5

CONFIDENTIAL

## Appendix C
## Purchases of Twitter Shares by Mr. Musk

| Date | Shares bought | Price | Cumulative Shares Bought | Shares Outstanding | % Ownership |
|---|---|---|---|---|---|
| 1/31/2022 | 620,083 | $36.83 | 620,083 | 800,641,166 | 0.1% |
| 2/1/2022 | 542,496 | $37.55 | 1,162,579 | 800,641,166 | 0.1% |
| 2/2/2022 | 850,373 | $36.75 | 2,012,952 | 800,641,166 | 0.3% |
| 2/3/2022 | 3,649,957 | $34.39 | 5,662,909 | 800,641,166 | 0.7% |
| 2/4/2022 | 1,070,429 | $36.18 | 6,733,338 | 800,641,166 | 0.8% |
| 2/7/2022 | 4,839,507 | $36.52 | 11,572,845 | 800,641,166 | 1.4% |
| 2/8/2022 | 730,000 | $35.73 | 12,302,845 | 800,641,166 | 1.5% |
| 2/9/2022 | 638,283 | $36.89 | 12,941,128 | 800,641,166 | 1.6% |
| 2/10/2022 | 2,604,907 | $36.64 | 15,546,035 | 800,641,166 | 1.9% |
| 2/11/2022 | 1,291,432 | $36.52 | 16,837,467 | 800,641,166 | 2.1% |
| 2/14/2022 | 958,849 | $35.92 | 17,796,316 | 800,641,166 | 2.2% |
| 2/15/2022 | 371,075 | $36.51 | 18,167,391 | 800,641,166 | 2.3% |
| 2/16/2022 | 655,000 | $35.81 | 18,822,391 | 800,641,166 | 2.4% |
| 2/17/2022 | 731,581 | $35.89 | 19,553,972 | 800,641,166 | 2.4% |
| 2/18/2022 | 1,331,040 | $34.51 | 20,885,012 | 800,641,166 | 2.6% |
| 2/22/2022 | 1,256,751 | $33.23 | 22,141,763 | 800,641,166 | 2.8% |
| 2/23/2022 | 1,063,170 | $32.81 | 23,204,933 | 800,641,166 | 2.9% |
| 2/24/2022 | 838,793 | $33.77 | 24,043,726 | 800,641,166 | 3.0% |
| 2/25/2022 | 695,849 | $34.78 | 24,739,575 | 800,641,166 | 3.1% |
| 2/28/2022 | 1,025,518 | $35.32 | 25,765,093 | 800,641,166 | 3.2% |
| 3/1/2022 | 897,656 | $35.33 | 26,662,749 | 800,641,166 | 3.3% |
| 3/2/2022 | 992,785 | $34.58 | 27,655,534 | 800,641,166 | 3.5% |
| 3/3/2022 | 1,211,426 | $33.97 | 28,866,960 | 800,641,166 | 3.6% |
| 3/4/2022 | 1,016,259 | $33.38 | 29,883,219 | 800,641,166 | 3.7% |
| 3/7/2022 | 1,779,530 | $33.07 | 31,662,749 | 800,641,166 | 4.0% |
| 3/8/2022 | 2,228,858 | $33.77 | 33,891,607 | 800,641,166 | 4.2% |
| 3/9/2022 | 1,005,125 | $34.15 | 34,896,732 | 800,641,166 | 4.4% |
| 3/10/2022 | 1,228,833 | $33.93 | 36,125,565 | 800,641,166 | 4.5% |
| 3/11/2022 | 2,927,000 | $33.24 | 39,052,565 | 800,641,166 | 4.9% |
| 3/14/2022 | 2,770,284 | $33.08 | 41,822,849 | 800,641,166 | 5.2% |
| 3/15/2022 | 1,966,000 | $33.79 | 43,788,849 | 800,641,166 | 5.5% |
| 3/16/2022 | 2,978,376 | $34.99 | 46,767,225 | 800,641,166 | 5.8% |
| 3/17/2022 | 1,500,000 | $37.09 | 48,267,225 | 800,641,166 | 6.0% |
| 3/18/2022 | 2,858,340 | $38.25 | 51,125,565 | 800,641,166 | 6.4% |
| 3/21/2022 | 1,942,482 | $37.28 | 53,068,047 | 800,641,166 | 6.6% |
| 3/22/2022 | 2,476,000 | $38.54 | 55,544,047 | 800,641,166 | 6.9% |
| 3/23/2022 | 2,502,140 | $38.15 | 58,046,187 | 800,641,166 | 7.2% |
| 3/24/2022 | 1,926,764 | $38.68 | 59,972,951 | 800,641,166 | 7.5% |
| 3/25/2022 | 3,491,274 | $38.20 | 63,464,225 | 800,641,166 | 7.9% |
| 3/28/2022 | 2,603,779 | $38.77 | 66,068,004 | 800,641,166 | 8.3% |
| 3/29/2022 | 2,875,934 | $40.30 | 68,943,938 | 800,641,166 | 8.6% |
| 3/31/2022 | 2,000,000 | $38.82 | 70,943,938 | 800,641,166 | 8.9% |
| 4/1/2022 | 2,171,100 | $39.34 | 73,115,038 | 800,641,166 | 9.1% |

