# Exhibit J

# In the Matter Of:

## Oklahoma Firefighters vs Musk

1:22-CV-03026-ALC-GWG

## JOSEPH R. MASON

*August 19, 2025*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 1:22-CV-03026-ALC-GWG

Class Action

-----------------------------------------------x

OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT

SYSTEM,

                        Plaintiff,

v.


ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED

JULY 22, 2003, EXCESSION LLC, AND JARED

BIRCHALL,

                        Defendants.

-----------------------------------------------x


DATE:  August 19, 2025


     Video-recorded Deposition of

          JOSEPH R. MASON


Stenographically Reported By:

Mark Richman, CSR, CCR, RPR, CM

Job No. J13321878



                    Tuesday, August 19, 2025

                        9:06 a.m.


                    Video-recorded Deposition of
JOSEPH R. MASON, held at the offices of Quinn
Emanuel Urquhart & Sullivan LLP, 295 Fifth
Avenue, New York, New York, before Mark
Richman, a Certified Shorthand Reporter,
Certified Court Reporter, Registered
Professional Reporter, and a Notary Public
within and for the State of New York.



A P P E A R A N C E S:

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP

Attorneys for the Witness and the Class

1251 Avenue of the Americas. 44th Floor

New York, NY 10020


BY:     KATHERINE M. SINDERSON, ESQ.

        EMILY A. TU, ESQ.

        REBECCA TEMKIN, ESQ. (Remote)


QUINN EMANUEL URQUHART & SULLIVAN LLP

1300 I Street NW #900

Washington, DC 20005

        -

295 Fifth Avenue

New York, New York 10016


BY:     BRENNA NELINSON, ESQ.

        AMY ELIZABETH SHEHAN, ESQ.


ALSO PRESENT:

SILVIO FACCHIN, VIDEOGRAPHER



MASON - 8.19.20

THE VIDEOGRAPHER:  This is the media label number 1 in the video recorded deposition of Dr. Joseph Mason in the matter of Oklahoma Firefighters Pension and Retirement System versus Elon Musk, et al.

This deposition is being taken in New York City, New York on August 19, 2025.

My name is Silvio Facchin, I am a certified legal video specialist.

The court reporter is Mark Richman, and we're both representing Esquire Deposition Solutions.

We are now going on the record.

The time is 9:06 a.m.

Counsel would state their appearances for the record.

MS. NELINSON:  Brenna Nelinson from Quinn Emanuel on behalf of the defendants, and I'm here with my colleague Amy Shehan.

MS. SINDERSON:  Katie Sinderson, Bernstein Litowitz Berger & Grossmann



MASON - 8.19.20

on behalf of Lead Plaintiff, the class, and the witness, here with my colleague Emily Tu.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

JOSEPH R. MASON, called as a witness, having been first duly sworn by the Notary Public (Mark Richman), was examined and testified as follows:

EXAMINATION BY MS. NELINSON:

Q.    Good morning, Dr. Mason.  How are you?

A.    Good morning.

Q.    Appreciate you being here today.

A.    Okay.

Q.    Hopefully we won't have to keep you for too long.

Dr. Mason, you understand that plaintiff has moved for class certification in this case, right?

A.    I think that's correct.  I don't know at what point the move comes from. I'm just not a legal expert, I'm sorry.



800.211.DEPO (3376)
EsquireSolutions.com

MASON - 8.19.20

MS. SINDERSON:  Objection to form.

A.    No.

MS. SINDERSON:  Opinions for this case or opinions in the colloquial sense?

MS. NELINSON:  In the colloquial sense, not opinions in this case.

A.    No.

Q.    Are you a Twitter investor?

A.    No.

Q.    Are you a Tesla investor?

A.    No.

Q.    Are you an investor in any other companies that Mr. Musk is affiliated with?

MS. SINDERSON:  Objection, form.

A.    Not in any active way.  I might have residual stake through an S&P 500 index fund.

Q.    I think you testified earlier that Mr. Musk issued two tweets during the class period.

Do you recall that testimony?



MASON - 8.19.20

A.    Yes.

Q.    And is it your understanding that those tweets are part of the scheme that plaintiff alleges?

MS. SINDERSON:  Objection to form.

A.    I don't know if those are part of the scheme per se.  I think those stand as misrepresentations, but these are distinctions that I understand are made under the law and I can only make them in a lay sense.

Q.    Is it your opinion that those tweets contributed to the deflation in Twitter stock during the class period?

MS. SINDERSON:  Objection to form.  Sorry, is it his opinion as an expert in his report here?

MS. NELINSON:  Correct.

A.    If by "contributed to the deflation" you meant maintained the deflation, I would answer yes.

Q.    How would you differentiate between deflation caused by those



MASON - 8.19.20

alleged misrepresentations and deflation

caused by the alleged scheme?

          MS. SINDERSON:  Objection to

   form.

   A.    In my prior answer I didn't mean

to distinguish those.  I meant to impart

that it's my interpretation that the

misrepresentations caused the deflation

to persist and did not cause deflation

independently of the prior scheme.

   Q.    So there would be no need to

parse deflation caused or maintained by

misrepresentation from that caused or

maintained by the scheme in your

opinion?

          MS. SINDERSON:  Objection to

   form.

   A.    I only hesitate because you

lumped together cause and maintain where

cause seems to me to be something

independent of maintain.  To me, cause

would be to drive down further the price

of Twitter stock, and I'm not sure that

the misrepresentations were alleged to



MASON - 8.19.20

have done that, nor do I have evidence that they did do that.

So I would stick with maintained as distinct from caused, at least as I interpret the use of cause in your question.

Q.    So is it your opinion that there were no independent losses caused by the misrepresentations themselves?

MS. SINDERSON:  Objection to form.

