# Exhibit 3

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION:

In the Matter of:                    )
                                     ) File No. SF-04519-A
CERTAIN PURCHASES, SALES AND   )
DISCLOSURES OF TWITTER SHARES )    COPY

WITNESS:   Jared Birchall
PAGES:     1 through 226
PLACE:     Securities and Exchange Commission
           44 Montgomery Street, Suite 2800
           San Francisco, California 94104
DATE:      Wednesday, June 1, 2022

     The above entitled matter came on for hearing via
Webex, pursuant to notice, at 8:05 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

```
 1              P R O C E E D I N G S
 2         MR. WALKER:  We are now on the record.
 3  Today's date is June the 1st in the year 2022 and
 4  the time is 11:05 a.m. Eastern Time.
 5         You may begin.
 6         MR. ANDREWS:  We are on the record at
 7  8:05 a.m. Pacific on June 1st, 2022.
 8              This testimony is being conducted via
 9  Webex.  My name is Robin Andrews.  I have been
10  designated an Officer of the Commission for
11  purposes of this investigation.  Also attending
12  for the SEC via Webex are Steven Buchholz,
13  Melissa Armstrong, Jim Connor and David Zhou.
14              Mr. Buchholz and Mr. Zhou have been --
15  also been designated as Officers of the
16  Commission for purposes of this investigation.
17  The witness and counsel are all attending via
18  Webex separately as well.  We'll ask for a roll
19  call in a bit.
20              Mr. Birchall, do you consent to taking
21  an oath or affirmation to tell the truth remotely
22  via Webex rather than in person?
23         MR. BIRCHALL:  Yes.
24         MR. ANDREWS:  Thank you.
25              Could you please raise your right hand,
```

ERM-Oklahoma0010237

1    sir.

2            Do you swear or affirm to tell the

3    truth, the whole truth and nothing but the truth?

4            MR. BIRCHALL:  I do.

5    Whereupon,

6                    JARED BIRCHALL

7    was called as a witness and, having been first

8    duly sworn, was examined and testified as

9    follows:

10                    EXAMINATION

11           BY MR. ANDREWS:

12       Q    Thank you.  You can -- you can lower

13    your hand.

14           Could you please state and spell your

15    full name for the record, sir.

16       A    Full name meaning, like, including

17    middle name type thing?

18       Q    Correct.

19       A    Okay.  Jared John Birchall. J-A-R-E-D.

20    J-O-H-N.  Last name B, as in boy, I-R-C-H-A-L-L.

21       Q    Thank you.

22           This is an investigation by the United

23    States Securities and Exchange Commission In The

24    Matter Of Certain Purchases, Sales and

25    Disclosures of Twitter Shares, SF-4519, to

Page 126

1            THE WITNESS:  Alex, were you on that
2    call?  I can't remember.
3            MR. SPIRO:  I may have been on that
4    call.  I don't remember either frankly, but I
5    don't want to testify either.
6        Q    Okay, that's fine.  Understood.
7            And just so -- this might be an obvious
8    thing.  Does McDermott already have a
9    relationship with you or Mr. Musk for these
10   things or were you just like -- you just found a
11   new law firm out of -- out of no where?  Just
12   trying to understand that context.
13       A    Yeah, that's correct.  We -- we didn't
14   have a previous working relationship.
15       Q    Okay.  All right.  So, this was kind
16   of -- it was a brand new relationship with a law
17   firm you had not worked -- that Mr. Musk or you
18   had not worked with before in -- well, at all,
19   for any -- for any purpose?
20       A    Correct.  I mean, the only securities
21   law issues that we ever had to date involved
22   Tesla. And -- and Tesla, the internal team, was
23   always our guiding light where that was
24   concerned.  And so, we had never had this as an
25   issue to deal with historically.  And so, this

Page 127

1   was the first.

2       Q    Okay.  So, you -- just so I understand

3   the timeline, you said somewhere between 4:30 and

4   5:30 p.m. Central ████ ████ called you, told

5   you, basically, what's in this -- the bottom of

6   Exhibit 12, plus a little more color on, it was

7   the GC and those kind of things.  And then --

8       A    Correct.

9       Q    -- he later e-mails you the same

10  information, but meanwhile you quickly figure

11  out, we need a law firm to look into this to

12  figure out what the right answer is, fair?