Source: Twitter Schedule 13D, April 5, 2022.

CONFIDENTIAL

## Appendix D
## Event Study Methodology for Twitter Common Stock

1.      For purposes of my Twitter event study analysis, I regress Twitter's stock price returns on the returns of the S&P 500 Index to control for market movements and the Dow Jones Internet Composite Index to control for industry movements ("DJ Internet"). I selected these two indices because, in its 2021 Form 10-K, Twitter compared its stock price performance to these two indices.[1] I also excluded Twitter's return from both indices.

2.      To estimate the historical relationship between Twitter's stock return and the return of the market and industry indices, I use a 252-trading day window prior to each event date. I add an indicator variable for the start of the Class Period date, the alleged misrepresentation date (*i.e.*, March 25 and 28, 2022), and alleged corrective disclosure dates (*i.e.*, April 4 and 5, 2022) that fall within the estimation period of any event date.

3.      The result of my event study for March 28, 2022[2] is reported in **Table 1**.[3] As the table shows, the residual return on March 28, 2022 is **not** statistically significant.

**Table 1**
**Event Study Results for March 28, 2022**

| Industry Index | Days in Estimation Period | Indicator Variables[4] | Residual Return | t-Stat | Stat Sig? |
|---|---|---|---|---|---|
| DJ Internet | 252 | Alleged Misreps & CDs | -0.73% | -0.38 | No |

4.      **Table 2** presents sensitivities of my event study result for March 28, 2022 had I used the following inputs from Dr. Mason's event study: (i) an industry index comprised of "38-42 companies included in a bespoke market-weighted version of the Dow Jones Internet

---

[1] Twitter, Inc. SEC Form 10-K for the fiscal year ended December 31, 2021, at 39.

[2] The Court ruled to that only March 26, 2022 Tweets are remaining in the case. These tweets were made after the market close on March 26, 2022, therefore I analyze Twitter stock price reaction on the next trading day – March 28, 2022. *See supra* Section VI.B.

[3] My backup materials present the event study results for each date during the purported Class Period. I also present in the backup materials a sensitivity of my event study results had I used a fixed 252-day estimation period from March 26, 2021 to March 24, 2022 for all event dates.

[4] I add an indicator variable on March 25, 2022 as it is the only event date in the 252 trading day estimation period prior to March 28, 2022.

**CONFIDENTIAL**

Composite Index;"[5] (ii) an estimation period spanning 63 trading days;[6] and (iii) including indicator variables for earnings announcement dates in addition to the alleged corrective disclosure dates (*i.e.,* no indicator variables for the alleged misrepresentation dates).[7] As the table shows, the residual return for March 28, 2022 is **not** statistically significant under all permutations of the above inputs.

**Table 2**
**Sensitivity Analysis of Event Study Results for March 28, 2022**
**Using Dr. Mason's Event Study Inputs**

| Industry Index | Days in Estimation Period | Indicator Variables | Residual Return | t-Stat | Stat Sig? |
|---|---|---|---|---|---|
| Mason | 252 | Alleged Misreps & CDs | -0.46% | -0.24 | No |
| DJ Internet | Mason | Alleged Misreps & CDs | -0.97% | -0.70 | No |
| DJ Internet | 252 | Mason | -0.78% | -0.50 | No |
| Mason | Mason | Alleged Misreps & CDs | -0.67% | -0.49 | No |
| Mason | 252 | Mason | -0.52% | -0.33 | No |
| DJ Internet | Mason | Mason | -1.03% | -0.75 | No |

---

[5] Mason Report, ¶ 63; industry index data per Dr. Mason's backup (MUSK_MASON_0005360). Dr. Mason uses logarithmic returns in his event study analysis. When I use his industry index in my sensitivity analysis, I convert his industry index's logarithmic returns into arithmetic returns.

[6] Mason Report, fn. 105.

[7] Mason Report, ¶ 64 & fn. 102.