A.    Independent of what?

Q.    Those losses caused by the alleged scheme.

MS. SINDERSON:  Objection to form.

A.    That's correct.  I'm not aware that the misrepresentations caused independent or interdependent greater losses than the scheme itself.

Q.    Switching gears briefly to an entirely different topic, Dr. Mason, can you explain to me what algorithmic trading is?



MASON - 8.19.20

form.

A.     Right.  In particular, confounding information that can drive the stock price in the same direction as disclosure, to the extent that there's other information that drives the stock price in the opposite direction that would mitigate damages.

Q.     And have you yet done any analysis to locate or disaggregate such confounding information from the disclosures in this case?

        MS. SINDERSON:  Objection to form.

A.     In advancing my methodology, I have certainly looked around the case. As I note in my report, I reviewed analyst reports at the time of the curative disclosure.

        I reviewed press that mentioned Twitter throughout the class period, the extended period and around the disclosure.

        I've seen nothing in analyst



MASON - 8.19.20

reports or press that gives me concern that there were other releases around that time of information relating to Twitter that would constitute confounding information.

Of course, that's a preliminary analysis. If I was to measure damages, I would want to nail that down even further. But sitting here today, right now, I haven't seen anything to be concerned about.

Q. If you wouldn't mind flipping back toward the front of your report to page 7 and looking at Paragraphs 25 to 27. Just let me know when you're there.

A. Okay. I'm there.

Q. Okay, great. I'm under the subheading 2, Alleged Curative Events. And I'm summarizing, but you indicate in these paragraphs that one of the curative events at issue is Mr. Musk's filing of a Schedule 13(g) on April 4th, 2022.

Do you see that in Paragraph 25?



MASON - 8.19.20

MS. SINDERSON:  Objection to form.

A.    Your question asked whether I've conducted such an event study.  To the extent you're asking whether I've analyzed damages in this case, I have not yet done so.

I provide an event study to measure whether it's reasonable to believe that the market for Twitter stock and options responds to the introduction of new value-relevant information, which I have performed in my analysis of the market efficiency for Twitter stock and options and provided results for in my report the appendices and reliance materials.

Q.    And how is it that you will use, or how is it -- strike that.

How is it that you will estimate damages on days of the class period that are not curative?

MS. SINDERSON:  Objection to form.



MASON - 8.19.20

A.    The methodology for doing so is to utilize the abnormal return response as of the date of the curative disclosure, or dates of the curative disclosure and apply those abnormal returns to prior days.

And by using what's typically referred to as a ribbon, often an inflation ribbon, in this case a deflation ribbon.

Q.    And so let's look at Paragraph 113, because I think that's related to the testimony that you're giving right now.

So 113 at the bottom of page 31 in your report is just under the subheading B, Calculating Share Price Deflation For Twitter Stock During the Class Period?

Do you see that?

A.    Yes.

Q.    And in Paragraph 113 you write that (Reading:)  Once the impact of the curative event, if any, on the price of



MASON - 8.19.20
characterization.

Q.    That's fair.

A.    So again, I explained that as you're confirming the status quo of Musk's relationship with Twitter in the tweets that are alleged to be misstatements in this matter.  So I don't have any problem with the assertion.

        MS. NELINSON:  Okay.  We can put this away.

Q.    Should Dr. Mason just close the laptop?  You can just shut that so it's not distracting you.  We're done with that.

        And, Dr. Mason, in preparing your report did you analyze any information that suggests that the two alleged misstatements, in other words, the tweets, had an impact on Twitter's stock price?

        MS. SINDERSON:  Objection to form.

A.    Did I what with regard to whether



MASON - 8.19.20

they had an impact?

Q.    Did you analyze any information that suggests that they did have an impact on Twitter's stock price?

MS. SINDERSON:  Objection to form.

A.    We just looked at information that suggested that they didn't have an effect on Twitter's stock price.  And as I testified a moment ago, since they confirmed the status quo, I would say, in the parlance of an event study, there was no conveyance of any new information to the market so I'm not surprised by that result.

Are you asking did I do anything else beyond that?

Q.    Yes, I was just curious if you saw any contrary information in connection with your analysis for your report.

MS. SINDERSON:  Objection to form.

A.    Any contrary information to?



800.211.DEPO (3376)
EsquireSolutions.com

MASON - 8.19.20

Q.    About whether those tweets had an impact on Twitter's stock price.

        MS. SINDERSON:  Objection to form.

A.    Well, I examined media reports during the period.  I examined analyst reports during the period.  I didn't see any evidence that Mr. Musk's tweets on the 26th did anything but confirm the status quo regarding thoughts about his involvement in Twitter.

Q.    So we talked earlier about plaintiff's theory as to why these two alleged misstatements are misleading, and we said that the theory generally is that the tweets supposedly suggested that Mr. Musk might not be, you know, interested in or pursuing Twitter while he was simultaneously buying shares, right?

        MS. SINDERSON:  Objection to form.

A.    I likely said something to that effect earlier today.  I don't have any



MASON - 8.19.20

A.    So I would say yes, I've seen evidence to support plaintiff's interpretation of these tweets as maintaining the status quo, misstating his position at the time.

Q.    And are those analyst reports cited as support in your report for plaintiff's interpretation of those tweets?

MS. SINDERSON:  Objection to form.

A.    I don't discuss plaintiff's interpretation of those tweets in my report.  But I certainly reviewed plaintiff's claims to make sure they made sense in light of what was known at the time.

Q.    Do you recall which --

A.    -- and certainly reviewed the analyst reports during the class period in preparation for answering questions here today.

Q.    Do you recall which analyst reports on April 4th and 5th referred