13      A    That's fair.

14      Q    And -- and I think you gave a timeframe

15  of how many hours after your call with ████

16  ████ you had your first call with McDermott.

17  And maybe I missed it.  How many hours was that?

18  I think you said two or three hours, but I think

19  I misheard you.

20      A    Yeah.  As I recall, I think it was

21  within two or three hours that we had our first

22  conversation.

23      Q    Okay.  So, the first conversation with

24  McDermott was about two or three hours later. And

25  I understand you don't know when the actual,

Attorneys Eyes Only

Page 154

```
 1    five-page document.  It's a Schedule 13G.  I'll
 2    represent that I printed from the SEC public
 3    Edgar filing system.
 4         A    Uh-huh.
 5         Q    And do you recognize Exhibit 15?
 6              MR. SPIRO:  It's very small.
 7              MR. ANDREWS:  Yeah, sorry -- sorry
 8    about that.  Yeah, thanks, Alex, yeah.  It was a
 9    little small when you review the whole thing
10    there.
11         Q    So, this is the first page of
12    Exhibit -- of Schedule 13, Exhibit 15.  And just
13    for quick reference, the last page has Mr. Musk's
14    electronic signature on April 4th, 2022.
15              Do you recognize Exhibit 15?
16         A    Yes.
17         Q    And what role did you play in this --
18    this document, either filling it out or providing
19    information or just, let's understand what you
20    role you played in this thing?
21         A    This is all legal counsel.
22         Q    Okay.
23         A    The McDermott team.
24         Q    So, did you -- so, you didn't actually
25    fill out any of this, but -- correct?
```

ERM-Oklahoma0010386

1       A     Correct.

2       Q     **Okay.  You -- you saw drafts before it**
3    **was filed?**

4       A     Possibly.  I'm not sure that I did,
5    but --

6       Q     **Okay.**

7       A     Yeah, I -- I'm pretty sure it's
8    possible that I did.

9       Q     **Okay.**

10      A     I'm not certain.

11      Q     **Okay.  So, you -- but -- but as you**
12   **made clear, you didn't fill out of any of this**
13   **information, McDermott did all of this?**

14      A     That's right.

15      Q     **And did you provide any of the**
16   **information included in here?  So, for example,**
17   **number of shares, any of the information about --**
18   **you know, any of the text here to try to**
19   **understand if you played any role in providing**
20   **any of the source of the information?**

21      A     I'm sure the shares would have been
22   something that they would have asked me for.  So,
23   there's likely some data there that -- yeah, the
24   shares specifically would have -- they would have
25   asked me for.

1      Q      Okay.  And then the other --

2      A      Which --

3      Q      The information, principle business

4  office, all that information, that information

5  would have come from you as well?

6      A      Yeah, I believe so.

7      Q      Okay, yeah.  And -- 'cause McDermott as

8  a new lawyer for Mr. Musk, it's not like they've

9  done this a bunch before and had all this

10  information already.

11             What about the -- the -- like, the

12  percentage of stock here.  It says here it's 9.2

13  percent.  Was that also coming from you or one of

14  your spreadsheets or, I guess, Morgan Stanley's

15  spreadsheets?

16      A      Yeah.  It was coming from the Morgan

17  Stanley spreadsheet to be clear which --

18      Q      Okay.

19      A      Which ultimately ended up being wrong,

20  but nonetheless, yes.

21      Q      By -- by a little bit, right?

22      A      By -- by some shares, yes.

23      Q      Okay.  All right.  And so, for that

24  percentage, you were relying on the spreadsheet

25  given to you by ███████████.  And you're saying

1  he was off by a number of shares and that was

2  corrected later?

3       A     That's right.

4       Q     Okay.  And we're looking at just April

5  4th before that -- before that correction, okay.

6            And -- okay.  So, with respect to the

7  other -- let me go back here.  There's items one

8  through ten.  Did you play any role in -- in --

9  or answer any questions as to what had to go into

10 any of these -- any of these forms -- any of

11 these items?

12      A     I -- I see five through ten on the

13 screen.  I don't believe so.

14      Q     Yeah.  I'm sorry.  Yeah, we'll start

15 here.  So, one and two were just the name of the

16 issuer and the people.

17      A     Yeah.

18      Q     Three --

19      A     Some of that came from me.

20      Q     Okay.  And then ownership, it sounds

21 like this probably came from you too, right, the

22 same information from before.  And then, five

23 through ten I mean.

24            So, I just want to understand, you had

25 no role in this and McDermott just filled all

Page 158

1    this out, right?  You have no idea what any of

2    this means.  And there was no scenario where you

3    were asked questions to help fill in -- fill out

4    this stuff.  And I'm just trying to understand if

5    you had any role in this at all with respect to

6    items five through ten?

7        A    I don't believe that I -- I'm just

8    looking through each of these to make sure I --

9    yeah, I don't think that I had any role in

10   filling out that stuff.

11       Q    Did you ever see any instructions for

12   filling out Schedule 13G?

13       A    I mean, there's a chance that back when

14   I was looking up internet articles at some point

15   I did, but outside of that, no.  There -- there

16   was a complete reliance on the securities lawyers

17   for this.

18       Q    McDermott?

19       A    Yes.

20       Q    And again, I'm not asking for what any

21   of them told you.  Just give me just the names of

22   the attorneys at McDermott that, from your

23   understanding, either you interacted with

24   directly or you understood worked on this filing?

25       A    As I understand it -- let me just tell

Page 159

1    you some of the names of people.

2         Q    Are you looking up something or --

3         A    Oh, am I not supposed to look up

4    something?

5         Q    Well, off the top -- well, starting

6    with your memory.  If you remember the names,

7    first or last names.  And then, we don't need to

8    look up anything.

9         A    Oh, sorry.  Yeah.  Off the top of my

10   head, I -- let's see here.  I, frankly, do not

11   remember their names.

12        Q    Does Heidi Steele sound familiar?

13        A    Yes.

14        Q    Okay.

15        A    She was one of them.

16        Q    Okay.  All right.  And you had

17   interactions with Ms. Steele in connection with

18   Exhibit 15?

19        A    Yes.

20        Q    And you answered questions by McDermott

21   related to their filling out of Exhibit 15?

22        A    Correct.

23        Q    And you were -- you were truthfully in

24   your responses to those questions?

25        A    Absolutely.

ERM-Oklahoma0010391

Page 160

1        Q    Okay.  And you were -- you were
2    complete in your answers.  You didn't -- you
3    didn't hold any -- any information back in -- in
4    response to their questions?
5        A    Yes.
6        Q    Okay.  All right.  And then the last
7    page has what appears to be like an electronic
8    signature.  Just, do you know how Mr. Musk signs
9    this or does he sign it or did he give someone
10   else permission to sign it?  Just trying to
11   understand how that works, the E signature
12   concept.
13       A    I -- I think that they had a separate
14   document electronically signed which I would have
15   overseen the -- the -- you know, gathering that.
16   And then -- when I say electronically signed like
17   not DocuSinged, but, you know, not wet signed.
18       Q    Sure.
19       A    And then they, I guess, display it
20   however they do it right here.
21                       (SEC Exhibit No. 17 was
22                       marked for identification.)
23       Q    Okay.  I'm going to show you what's
24   been marked as Commission Exhibit 17.  So, this
25   is a one-page set of text messages with Bates

ERM-Oklahoma0010392

Page 162

1  what has to be filed up to five percent?

2      A    That's right.

3      Q    So, you didn't mean to say that -- that

4  you were alerted that you hit the five percent

5  threshold.  Just that you were alerted that there

6  might be a different interpretation of -- for

7  when you had to file?

8      A    I'm not sure of the difference of what

9  you're saying there.

10      Q    Okay.  'Cause you say, We hit the

11  threshold, like, one word of threshold could be,

12  we were alerted we hit five percent and clearly

13  that it happened, you know, a month before or,

14  you know, weeks before that, correct?

15      A    Yeah.  So, I -- I guess what I was

16  trying to say is that the new information that we

17  received as of Friday caused us to realize that

18  we needed to -- that -- that we had already hit

19  the thresholds for filing and, therefore, we were

20  filing ASAP.

21      Q    Okay.  And it says, The legal team

22  prepped the filing and submitted this morning.

23  You're referring to McDermott?

24      A    That's right.

25      Q    Okay.  And then -- okay.

Attorneys Eyes Only

1          And this -- actually, let me quickly go
2     back to 15.  I think -- so, I think we said you
3     weren't sure if you ever saw a draft of this
4     document before it was filed.  Did I have that
5     right?
6          A     Yeah.  I'm guessing that I was CC'ed on
7     something.  Whether or not I saw something --
8          Q     Yeah.
9          A     -- I just don't know.  I mean, because
10    to be quite honest, SEC filings, like, I -- I
11    would be almost completely -- well, I would be
12    completely reliant on legal counsel to make sure
13    that that is correct.
14         Q     Okay.
15         A     So, did my eyes lay on it, possibly.
16    Yeah.
17         Q     And -- and I -- I think we covered it.
18    You never sent to McDermott a -- a draft of this
19    that you had filled out?
20         A     No.
21         Q     Okay.  So, the only -- only draft that
22    ever existed of Exhibit 15 were -- to your
23    knowledge, were created by McDermott?
24         A     Correct.  I --
25         Q     Okay.

Page 164

```
 1        A    I would have no idea how to fill out a
 2   draft or --
 3        Q    Okay.
 4        A    I wouldn't have.
 5        Q    Did -- so there's a -- an item here in
 6   certification that you -- you may know now it
 7   relates to whether there's passive attempts or,
 8   you know, whether -- there's not an attempt to
 9   influence or -- or control the company.  Are you
10   aware that that's what item ten relates to now?
11        A    No.
12        Q    Okay.  Did -- okay.
13             Did -- did McDermott ask you any
14   questions on the topic of Mr. Musk's intent to
15   control the company or not?
16        A    I -- I think, I mean, they must have.
17   Though that would have -- I mean, 'cause that's
18   what would have informed the filing, right,
19   ultimately or -- right?
20        Q    Okay.
21        A    I mean --
22             MR. SPIRO:  Let me just tell the
23   witness, please don't guess.  And also, don't
24   reveal any legal advice that they gave you, but
25   I -- I think the question of just simply, do you
```

ERM-Oklahoma0010396

Page 165

1   know whether if this filing, that was part of the

2   categories you answered for is the question.

3           So, you know, if you just try to

4   reframe it in a way that you can maybe answer it

5   without -- if you recall, in this filing, did you

6   get asked questions by McDermott regarding

7   passive versus active intent.  Is that fair,

8   Robin?

9           MR. ANDREWS:  Yeah.  Just a yes or no,

10  did they ask questions on the topics.  Not

11  looking for any of the details, that's right,

12  Alex.

13      A    I believe so, yes.

14      Q    Okay.  And -- and again, not asking for

15  what questions they asked you.  Not asking what

16  answers you gave them, but whatever answers you

17  gave to the questions were -- were the entire --

18  were everything you knew in response to that

19  question and truthful, fair?

20      A    Absolutely.

21                  (SEC Exhibit No. 18 was

22                  marked for identification.)

23      Q    Okay.  I'm now going to show you what's

24  been marked Commission Exhibit 18 which is --

25  which is now -- it's a Schedule 13D that was

Page 167

1  is an amendment to 13G.  And Exhibit 18 has a
2  listing of the two attorneys at McDermott here on
3  the first page.  And Exhibit 15 doesn't.  Do you
4  have any -- do you have an idea why?
5      A    No idea.
6      Q    Okay.  And some of the same questions
7  from before.  Exhibit 18, the 13D, what role, if
8  any, did you play in filling this out or
9  answering questions about it -- about it?
10     A    I mean, at this point I think -- I
11 can't remember if this was the day where we
12 corrected the number of shares.  I think it may
13 have been.
14     Q    We could probably -- probably see that
15 pretty quickly here.  Hang on a second.  3486,
16 yeah, so, it has -- oops, sorry.  Yeah.  So, it
17 does.  It looks like it corrects it.  So, this is
18 the 73,486 and now it's -- okay.
19          All right.  So, go ahead, I think you
20 were starting to answer that.
21     A    Yeah.  I think that was the input that
22 I had on this was to provide a -- a corrected
23 number of shares.  And beyond that, again, would
24 have -- they now at this point had every other
25 piece of information from the prior filing and

Page 168

1   would have -- you know, again, was -- was relying
2   on -- on the -- on the legal counsel to do their
3   thing.
4       Q    Okay.  So, you -- other than giving
5   the -- the new share numbers, do you recall
6   answering any other questions by McDermott to
7   help -- help fill this out?  Any other topics.
8   I'm not asking for the questions.
9       A    Yeah.  I -- I don't clearly recall.
10  Questions may have been asked, I -- but I don't
11  clearly recall whether additional questions
12  beyond the share count was -- whether this was
13  based on input from me on anything beyond the
14  share count, I just don't recall.
15      Q    Okay.  All right.  So, I'm just going
16  to go back briefly to Exhibit 15.  And -- so, I'm
17  going to ask you a question.
18          MR. ANDREWS:  And, Alex, look, if you
19  want to instruct the witness to not answer based
20  on privilege, I get that, but I have -- we just
21  want to ask the question.  So, I just want to let
22  you know.
23          MR. SPIRO:  I don't -- just so you --
24  just to be very clear, the -- I don't know.  I
25  have -- I have no idea.  I've never done one of

1  these before, but the prior one was submitted by

2  the same two lawyers.  I have no idea why their

3  name is not on that.  Just to be very clear about

4  something.

5        MR. ANDREWS:  Okay.  Well -- okay.

6  Okay, fair enough.

7     **Q    All right.  So, on Exhibit 15, which is**

8  **the 13G, did -- did McDermott ask you whether Mr.**

9  **Musk had any intent to control Twitter?**

10        MR. ANDREWS:  Sounds like Alex -- go

11  ahead, Alex, if you want to take a your time to

12  take a look.

13        MR. SPIRO:  Yeah.  I think the --

14  the -- the best course -- I think this calls for

15  privileged communications frankly.  I mean, I get

16  what you're trying to do.  I just --

17        MR. ANDREWS:  Okay, that's fine. That's

18  why I gave you the heads up.

19        MR. SPIRO:  I appreciate it.  I

20  appreciate it.  I don't see how I can let him

21  delve into this.  I think you've gone over the

22  subject matters that were discussed, to the best

23  of his recollection here.  And -- and he's told

24  you he's -- he answered whatever questions were

25  posed to him truthfully.  Other than that, I

Attorneys Eyes Only

Page 170

1    don't think we can go further than that without

2    me having to invoke privilege.

3              MR. ANDREWS:  Okay.  And that's fine.

4    The question -- I'm going to ask a few of these

5    questions and if you want to just say, Instruct

6    the witness not to answer, attorney-client

7    privilege, that's totally fine.  We're just

8    making a record. So, that's why I -- I alerted

9    you all so that you're not, you know, caught off

10   guard.  That you're able to properly object

11   before he answers.

12        Q    So, I'll just say it again.  I'll ask

13   the same question or -- or close to the same

14   question.  In connection with 13G, did McDermott

15   ask you whether Mr. Musk had any intent to

16   control Twitter?

17             MR. SPIRO:  Again, we're going to

18   object on the grounds of privilege and --

19             MR. ANDREWS:  Okay.  And you instruct

20   the witness not to answer, correct?

21             MR. SPIRO:  Yes.  Yes.

22             MR. ANDREWS:  Okay.  All right.  And

23   that's fine.  I'm making a record.  You're making

24   a record.

25        Q    And did you tell -- Mr. Birchall, did

1  you tell -- did you tell McDermott that you were
2  aware that Mr. Musk had been offered a board seat
3  at the latest April 3rd?
4              MR. SPIRO:  Again, I'm going to object
5  and instruct the witness not to answer. These are
6  privileged communications.
7              MR. ANDREWS:  Okay, fair enough.
8      Q     And beyond -- beyond a board seat in
9  particular, did -- are you aware of either you or
10 Mr. Musk telling McDermott of any other intent by
11 Mr. Musk to control Twitter?
12             MR. SPIRO:  Objection.  Yeah, same
13 objection.  Instruct the witness not to answer.
14             MR. ANDREWS:  Okay.  Give me one
15 moment.
16             MR. SPIRO:  And again, as I've told
17 you, Robin, I believe that the -- that Ms. Steele
18 and Mr. Lutz had a conversation with Nick Panos
19 the morning after or right around the timing of
20 when this was filed.
21             MR. ANDREWS:  Okay.  All right.
22                         (SEC Exhibit No. 19 was
23                         marked for identification.)
24     Q     Okay.  I'm going to show you what has
25 been marked as Commission Exhibit 19.  And this

ERM-Oklahoma0010403